## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| R.M., by and through next friend Elfego Maldonado Estrada, and A.B., by and through next friend Kadijah Hutchinson-McLean, on behalf of themselves and all others similarly situated,<br><br>                 Plaintiffs,<br><br>                 - vs -<br><br>NEW YORK STATE OFFICE OF MENTAL HEALTH; ANN MARIE T. SULLIVAN, in her official capacity as the Commissioner of the New York State Office of Mental Health; the NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE; MICHELLE MORSE, in her official capacity as the Commissioner of the New York City Department of Health and Mental Hygiene; and NEW YORK CITY HEALTH AND HOSPITALS CORPORATION;<br><br>                 Defendants. | C.A. No. 25-cv-06667<br><br><br><br>**CLASS ACTION COMPLAINT** |

## PRELIMINARY STATEMENT

1.      This class action civil rights lawsuit challenges the state's failure to administer a mental health system that provides timely and adequate competency restoration services to people who are accused of crimes and found unfit to stand trial in New York City. Widespread failures of the state mental health agency, the New York Office of Mental Health, and its city partners cause hundreds of people each year to languish for months in the brutal jails on Rikers Island while they wait for services that restore their competence to stand trial. The dysfunction also causes individuals to be denied the opportunity, when appropriate, to be placed in the community, with community-based treatment services that restore them to fitness and keep them and their communities safe.

1

2.     On any given day, approximately 100 individuals are held on Rikers Island despite being ordered by a criminal court into the custody of the New York State Office of Mental Health ("OMH") to receive competency restoration services after being found unfit to stand trial under New York Criminal Procedure Law 730 ("CPL 730"). OMH routinely flouts criminal courts' CPL 730 orders, refusing to accept custody of individuals ordered into their care and ignoring the urgency of these individuals' treatment needs, for months on end. While the median wait time in jail prior to transfer to OMH custody was 81 days in 2024, very often delays run much longer. Women waited a median of 102 days in 2023. In 2024, 130 people faced wait times longer than 100 days. Eleven people in the last two years waited more than six months, including one individual whose treatment OMH delayed for nine months. In February 2025, according to a report by THE CITY, over two dozen people had been waiting 100 days or more for restoration services.

3.     Individuals subject to CPL 730 orders *must* receive court-mandated treatment; their criminal cases cannot progress without it. But, due to OMH's dysfunction, these individuals are consigned to indefinite legal limbo. This harm is compounded by jail conditions that expose them to constant risk of the neglect and brutality that defines Rikers Island. Chronic failures in the delivery of mental health and medical services at Rikers Island's jails create grave danger for people with psychiatric disabilities generally and particularly for people found unfit to stand trial.

4.     Rikers' staff subject people with psychiatric disabilities to discipline for behavior related to unmet treatment needs. They also "deadlock" people—a practice of arbitrary extended cell confinement that deprives people of out-of-cell activities like recreation and therapy, and interferes with access to attorneys and advocates and even medication, effectively placing them in a black hole within the jail. Physical brutality—including violence perpetrated by jail staff—is so entrenched on Rikers Island that the New York City Department of Correction ("DOC") will soon

2

be placed under federal receivership in another class action pending in this court, *Nunez v. City of New York.*

5.    In this context of neglect, brutality, and the denial of basic mental and medical health services, the harm for people with psychiatric disabilities can be deadly. Of the 59 people who died in DOC custody since 2021, about half had mental health needs, including five people who required competency restoration while incarcerated.

6.    People awaiting competency restoration have not been convicted of any crime. Like all criminal defendants, they are presumed innocent. Yet they are routinely jailed for longer than necessary, separated from their families, and kept from the treatment they need, simply because of the state's dysfunctional and deficient system of care.

7.    Many people with CPL 730 orders have been diagnosed with a psychiatric disability, are poor, and were homeless prior to their arrest and commitment. And many are casualties of a mental health system that has chronically failed to meet their treatment needs, placing them at risk of hospitalization or worse, being jailed on Rikers Island. These outcomes are often driven by systemic issues, particularly structural racism. A disproportionate number of Black and Latinx people lack access to quality community-based mental health care in New York. Unequal access produces disproportionate rates of incarceration among Black and Latinx people—disparities that are apparent in the city's jail admissions and in the population of people found unfit to stand trial in New York City. Delays in competency restoration services are but another ugly manifestation of structural racism in the mental health and criminal legal systems.

8.    OMH administers and operates a competency restoration system that relies almost exclusively on "secure" hospitals that do not have nearly enough beds and staffing to accommodate the numbers of people committed to inpatient care. Secure hospitals have the highest level of

security restrictions and require additional safety staff. There are only four in the entire state. OMH is aware that its policies and practices cause months-long delays in providing appropriate treatment, which in turn results in months-long dangerous and unnecessary jail confinement that is wholly disconnected from the goal of competency restoration. Despite the mismatch between its system and the demand for services, OMH has adopted a band-aid approach: adding a small number of hospital beds here and there.

9.      Neither OMH nor its city partners—the New York City Department of Health & Mental Hygiene ("DOHMH") and New York City Health + Hospitals ("HHC")—have implemented standards, procedures, or policies to assess individuals who are unfit to stand trial for treatment in a setting that is more community integrated than a secure hospital, such as with an outpatient provider of competency restoration services. Assessing people for what treatment setting best suits their needs would allow for off-ramping people who can be appropriately served in the community, reserving limited and costly hospital beds for the people who most need them and incidentally saving taxpayer dollars.

10.      This failure to assess the treatment needs of people who are unfit to stand trial causes them to be needlessly locked in hospitals away from their communities and warehoused in jails plagued by rampant brutality and neglect. And although OMH has an outpatient competency restoration program, it is underdeveloped, capable of accepting only a handful of referrals at a time and lacking adequate support services to facilitate community-based placement. Even when people are initially referred to outpatient competency restoration services, many ultimately wind up hospitalized because OMH does not provide timely evaluations or support to allow them to succeed in the community. As a result of OMH's policies and practices, people receive competency

restoration services in unnecessarily segregated settings and risk losing their housing, connection to family, services, and any stability they had prior to their commitment.

11.    Plaintiffs bring this lawsuit on behalf of two classes of plaintiffs harmed by these systemic failures: first, those who are deprived of timely competency restoration services and forced to wait in jail for those services (the "Delays Class") and, second, those who are not assessed to determine whether they are eligible for and would benefit from competency restoration services in a more integrated setting than a hospital (the "Integration Class").[1] OMH's policies and practices that cause Delays Class members who are unfit to stand trial to languish on Rikers Island for months without timely competency restoration services violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. And these same policies and practices also violate Delays Class members' right to a reasonable accommodation—timely competency restoration— to enable equal participation in their criminal proceedings under Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794, ("Section 504").

12.    OMH's, DOHMH's and HHC's policies and practices that cause the reflexive commitment of Integration Class members to a hospital for competency restoration services without any determination of their treatment needs, including whether hospitalization is necessary to restore them to fitness, violate the non-discrimination provisions of the ADA and Section 504. And OMH's practice of providing Integration Class members an inadequate outpatient competency restoration program that sets people up for failure and causes segregation or the risk of unnecessary segregation violates the ADA and Section 504.

---

[1] The Delays Class and Integration Class are defined more comprehensively at Paragraphs 65–66, *infra*.

13.     Plaintiffs seek declaratory and injunctive relief to end Defendants' extended delays in providing appropriate competency restoration services, their failure to provide reasonable accommodations, and their failure to provide competency restoration services in the most integrated setting appropriate to people's needs. Together, these practices cause hundreds of people to be confined for months longer than is lawful in New York City jails at great risk to their health and safety.

## PARTIES

### I.   *Plaintiffs*

14.     R.M. is a 31-year-old Latino man who resided in private housing in Brooklyn, New York prior to his arrest. He received a diagnosis of "other specified schizophrenia spectrum" and "other psychotic disorder," mental impairments that substantially limit one or more major life activities, including thinking. After his arrest, R.M. remained in the community and continued to report to his court dates. On March 12, 2025, R.M. was found unfit to stand trial and ordered committed to an OMH hospital for competency restoration. He was remanded to jail following his commitment. R.M. is qualified to receive competency restoration services in the community with appropriate services and supports, and he desires such services, but OMH, DOHMH, and HHC failed to assess him to determine which competency restoration setting is most appropriate for his needs. OMH can reasonably accommodate R.M. in an outpatient program, but OMH placed R.M. on a waitlist for a bed at a secure hospital instead. He has been jailed on Rikers Island for 153 days awaiting transfer to the hospital and has not received any competency restoration services while detained. To assist R.M. and protect his interests, his uncle, Elfego Maldonado Estrada, is serving as R.M.'s next friend in this action. Mr. Maldonado Estrada brings this action on R.M.'s behalf,

and he is dedicated to the best interests of R.M. and will advocate for those best interests in this action.

15.    A.B. is a 29-year-old Black man who resided in supportive housing in Bronx, New York prior to his arrest. He has a diagnosis of "other specified schizophrenia spectrum" and "other psychotic disorder," mental impairments that substantially limit one or more major life activities, including thinking, working, and self-care. A.B. was incarcerated at Rikers Island following his arrest because he was unable to post bail. On March 26, 2025, the court found that he was unfit to stand trial and ordered him committed to an OMH hospital for competency restoration services. A.B. has been waiting in DOC custody since then. A.B. is qualified to receive competency restoration services in the community with appropriate services and supports, and he desires such services, but OMH, DOHMH, and HHC failed to assess him to determine which competency restoration setting is most appropriate for his needs. OMH can reasonably accommodate A.B. in an outpatient program, but OMH placed him on a waitlist for a bed at a secure hospital instead. A.B. has been held in DOC custody for 139 days awaiting transfer to the hospital and has not received any competency restoration services while detained. To assist A.B. and protect his interests, his sister, Kadijah Hutchinson-McLean, is serving as A.B.'s next friend in this action. Ms. Hutchinson-McLean brings this action on A.B.'s behalf, and she is dedicated to the best interests of A.B. and will advocate for those best interests in this action.

## II. Defendants

16.    Defendant New York State Office of Mental Health ("OMH") is a department of the state responsible for overseeing a mental health system that provides people with psychiatric disabilities "with care and treatment" and for ensuring "that such care, treatment and rehabilitation is of high quality and effectiveness, and that the personal and civil rights of persons receiving care,

treatment, and rehabilitation are adequately protected," under New York Mental Hygiene Law § 7.07(c). OMH is responsible for developing, implementing, and overseeing New York State's hospital-based and community-based competency restoration mental health programs and community-based mental health treatment, housing, and service programs for people found unfit for trial under New York Criminal Procedure Law. As part of these responsibilities, OMH must develop a comprehensive, integrated mental health system that ensures that people with psychiatric disabilities receive services in their communities whenever possible. OMH is a public entity that receives federal financial assistance and is covered by the ADA and Section 504.

17.    Defendant Dr. Ann Marie T. Sullivan is the Commissioner of OMH. As Commissioner, Dr. Sullivan is responsible for the administration and operation of OMH, including providing competency restoration services for people with psychiatric disabilities committed to OMH's custody for care and treatment after a CPL 730 order. She is responsible for establishing the standards for operating and funding a continuum of community-based services, including mental health housing, and for determining what mental health and competency restoration services to provide, in what setting to provide them, and how to allocate funds for each program. Defendant Sullivan oversees OMH's coordination and planning with local governments to ensure that people with psychiatric disabilities receive care, treatment, and rehabilitation in their home communities. She is sued in her official capacity.

18.    Defendant New York City Department of Health and Mental Hygiene ("DOHMH") is a department of local government whose mission is to protect and promote the health of New Yorkers. DOHMH also serves as the director of community mental health services for New York City and in that capacity develops, implements, and oversees New York City's competency

examinations conducted pursuant to New York Criminal Procedure Law § 730.30. DOHMH is a public entity that receives federal financial assistance and is covered by the ADA and Section 504.

19.     Defendant Dr. Michelle Morse is the Acting Commissioner and Chief Medical Officer of DOHMH. As the Acting Commissioner, Dr. Morse is responsible for the administration and operation of DOHMH, including overseeing competency examinations in New York City. She is sued in her official capacity.

20.     Defendant New York City Health + Hospitals Corporation ("HHC") is a public benefit corporation with the power and responsibility to perform essential public and governmental functions. DOHMH has delegated the responsibility of conducting competency examinations to HHC's subdivision Correctional Health Services ("CHS"). HHC is a public entity that receives federal financial assistance and is covered by the ADA and Section 504.

## FACTS

### *New York's Competency Restoration System Places People on Hospital Waitlists Without Providing Care or Determining Whether Hospitalization Is Necessary*

21.     New York's competency restoration system does not meet the needs of people who are found unfit to proceed with their criminal trials in New York City. OMH administers and operates a system where people who need hospital-based services are jailed for months because hospitals lack the beds or staff to serve them, and people who are appropriate for an outpatient program are not identified, provided programming, or given the services they need to successfully complete it.

22.     Before a criminal case can proceed, a court must ensure that a person accused of a crime is able to understand the criminal proceedings against them and assist and consult with their attorney to prepare a defense. If a court believes that an individual may lack these abilities due to a psychiatric disability, it must order that person to undergo a competency examination,

colloquially referred to as a "730 exam." In New York City, the court issues the order of examination to the director of community mental health services in DOHMH. Although DOHMH develops, implements, and oversees New York City's competency examinations, it has delegated the task of conducting competency exams to CHS, a division of HHC.

23.     CHS doctors conduct the competency exams, often over video-teleconference, prepare a report with their findings, and submit the report to the court. The court then shares the exam report with the defense and prosecution. After receiving the exam report, the court may choose to hold a hearing to determine whether the person accused of a crime is unfit to stand trial.

24.     If the court finds that the individual is unfit to proceed, it must issue a temporary order of observation if the person is charged with an unindicted felony, or an order of commitment if the person is charged with an indicted felony. With either order, the court commits the person to OMH's custody for care and treatment—for up to 90 days in the case of a temporary order, and up to one year in the case of an order of commitment. With the consent of the district attorney, commitment to OMH's custody may be on an outpatient basis, which allows the person to stay in the community while they receive competency restoration services from an outpatient provider.

25.     Temporary orders and orders of commitment—collectively "commitment orders"—give OMH custody over a person for purposes of delivering competency restoration services. Competency restoration services involve psychiatric treatment to stabilize the person and education about how the legal system works so that the person understands the roles of the judge, prosecutor, and defense attorney, the charges against them, and other relevant information.

26.     Once the court commits a person to OMH's custody, their criminal case is suspended. The criminal proceeding can only resume after OMH restores the person's fitness. Many people are in jail when the commitment order for competency restoration is entered. But

other people are living at home or in other community settings, for example after posting bail, when the court decides that restoration is necessary. Under New York Criminal Procedure Law 730.50, these unincarcerated persons are immediately remanded to jail once courts issue a commitment order for hospital-based competency restoration. They must wait in jail, typically at Rikers Island, for transfer to an OMH hospital for restoration treatment.

27.    When OMH receives the commitment order, it designates an "appropriate" facility that will provide competency restoration services to the person. For the vast majority of people, those who are held in or remanded to jail, DOC is required to detain the person until OMH provides notification of the designation of the "appropriate" facility and then DOC transports the individual to that facility. In practice, even though OMH notifies DOC of a hospital designation typically within a few days of the commitment order, DOC does not transport the individual to the hospital until OMH green-lights the admission, which usually takes months. So begins a detained person's prolonged jail confinement on Rikers Island, without the competency restoration services the court has ordered, while they await placement at a hospital

28.    OMH delays competency restoration for people who are designated for a hospital bed because there is no bed or staff capacity at hospitals that OMH has designated for competency restoration services. As a matter of policy, OMH only places people charged with felonies in "secure" hospitals—Kirby Forensic Psychiatric Center ("Kirby"), Mid-Hudson Forensic Psychiatric Center ("Mid-Hudson"), Central New York Psychiatric Center ("CNYPC"), and Rochester Psychiatric Center ("Rochester")—with the lone exception of a 25-person unit at Manhattan Psychiatric Center, a non-secure hospital. Secure and non-secure hospitals differ in the amount of staffing, and staff at secure facilities receive additional training related to criminal procedure law. Together, the secure facilities and the Manhattan Psychiatric Center have

approximately 850 beds and typically operate at full capacity. OMH uses these hospitals to not only serve people deemed unfit for trial, but also incarcerated people who require hospital care, people who are not guilty by reason of mental disease or defect, and civilly committed patients who are transferred to a secure facility. Instead of arranging for prompt admission to a hospital, OMH places each person who is found unfit to proceed on a waitlist for their designated hospital.

29.     Last year, in sworn testimony, an OMH official admitted that admissions to the hospital were "rarely immediate, and can often take weeks or months" because of lack of bed availability. OMH does not assert that there is a therapeutic benefit to delayed competency restoration treatment or prolonged jail confinement. According to OMH, there are no immediate solutions to its delays in providing competency restoration services. The official testified that "it is simply not possible for OMH to instantly create new forensic beds, or do so within any relatively short timeframe," and bed development "is a process that would take years." The official also testified that "[e]ven if a secure facility could be built overnight, OMH would be hard pressed to adequately staff it under current conditions."

30.     Delay times and the number of people affected by delays have steadily climbed upwards in recent years. According to OMH's data, the median waiting period for people in New York City from the time OMH received the commitment order to admission rose from 49 days in 2022 to 68 days in 2023. From 2019 to 2023, median wait times almost quintupled, as shown in the graph below. In 2024, the median wait time was 81 days.



Median Time from Order Received to Admission in NYC in Calendar Days, 2019 - 2023

31.     In early 2023, between 124 and 155 people statewide waited in jail for hospital-based competency restoration services. By September 2024, the statewide figure remained high at 132 people. In 2024, from New York City alone, a median of 114 people waited for competency restoration services on any given day. OMH's own data shows that the average number of people statewide who waited over 30 days for a hospital transfer increased from 45 people in 2022 to 79 people in the first half of 2023. Many people have faced significantly longer delays. In 2024, 130 people from New York City waited longer than 100 days, and in the last two years, eleven people waited 180 or more days.

32.     For people who have an outpatient competency restoration order, OMH designates an OMH patient clinic to provide outpatient competency restoration services. But few people make it to this program. New York's competency restoration system lacks standards, policies, and procedures to identify and assess people who are appropriate for outpatient competency restoration, which would avoid unnecessary hospitalization and reduce the backlog for hospital

beds. Although the legislature amended state law in 2013 to provide for outpatient competency restoration, this program has been severely under-utilized. Between 2013 and June 2023, 99.3% of the people charged with felonies were restored in a secure hospital, not the community.

33.    OMH has not issued standards or developed forms, manuals, or policies mandating that the CHS doctors who conduct competency exams determine a person's individual service needs, including whether hospitalization is necessary for restoration. Form-16b (12/1988), the state's official competency examination report form, only prompts doctors to provide a summary of the individual's history, diagnosis, prognosis, and an opinion on the individual's competence. It does not direct doctors to address service needs or suitability of an outpatient or inpatient setting for restoration. OMH is responsible for approving this form (together with the state court chief administrator), but it has not proposed any changes to the form to require an assessment.

34.    OMH's Forensic Coordinator Manual, a guide for forensic coordinators and staff on topics related to the criminal procedure law, similarly fails to direct forensic examiners to consider an individual's suitability for outpatient or inpatient placement. The manual makes passing acknowledgment that outpatient restoration is available, stating that OMH's "usual[]" practice uses secure hospitals. This manual has not been updated since 2012.

35.    In 2023, OMH updated a ten-year-old document titled, "OMH Guidance for Implementation of Outpatient Competency Restoration (OCR)." OMH acknowledges that people who are unfit to stand trial may not meet traditional civil commitment criteria of having mental illness necessitating hospitalization, and could be appropriate for outpatient competency restoration. The document provides five clinical and environmental factors relevant to outpatient restoration, but does not instruct doctors to affirmatively and actively explore whether hospitalization is necessary for competency restoration or to provide an opinion as to whether

hospitalization or outpatient care is appropriate. To the contrary, the document states: "*Suggested Process for Determining Appropriateness for Outpatient Restoration: 1. When information relevant to the factors listed above becomes available* in the course of a competency evaluation, evaluators *are advised* to include that information as part of the competency report." OMH's guidance indicates, "If after consideration of relevant clinical and risk factors, and upon consent of the District Attorney, there is a determination that the defendant who is subject to pretrial release may be appropriate for outpatient restoration," the court should contact OMH "for an opinion regarding the viability of [outpatient] restoration." The guidance, however, provides no explanation of who renders the "determination" or how the court receives this determination. In other policies, OMH asserts that it does not get involved in the CPL 730 process until after the court issues a commitment order.

36.    OMH's failure to require and train CHS doctors conducting competency evaluations to consider whether a person is eligible for and would benefit from services in an outpatient setting ensures that 730 exam reports systematically lack such critical information. As a result, the courts lack information relevant to any determination of whether hospitalization or outpatient placement is appropriate in any given case before issuing a commitment order.

37.    None of OMH's forms, manuals, or guidance documents address reassessment of people who remain confined while waiting for hospital-based competency restoration. As a result, Plaintiffs and other similarly situated individuals spend months on Rikers Island, waiting for competency restoration at a hospital, even though they are eligible for and would benefit from outpatient competency restoration services in the weeks or months following issuance of a commitment order.

38.    OMH also lacks written standards and procedures for individually determining whether hospitalization in a secure as opposed to a non-secure, civil hospital is necessary for competency restoration. As of September 2024, OMH had not issued any policies describing criteria or procedures for having an individual placed in Manhattan Psychiatric Center's 25-bed unit. As a result, OMH sends virtually every person found unfit to proceed in New York City to a secure facility.

39.    OMH's city partners—DOHMH and HHC—likewise lack any policies or procedures to mandate an individual determination of whether a person requires hospitalization or alternatively is eligible and would benefit from restoration in an outpatient setting. Neither agency has developed training materials related to 730 exams or policies describing the factors and criteria CHS doctors should consider in determining a person's appropriate level of care. The forms issued to doctors who complete the 730 exam reports contain no prompts to consider the appropriateness of community-based versus hospital-based competency restoration or to provide an opinion as to placement. As a result, CHS doctors routinely fail to make any individualized determination about what treatment setting is most appropriate.

40.    Although each Plaintiff is qualified for community-based placement, none were identified or assessed for outpatient competency restoration services due to OMH's, DOHMH's, and HHC's deficient assessment and evaluation policies and practices. Immediately prior to being remanded to Rikers following his commitment to OMH's custody, Plaintiff R.M. was living and working two jobs in the community. He lived in private housing, appeared at his court dates, attended his appointment for a 730 exam in the community, and had sought medical treatment before he was arrested. Since being at Rikers, R.M. has taken his mental health medications and desires to continue treatment once he is home. With appropriate supports and services, R.M. can

be successful in an outpatient competency restoration program. The failure to provide this outpatient program or *any* appropriate competency restoration services since R.M.'s commitment is discriminatory and unlawful. Further, R.M.'s confinement on Rikers Island since March 12, 2025—five months ago—and his prospective hospitalization at an OMH secure hospital are unnecessary and unjustified.

41.    Similarly, prior to his arrest, Plaintiff A.B. was living in supportive housing in the Bronx and receiving outpatient mental health services through an Assertive Community Treatment ("ACT") team that is designed to provide 24/7 multidisciplinary care services in the community. A.B. has been adhering to his mental health treatment plan on Rikers Island. In the four months since his commitment to a hospital, A.B. has never been reassessed to determine whether outpatient competency restoration is appropriate. A.B. will not be reassessed before he is transferred to an OMH hospital. With appropriate supports and services, A.B. can be successful in an outpatient competency restoration program. The failure to provide this outpatient program, or *any* appropriate competency restoration since his commitment, and his prospective hospitalization at an OMH secure hospital are unnecessary and unjustified.

42.    OMH's, DOHMH's, and HHC's lack of any standards or regular process for identifying and assessing people's treatment needs creates a void in New York's competency restoration system that causes people to be unnecessarily segregated or placed at risk of segregation.

***New York's Competency Restoration System Subjects People to Prolonged Confinement Unconnected to the Goal of Competency Restoration***

43.    OMH's practice of delaying competency restoration services subjects Plaintiffs and class members to criminal process and incarceration that are longer than necessary, all while

17

exposing them to great risk of neglect and abuse that thwarts, rather than aids, their restoration to fitness.

44.    The delays in competency restoration services lengthen Plaintiffs' and class members' time in a jail system at Rikers Island that is deeply unsafe due to chronically deficient medical and mental health services and violence. According to data published by CHS in May 2025, approximately 21% of people held in jails at Rikers have serious mental illness, but DOC consistently fails to ensure that people incarcerated in those jails have access to mental health care. In 2024, only 49.4% of incarcerated individuals' requests for health services resulted in DOC staff producing the incarcerated individual to a CHS clinic, and only 39.5% of those productions were timely.

45.    Each Plaintiff has experienced disruptions in accessing medical and mental health services. For example, between March and July 2025, corrections staff did not produce Plaintiff R.M. for several medical appointments, including chronic care, wound care, and social work appointments. Corrections staff also did not produce Plaintiff A.B. for a medical appointment, and other mental health appointments were cancelled due to staffing problems.

46.    At least 136 people have died in custody of DOC since 2014. Approximately half of the 59 people who have died in the jail system since June 2021 were individuals with psychiatric needs, including at least five people who were subject to CPL 730 procedures. The longer Plaintiffs and class members are in jail, the greater the chance that they will not receive the care they need and deteriorate psychiatrically. When people experience extended periods with untreated mental illness, their risk of suicide and poorer treatment outcomes increase. Delayed treatment not only harms people because they must cope with the effects of untreated psychiatric needs, but also because they are set back in the process of attaining competency.

47.     Rikers Island, known for its "deep-seated culture of violence," is also an unstable and punitive environment for people with psychiatric disabilities. Corrections officers respond to manifestations of psychiatric disabilities with harsh discipline and administrative restrictions. Specifically, in the mental health units, Rikers correctional officers arbitrarily engage in an unofficial practice called "deadlocking," locking some individuals in their cells for days and even weeks, effectively enforcing solitary-like conditions with no accountability. People with psychiatric disabilities are also more likely to experience physical and sexual assault.

48.     The experience in early 2024 of former class member G.S. illustrates the danger of prolonging the confinement of Plaintiffs and class members on Rikers Island. G.S. was committed to OMH custody in January 2024 while detained on Rikers Island. A father of four and a grandparent, G.S. had tried to stay safe at Rikers by staying in his cell. In early February 2024, however, G.S. was attacked and stabbed in the face, neck, and hands by another incarcerated individual while housed in a mental observation unit at Rikers Island. G.S. required surgery and over 100 stitches for his injuries. At the time of the stabbing, G.S. had already waited 27 days for a bed at Mid-Hudson. But it took a total of 89 days for OMH to finally admit G.S. to the hospital and begin competency restoration services. It then took six months for G.S. to be restored to fitness. Because the judge in G.S.'s criminal case recognized how dangerous Rikers Island was for G.S., the court changed G.S.'s status to "release on his own recognizance" so that once restored, G.S. would not be returned to jail. The court ordered that G.S. be transported directly from the hospital to the court so he could be released. The next day, G.S. was admitted to a transitional living residence.

49.     While waiting on Rikers Island for competency restoration services, R.M. and A.B. have also experienced violence—they were punched by other incarcerated people.

50.    Delays also introduce uncertainty in an individual's legal status which may further prolong confinement in this dangerous environment. Under state law, if an individual is in OMH's custody at the expiration of a temporary order, their criminal case must be dismissed. But if the order expires while the person sits in jail, it is unclear whether the court should dismiss the case, extend the temporary order, or order a new competency exam. At times, judges have chosen to order a new exam, which forces individuals to go through yet another period of waiting for a hospital bed.

***OMH's Deficient Outpatient Restoration Program Limits Participation While Jeopardizing People's Success in the Program***

51.    OMH administers and operates an outpatient competency restoration program that cannot serve even 15 individuals at a single time, according to an OMH statement in 2023. For the small number of individuals lucky enough to participate, OMH's outpatient restoration program is nonetheless dysfunctional. OMH regularly causes people to fend for themselves for weeks without services or other appropriate supports that would help them remain safe in the community. OMH's poor administration sets people up to fail their outpatient competency restoration programs and be subjected to unnecessary segregation.

52.    In New York City, many people who are subject to an outpatient competency restoration order receive a "hybrid" order, rather than a pure outpatient competency restoration order. The district attorney must consent to it before any patient can receive an outpatient competency restoration order. Under a "hybrid" order, the person is permitted to begin competency restoration in the community while waiting for a hospital bed to become available in one of OMH's secure facilities. When the hospital bed becomes available, people are expected to surrender themselves and be escorted to the hospital for competency restoration services.

53.     People subject to outpatient competency restoration orders are typically at home or in the community but wait weeks or months to begin their programming. OMH requires the designated outpatient provider—typically an OMH patient clinic—to schedule an initial evaluation appointment and notify the person of that appointment by letter. The OMH patient clinic designated to provide outpatient competency restoration services is expected to contact the person by letter to arrange for an initial community appointment to evaluate the person and develop an individualized restoration service plan. But communication from OMH regarding this first step is scattered at best. It often takes many weeks for OMH to simply schedule the evaluation appointment.

54.     Former class member J.C., a 45-year-old South Asian man, initially had a "hybrid" order, which the Queens County Supreme Court issued in mid-November 2024. It took OMH more than seven weeks to schedule J.C. for an evaluation in the community for mid-January 2025— more than *eight* weeks after the court issued its order. This evaluation was to be the first step in developing a competency restoration program responsive to J.C.'s individual needs. Due to suffering excruciating back pain in mid-January 2025, J.C. missed the evaluation appointment and re-scheduled appointments. Dismayed that J.C. had received no services since it had issued its order, the court remanded J.C. to jail. Just a few weeks later, J.C. was punched in the face by another incarcerated individual in his housing unit. Ultimately, he was incarcerated for 85 days at Rikers until he was finally transferred to the hospital for competency restoration services.

55.     Former class member T.P. is a 41-year-old man who was in the community on supervised release when he similarly received a "hybrid" order on March 1, 2024 from New York County Supreme Court that allowed him first to engage in outpatient restoration services while waiting for an inpatient bed. Under the "hybrid" order, T.P. would be escorted by the sheriff to the

hospital once the inpatient bed became available. Although T.P.'s attorney contacted OMH about the hybrid order repeatedly, including before it was signed, OMH forced T.P. to wait over eight weeks for his initial evaluation appointment for his services. To expedite services, T.P.'s attorney gathered and provided relevant medical records to OMH. OMH finally scheduled an evaluation only after The Legal Aid Society threatened to file a contempt motion against OMH for failure to comply with the order. Because T.P.'s attorney needed clarification about the scope of the evaluation to protect T.P.'s rights, the appointment was rescheduled for May 8, 2024.

56. Six weeks after the evaluation, however, OMH had still not delivered any outpatient restoration programming to T.P. When a bed at Kirby became available, the prosecutor in T.P.'s case insisted that T.P. be hospitalized for competency restoration. T.P. was then transported by the sheriff in handcuffs from the courtroom following a court appearance to Kirby on June 14, 2024. In total, T.P. was forced to wait for *fifteen weeks* for court-ordered competency restoration services. T.P. was restored to fitness and returned to the community after another sixteen weeks—close to the amount of time he spent waiting for restoration services. As it did in J.C.'s and T.P.'s case, OMH's ongoing failure to provide a functioning outpatient competency restoration program delays competency restoration and causes unnecessary hospitalization or the risk of unnecessary hospitalization for members of the Integration class.

57. Although OMH provides and funds supportive housing, Assertive Community Treatment ("ACT") and Forensic ACT ("FACT"), OMH does not assure that people who are subject to an outpatient restoration order receive these evidence-based services, even though they help people with serious psychiatric disabilities avoid the risk of hospitalization. These services would enable people who are unfit to stand trial to successfully complete an outpatient competency restoration program. ACT and FACT use multidisciplinary teams to deliver hands-on treatment

services, 24/7, in the community. Recipients of ACT and FACT team services receive medication and therapy, medication supervision, case management services (e.g., assistance obtaining benefits, securing medical appointments, appointment reminders, transportation), crisis services, substance use treatment, and vocational and job supports. While OMH officials are aware that homelessness impedes greater utilization of the outpatient restoration program, OMH has neither developed sufficient capacity in supportive housing, nor developed policies to ensure that people who are unfit to stand trial are placed in such housing. OMH has similarly not ensured that people with 730 orders are assigned ACT or FACT teams where appropriate.

58.     The absence of adequate mental health services for outpatient restoration program participants undermines the program and leads to the unnecessary hospitalization of Integration class members who can, and should, be served in the community. These deficiencies also increase the risk that prosecutors withdraw their consent to outpatient competency restoration orders out of concern that there are not adequate services to keep people safe in the community.

***OMH's Failure to Plan Subjects New Yorkers Who Are Found Unfit to Proceed to Conditions that Exacerbate Their Psychiatric Symptoms, Including Deadly Jail Conditions and Staggering Delays in Treatment***

59.     Because OMH proactively collects data on commitment orders, it is aware that delay times have steadily increased for over a decade. Rather than systematically address the problem of untimely competency restoration services, OMH has adopted a complacent approach. It has periodically added minimal bed capacity, primarily at secure hospitals, but this "band-aid" effort has not eliminated the approximately 100-person backlog of people waiting for services in New York City. In 2024, the director of the OMH bureau responsible for CPL 730 placements testified that OMH rejected the idea of making greater use of civil hospitals to reduce competency restoration delays:

OMH has considered placing CPL patients in civil hospitals; however, those civil hospitals are currently running at capacity. This recommendation would take beds away from patients receiving treatment under Article 9 of the Mental Hygiene Law, who require immediate treatment because they pose a danger to themselves or others. Article 9 patients are arguably a higher priority than CPL 730 patients because they lack access to the care and treatment that CPL 730 patients receive in jail.

60.     OMH's statement is a stark acknowledgement of its deficient system of care and articulates a policy of deprioritizing the needs of people who are unfit to stand trial. The lack of access to community-based care is driving civil hospitalization, and OMH is aware that taking civil hospital beds away will hurt patients admitted for civil hospitalization. Rather than address the root problem—lack of access to community-based care—OMH uses its own systemic deficiencies to justify not allocating resources to prevent prolonged jail confinement for people who are unfit to stand trial. OMH has chosen not to reallocate resources within its hospital system to address competency restoration delays, satisfied that the health services available in a notoriously violent and chaotic jail system will provide *some* treatment, even if it is not the treatment determined necessary by the court. Meanwhile, each day of needless detention at Rikers costs approximately $1,110 per person per day. Multiply the daily figure by the number of people waiting for competency restoration services in New York City jails, and the cost of these systemic deficiencies amount to millions of dollars per year.

61.     OMH is statutorily required to develop a statewide comprehensive plan to meet the treatment needs of New Yorkers, including people who are unfit to proceed to trial. This plan must address service gaps and propose new service configurations. But OMH's most recent planning documents, issued in 2024, merely report high-level data on hospital capacity and CPL 730 hospital admissions and lengths of stay, without any identification of service gaps or solutions.

62.     New York's low use of outpatient competency restoration is the product of OMH's system design, implementation, planning, and funding choices. OMH, DOHMH, and HHC have

no standards and procedures to facilitate obtaining doctors' opinions about the appropriateness of hospitalization. OMH lacks any standards or procedures for re-assessing people who languish in jail while pending hospital placement for their appropriateness for outpatient competency restoration services. OMH fails to support those referred to outpatient competency restoration by providing timely competency restoration and other necessary services that people need to remain safe in the community.

63.    OMH also has failed to operate and fund a system responsive to the very visible, years-long trends in the number of commitment orders, delay times, and system utilization, or to the widely reported danger of confinement on Rikers Island. For example, in 2024, OMH informed The Legal Aid Society that it had not conducted a comprehensive needs assessment to determine what percentage of people who are unfit to proceed could be appropriate for outpatient competency restoration. And rather than expand its outpatient program, OMH has chosen to fund a jail program that assists incarcerated people in maintaining competency *after* they are restored, leaving those in need of restoration services to remain in limbo on months-long waitlists for treatment.

## CLASS ALLEGATIONS

64.    The named Plaintiffs, by and through their next friends, bring this action on their own behalf and, pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of themselves and similarly situated individuals in the Delays Class and the Integration Class.

65.    The Delays Class consists of all persons who have been, or will be in the future, charged with a felony in New York City and: (a) who receive a CPL 730 court order to receive competency restoration services by OMH, and (b) who remain confined in a New York City Department of Correction jail pending competency restoration services (the "Delays Class").

66.     The Integration Class consists of all persons who have been, or will be in the future, charged with a felony in New York City and: (a) who receive a CPL 730 court order to receive competency restoration services by OMH; (b) who do not receive an individualized assessment of the most integrated setting appropriate to their needs; and (c) who will not receive competency restoration services in the most integrated setting appropriate to their needs pursuant to an individualized assessment.

67.     All four requirements of Rule 23(a) are satisfied for the Delays and Integration Classes.

i.  *Numerosity*: Joinder of all class members is impracticable because of the size and fluid nature of the class of pre-trial people in New York City. Each year, hundreds of individuals in New York City experience prolonged jail confinement as they wait to receive competency restoration services from OMH, including approximately 100 people who are detained at any given time on this basis. Further, each year, hundreds of individuals in New York City are designated to a secure hospital without an individualized assessment by OMH and HHC of the most integrated setting appropriate to their needs.

ii.  *Commonality*: There are questions of law and fact common to the Delays Class, including: whether OMH has a practice of failing to provide timely competency restoration services to Delays class members in OMH hospitals; whether OMH's competency restoration policies and practices prolong the confinement of Delays class members in New York City jails; whether OMH's practice of failing to provide timely competency

restoration services to Delays class members in OMH hospitals violates the Fourteenth Amendment; whether OMH's failure to provide timely competency restoration services to Delays class members violates the obligation to provide reasonable accommodations under Title II and Section 504. There are also questions of law and fact common to the Integration Class including: whether Defendants fail to assess Integration class members to determine the most integrated setting appropriate to their needs for competency restoration services; whether OMH fails to provide competency restoration services in the most integrated setting appropriate to the needs of Integration class members; whether Defendants' methods of administration cause Integration class members to be denied the opportunity to receive competency restoration services in the most integrated setting appropriate to their needs; whether Defendants' failure to assess Integration class members to determine the most integrated setting appropriate to their needs for competency restoration services violates the Title II and Section 504; whether Defendants' failure to place Integration class members in the most integrated setting appropriate to their needs violates the Title II and Section 504.

iii. *Typicality*: The claims of the named Plaintiffs are typical of the claims of the class. The named Delays Plaintiffs, like all Delays class members, have been subjected to OMH's failure to provide timely competency restoration services, have been injured by this practice, and require similar relief. The named Integration Plaintiffs, like all Integration class members, have been

subjected to Defendants' failure to individually assess individuals to determine the most integrated setting appropriate to their needs for competency restoration services and OMH's failure to provide an outpatient competency restoration program, have been injured by these practices, and require similar relief.

iv.  *Adequacy of Representation*: The named Plaintiffs and class counsel will fairly and adequately protect the interests of the class members of each respective class. The named Plaintiffs have suffered injury and are committed to obtaining declaratory and injunctive relief that will benefit the entire class by addressing the policies and practices that have led to delayed competency restoration services and unnecessary institutionalization of people who are appropriate for outpatient competency restoration. Their interests are not antagonistic to those of other class members. Class counsel have many years of combined experience in complex civil, civil rights, disability rights, and class action litigation.

68.     Class-wide declaratory and injunctive relief are appropriate under Rule 23(b)(2) because Defendants have acted or refused to act on grounds applicable to the Delays Class and Integration Class as a whole.

## JURISDICTION AND VENUE

69.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

70.     Declaratory and injunctive relief are sought under 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

71.     Venue is properly set within the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this district.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**U.S. Const. Amend. XIV; 42 U.S.C. § 1983**
**(Plaintiffs and Delays Class Members against Defendant Sullivan)**

72.     Due process requires that the nature and duration of confinement must bear a reasonable relation to the purpose for which a person is committed.

73.     Once an individual is found unable to aid and assist in their own defense, the only lawful purpose for confinement is to treat them to return the individual to competency.

74.     Defendant Sullivan's actions or inactions alleged herein have violated and continue to violate the rights of the Plaintiffs and Delays class members under the Fourteenth Amendment to the U.S. Constitution.

### SECOND CAUSE OF ACTION
**Americans with Disabilities Act**
**(Plaintiffs and Delays Class Members against Defendant Sullivan)**

75.     Plaintiffs are qualified individuals with disabilities within the meaning of Title II of the ADA. 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104.

76.     Title II prohibits public entities from discriminating against individuals with disabilities in programs and services. 42 U.S.C. § 12132. Discrimination as defined under Title II includes the "exclu[sion] from participation in or [] den[ial of] the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. Title II requires that public entities "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can

demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

77.    Plaintiffs have been found to be unfit to proceed with trial and to require competency restoration services to participate in their criminal proceedings. Timely competency restoration is a state-developed reasonable accommodation that enables people who are found unfit to stand trial to participate in their criminal proceedings. This accommodation enables access to criminal proceedings that people without disabilities enjoy.

78.    Defendant Sullivan's actions or inactions alleged herein have violated and continue to violate the rights of the Plaintiffs and Delays class members under Title II of the ADA.

### THIRD CAUSE OF ACTION
### Rehabilitation Act
### (Plaintiffs and Delays Class Members against Defendants OMH and Sullivan)

79.    Plaintiffs are qualified individuals with disabilities within the meaning of 29 U.S.C. § 705(20) and 45 C.F.R. § 84.3(1).

80.    Defendant OMH, which is overseen by Defendant Sullivan, is a recipient of federal financial assistance, subject to the requirements of Section 504.

81.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

82.    The Rehabilitation Act requires recipients of federal financial assistance to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. *See* 45 C.F.R. § 84.4.

83.    Delays Plaintiffs have been found to be unfit to proceed with trial and to require competency restoration services to participate in their criminal proceedings. Timely competency

restoration is a state-developed reasonable accommodation that enables people who are found unfit to stand trial to participate in their criminal proceedings. This accommodation enables access to criminal proceedings that people without disabilities enjoy.

84.    Defendants OMH and Sullivan's actions or inactions alleged herein have violated and continue to violate the rights of Plaintiffs and Delays class members under Section 504.

**FOURTH CAUSE OF ACTION**
**Americans with Disabilities Act**
**(Plaintiffs and Integration Class Members against Defendants Sullivan, Morse, DOHMH, and HHC)**

85.    Plaintiffs are qualified individuals with disabilities within the meaning of Title II of the ADA. 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104.

86.    Defendants DOHMH and HHC are "public entities" as defined by the ADA. 42 U.S.C. § 12131(1). Defendant Sullivan oversees OMH, which is a "public entity," and Defendant Morse oversees DOHMH.

87.    Title II prohibits public entities from discriminating against individuals with disabilities in programs and services. 42 U.S.C. § 12132. Discrimination as defined under Title II includes the "exclu[sion] from participation in or [] den[ial of] the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132.

88.    Title II requires that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Further, a "public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3).

89.     Plaintiffs are qualified to receive services in more integrated community-based settings that meet their mental health needs. Serving Plaintiffs in the most integrated settings appropriate to their needs can be reasonably accommodated and would not fundamentally alter OMH's, DOHMH's, or HHC's programs and services.

90.     Defendants Sullivan, Morse, DOHMH, and HHC are obligated under the ADA to administer services, programs, and activities in a manner that enables Plaintiffs and Integration class members to receive services in the most integrated setting appropriate to their needs.

91.     Defendants Sullivan, Morse, DOHMH, and HHC's actions or inactions alleged herein have violated and continue to violate the rights of the Plaintiffs and Integration class members under Title II of the ADA, 42 U.S.C. § 12132.

**FIFTH CAUSE OF ACTION**
**Rehabilitation Act**
**(Plaintiffs and Integration Class Members against All Defendants)**

92.     Plaintiffs are qualified individuals with disabilities within the meaning of 29 U.S.C. § 705(20) and 45 C.F.R. § 84.3(1).

93.     Defendants are recipients of federal financial assistance, subject to the requirements of Section 504.

94.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be the denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

95.     Plaintiffs are qualified to receive services in more integrated community-based settings that meet their mental health needs. Serving Plaintiffs and Integration class members in the most integrated settings appropriate to their needs can be reasonably accommodated and would not fundamentally alter OMH's, DOHMH's, or HHC's programs and services.

96.     Defendants are obligated under Section 504 to administer programs and services for individuals with psychiatric disabilities that provide the opportunity to receive services in the most integrated setting appropriate to their needs.

97.     Defendants' actions or inactions alleged herein have violated and continue to violate the rights of the Plaintiffs and Integration class members under Section 504.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a)  Certify, pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure:

    i.  A Delays Class defined as: All persons who have been, or will be in the future, charged with a felony in New York City and: (a) who receive a CPL 730 court order to receive competency restoration services by OMH, and (b) who remain confined in a New York City Department of Correction jail pending competency restoration services (the "Delays Class")

    ii.  An Integration Class defined as: All persons who have been, or will be in the future, charged with a felony in New York City and: (a) who receive a CPL 730 court order to receive restoration services by OMH; (b) who do not receive an individualized assessment of the most integrated setting appropriate to their needs; and (c) who will not receive competency restoration services in the most integrated setting appropriate to their needs pursuant to an individualized assessment (the "Integration Class").

b)  Appoint the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.

c) Enter an order declaring Defendant Sullivan's conduct as alleged herein unconstitutional and unlawful under the Fourteenth Amendments to the U.S. Constitution.

d) Enter an order declaring Defendants' conduct as alleged herein unlawful under the Americans with Disabilities Act and Section 504.

e) Enter a permanent injunction requiring Defendants to promptly take all necessary and appropriate actions to serve Integration Plaintiffs and class members in the most integrated setting appropriate to their needs.

f) Enter a preliminary and permanent injunction preventing Defendant Sullivan from subjecting the Delays Plaintiffs and class members to an unreasonable delay in jail prior to receipt of competency restoration services.

g) Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, 29 U.S.C. § 794a, and other applicable law.

h) Order such other relief as the Court deems appropriate.

Dated: August 12, 2025                    Respectfully submitted,
      New York, New York

By:   */s/ Elena Landriscina*
       Elena Landriscina
       Shona Hemmady (*admission pending*)
       Philip Desgranges
       THE LEGAL AID SOCIETY
       49 Thomas Street, 10th Floor
       New York, New York 10013
       (212) 577-3398
       elandriscina@legal-aid.org
       shemmady@legal-aid.org
       pdesgranges@legal-aid.org

By:   */s/ Alexis Karteron*
       Alexis Karteron
       WASHINGTON SQUARE LEGAL
       SERVICES
       CIVIL RIGHTS IN THE CRIMINAL
       LEGAL SYSTEM CLINIC
       245 Sullivan Street, 5th Floor
       New York, NY 10012
       212-998-6430
       alexis.karteron@nyu.edu

By:   */s/ James I. McClammy*
       James P. Rouhandeh
       James I. McClammy
       Diane O. Lucas
       Chui-Lai Cheung
       Marie Killmond
       DAVIS POLK & WARDWELL LLP
       450 Lexington Avenue
       New York, NY 10017
       (212) 450-4000
       rouhandeh@davispolk.com
       james.mcclammy@davispolk.com
       diane.lucas@davispolk.com
       chui-lai.cheung@davispolk.com
       marie.killmond@davispolk.com

       *Counsel for Plaintiffs R.M. and A.B.*