# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| R.M., by and through next friend Elfego Maldonado Estrada, and A.B., by and through next friend Kadijah Hutchinson-McLean, on behalf of themselves and all others similarly situated,<br><br>                     Plaintiffs,<br><br>                  - vs -<br><br>NEW YORK STATE OFFICE OF MENTAL HEALTH; ANN MARIE T. SULLIVAN, in her official capacity as the Commissioner of the New York State Office of Mental Health; the NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE; MICHELLE MORSE, in her official capacity as the Commissioner of the New York City Department of Health and Mental Hygiene; and NEW YORK CITY HEALTH AND HOSPITALS CORPORATION;<br><br>                  Defendants. | C.A. No. 25-cv-06667 (AKH) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 2

    A.   OMH Denies Plaintiffs and Class Members Timely Competency Restoration Services by Delaying Transfer of People Committed to Their Care for Months ................................. 2

    B.   Prolonged Confinement in New York City Jails Causes Irreparable Harm to People Who Are Unfit to Stand Trial ................................................................................................ 7

ARGUMENT ......................................................................................................................... 15

    I.   PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THEIR DUE PROCESS CHALLENGE TO THE DELAYS IN TRANSFER TO COMPETENCY RESTORATION FOR PEOPLE FOUND UNFIT TO STAND TRIAL. ................................. 16

    II.   UNCONSTITUTIONAL INCARCERATION INFLICTS IRREPARABLE HARM ON THE PLAINTIFFS ........................................................................................................... 21

        A.   Constitutional Violation ................................................................................. 22

        B.   Risk of Serious Injury ................................................................................... 23

    III.   A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST ........................ 24

CONCLUSION ....................................................................................................................... 26

PAGE(S)

CASES

*Advoc. Ctr. For Elderly & Disabled v. La. Dep't of Health & Hosps.*,
731 F. Supp. 2d 603 (E.D. La. 2010) ............................................................... *passim*

*Ahlschlager v. Imhof*,
2024 WL 5168732 (E.D.N.Y. Dec. 19, 2024) ........................................................ 23

*Arias v. Decker*,
459 F. Supp. 3d 561 (S.D.N.Y. 2020) ............................................................ 22, 25

*Averhart v. Annucci*,
2021 WL 2383556 (S.D.N.Y. June 10, 2021) .................................................. 25, 26

*Barbecho v. Decker*,
2020 WL 1876328 (S.D.N.Y. Apr. 15, 2020) ........................................................ 22

*Brown v. Maher*,
597 F. Supp. 3d 541 (N.D.N.Y. 2022) ...................................................................24

*Charles W. v. Maul*,
214 F.3d 350 (2d Cir. 2000) ................................................................................. 17

*Conn. Dep't of Env't Prot. v. O.S.H.A.*,
356 F.3d 226 (2d Cir. 2004) ................................................................................. 22

*Coronel v. Decker*,
449 F. Supp. 3d 274 (S.D.N.Y. 2020) .................................................................. 23

*Deide v. Day*,
676 F. Supp. 3d 196 (S.D.N.Y. 2023) .................................................................. 25

*Henrietta D. v. Giuliani*,
119 F. Supp. 2d 181 (E.D.N.Y. 2000) .................................................................. 23

*Hernandez Aguilar v. Decker*,
482 F. Supp. 3d 139 (S.D.N.Y. 2020) .................................................................. 22

*Jackson v. Indiana*,
406 U.S. 715 (1972) .............................................................................. 16, 17, 18

*Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*,
596 F.2d 70 (2d Cir. 1979) ............................................................................ 21, 22

*J.K. v. Alaska*,
469 P.3d 434 (Alaska Ct. App. 2020) .................................................................. 20

*Jolly v. Coughlin*,
   76 F.3d 468 (2d Cir. 1996) ............................................ 22

*Marquez v. Annucci*,
   2020 WL 3871362 (S.D.N.Y. July 9, 2020) ..................... 22

*Mullins v. City of New York*,
   626 F.3d 47 (2d. Cir 2010) ...........................................7

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015) ..................................... 15, 16

*Nken v. Holder*,
   556 U.S. 418 (2009) ...................................................24

*Oregon Advocacy Ctr. v. Mink*,
   322 F.3d 1101 (9th Cir. 2003) ......................... 18, 19, 20, 23

*Paykina ex rel. E.L. v. Lewin*,
   387 F. Supp. 3d 225 (N.D.N.Y. 2019) ........................... 23

*Pearson Educ., Inc. v. Labos*,
   2019 WL 1949820 (S.D.N.Y. Apr. 23, 2019) ................... 21

*People v. L.G.*,
   208 N.Y.S.3d 469 (N.Y. Sup. Ct. 2024), *aff'd as modified*,
   238 A.D.3d 568 (1st Dept. 2025) ......................... 7, 25, 26

*People v. M.T.*,
   86 Misc. 3d 1212(A) (N.Y. Sup. Ct. 2025) ...................... 7, 26

*Reynolds v. Giuliani*,
   35 F. Supp. 2d 331 (S.D.N.Y. 1999) ............................ 24

*SEC v. Citigroup Global Mkts. Inc.*,
   673 F.3d 158 (2d Cir. 2012) ...................................... 24

*Strouchler v. Shah*,
   891 F. Supp. 2d 504 (S.D.N.Y. 2012) ........................... 15

*Terry ex rel. Terry v. Hill*,
   232 F. Supp. 2d 934 (E.D. Ark. 2002) .......................... 23

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
   60 F.3d 27 (2d Cir. 1995) ......................................... 21

*Trueblood v. Washington State Dep't of Soc. & Health Servs.*,
   101 F. Supp. 3d 1010 (W.D. Wash. 2015), *modified*, 2015 WL 13664033 (W.D. Wash.
   May 6, 2015), *and vacated and remanded on other grounds*,
   822 F.3d 1037 (9th Cir. 2016) ................................... 20

*United States v. Brennan*,
  928 F.3d 210 (2d Cir. 2019) ................................................................ 17

*United States v. Magassouba*,
  544 F.3d 387 (2d Cir. 2008) ............................................................ 17, 18

*V.W. by & through Williams v. Conway*,
  236 F. Supp. 3d 554 (N.D.N.Y. 2017) .................................................. 23

STATUES & RULES

N.Y. Crim. Proc. Law § 730 ............................................................ *passim*

N.Y. Crim. Proc. Law § 730.50 ............................................................ 4

OTHER AUTHORITIES

U.S. Const. amend. XIV .................................................... 16, 17, 22, 25

*CHS Injury Reporting: December 2024* (Mar. 12, 2025),
  https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc//CHS-and-DOC-Joint-
  Injury-Report-December-2024.pdf ..........................................................14

*CHS Injury Reporting: November 2024* (Mar. 7, 2025),
  https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc//CHS-and-DOC-Joint-
  Injury-Report-November-2024.pdf ..........................................................14

*CHS Injury Reporting: October 2024* (Mar. 3, 2025),
  https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-
  doc/chs_and_doc_joint_injury_report_october_2024.pdf .................................... 14

*CHS Injury Reporting: September 2024* (Dec. 23, 2024),
  https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-
  doc/chs_and_doc_joint_injury_report_september_2024.pdf ................................. 14

*CHS Injury Reporting: August 2024* (Dec. 18, 2024),
  https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/CHS-and-DOC-Joint-Injury-
  Report-August-2024.pdf .................................................................. 14

*CHS Injury Reporting: July 2024* (Dec. 13, 2024),
  https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/CHS-and-DOC-Joint-Injury-
  Report-July-2024.pdf....................................................................14

*CHS Injury Reporting: June 2024* (Dec. 5, 2024),
  https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/CHS-and-DOC-Joint-Injury-
  Report-June-2024.pdf....................................................................14

*CHS Injury Reporting: May 2024* (Oct. 14, 2024),
https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/chs_and_doc_joint_injury_report_may_2024.pdf...........................................................14

*CHS Injury Reporting: April 2024* (Aug. 12, 2024),
https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/chs-doc-joint-injury-report-202404.pdf....................................................................................................................14

*CHS Injury Reporting: March 2024* (Jun. 24, 2024),
https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/chs-doc-joint-injury-report-202403.pdf ...................................................................................................................14

*CHS Injury Reporting: February 2024* (May 6, 2024),
https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/CHS-and-DOC-Joint-Injury-Report-February-2024.pdf ...............................................................................................14

*CHS Injury Reporting: January 2024* (Mar. 19, 2024),
https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/chs-and-doc-joint-injury-report-january-2024.pdf ...............................................................................................14

Correctional Health Services, *CHS Patient Profile for Individuals in the New York City Jail System* (July 2025), https://hhinternet.blob.core.windows.net/uploads/2025/08/correctional-health-services-patient-profile-metrics-july-2025.pdf..............................................................11

*Governor Hochul Announces 125 New Psychiatric Beds Opened at State-Operated Facilities Since December 2024*, NY.gov, https://www.governor.ny.gov/news/governor-hochul-announces-125-new-psychiatric-beds-opened-state-operated-facilities-december..................3

Independent Rikers Commission, A Path Forward: The Blueprint to Close Rikers (Mar. 2025),
https://static1.squarespace.com/static/5b6de4731aef1de914f43628/t/6802a228b5619e3f5bafd0cf/1745003055967/Independent+Rikers+Commission+Blueprint+to+Close+Rikers+Island+March+2025.pdf .........................................................................................................................7

Jan Ransom, Sarah Kerr, Caroline Kim, and Malachy Browne, *Footage of Inmate Suicide Captures Dysfunction on Rikers Island,* N.Y. Times (Jul. 14, 2025),
https://www.nytimes.com/2025/07/14/nyregion/rikers-island-inmate-suicide-deaths-federal-takeover.html ...............................................................................................................13

*Known Deaths In Custody*, NYC.GOV, https://comptroller.nyc.gov/services/for-the-public/department-ofcorrection-doc/dashboard......................................................................12

New York City Board of Correction, *An Assessment of the Use of Chemical Agents in New York City Jails* (Feb. 21, 2024), https://www.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/An-Assessment-of-the-Use-of-Chemical-Agents-in-NYC-Jails-Final.pdf...............10

New York City Board of Correction, *Preliminary Report to the Board* (May 12, 2022),
    https://www.documentcloud.org/documents/22088795-dashawn-carter-preliminary-board-
    report-final-updated-51322_redacted/ ....................................................................................13

New York City Department of Correction, *Quarterly Emergency Lock-In Report FY25 Q3*,
    https://www.nyc.gov/assets/doc/downloads/pdf/FY25_Q3.pdf................................................11

Office of Special Investigation, *Report on the Investigation into the Death of Michael Nieves*
    (2024), https://ag.ny.gov/sites/default/files/reports/osi-michael-nieves-report.pdf ...............13

Paige Oamek, *Another Rikers death puts NYC on pace to double jail fatalities from all of 2024*,
    Gothamist (Aug. 23, 2025), https://gothamist.com/news/another-rikers-death-puts-nyc-on-
    pace-to-double-jail-fatalities-from-all-of-2024 ......................................................................12

Reuven Blau, Latest Rikers Death Prompts Suspensions as Family Struggles for Answers, The
    City (Aug. 25, 2025), https://www.thecity.nyc/2025/08/25/ardit-billa-rikers-death-
    department-correction-suspensions/ .........................................................................................12

Reuven Blau, Rosa Goldensohn, *Dashawn Carter Missed Nearly 100 Clinic Appointments at
    Rikers Before Dying, Records Show*, The City (Jul. 24, 2022),
    https://www.thecity.nyc/2022/07/24/dashawn-carter-missed-clinic-rikers-island/.................13

*Status Report by the* Nunez *Independent Monitor* (Apr. 18, 2024),
    https://www.nyc.gov/assets/doc/downloads/Nunez/2024-04-18%20-
    -%20Monitor's%20Report.pdf ............................................................................................... 10

*Status Report by the* Nunez *Independent Monitor* (Jul. 10, 2023),
    https://www.nyc.gov/assets/doc/downloads/Nunez/
    Special%20Report_Filed_July_10_2023.pdf........................................................................ 10

## PRELIMINARY STATEMENT

This motion asks the Court to order Defendant Ann Sullivan, Commissioner of the New York State Office of Mental Health ("OMH"), to provide timely and effective competency restoration services so that people found unfit to stand trial are not forced to languish untreated on Rikers Island. In New York City in 2024, half of all people charged with felonies and committed to OMH under New York Criminal Procedure Law § 730 ("CPL 730") waited 81 or more days in jail before they began the treatment and legal education services that restored their competence to stand trial. That same year, 130 people faced wait times longer than 100 days. And 11 people faced a delay longer than six months, including one individual whose treatment OMH delayed for nine months.

Rather than receiving treatment at a hospital immediately after their CPL 730 order, people are typically held for months at the notoriously violent Rikers Island, where medical and mental health care are abysmal, and people rapidly deteriorate. While people wait for their court-mandated treatment, their criminal proceedings grind to a halt. Some individuals, like Plaintiff R.M., who were living in the community when the court issued a commitment order for hospital-based competency restoration services, were remanded to jail and were then forced to wait—and, in some instances, continue to wait—for these services sitting in jail.

The lengthy delays in the provision of competency restoration services violate the due process rights of Plaintiffs and a putative class (hereinafter, "class members") of people who are charged with felonies, have been committed to OMH custody pursuant to a CPL 730 order, but remain detained on Rikers Island. Due process requires that the nature and duration of their confinement bear a reasonable relation to the purpose of their commitment to OMH's custody, which is competency restoration. No such relationship exists here. Approximately 100 people, including Plaintiff A.B., are currently jailed on Rikers as they wait for competency restoration

1

services. A.B. remains in jail 155 days and counting since his commitment and still has no clarity on his transfer date. Plaintiff R.M. languished on Rikers Island for 166 days before he was finally transferred on Monday, August 25, 2025 to an OMH hospital, just days before the filing of this motion. For months, Plaintiffs and class members have gone without receiving the services that courts have deemed necessary. And dangerous jail conditions have exposed and continue to expose them to the risk of physical and mental harm, which is wholly incompatible with the therapeutic goals of competency restoration.

OMH routinely denies Plaintiffs and class members timely competency restoration services—at great risk to their health and safety—due to widespread failures in the state's competency restoration system. Without preliminary relief, this practice will continue to prolong the harmful detention of an already vulnerable group of people, primarily poor people of color, who require the competency restoration services.

## STATEMENT OF FACTS

Plaintiff A.B. brings this motion for a preliminary injunction on his own behalf, and both Plaintiffs A.B. and R.M. further bring this motion on behalf of a Delays Class as defined in Paragraph 65 of the Complaint.

### A. *OMH Denies Plaintiffs and Class Members Timely Competency Restoration Services by Delaying Transfer of People Committed to Their Care for Months*

Plaintiffs and class members have been found unfit to stand trial pursuant to New York Criminal Procedure Law § 730, which means a court has confirmed the findings of doctors from Correctional Health Services ("CHS"), a division of New York City Health + Hospitals, who, after conducting an evaluation, found that each Plaintiff and class member was unable to understand the criminal proceedings against them and assist their attorney in preparing a defense, and required

competency restoration services—namely, psychiatric treatment and education.[1] Based on these findings, a court ordered the commitment of Plaintiffs R.M. and A.B., and the class members they seek to represent, to the custody of OMH for care and treatment.[2]

After OMH received the commitment orders, it designated the hospitals where Plaintiffs and class members will be treated.[3] At these hospitals, OMH's policy is to provide a "psychosocial psychiatric rehabilitation approach to treatment" that consists of individualized, comprehensive treatment in a "generally therapeutic milieu."[4] As a matter of policy, OMH only places people charged with felonies in "secure" hospitals—Kirby Forensic Psychiatric Center, Mid-Hudson Forensic Psychiatric Center, Central New York Psychiatric Center, and Rochester Psychiatric Center—with the lone exception of a 25-bed unit at a non-secure hospital, Manhattan Psychiatric Center.[5] Together, these facilities have approximately 850 beds and serve not only people who are found unfit to stand trial, but other categories of individuals, such as incarcerated people who require hospital care.[6] They typically operate at full capacity, however, leading to severe delays in competency restoration services.[7] An OMH official testified in 2024 that OMH lacks the staffing and bed capacity to provide timely competency restoration treatment.[8] As a result, hospital admissions are "rarely immediate, and can often take weeks or months."[9]

---

[1] Declaration of Shona Hemmady in Support of Class Certification ("Hemmady Class Cert. Decl."), Ex. A (R.M. Commitment Order), ECF 13-1; Hemmady Class Cert. Decl., Ex. B (A.B. Commitment Order), ECF 13-2.
[2] *Id.*
[3] Declaration of James I. McClammy in Support of Class Certification ("McClammy Decl."), Ex. C (OMH Forensic Coordinator Manual) at 3-6, ECF 11-3.
[4] Declaration of Shona Hemmady in Support of Preliminary Injunction ("Hemmady PI Decl."), Ex. 16 (Plan for Patient Care, Kirby Forensic Psychiatric Center) at 34-36.
[5] McClammy Decl., Ex. F (Schatzel Aff. (Gibbs)) ¶¶ 3, 13, ECF 11-6.
[6] *See, e.g.*, Hemmady Class Cert. Decl., Ex. E (May 2024 OMH Emails) at 1-4, ECF 13-5 (indicating lack of bed availability as a cause of delayed placement.); *Governor Hochul Announces 125 New Psychiatric Beds Opened at State-Operated Facilities Since December 2024*, NY.gov, https://www.governor.ny.gov/news/governor-hochul-announces-125-new-psychiatric-beds-opened-state-operated-facilities-december (last visited August 12, 2025).
[7] McClammy Decl., Ex. F (Schatzel Aff. (Gibbs)) ¶ 6, ECF 11-6.
[8] *Id.* ¶¶ 6-9.
[9] *Id.* ¶ 6.

Because OMH lacks capacity at its hospitals, OMH communicates to New York City Department of Correction ("DOC") officials that there are no vacancies, leading DOC to hold people in the jails on Rikers Island, at OMH's behest.[10] OMH adds those same people to a wait list for their designated hospital.[11] Approximately 100 people are currently on a wait list for hospital treatment and jailed on Rikers Island.[12] They include people like Plaintiff R.M., who resided in the community and was regularly attending court appearances when a court decided that competency restoration was necessary. Under section 730.50 of the New York Criminal Procedure Law, unincarcerated people like R.M. are immediately remanded to jail once the court issues a commitment order for hospital-based competency restoration.

Wait times have grown extreme in recent years. The median delay for competency restoration increased six-fold between 2018 and 2024, from 13 days in 2018 to 81 days

---

[10] *See* Hemmady PI Decl., Ex. 15 (DOC Transportation Division Emails).
[11] McClammy Decl., Ex. F (Schatzel Aff. (Gibbs)) ¶¶ 5-6.
[12] Declaration of Leighann Starkey in Support of Class Certification ("Starkey Decl.") ¶ 9, ECF 14.

in 2024.[13] In 2023, women waited a median of 102 days for a transfer.[14]



Monthly median wait time for competency restoration, 2016-2024
Overlaid with yearly median wait time

As wait times have climbed, so too has the number of people experiencing delays. In 2024, the most recent year where a full year of data is available, 293 people waited longer than 50 days, and 130 people waited longer than 100 days.[15] The percentage of people delayed longer than 100 days increased from 1% in 2016 to 32% in 2024.[16]

Plaintiff R.M. was found unfit to stand trial on March 12, 2025, and was removed from the community and taken to Rikers Island that day.[17] He was jailed for 166 days prior to his transfer to the hospital, just days before this motion was filed. For all 166 days, R.M. received none of the competency restoration services ordered by the court.[18] A.B. was found unfit to stand trial on March 26, 2025, and has been jailed on Rikers Island for 155 days.[19] A.B. has also not received

[13] Starkey Decl. ¶¶ 13-14, ECF 14.
[14] Id. ¶ 15.
[15] Id. ¶¶ 11–12.
[16] Id.
[17] Hemmady Class Cert. Decl., Ex. A (R.M. Commitment Order), ECF 13-1.
[18] Hemmady PI Decl. ¶ 3.
[19] Hemmady Class Cert. Decl., Ex. B (A.B. Commitment Order), ECF 13-2.

any competency restoration services ordered by the court and is still waiting for transfer to an OMH hospital.[20]

Some individuals are found unfit more than once during their criminal proceeding because they decompensate after returning to Rikers Island from the hospital. They are then put through the 730 process a second time and, as a result, are subject to multiple extreme periods of delay as they wait for competency restoration services. Between 2018 and the first three quarters of 2023, an average of 21% of people from New York City admitted to an OMH hospital under a CPL 730 order had to be restored more than once.[21] J.B., a Black man in his sixties with a diagnosis of schizophrenia and cognitive limitations,[22] waited more than 249 days for competency restoration services combined—111 days after his first commitment order, and more than 138 days after a second commitment order.[23]

During this delay period, class members remain at Rikers Island with no clear transfer date and no progress in their criminal proceedings. Public defenders expend their limited time and resources contacting OMH to get clarification on hospital admission dates and/or to urge immediate admission to the hospital for clients who are deteriorating.[24] These delays have strained the relationship between public defenders and their clients, who do not understand the reasons for the delays, seek help from public defenders with their situation, and grow anxious or frustrated

---

[20] Hemmady PI Decl. ¶ 4; *id.*, Ex. 14.
[21] *Id.*, Ex. 17 (OMH FOIL Response No. 23-401).
[22] *Id.*, Ex. 18 (J.B. Discharge Summary) at 5; *id.*, Ex. 19 (J.B. Psychological Report) at 12.
[23] *Id.*, Ex. 25 (J.B. Commitment Order 2023); *id.*, Ex. 26 (J.B. PIC Lookup); *id.*, Ex. 27 (J.B. Commitment Order 2024); *id.*, Ex 28 (OMH email regarding transfer).
[24] *See, e.g.*, Declaration of Jeffrey Berman in Support of Motion for Preliminary Injunction ("Berman Decl.") ¶ 7; Declaration of Stacy Meisner in Support of Motion for Preliminary Injunction ("Meisner Decl.") ¶ 4; Declaration of Florence Morgan in Support of Motion for Preliminary Injunction ("Morgan Decl.") ¶¶ 2, 4; Declaration of Susan Platis in Support of Preliminary Injunction ("Platis Decl.") ¶¶ 2, 4.

with the limbo they are in.[25] In response to advocacy from attorneys, OMH officials do not respond, or provide vague answers.[26] DOC officials are similarly kept in the dark and simply wait for instructions from OMH.[27]

These delays are an exceptional waste of public resources. To confine an individual on Rikers costs approximately $1,110 per person per day[28] — a staggering sum that could be better spent on timely care and treatment. For years, OMH has closely tracked the steadily increasing delay in hospital admissions. The Legal Aid Society advocated to OMH for systemic changes to address this long-standing problem,[29] and state court judges have voiced concern about the unacceptable delays[30]—all to no avail.

**B.** ***Prolonged Confinement in New York City Jails Causes Irreparable Harm to People Who Are Unfit to Stand Trial***

Rikers Island has earned its reputation for brutality and death. So troubled by that reputation, one judge remarked: "[G]iven the current situation at Rikers, the court would be remiss if it did not acknowledge that Rikers is, at present, one of the worst places for mentally ill individuals [] to be for any length of time, let alone a prolonged period."[31] While trapped on Rikers Island pending competency restoration services, people experience fear, uncertainty, neglect, and violence.[32]

---

[25] Platis Decl. ¶ 8; Declaration of Jamie Niskanen-Singer in Support of Motion for Preliminary Injunction ("Niskanen-Singer Decl.") ¶ 8. This Court may consider hearsay evidence in ruling on this Motion for preliminary relief. *See Mullins v. City of New York*, 626 F.3d 47, 52 (2d. Cir 2010).

[26] *See* Berman Decl. ¶¶ 11, 13.

[27] *See* Hemmady PI Decl., Ex. 15 (DOC Transportation Division Emails).

[28] *See* Independent Rikers Commission, A Path Forward: The Blueprint to Close Rikers, at 46 (Mar. 2025), https://static1.squarespace.com/static/5b6de4731aef1de914f43628/t/6802a228b5619e3f5bafd0cf/1745003055967/Independent+Rikers+Commission+Blueprint+to+Close+Rikers+Island+March+2025.pdf (last accessed Aug. 28, 2025) (indicating the average annual cost of incarceration per person at Rikers is $400,000, which corresponds to an average daily rate of approximately $1,096).

[29] Hemmady Class Cert. Decl., Ex. C (May 2024 OMH Emails), ECF 13-5.

[30] *People v. L.G.*, 208 N.Y.S.3d 469 (N.Y. Sup. Ct. 2024), *aff'd as modified*, 238 A.D.3d 568 (1st Dept. 2025); *People v. M.T.*, 86 Misc. 3d 1212(A) (N.Y. Sup. Ct. 2025) (unreported).

[31] *L.G.*, 208 N.Y.S.3d at 476.

[32] *See* Hemmady PI Decl., Ex 24 (G.S. Declaration) ¶¶ 6-9.

Rikers Island is a destabilizing and inappropriate environment for people with psychiatric disabilities. As Plaintiffs' expert clinical psychologist Dr. Lauren Kois notes, the jail environment inherently increases the vulnerability of people with serious mental illness.[33] Overcrowding, excessive noise levels, confined intake areas, minimal natural light, restricted outdoor access, few spaces for therapeutic interventions, and chronic lack of resources are adverse to a therapeutic environment.[34] Limited treatment access combined with environmental stressors can trigger significant clinical deterioration, which manifests as more acute symptoms, including self-neglect and self-harm.[35] Dr. Kois notes the practice of "administrative segregation," where corrections staff lock individuals in a room or cell for 22 or more hours a day "to monitor or control individuals whose psychiatric symptoms manifest as institutional rule violations," can "exacerbate existing symptoms and psychological vulnerabilities."[36] People with psychiatric disabilities are also subjected to "deadlocking" a similar, but unauthorized practice.[37] Dr. Kois further notes that in jail, people with serious mental illness experience disproportionate rates of peer victimization, rule violations leading to discipline and segregation, use of force by corrections staff, and self-injurious behaviors which elevate the risk of suicide.[38]

The risk of peer victimization is particularly high for people with psychiatric disabilities. Both Plaintiffs R.M. and A.B. have been injured by other incarcerated people who attacked them. The physical injuries that Plaintiffs R.M. and A.B. experienced—being punched at random—are common on Rikers Island and well known to Defendants. In February 2022, J.B., who had not

---

[33] *See* Kois Decl. ¶¶ 50-51, 53.
[34] *Id.* ¶¶ 50-51.
[35] *Id.* ¶ 53.
[36] *Id.* ¶ 58.
[37] *Id.* ¶ 83. Deadlocking is an arbitrary practice of cell confinement without any official documentation of the reason for the confinement and without any oversight. *See* Declaration of Justyna Rzewinski ("Rzewinski Decl.") ¶¶ 14-18.
[38] *See* Kois Decl. ¶ 53.

been placed in a specialized mental health unit despite extensive psychiatric treatment history, was repeatedly punched in the face by another incarcerated individual.[39] As a result of the attack, J.B. suffered bruises and lacerations to his face.[40] J.B. would be later found unfit and experience more than 249 days of delay in receiving competency restoration services.[41]

N.P., a 48-year-old Black man with psychiatric disabilities, was also attacked at Rikers. In June 2021, a few weeks after his arrest, N.P. was stabbed in the forehead, neck, and torso by multiple incarcerated individuals while detained at the Anna M. Kross Center on Rikers Island.[42] For many years prior to his arrest, N.P. received mental health treatment, including when hospitalized at an OMH civil hospital.[43] N.P. was later found unfit to proceed with trial and committed to OMH custody in January 2022, but was forced to wait 58 days before he was transferred to an OMH hospital for competency restoration services.[44]

Like Plaintiffs R.M. and A.B., many people have been severely injured while awaiting transfer to an OMH hospital. On February 6, 2024, G.S., a 54-year-old Latinx man, was assaulted and stabbed in the face, neck, and hands by another incarcerated individual while housed in a mental observation unit at Rikers Island, where CHS staff provide more monitoring than a general population unit.[45] G.S.'s injuries were so extensive that he required over 100 stitches and a blood transfusion.[46] At the time of the assault, G.S. had been waiting for 27 days for a hospital bed.[47]

---

[39] *See* Hemmady PI Decl., Ex. 19 (J.B. Psychological Report) at 3, 7, 14-15; *id.*, Ex. 20 (J.B. COD Report) at 3-4.
[40] *See Id.*, Ex. 20 (J.B. COD Report) at 4, 6, 10, 12-13, 16-17.
[41] *Id.*, Ex 25 (J.B. Commitment Order 2023), Ex 26 (J.B. PIC Lookup), Ex 27 (J.B. Commitment Order 2024), Ex 28 (OMH email regarding transfer).
[42] *See Id.*, Ex. 21 (N.P. CHS Records) at 225, 237, 244.
[43] *See Id.*, Ex. 22 (N.P. OMH Records) at 31-32; *id.*, Ex. 21 (N.P. CHS Records) at 29, 198, 208, 291-92, 296.
[44] *Id.*, Ex. 22 (N.P. OMH Records) at 15-16, 29 (indicating commitment date of January 10, 2022, and admission date of March 9, 2022).
[45] Berman Decl. ¶ 10; *id.*, Ex. 2 (G.S. CHS Record) at 214; *id.*, Ex. 4 (Apr. 2024 Email to Judge Carro.) at 1.
[46] *Id.* ¶ 10; *id.*, Ex. 2 (G.S. CHS Record) at 1.
[47] *See id.*, Ex. 1 (G.S. Commitment Order) at 1 (dated Jan. 10, 2024).

G.S. was eventually transferred to the hospital 89 days after his commitment order.[48] In response to advocacy from G.S.'s attorney, the New York Supreme Court took the exceptional step of modifying its remand order, and directed that once restored, G.S. should not be returned to Rikers Island but should be brought directly to court by the sheriff.[49]

Independent monitors have also chronicled patterns of unnecessary excessive use of force by jail staff. The monitor appointed in the *Nunez v. City of New York*, No. 11-cv-05845 (S.D.N.Y.), litigation challenging brutality in the city jails, found pervasive operational lapses "result in the widespread unnecessary and excessive use of force and imminent risk of harm to those in custody" in 2024 and noted that use of force ("UOF") rates by staff doubled in 2023 as compared to 2016.[50] Over the same period of time, the *Nunez* Monitoring Team also concluded the rate of use of force increased in the George R. Vierno Center, a facility on Rikers Island where DOC has tended to house people with psychiatric disabilities including class members.[51] Additionally, the New York City Board of Correction, which performs jail oversight, found that people with psychiatric disabilities are disproportionately victims of jail staff's use of chemical agents.[52] Contrary to the Department's own "anticipated use of force protocols," the Board found no evidence of any "effort

---

[48] *See Id.* ¶ 18.

[49] *Id.*, Ex. 4 at 1; *id.*, Ex. 5 (Apr. 8, 2024 Transcript) at 2-3.

[50] *Status Report by the* Nunez *Independent Monitor* (Apr. 18, 2024), at 78, https://www.nyc.gov/assets/doc/downloads/Nunez/2024-04-18%20--%20Monitor's%20Report.pdf (last accessed Aug. 25, 2025). Brutality on Rikers Island remains so pervasive after years of monitorship that the *Nunez* Court plans to appoint an independent federal remediation manager empowered to cure the Department of Correction's failure to abide by prior remedial orders. *See* Opinion and Order Regarding Appointment of a *Nunez* Remediation Manager, *Nunez v. NYC Dep't of Corr.*, 1:11-cv-05845 (S.D.N.Y May 13, 2025) (Dkt. No. 846).

[51] *See Status Report by the* Nunez *Independent Monitor* (Jul. 10, 2023), at 181-82, https://www.nyc.gov/assets/doc/downloads/Nunez/Special%20Report_Filed_July_10_2023.pdf (last accessed Aug. 25, 2025)*;* Rzewinski Decl. ¶ 7 (describing several mental health units at GRVC).

[52] New York City Board of Correction, *An Assessment of the Use of Chemical Agents in New York City Jails*, at 9 & n.30, 16 (Feb. 21, 2024) (finding that, out of the first 50 incidents of chemical agent use in October of 2023 that Board staff identified where the person targeted was not engaged in interpersonal violence, "[n]early half . . . (n=24) involved a person with a recent history of being housed in specialized mental health units."), https://www.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/An-Assessment-of-the-Use-of-Chemical-Agents-in-NYC-Jails-Final.pdf (last accessed Aug. 26, 2025).

by DOC staff to summon a mental health professional" before deploying chemical agents "in any of the incidents reviewed."[53] The Board further detailed instances where body-worn camera recordings depicted officers spraying chemical agents at individuals who passively resisted orders while expressing "the desire to access medical care, mental health care, medication, and fears for their safety," a practice the Board described as "unnecessary and punitive."[54]

In addition to being subjected to violence, people on Rikers Island are frequently denied access to adequate medical and mental healthcare. Even though 57% of incarcerated individuals require mental health services, and approximately 21% of people have serious mental illness,[55] DOC consistently fails to ensure that people have access to jail-based mental health care. In 2023, only 49.4% of incarcerated individuals' requests for health services resulted in DOC staff producing the incarcerated individual to a CHS clinic, and only 39.5% of those productions were timely.[56] Emergency lock-ins also routinely cause delays or total cancellations of "sick call" services.[57]

Plaintiff A.B. deteriorated rapidly during his months-long detention on Rikers Island. Clinicians noted that he became more paranoid and delusional, and that they were unable to "safely manage[] and treat[]" A.B. "in a jail based setting," leading them to refer him to Bellevue Hospital in March 2025.[58] Before this, A.B. missed at least 10 medical or mental healthcare appointments due to DOC failing to escort him to the clinic.[59]

---

[53] *Id.* at 16.
[54] *Id.* at 5, 16.
[55] *See* Correctional Health Services, *CHS Patient Profile for Individuals in the New York City Jail System*, at 1 (July 2025), https://hhinternet.blob.core.windows.net/uploads/2025/08/correctional-health-services-patient-profile-metrics-july-2025.pdf (last accessed Aug. 26, 2025).
[56] McClammy Decl., Ex. G (Utilization of Sick Call in New York City Jails: Analysis of CY2023 Data) at 13, ECF 11-7.
[57] New York City Department of Correction, *Quarterly Emergency Lock-In Report FY25 Q3*, at 5–6, https://www.nyc.gov/assets/doc/downloads/pdf/FY25_Q3.pdf (last accessed Aug. 28, 2025).
[58] Hemmady PI Decl., Ex. 14 (A.B. CHS Records Excerpt) at 3.
[59] *Id.* at 4–14.

During his incarceration from March 12 until July 25, 2025, R.M. missed approximately 40 medical or mental healthcare appointments due to DOC failing to escort him to the clinic.[60] There were at least three instances when R.M. requested medical care due to a wound or medication consultation, but DOC did not produce him.[61] Such pervasive disruptions in the timely care of people with known, significant mental health treatment needs expose already vulnerable individuals to a severe risk of harm.[62]

People with psychiatric disabilities are at a higher risk of death while detained on Rikers Island. Since June 2021, 60 people have died in the custody of New York City jail officials,[63] with about half of those individuals having mental health needs.[64] Just days before this motion, Ardit Billa died while housed in one of Rikers Island's specialized mental health units, the Program for Accelerated Clinical Effectiveness (PACE) unit, and was found with feces on his body.[65] At least

---

[60] *Id.*, Ex. 13 (R.M. CHS Records Excerpt) at 3–43.

[61] *See id.* at 4, 10, 14.

[62] *See* Kois Decl. ¶¶ 55–57, 70.

[63] *See Department of Correction Dashboard: Known Deaths in Custody*, N.Y.C. DEP'T OF CORR., https://comptroller.nyc.gov/services/for-the-public/department-ofcorrection-doc/dashboard (last visited Aug. 28, 2025) (reporting 58 deaths from 2021 onward); Paige Oamek, *Another Rikers death puts NYC on pace to double jail fatalities from all of 2024*, GOTHAMIST (Aug. 23, 2025), https://gothamist.com/news/another-rikers-death-puts-nyc-on-pace-to-double-jail-fatalities-from-all-of-2024 (noting the death of an additional person—Ariel Quidone—whom DOC excluded from its list of deaths); Reuven Blau, "Latest Rikers Death Prompts Suspensions as Family Struggles for Answers," THE CITY (Aug. 25, 2025), https://www.thecity.nyc/2025/08/25/ardit-billa-rikers-death-department-correction-suspensions (reporting one death in a PACE unit on August 23, 2025).

[64] *See* McClammy Decl., Ex. J (BOC Second Report and Recommendations, 2023 Deaths), ECF 11-10 (reporting the death of four people from mid-July to December 2023, all of whom had serious mental illnesses); McClammy Decl., Ex. K (BOC First Report and Recommendations, 2023 Deaths), ECF 11-11 (reporting the death of four people from January through early July 2023, two of whom had serious mental illnesses); McClammy Decl., Ex. L (BOC Third Report and Recommendations, 2022 Deaths), ECF 11-12 (reporting the death of seven people from mid-August to December 2022, three of whom had serious mental illnesses); McClammy Decl., Ex. M (BOC Second Report and Recommendations, 2022 Deaths), ECF 11-13 (reporting the death of nine people from May through mid-August 2022, seven of whom had serious mental illnesses); McClammy Decl., Ex. N (BOC Report and Recommendations, 2021 Deaths), ECF 11-14 (reporting the death of 10 people in 2021, at least six of whom had serious mental illnesses); McClammy Decl., Ex. O (BOC Report and Recommendations, February & March 2022 Deaths), ECF 11-15 (reporting the death of three people from February to March 2022, one of whom had serious mental illness).

[65] Blau, *supra* note 63.

four deaths were of individuals who were subject to CPL 730 procedures.[66] Prior to their deaths, individuals lacked access to medical appointments or were deprived of adequate care. For example, after being found unfit to stand trial, Michael Nieves waited two months in jail before transfer to an OMH hospital for competency restoration.[67] In August 2022, Mr. Nieves, who had returned to Rikers following competency restoration treatment at the hospital, committed suicide in a PACE unit.[68] He sliced his neck open and bled out while corrections staff stood idly by and offered no assistance.[69] Reviewing the 2022 suicide of Dashawn Carter, the Board of Corrections report noted, "CHS records indicate that during those two incarcerations [for a total of 27 months], Mr. Carter missed a combined total of 92 medical appointments, 76 instances due to [DOC's] failure to escort him to the clinic."[70] Following competency restoration treatment, Dashawn Carter was returned to Rikers Island and placed in a general population unit equipped with bars, despite jail officials' knowledge of his mental health history.[71] Mr. Carter committed suicide two days later by hanging himself with a bedsheet tied to a window bar.[72]

---

[66] *See* McClammy Decl., Ex. J (BOC Second Report and Recommendations, 2023 Deaths), ECF 11-10 (reporting the death of Donny Ubiera); McClammy Decl., Ex. K (BOC First Report and Recommendations, 2023 Deaths), ECF 11-11 (reporting the death of Rubu Zhao); McClammy Decl., Ex. L (BOC Third Report and Recommendations, 2022 Deaths), ECF 11-12 (reporting the death of Michael Nieves); McClammy Decl., Ex. M (BOC Second Report and Recommendations, 2022 Deaths), ECF 11-13 (reporting the death of Dashawn Carter).
[67] McClammy Decl., Ex. L (BOC Third Report and Recommendations, 2022 Deaths), ECF 11-12.
[68] *See id.* (reporting the death of Michael Nieves); *see also* Office of Special Investigation, *Report on the Investigation into the Death of Michael Nieves*, at 2 (2024), https://ag.ny.gov/sites/default/files/reports/osi-michael-nieves-report.pdf (last visited Aug. 28, 2025).
[69] *See* Office of Special Investigation, *Report on the Investigation into the Death of Michael Nieves*, at 2 (2024), https://ag.ny.gov/sites/default/files/reports/osi-michael-nieves-report.pdf (last visited Aug. 28, 2025); *see also* Jan Ransom, Sarah Kerr, Caroline Kim, & Malachy Browne, *Footage of Inmate Suicide Captures Dysfunction on Rikers Island*, N.Y. TIMES (Jul. 14, 2025), https://www.nytimes.com/2025/07/14/nyregion/rikers-island-inmate-suicide-deaths-federal-takeover.html.
[70] McClammy Decl., Ex. M (BOC Second Report and Recommendations, 2022 Deaths) at 4, ECF 11-13.
[71] *See id.* at 25; *see also* Reuven Blau, Rosa Goldensohn, *Dashawn Carter Missed Nearly 100 Clinic Appointments at Rikers Before Dying, Records Show*, The City (Jul. 24, 2022), https://www.thecity.nyc/2022/07/24/dashawn-carter-missed-clinic-rikers-island (last visited Aug. 28, 2025).
[72] *See* Blau, *supra*; *see also* New York City Board of Correction, *Preliminary Report to the Board*, at 5, 7 (May 12, 2022), available at https://www.documentcloud.org/documents/22088795-dashawn-carter-preliminary-board-report-final-updated-51322_redacted (last visited Aug. 28, 2025); McClammy Decl., Ex. M (BOC Second Report and Recommendations, 2022 Deaths) at 3-6, ECF 11-13.

Further, in 2024, there were more than 1,500 incidents of self-harm—head banging, hanging or attempting hanging, cutting, overdoses—including among people in specialized mental health units where CHS provides additional monitoring.[73] These incidents illustrate the profound risk to which class members are exposed while held at Rikers Island.[74]

Based on a review of CHS data, Dr. Kois found that "the New York City jail system systematically fails to provide adequate mental health care to a vulnerable population." [75] Specifically, she found a systemic failure in reliably delivering mental health care and found systemic failures even in the "most heavily staffed intensive-care psychiatric housing areas" such as the PACE units.[76] A practice of delayed and/or inadequate mental health care exposes people to irreparable harm. As Dr. Kois notes, "untreated psychotic disorders are progressive conditions

---

[73] *See CHS Injury Reporting: December 2024*, at 13 (Mar. 12, 2025), https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc//CHS-and-DOC-Joint-Injury-Report-December-2024.pdf (indicating 175 incidents of self-harm); *CHS Injury Reporting: November 2024*, at 13 (Mar. 7, 2025), https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc//CHS-and-DOC-Joint-Injury-Report-November-2024.pdf (indicating 150 incidents of self-harm); *CHS Injury Reporting: October 2024*, at 13 (Mar. 3, 2025), https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/chs_and_doc_joint_injury_report_october_2024.pdf (indicating 138 incidents of self-harm); *CHS Injury Reporting: September 2024*, at 13 (Dec. 23, 2024), https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/chs_and_doc_joint_injury_report_september_2024.pdf (indicating 138 incidents of self-harm); *CHS Injury Reporting: August 2024*, at 13 (Dec. 18, 2024), https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/CHS-and-DOC-Joint-Injury-Report-August-2024.pdf (indicating 120 incidents of self-harm); *CHS Injury Reporting: July 2024*, at 13 (Dec. 13, 2024), https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/CHS-and-DOC-Joint-Injury-Report-July-2024.pdf (indicating 113 incidents of self-harm); *CHS Injury Reporting: June 2024*, at 13 (Dec. 5, 2024), https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/CHS-and-DOC-Joint-Injury-Report-June-2024.pdf (indicating 109 incidents of self-harm); *CHS Injury Reporting: May 2024*, at 13 (Oct. 14, 2024), https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/chs_and_doc_joint_injury_report_may_2024.pdf (indicating 105 incidents of self-harm); *CHS Injury Reporting: April 2024*, at 13 (Aug. 12, 2024), https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/chs-doc-joint-injury-report-202404.pdf (indicating 107 incidents of self-harm); *CHS Injury Reporting: March 2024*, at 13 (Jun. 24, 2024), https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/chs-doc-joint-injury-report-202403.pdf (indicating 135 incidents of self-harm); *CHS Injury Reporting: February 2024*, at 13 (May 6, 2024), https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/CHS-and-DOC-Joint-Injury-Report-February-2024.pdf (indicating 133 incidents of self-harm); *CHS Injury Reporting: January 2024*, at 13 (Mar. 19, 2024), https://www.nyc.gov/assets/boc/downloads/pdf/Reports/chs-doc/chs-and-doc-joint-injury-report-january-2024.pdf (indicating 143 incidents of self-harm).

[74] *See* Kois Decl. ¶ 53 (noting that "[t]he jail milieu—characterized by disorder and therapeutic limitations—combined with structural barriers to care" can trigger decompensation that manifests as self-destructive behavior).

[75] *Id.* ¶ 70.

[76] *Id.* ¶¶ 75-82.

that deteriorate without appropriate psychiatric intervention, leading to increasingly severe symptomatology, greater cognitive impairment, and more profound functional deficits over time."[77] The longer a person's psychiatric treatment needs are unmet, the more "entrenched and treatment-resistant" their illnesses become and the harder it is for them to recover, reducing the likelihood of successful competency restoration.[78] Segregation practices used on Rikers Island compound the harm that Plaintiffs and class members experience, as research has "consistently shown" that isolation "cause[s] severe psychological decompensation in the form of self-harm, suicide attempts, psychiatric crises requiring hospitalization, and behavioral infractions that perpetuate a destructive cycle of continued isolation."[79] Therefore, Dr. Kois concluded that "documented conditions at Rikers Island are not merely inadequate for competence restoration—they are counterproductive to the therapeutic goals that restoration programming is designed to accomplish."[80]

## ARGUMENT

Plaintiffs seek an injunction ordering Defendant Sullivan to provide timely and effective competency restoration services to Plaintiffs and class members.[81] In cases where plaintiffs seek an alteration of the status quo in their preliminary injunction, as here, a plaintiff must show (1) "a clear or substantial" likelihood of success on the merits," (2) a "strong showing of irreparable harm" in the absence of preliminary relief, and (3) that such an injunction "is in the public interest." *N.Y.*

---

[77] *Id.* ¶ 62.
[78] *Id.* ¶ 62; *see also id.* ¶¶ 90-92.
[79] *Id.* ¶ 86.
[80] *Id.* ¶ 87.
[81] On August 12, 2025, Plaintiffs moved for class certification. (*See* Mot. to Certify Class, ECF 9.) When the Court rules on the motion for preliminary injunction, it "may conditionally certify the class or otherwise award a broad preliminary injunction, without a formal class ruling, under its general equity powers." *Strouchler v. Shah*, 891 F. Supp. 2d 504, 517 (S.D.N.Y. 2012) (citation omitted).

*ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (citations and internal quotation marks omitted).

Plaintiffs and class members meet each factor. They are substantially likely to succeed on the merits because their prolonged confinement in jail without competency restoration services in conditions that thwart their restoration bears no reasonable relation to the very purpose of their commitment—competency restoration—under *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). They suffer irreparable harm each day they are denied necessary treatment to restore their competence and are instead incarcerated in jail where they are subjected to brutality and neglect that causes physical and psychiatric harm. Further, Plaintiffs establish irreparable harm as they allege that their prolonged jail confinement violates the due process clause of the Fourteenth Amendment to the U.S. Constitution. Granting a preliminary injunction is in the public interest because it will further the state's interest in disposing of criminal matters and administering an efficient mental health system.

## I. PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THEIR DUE PROCESS CHALLENGE TO THE DELAYS IN TRANSFER TO COMPETENCY RESTORATION FOR PEOPLE FOUND UNFIT TO STAND TRIAL.

Plaintiffs are substantially likely to succeed on their due process challenge, *N.Y. ex rel. Schneiderman*, 787 F.3d at 650 (citations omitted), because the months-long confinement of Plaintiffs and class members in New York City jails bears no "reasonable relation to the purpose for which [they are] committed," which is competency restoration. *Jackson*, 406 U.S. at 738. In *Jackson*, a deaf man with intellectual and developmental disabilities, who lacked competence to stand trial and was unlikely to ever attain competence, challenged his indefinite hospital commitment as violating his due process rights under the Fourteenth Amendment. 406 U.S. at 717-19. The Supreme Court held that a person committed after being found unfit "cannot be held more

than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." *Id.* at 738. The Court announced the standard that courts must apply when assessing the constitutionality of an individual's competency restoration commitment: "the nature and duration of commitment [must] bear some reasonable relation to the purpose for which the individual is committed." *Id.* Thus, where it is possible that a defendant may be restored and able to stand trial, the commitment must be in service of progress toward the purpose of commitment: competency restoration. *Id.* ("[E]ven if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal.").

The Second Circuit has not reviewed a claim of unconstitutionally prolonged confinement in local jails arising from the systemic failure to provide timely competency restoration services. But it has applied *Jackson* in analogous contexts. *See, e.g.*, *United States v. Brennan*, 928 F.3d 210, 213-14 (2d Cir. 2019) (applying *Jackson* in a case involving a federal criminal defendant who challenged a commitment order for a competence evaluation); *Charles W. v. Maul*, 214 F.3d 350, 358-59 (2d Cir. 2000) (applying *Jackson* in a damages case where an individual found unfit to proceed and charged with a misdemeanor offense challenged 72-hour hold policy). The only instance where the Second Circuit considered additional factors beyond the *Jackson* standard is *United States v. Magassouba*, where a criminal defendant who was unfit to proceed refused competency restoration treatment for months, and then sought an end to his confinement for treatment purposes and the dismissal of his indictment. 544 F.3d 387, 398-99 (2d Cir. 2008). Given those factual complexities and the extreme relief sought, the court applied a test similar to the speedy trial test, noting that "the concerns animating due process concerns identified in *Jackson v.*

*Indiana* are different from those informing the right to speedy trial," and ultimately declining to dismiss the indictment on due process grounds. *Id.* at 417 n.24, 419.

Here, a straightforward *Jackson* application confirms that Plaintiffs' confinement is inconsistent with due process. Under *Jackson*, Defendant Sullivan violates due process because the nature of Plaintiffs' and class members' jail confinement—the reason for their incarceration, the jail conditions to which they are subject, and the absence of appropriate competency restoration services—and the length of such confinement lack any reasonable relationship to competency restoration. As the Supreme Court held in *Jackson*, when the purpose of the confinement is competency restoration, prolonged confinement that fails to help a person attain competency violates due process. *Jackson*, 406 U.S. at 738; *see also Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1122 (9th Cir. 2003) ("Holding incapacitated criminal defendants in jail for weeks or months violates their due process rights because the nature and duration of their incarceration bear no reasonable relation to the *evaluative and restorative purposes* for which courts commit those individuals." (emphasis added)); *Advoc. Ctr. For Elderly & Disabled v. La. Dep't of Health & Hosps.*, 731 F. Supp. 2d 603, 603, 610 (E.D. La. 2010) (granting in part preliminary injunction where jail confinement bore no rational relationship to restoration of competency). When people who are unfit to stand trial are incarcerated because defendants "refuse" to admit them to the hospital, *Mink*, 322 F.3d at 1107, 1121-22, or "there is no room for them elsewhere," *Advoc. Ctr.*, 731 F. Supp. 2d at 610, and they are not provided with the care they would receive at the hospital or are exposed to punitive conditions that worsen their mental health conditions, the nature of their confinement bears no reasonable relationship to the purpose of commitment. *See Mink*, 322 F.3d at 1122; *Advoc. Ctr.*, 731 F. Supp. 2d at 613-15, 623-24.

In *Mink*, the Ninth Circuit affirmed an injunction on due process grounds that required the state to transfer people who were unfit to stand trial and detained in county jails within seven days of a judicial order of commitment. 322 F.3d at 1122-23. Analyzing the nature of plaintiffs' confinement under *Jackson*, the Ninth Circuit found that only the hospital could fulfill the purpose of competency restoration; the jails could not provide the services plaintiffs required. *Id.* at 1122. Thus, jail confinement delayed restoration, making plaintiffs' confinement not reasonably related to their purpose of commitment. *Id.* The jail's disciplinary system also harmed people and prolonged jail confinement exacerbated the risk of psychiatric decompensation and undue harm. *Id.* at 1107, 1120.

Here, as in *Jackson* and *Mink*, the purpose of Plaintiffs' commitment is *only* competency restoration. Though committed to OMH's custody for the sole reason that they lack competence to stand trial and need treatment, Plaintiffs and class members do not receive *any* competency restoration services for months on end.[82] As acknowledged in OMH testimony in 2024, the single reason for delayed treatment is OMH's lack of staff and bed capacity in its hospitals.[83] Meanwhile, Plaintiffs and class members also experience disruptions in accessing medical and mental health care, along with punitive conditions on Rikers Island.

With brutality, chronic neglect of medical and mental health treatment needs, and arbitrary, punitive practices such as "deadlocking," Rikers Island hardly provides the "therapeutic milieu" of a hospital.[84] So ill-equipped are New York City jails for meeting class members' needs that 21% of people who are restored to fitness lose competence following their return to Rikers Island,

---

[82] *See* Hemmady PI Decl. ¶¶ 3-4.
[83] McClammy Decl., Ex. E (Schatzel Aff. (Parker)) ¶¶ 6, 12, ECF 11-5.
[84] *See* Rzewinski Decl. ¶¶ 23, 26, 27; McClammy Decl., Ex. G (Utilization of Sick Call in New York City Jails); Kois Decl. ¶ 70.

as in the case of J.B.[85] This causes them to go on a merry-go-round: they are found unfit in jail again, committed to the hospital again, but confined in jail instead in another round of extreme delay. Because delayed treatment causes greater risks of suicide and poorer treatment outcomes and because conditions on Rikers Island exacerbate people's mental health conditions, prolonged jail confinement actually *thwarts* competency restoration.[86]

Under *Jackson*, egregious lengths of jail confinement further demonstrate the absence of a reasonable relation to the purpose of commitment—competency restoration. In a class action involving hospital admission delays that were on average a month and a half long in Washington, the district court found that under *Jackson*'s nature and duration standard, "seven days [was] the maximum justifiable period of incarceration absent an individualized finding of good cause to continue incarcerating that person." *Trueblood v. Wash. State Dep't of Soc. & Health Servs.,* 101 F. Supp. 3d 1010, 1022 (W.D. Wash. 2015), *modified*, 2015 WL 13664033 (W.D. Wash. May 6, 2015), *and vacated and remanded on other grounds*, 822 F.3d 1037 (9th Cir. 2016). In *Mink*, delays averaged one month long, and, as a result, the court held that state officials violated the due process rights of incompetent defendants. 322 F.3d at 1106, 1122. In *Advocacy Center*, the district court granted a preliminary injunction setting a 21-day transfer limit, stating that there was "no evidence that the decision to keep the Incompetent Detainees in parish jails for lengthy durations of time was made by any mental-health professional." *Advoc. Ctr.*, 731 F. Supp. 2d at 622. The court noted that detainees found unfit to proceed waited many months for competency restoration services. *Id.*; *see also J.K. v. Alaska*, 469 P.3d 434, 444 (Alaska Ct. App. 2020) (holding delay of 173 days violated due process).

---

[85] *See* Hemmady PI Decl., Ex. 17 at 7 (OMH FOIL Response No. 23-401).
[86] *See* Kois Decl. ¶¶ 53, 70, 87-95.

Like the 130 people who waited in 2024, Plaintiffs R.M. and A.B. already exceeded 100 days without competency restoration services.[87] In 2024, 11 people waited longer than six months.[88] As in *Mink* and *Trueblood*, such extended jail confinement is not reasonably related to the purpose of commitment, which is competency restoration. To the contrary, delaying necessary treatment "may inadvertently create a population of permanently unrestorable defendants—not because their conditions are inherently untreatable, but because the system's delays and inadequate jail-based care have allowed their psychiatric conditions to be increasingly resistant to clinical intervention."[89]

Because the nature and duration of Plaintiffs' and class members' confinement are not reasonably related to the purpose of commitment, Defendant Sullivan violates their due process rights and Plaintiffs are substantially likely to succeed on the merits of their due process claims.

## II. UNCONSTITUTIONAL INCARCERATION INFLICTS IRREPARABLE HARM ON THE PLAINTIFFS.

To show irreparable harm, a plaintiff needs to show specific, concrete injuries that will happen absent the grant of a preliminary injunction. "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Pearson Educ., Inc. v. Labos*, 2019 WL 1949820, at \*5 (S.D.N.Y. Apr. 23, 2019) (quotation marks and citation omitted). "Irreparable harm is an injury that is not remote or speculative but actual and imminent," and "for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,

---

[87] Starkey Decl. ¶ 11, ECF 14; Hemmady Class Cert Decl., Ex. A (R.M. Commitment Order), ECF 13-1; Hemmady Class Cert. Decl., Ex. B (A.B. Commitment Order), ECF 13-2; Hemmady PI Decl., Ex. 23 (A.B. Person-in-Custody Profile as of Aug. 27, 2025).
[88] Starkey Decl. ¶ 11, ECF 14.
[89] *See* Kois Decl. ¶ 69; *see also id.* ¶¶ 87-95.

596 F.2d 70, 72 (2d Cir. 1979) (per curiam)). Plaintiffs allege both a constitutional violation and risk of serious physical injuries and psychiatric illness to make this showing.

## A. *Constitutional Violation*

Where a plaintiff asserts a constitutional violation, there is a presumption of irreparable harm. *Conn. Dep't of Env't Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004); *see also Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).

Courts have repeatedly held that an alleged due process violation establishes irreparable harm. For example, in *Arias v. Decker*, immigration detainees successfully sought a temporary restraining order ("TRO") to obtain release with conditions from a detention center where nearly 90 detainees and staff had COVID-19. 459 F. Supp. 3d 561, 565 (S.D.N.Y. 2020). The court then converted the TRO into a preliminary injunction, ordering release during the pendency of the detainees' immigration proceedings. *Id.* The court held that the detainees established irreparable harm by asserting a violation of their Fifth and Fourteenth Amendment due process rights, as well as the separate basis that they faced a risk of serious illness or death. *Id.* at 569-71. The Southern District Court of New York in particular has repeatedly held that irreparable harm is established based on alleged due process violations. *See, e.g.*, *Hernandez Aguilar v. Decker*, 482 F. Supp. 3d 139, 149 (S.D.N.Y. 2020) (finding irreparable harm established by allegation that the plaintiff noncitizen was deprived of his procedural due process rights by detention without a bond hearing); *Marquez v. Annucci*, 2020 WL 3871362, at *5 (S.D.N.Y. July 9, 2020) (Hellerstein, J.) (holding allegation of violations of plaintiffs' due process rights to familial relationships established irreparable harm); *Barbecho v. Decker*, 2020 WL 1876328, at *6 (S.D.N.Y. Apr. 15, 2020) (holding allegation of substantive due process violation established irreparable harm). Further, in *Advocacy Center*, a case presenting circumstances analogous to those here, the court granted a preliminary injunction, finding that plaintiffs demonstrated irreparable harm through allegations

that the incompetent individuals were unconstitutionally deprived of their liberty when they were detained in jail pending competency restoration. 731 F. Supp. 2d at 625.[90]

Because Plaintiffs allege a due process violation, they establish irreparable harm that A.B. and class members will continue to suffer without the court's injunction.

## B. *Risk of Serious Injury*

Plaintiffs separately show irreparable harm based on suffering serious injuries, specifically, worsened mental health conditions and physical injuries, and the continued risk thereof from dangerous conditions and inadequate mental health care on Rikers Island.

"[I]rreparable harm exists where, as here, petitioners 'face imminent risk to their health, safety, and lives.'" *Coronel v. Decker*, 449 F. Supp. 3d 274, 281 (S.D.N.Y. 2020) (quoting *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 214 (E.D.N.Y. 2000)). In *Ahlschlager v. Imhof*, for example, the court found that the plaintiff established irreparable harm when plaintiff showed that, without an injunction to allow her to keep her service dog, she could not "move about her place of residence freely and independently without risking a fall" and would face higher risk of psychiatric harm from her depression, anxiety, and other mental health symptoms. 2024 WL 5168732, at *3-4 (E.D.N.Y. Dec. 19, 2024); *see also Paykina ex rel. E.L. v. Lewin*, 387 F. Supp. 3d 225, 241 (N.D.N.Y. 2019) (finding that "subjecting [plaintiff] to present and future psychological damage" of segregated conditions established irreparable harm); *V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554, 588-89 (N.D.N.Y. 2017) (finding irreparable harm where county's solitary confinement put juveniles "at serious risk of short- and long-term psychological damage"); *Reynolds v. Giuliani*, 35 F. Supp. 2d 331, 339-40 (S.D.N.Y. 1999) (noting the lack of public

---

[90] Notably, courts have held the government liable for due process violations for the precise conduct Plaintiffs allege in this action—delayed competency restoration services—and issued permanent injunctions. *See, e.g.*, *Mink*, 322 F.3d. at 1123; *Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934, 941, 944 (E.D. Ark. 2002).

assistance endangered individuals and holding evidence "established the risk of immediate and irreparable harm"). In *Advocacy Center*, plaintiffs presented evidence that "continued incarceration could exacerbate the Incompetent Detainees' mental conditions" and thus showed irreparable harm. 731 F. Supp. 2d at 625-26.

As in *Advocacy Center*, Plaintiffs show that confinement on Rikers Island is exceptionally dangerous due to unmet treatment needs (as well as rampant violence). Like so many others on Rikers Island, Plaintiffs R.M. and A.B. have already been physically injured after being attacked by other incarcerated people, and their needs have been neglected by DOC's failure to bring them to medical appointments.[91] Each day Plaintiff A.B. and class members linger in the jail pending transfer to an OMH hospital is another day of risk—of psychiatric deterioration, injury, and death due to the systemic lack of access to medical services and high rates of excessive force. Moreover, the longer that Plaintiffs and class members languish in jail without necessary competency restoration services, the poorer their response to treatment when it is finally provided.[92] The physical and psychiatric harm that prolonged confinement causes Plaintiffs and class members cannot be adequately compensated monetarily.

**III. A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST.**

The balance of equities and public interest favor Plaintiffs. When the government is a defendant, "the balance of the equities and the public interest merge into a single inquiry . . . in a dispute over a preliminary injunction." *Brown v. Maher*, 597 F. Supp. 3d 541, 549 (N.D.N.Y. 2022) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). A plaintiff needs to show that the preliminary injunction is "in the public interest" by showing that it would not "cause harm to the public interest." *SEC v. Citigroup Global Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012). District

---

[91] *See* Hemmady PI Decl., Ex. 14, 4-14; Ex. 13, 3-43.
[92] *See* Kois Decl. ¶¶ 61-69, 90.

courts in the Second Circuit have held that "where a plaintiff alleges constitutional violations, the balance of hardships tips decidedly in the plaintiff's favor despite arguments that granting a preliminary injunction would cause financial or administrative burdens on the Government." *Averhart v. Annucci*, 2021 WL 2383556, at \*16 (S.D.N.Y. June 10, 2021) (citation omitted); *see also Deide v. Day*, 676 F. Supp. 3d 196, 233 (S.D.N.Y. 2023) ("Because the public interest lies with enforcing the Constitution, the balance ultimately tips in Plaintiffs' favor.") (citation and quotations omitted).

In *Advocacy Center*, the court reasoned that a preliminary injunction requiring the state to timely transfer plaintiffs to a treatment facility was in the public interest. 731 F. Supp. 2d at 626 ("It cannot be denied that there is a strong public interest in protecting the Fourteenth Amendment rights of those in state custody who have not been convicted of a crime. There is a similar public interest in having those charged with criminal offenses proceed speedily to trial.") Furthermore, in *Arias*, the court found that the public interest would be served by a preliminary injunction that would reduce risk of injury or death to an incarcerated population. 459 F. Supp. 3d at 578-79.

Here, securing Plaintiffs' Fourteenth Amendment due process rights is in the public interest and strongly outweighs any state interests implicated in the injunction, particularly because the state's actions currently also harm the state's interest in disposing of criminal matters and administering an efficient mental health system. As state court judges have noted when finding OMH in contempt of their commitment orders, OMH's failure to provide timely competency restoration services harms criminal defendants and the legal system as a whole. In May 2024, Judge April Newbauer noted: "The longer it takes to restore a defendant to competency, the more likely it is that witnesses' memories will fade and the harder it is for the court to guarantee a fair

trial for everyone." *L.G.*, 208 N.Y.S.3d at 474 n.3. Judge Althea Drysdale expressed similar condemnation of OMH's pattern of delays:

> Justice delayed is justice denied. That statement is especially true for defendants suffering from mental illness, who represent some of the most vulnerable members of our community. . . . Delays in transferring mentally ill defendants from Riker's Island to a psychiatric facility are not only inhumane, but further undermine the Court's goal of ensuring public safety and effectuating a timely criminal proceeding against the Defendant.

*M.T.*, 86 Misc. 3d 1212(A).

The state's failure to provide timely competency restoration services is an ongoing violation of constitutional rights that demands immediate remedy. As in *Arias*, an injunction would prevent further harm to Plaintiff A.B. and the class caused by prolonged confinement in the dangerous jail environment. Additionally, the "argument that [defendants] will have to reallocate resources from elsewhere in order to satisfy an injunctive order is not a legitimate consideration," and will not prevent the issuance of the injunction. *Advoc. Ctr.*, 731 F. Supp. 2d at 626. Any arguments that OMH cannot comply due to financial or administrative burdens are outweighed by the public interest in upholding the Constitution. *Averhart*, 2021 WL 2383556, at *16.

The requested relief would not impose any novel or burdensome requirements on the state and would instead conserve public resources by reducing the cost of unnecessary incarceration and expediting criminal trials to ensure a fairer legal system for everyone. For all these reasons, the injunction serves the public interest.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for a preliminary injunction and order Defendant Sullivan to provide timely and effective competency restoration services to Plaintiffs and the Delays Class members.

Dated: August 28, 2025          Respectfully submitted,
      New York, New York

By:   */s/ Elena Landriscina*
     Elena Landriscina
     Shona Hemmady (*admission pending*)
     Philip Desgranges
     THE LEGAL AID SOCIETY
     49 Thomas Street, 10th Floor
     New York, New York 10013
     (212) 577-3398
     elandriscina@legal-aid.org
     shemmady@legal-aid.org
     pdesgranges@legal-aid.org

By:   */s/ Alexis Karteron*
     Alexis Karteron
     WASHINGTON SQUARE LEGAL
     SERVICES
     CIVIL RIGHTS IN THE CRIMINAL
     LEGAL SYSTEM CLINIC
     245 Sullivan Street, 5th Floor
     New York, NY 10012
     (212) 998-6430
     alexis.karteron@nyu.edu

By:   */s/ James I. McClammy*
     James P. Rouhandeh
     James I. McClammy
     Diane O. Lucas
     Chui-Lai Cheung
     Marie Killmond
     DAVIS POLK & WARDWELL LLP
     450 Lexington Avenue
     New York, NY 10017
     (212) 450-4000
     rouhandeh@davispolk.com
     james.mcclammy@davispolk.com
     diane.lucas@davispolk.com
     chui-lai.cheung@davispolk.com
     marie.killmond@davispolk.com

     *Counsel for Plaintiffs R.M. and A.B.*

## WORD COUNT CERTIFICATION

The undersigned hereby certifies that this Memorandum of Law contains 8,615 words and is in compliance with Local Civil Rule 7.1. In preparing this certification, the word-processing system that was used to prepare this document was relied upon.


*/s/ Elena Landriscina*

Elena Landriscina