UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

R.M., by and through next friend Elfego Maldonado
Estrada, and A.B., by and through next friend Kadijah
Hutchinson-McLean, on behalf of themselves and all
others similarly situated,

                                           Plaintiffs,

                  -against-

NEW YORK STATE OFFICE OF MENTAL HEALTH;
ANN MARIE T. SULLIVAN, in her official capacity as
Commissioner of the New York State Office of Mental
Health; THE NEW YORK CITY DEPARTMENT OF
HEALTH AND MENTAL HYGIENE, MICHELLE
MORSE, in her official capacity as the Commissioner of the
New York City Department of Health and Mental Hygiene;
and NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION,

                                     Defendants.

------------------------------------------------------------------------x

25-cv-06667 (AKH)

**ORAL ARGUMENT
REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF
## OMH DEFENDANTS' MOTION TO DISMISS

LETITIA JAMES
Attorney General
State of New York
*Counsel for OMH Defendants*
28 Liberty Street
New York, New York 10005

CAROLINE WALLITT
HALEY HAWKINS
Assistant Attorneys General
    *of Counsel*

1

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF ALLEGED FACTS ...................................................................................4

   I.   THE NEW YORK STATUTORY SCHEME FOR CRIMINAL DEFENDANTS FOUND UNFIT TO STAND TRIAL ..................................................................4

   II.   THE TRANSFER PROCESS .......................................................................................6

   III.   WAIT TIMES FOR TRANSFER OF CPL 730 DEFENDANTS..............................8

   IV.   OMH'S EFFORTS TO MINIMIZE WAIT TIME FOR TRANSFER.....................9

   V.   CPL 730 OUTPATIENT RESTORATION ...............................................................9

   VI.   CLASS ALLEGATIONS .............................................................................................10

STANDARD OF REVIEW ......................................................................................................11

ARGUMENT ..............................................................................................................................12

   I.   PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THEIR DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT ............................12

      A.   The Framework—*Jackson v. Indiana*............................................................12

      B.   Second Circuit Courts Nearly Uniformly Reject Due Process Claims By Defendants Awaiting Restoration .............................................................13

      C.   Courts Outside the Second Circuit Largely Reject Due Process Claims By Detainees Awaiting Restoration Treatment ..............................................17

          1.  *Cases Rejecting Due Process Claims* ...............................................17

          2.  *Cases Finding Due Process Violations* .............................................21

      D.   Application of the Due Process Cases..............................................................23

   II.   PLAINTIFFS FAIL TO STATE CLAIMS FOR RELIEF UNDER THE AMERICANS WITH DISABILITIES ACT OR THE REHABILITATION ACT ........................24

      A.   Applicable Legal Standards ...............................................................................24

          1.  *Reasonable Accommodation Claims* ...............................................24

          2.  Olmstead *Integration Mandate Claims* ...........................................25

      B.   Plaintiffs Fail to State a Claim Under the ADA or Rehabilitation Act As To the Purported "Delays Class"..........................................................................26

          1.  *The Purported Delays Class Members Fail To State a Reasonable Accommodation Claim*............26

          2.  *The Purported Delays Class Members Fail to State a Claim Under* Olmstead............31

C.    Plaintiffs Fail To State a Claim Under the ADA or the Rehabilitation Act As To the Purported "Integration Class" ......................................................................................34

1.   *The Purported Integration Class Members Fail To State a Claim of Discrimination "Due to Their Disability"* .......................................................................................................34

2.   *The Purported Integration Class Members Fail to State an* Olmstead *Claim* ...............35

3.   *None of Plaintiffs' Other Allegations About the Outpatient Restoration Program States a Claim Under the ADA and Rehabilitation Act* .........................................................38

CONCLUSION .....................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................11

*Bell Atlantic Corporation v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................11

*Borkowski v. Valley Central School District*,
    63 F.3d 131 (2d Cir. 1995) ............................................................................................*passim*

*Davis v. Shah*,
    821 F.3d 231 (2d Cir. 2016) ..........................................................................................*passim*

*DiFolco v. MSNBC Cable LLC*,
    622 F.3d 104 (2d Cir. 2010) ..................................................................................................6

*Disability Rights North Carolina v. North Carolina Department of Health & Human Services*,
    No. 24-CV-335, 2025 WL 1665327 (M.D.N.C. June 12, 2025) ...................................... 21, 28, 33, 35

*Glendening, as Next Friend of G.W. v. Howard*,
    707 F.Supp.3d 1089 (D. Kan. 2023) ...........................................................................17–19, 23

*Halpern v. Wake Forest University Health Services*,
    669 F.3d 454 (4th Cir. 2012) ................................................................................................31

*Harris v. Mills*,
    572 F.3d 66 (2d Cir. 2009) ..................................................................................................11

*Henrietta D. v. Bloomberg*,
    331 F.3d 261 (2d Cir. 2003) ....................................................................................24, 27, 34

*Indiana Protection & Advocacy Services Commission v. Indiana Family & Social Services Administration*,
    630 F.Supp.3d 1022 (S.D. Ind. 2022) .............................................................................. 17, 19

*Jackson v. Indiana*,
    406 U.S. 715 (1972) ........................................................................................................12–13

*Lakey v. Taylor*,
    435 S.W.3d 309 (Tex. App. 2014) ..................................................................................*passim*

*Lawtone-Bowles v. City of New York*,
    No. 21-CV-5620, 2021 WL 2942013 (S.D.N.Y. July 12, 2021)……………………………29

*Lindsay v. Navarretta,*
    No. 22-CV-1518, 2024 WL 5125954 (D. Conn. Dec. 16, 2024) ..........................................39

*M.S. v. County of Ventura,*
    No. 16-CV-3084, 2016 WL 11506613 (C.D. Cal. Oct. 24, 2016) ......................................28

*Mary Jo C. v. New York State & Local Retirement System,*
    707 F.3d 144 (2d Cir. 2013) ............................................................................................28

*Matthew P. v. Neifeld,*
    80 Misc. 3d 950 (N.Y. Sup. Ct. Putnam Cnty. 2023) ............................................27, 32, 37

*Meekins v. City of New York,*
    524 F.Supp.2d 402 (S.D.N.Y. 2007) ....................................................... 25, 28–29, 35

*National Federation of the Blind v. Lamone,*
    813 F.3d 494 (4th Cir. 2016) ..........................................................................................31

*Olmstead v. L.C. ex rel. Zimring,*
    527 U.S. 581 (1999) ..................................................................................... 25–26, 32, 35

*Oregon Advocacy Center v. Mink,*
    322 F.3d 1101 (9th Cir. 2003)………………………………………………………………..22

*People v. B.D.,*
    79 Misc. 3d 920 (N.Y. Sup. Ct. N.Y. Cnty. 2023)..........................................................36

*Powell v. National Board of Medical Examiners,*
    364 F.3d 79 (2d Cir. 2004) ............................................................................................29

*Rodriguez v. City of New York,*
    197 F.3d 611 (2d Cir. 1999) ..........................................................................................24

*Summers v. Louisiana,*
    No. 20-CV-21, 2022 WL 4490161 (M.D. La. Sept. 27, 2022) ......................................37–38

*Tardif v. City of New York,*
    991 F.3d 394 (2d Cir. 2021) ......................................................................................27, 34

*Terry v. Hill,*
    232 F.Supp.2d 934 (E.D. Ark. 2002) ............................................................................21

*Trueblood v. Washington State Department of Social & Health Services,*
    101 F.Supp.3d 1010 (W.D. Wash. 2015) ......................................................................22

*United States v. Derman,*
   779 F. App'x 497 (10th Cir. 2019) ..................................................................................18

*United States v. Hylton,*
   No. 18-CR-102, 2023 WL 7280170 (S.D.N.Y. Nov. 3, 2023) .................................15–16, 22

*United States v. Magassouba,*
   544 F.3d 387 (2d Cir. 2008) .................................................................................13–14, 16

*United States v. McCarthy,*
   703 F.Supp.3d 1377 (M.D. Fla. 2023) .............................................................................21

*United States v. Olaniyi,*
   No. 21-CR-350, 2024 WL 4500921 (E.D.N.Y. Oct. 15, 2024) ...........................................16

*United States v. Reeves,*
   690 F.Supp.3d 531 (W.D.N.C. 2023) .............................................................................21

*United States v. Smith,*
   764 F.Supp.2d 541 (W.D.N.Y. 2011) ........................................................................16–17

*United States v. Young,*
   No. 21-CR-6010L, 2022 WL 7087140 (W.D.N.Y. Oct. 12, 2022)...............................14–15

*Winters v. Arkansas Department of Health & Human Services,*
   491 F.3d 933 (8th Cir. 2007).....................................................................................27–28, 32

## Statutes

Article 330 of the New York Criminal Procedure Law (CPL § 330) ....................................7–8

Article 730 of the New York Criminal Procedure Law (CPL § 730) ...............................*passim*

New York Correction Law § 402 ..........................................................................................8

New York Correction Law § 508 ..........................................................................................8

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 79 .........................................24

Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 ....................24, 35

## Rules

Federal Rule of Civil Procedure 12(b)(6)...............................................................................1

**<u>Regulations</u>**

14 N.Y.C.R.R. § 540 ..................................................................................................................7

14 N.Y.C.R.R. § 57 ....................................................................................................................7

28 C.F.R. § 35 ...........................................................................................................................29

Defendants New York State Office of Mental Health ("OMH") and Ann Marie T. Sullivan, M.D., in her official capacity as the Commissioner of OMH ("Commissioner Sullivan") (collectively, the "OMH Defendants"), by their attorney, Letitia James, Attorney General of the State of New York, submit this memorandum of law in support of their motion to dismiss the Class Action Complaint, filed August 12, 2025 (the "Complaint"), pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiffs R.M. and A.B. are two individuals who have been charged with felony crimes; have been found, after a psychiatric examination, unfit to stand trial due to mental illness; have been ordered by New York State Supreme Court to receive inpatient restoration treatment at an OMH facility; and are currently housed at New York City's Rikers Island Correctional Facility ("Rikers") while awaiting transfer to an OMH secure forensic psychiatric facility[1]. Plaintiffs were not immediately transferred to OMH custody due to finite capacity at these facilities, which obligates OMH to maintain a waitlist. The alleged median wait time for admission to an OMH facility for restoration treatment is 81 days.

Plaintiffs assert five causes of action: (i) by Plaintiffs and the putative Delays Class, a claim for violation of the due process clause of the Fourteenth Amendment against Commissioner Sullivan; (ii) by Plaintiffs and the purported Delays Class, a claim for a violation of the Americans With Disabilities Act ("ADA") against Commissioner Sullivan; (iii) by Plaintiffs and the purported Delays Class, a claim for a violation of the Rehabilitation Act against the OMH Defendants; (iv) by Plaintiffs and the purported Integration Class, a claim for a violation of the ADA against Commissioner Sullivan; New

---

[1] Plaintiffs also bring their action on behalf of two purported classes of individuals allegedly harmed by claimed systemic failures. The putative "Delays Class" is comprised of individuals held in pretrial detention while waiting for transfer to an OMH facility to receive competency restoration services prior to being returned to jail to stand trial. The putative "Integration Class" is comprised of individuals who allege that they were not assessed to determine whether they might be eligible for competency restoration services in a more integrated setting than an OMH forensic psychiatric facility, such as the community.

York City Department of Health and Mental Hygiene ("DOHMH"); Michelle Morse, in her official capacity as the Commissioner of the DOHMH; and New York City Health and Hospitals Corporation ("HHC");[2] and (v) by Plaintiffs and the purported Integration Class, a claim for a violation of the Rehabilitation Act against all Defendants.

None of Plaintiffs' allegations state a claim for relief. The Court should dismiss the Complaint for four reasons.

*First*, the Fourteenth Amendment due process cause of action fails as a matter of law. While the Complaint suggests that the issue of criminal defendants waiting for restoration to fitness treatment due to finite hospital space has been caused by some unique policy failure by OMH, that is not the case. Rather, providing prompt restoration treatment to pretrial detainees who lack mental capacity to stand trial is a logistical challenge for both the federal government and state governments across the nation. The number of criminal defendants found unfit to stand trial very often exceeds the finite capacity at federal and state hospitals equipped to safely provide restoration treatment to criminal defendants. As a result, criminal defendants in this Circuit and elsewhere have brought due process challenges raising this precise issue. In this Circuit, <u>courts have nearly uniformly held that wait times significantly longer than those alleged here do not violate pretrial detainees' due process rights</u>. Although Plaintiffs have already filed multiple motions in this case, they have chosen to omit any mention of the existence of these cases fatal to their due process claim. Outside of the Second Circuit, courts have largely reached the same result, with limited and distinguishable exceptions.

*Second*, the Delays Class Plaintiffs' ADA and Rehabilitation Act failure-to-accommodate claims also fail as a matter of law. The Delays Class alleges that the OMH Defendants failed to accommodate their disability by not immediately transferring them to State hospitals for restoration treatment. This

---

[2] Defendants DOHMH, Commissioner Morse, and HHC are independent from the OMH Defendants and represented by separate counsel.

precise question, too, has been thoroughly litigated by individuals waiting for restoration treatment, and by a wide margin courts have rejected Plaintiffs' theory of liability. Plaintiffs' theory fails because they do not allege that the delays in transfer from Rikers to an OMH facility are *due to Plaintiffs' disability*—rather, they concede in the Complaint that the transfer delays are due to the challenge of managing finite bed space in State secure hospitals. Moreover, to state a failure to accommodate claim, Plaintiffs must plausibly allege the existence of an available accommodation, the costs of which do not clearly exceed its benefits. Plaintiffs have made *no* attempt to do so. The Complaint wholly fails to allege what specific accommodations or proposed changes to a claimed OMH policy or practice Plaintiffs believe the ADA and Rehabilitation Act require OMH to implement, the costs of which do not clearly exceed the benefits. In other words, Plaintiffs identify no accommodation which would allow OMH to immediately admit and treat every defendant found unfit to stand trial, with no wait time. They simply would like this Court to order that result into being, regardless of any logistical or practical impediment. In reality, in response to a recent increase in the number of CPL 730 orders, OMH has already instituted multiple major projects that will increase its capacity to treat CPL 730 defendants.

*Third*, the Delays Class also fails to state an ADA and Rehabilitation Act claim under an alternative *Olmstead* integration mandate theory. Any delay in transfer does not implicate the integration mandate, as Plaintiffs are subject to inpatient restoration orders and therefore would be institutionalized and unable to engage in community-based interactions regardless of whether they are in Rikers or an OMH facility. Further, Plaintiffs fail to allege that State treatment professionals have recommended that they receive treatment in a less restrictive community setting, as they must to state an integration mandate claim.

*Fourth,* the purported Integration Class causes of action brought pursuant to the ADA and the Rehabilitation Act also fail as a matter of law. Plaintiffs and the members of the putative Integration

Class fail to state a claim for disability discrimination because the Complaint is devoid of allegations that the OMH Defendants denied Integration Class members an individualized assessment or care and treatment by reason of their disability. Plaintiffs and the Integration Class members also fail to state a claim under an *Olmstead* integration mandate theory, for multiple reasons. Plaintiffs do not allege that any State professional has determined that a less restrictive community setting is appropriate. Rather, Plaintiffs *concede* that, following a psychiatric evaluation and criminal proceedings in New York Supreme Court, a State court judge has ordered them to undergo *inpatient* competency restoration services in an OMH facility. Plaintiffs' novel theory that the ADA and Rehabilitation Act contain a hidden requirement that States must release a psychiatrically unfit criminal defendant for outpatient treatment, even when the District Attorney and criminal court have found that the defendant requires inpatient restoration treatment, based on the defendant's own say so that he is "eligible" for outpatient treatment, has no support in *Olmstead* and its progeny. The Complaint also concedes that, in any event, OMH has no role in this determination—pursuant to the New York statutory scheme, outpatient restoration is only available with the consent of the District Attorney and upon an order by New York Supreme Court. Finally, to the extent that Plaintiffs allege that OMH has failed to issue guidance concerning individualized assessments for outpatient restoration services and that the outpatient restoration program is underdeveloped, these allegations fail to state a claim because they are by turns internally inconsistent and irrelevant to the Integration Class Plaintiffs' claims.

## STATEMENT OF ALLEGED FACTS

### I.    THE NEW YORK STATUTORY SCHEME FOR CRIMINAL DEFENDANTS FOUND UNFIT TO STAND TRIAL

A defendant who is not mentally competent to stand trial cannot be prosecuted for a criminal offense. Before a criminal case can proceed, a court must ensure that a person accused of a crime is able to understand the criminal proceedings against them, as well as to assist and consult with their

attorney to prepare a defense. *See* Complaint, filed Aug. 12, 2025 (ECF Dkt. No. 1) ("*Compl.*"), ¶ 22. Article 730 of New York Criminal Procedure Law ("CPL 730") furnishes the procedure in New York State for determining a criminal defendant's fitness to stand trial and for managing the care of a defendant adjudged to be an incapacitated person.

If a court believes that an individual may lack capacity to stand trial, it must order that person to undergo a competency examination. *See generally* CPL § 730.20; *Compl.* ¶ 22. In cases arising in New York City, the court issues the order of examination to the director of community mental health services in New York City's DOHMH, who then delegates the task of conducting the competency exam to Correctional Health Services ("CHS"), a division of New York City's HHC. *Compl.* ¶ 22. After conducting the competency exam, the CHS doctors prepare a report of findings, which is submitted to the court and shared with the defense and the District Attorney's office responsible for prosecuting the offense. *See* CPL § 730.20(5); *Compl.* ¶ 23. Depending on the results of the CHS report, the court may order a hearing on the issue of competency. *See generally* CPL § 730.30; *Compl.* ¶ 23.

If the court finds that the individual is unfit to proceed, what happens next depends upon the severity of the charges. If the defendant is facing only misdemeanor or other non-felony charges, the court dismisses the indictment, issues a final order of observation, and orders OMH to provide the defendant with *civil* psychiatric treatment for a period not to exceed ninety days. CPL § 730.50(1). If the defendant is facing felony charges, the court issues an order committing the person to OMH's custody for care, treatment, and restoration to fitness to stand trial for a period not to exceed one year. CPL § 730.50(1); *Compl.* ¶ 23. Competency restoration services involve psychiatric treatment to stabilize the person, as well as education about how the legal system works so that the person understands, among other things, the charges against them and the roles of the judge, prosecutor, and defense attorney. *Compl.* ¶ 25. Upon issuance of a commitment order, the defendant's criminal case is suspended until they are restored to fitness. *See* CPL § 730.60(2); *Compl.* ¶ 26. Notably, the

commitment to OMH is not to treat the defendant's general psychiatric condition, but rather is specifically for the purpose of restoring them to competency so that they can be returned to jail and await trial.

When a court commits a defendant facing felony charges to OMH custody for restoration treatment, CPL 730 provides two options. The court may order OMH to provide inpatient treatment in an OMH hospital. CPL § 730.50(1). Alternatively, only upon the consent of the District Attorney, the court may order OMH to provide outpatient restoration treatment while the defendant remains free in the community. *Id.*

Pursuant to the CPL, OMH has no role in the underlying proceedings to determine whether a defendant is fit to stand trial or whether a felony defendant found unfit will receive inpatient or community treatment. *Id.* OMH is uninvolved with such decisions, unless contacted for clinical input by the court or a party to the criminal proceeding. *See* Affidavit of Matthew S. Schatzel, sworn to on the 15th day of February, 2024 ("*Schatzel Aff.*"), ¶ 4 (ECF Dkt. No. 11-6).[3]

## II.    **THE TRANSFER PROCESS**

When New York Supreme Court issues a CPL 730 commitment order, it forwards the order, along with a copy of the examination reports and accusatory instrument, to OMH. *See* CPL §

---

[3] In their Complaint, Plaintiffs incorporate by reference the Affidavit of Matthew S. Schatzel, which was submitted by OMH in *People v. L.G.*, Ind. No. 01411/2020 (N.Y. Sup. Ct., N.Y. Cnty.), and which Plaintiffs have attached to their motion for class certification as Exhibit F (ECF Dkt. No. 11-6). *See Compl.* ¶ 29 (quoting *Schatzel Aff.* ¶¶ 6 & 11–12). Because Plaintiffs have "ma[de] a clear, definite and substantial reference to th[is] document," which is in the record before the Court, and thus incorporated this document by reference, the Court may consider it in ruling on the OMH Defendants' motion to dismiss. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and *documents incorporated by reference in the complaint*.") (emphasis added)). However, while the information in the Schatzel Affidavit provides helpful context to understand the practical issues in this case, the Court need not rely on its contents to find that Plaintiffs have failed to state a claim, for all the reasons expressed in this memorandum.

730.60(1); *Compl.* ¶ 27. This is typically the first point at which OMH becomes aware of the case. *Compl.* ¶¶ 21–27. If the order instructs OMH to provide inpatient treatment, OMH will, within a few days of receipt, designate an appropriate institution[4] at which to place the defendant. *See id.* ¶ 27. The defendant remains in New York City custody until they are transferred to the designated OMH facility. *See id.*

OMH operates three secure forensic psychiatric hospitals—Kirby Forensic Psychiatric Center ("Kirby"), Mid-Hudson Forensic Psychiatric Center ("Mid-Hudson"), and Central New York Psychiatric Center—that are equipped to safely provide restoration psychiatric services to individuals who have been charged with felonies and committed to OMH inpatient custody. *See id.* ¶ 28. OMH also operates secure forensic units in two civil psychiatric hospitals—Manhattan Psychiatric Center ("MPC") and the Rochester Regional Forensic Unit ("RRFU") at the Rochester Psychiatric Center. *Id.* Because of the unique public safety risks posed by patients involved with the criminal justice system being treated at secure psychiatric hospitals, state law requires these facilities to have additional security measures in place, such as extra staffing. *Id.* Secure facilities must also have physical security measures in place to protect patients and staff and to minimize the risk of escape. *See* CPL § 330.20(b); 14 N.Y.C.R.R. § 540.6(a)(1). These measures include structural modifications, such as locked, gender-segregated wards and a secure perimeter, as well as more granular modifications to the physical environment, such as specific fixtures that cannot be used as weapons or to assist in an escape. *See* 14 N.Y.C.R.R. § 57.1(d). In addition to CPL 730 patients, OMH secure facilities must also devote staff,

---

[4] "Appropriate institution" is defined by statute to mean: (a) a hospital operated by OMH or a developmental center operated by the office for people with developmental disabilities; or (b) a hospital licensed by the department of health which operates a psychiatric unit licensed by OMH, as determined by the commissioner provided, however, that any such hospital that is not operated by the state shall qualify as an "appropriate institution" only pursuant to the terms of an agreement between the commissioner and the hospital. CPL § 730.10(9). It does not refer to outpatient restoration.

hospital resources, and bed space to persons who suffer from a dangerous mental disorder and have been acquitted of a crime by reason of that illness, *see* CPL § 330.20; and persons who need treatment while incarcerated pursuant to a sentence following conviction or who are in pre-sentence detention, *see* Correction Law §§ 402 & 508.

III.    **WAIT TIMES FOR TRANSFER OF CPL 730 DEFENDANTS**

Given the current volume of CPL 730 inpatient orders issued by New York Supreme Court each year, along with the number of CPL 330 patients and other patients requiring treatment in a secure facility, OMH's secure facilities currently operate at full capacity, and there are usually no immediately available beds. *Compl.* ¶ 29; *Schatzel Aff.* ¶ 6. As such, when OMH receives a new CPL 730 order for inpatient treatment, it places the defendant on a waitlist for admission at the designated facility. OMH admits defendants in chronological order as beds become available. *Id.* OMH always seeks to effectuate admission as soon as possible, but transfer to the designated secure facility is unfortunately rarely immediate and can often take weeks or months. *Id.*

Starting in or around 2022, there has been an unexpectedly steep increase in the number of inpatient felony CPL 730 orders issued by courts throughout New York State. *See Schatzel Aff.* ¶ 7. Between 2016 and 2019, OMH received approximately 700 inpatient CPL 730 orders per year. *Id.* Following a temporary reduction during the COVID pandemic, OMH received 726 inpatient CPL 730 orders in 2021. *Id.* In 2022, that number rose to 869. *Id.* In 2023, the number rose to 981. *Id.* The pace of CPL 730 orders has continued to rise in every year since. *Id.*[5]

---

[5] OMH Defendants will provide the latest data regarding the volume of CPL 730 orders in opposition to Plaintiffs' motion for a preliminary injunction. While this data is helpful context to understand the issue, the Court need not rely on the latest data to find that Plaintiffs have failed to state a claim for all the reasons stated in this memorandum of law.

The result of the increase in felony CPL 730 inpatient orders around the State is that there are currently longer-than-usual wait times for admission into OMH's secure facilities. *Compl.* ¶ 30; *Schatzel Aff.* ¶ 9. The Complaint alleges that the current median wait time for admission to a secure facility is 81 days, up from 49 days in 2022. *Compl.* ¶ 30.

## IV.   OMH'S EFFORTS TO MINIMIZE WAIT TIME FOR TRANSFER

In response to the recent historic increase in CPL 730 inpatient orders, OMH and New York State have taken multiple tangible steps to increase capacity to treat CPL 730 patients at OMH hospitals. Although Plaintiffs' counsel are well aware of these steps from briefing as part of individual criminal cases, Plaintiffs omitted any information about these actions in the Complaint. Nevertheless, information about some of these OMH actions has been incorporated into the Complaint by reference to the Schatzel Affirmation. Specifically, on February 7, 2024, OMH opened a new 25-bed secure unit at MPC to treat CPL 730 patients. *Schatzel Aff.* ¶ 13. OMH has also initiated a construction project at Mid-Hudson that will substantially increase the capacity to treat CPL 730 patients at that facility. *Id.* ¶ 17.[6] Particularly considering the complex regulatory requirements for constructing secure inpatient psychiatric facilities, these projects take time to implement; it is not possible for OMH to instantly eliminate the waitlist by adding extra capacity for CPL 730 defendants. *Id.* ¶ 11.

## V.   CPL 730 OUTPATIENT RESTORATION

Pursuant to the CPL, OMH has no role in the determination of whether a defendant facing felony charges found unfit will receive inpatient or community treatment. CPL § 730.50. Community-

---

[6] OMH and New York State have also initiated multiple other major projects to significantly increase capacity to treat CPL 730 patients and therefore reduce wait times for admission, including: (1) adding an additional 25 beds at Kirby; (2) adding an additional 25 beds at RRFU; (3) as a result of a substantial new appropriation of $160 million in the FY 2026 State budget, constructing a new 100-bed forensic inpatient psychiatric hospital on Ward's Island in New York City. Plaintiffs omitted any mention of these developments in their Complaint, but OMH Defendants will provide more details about these projects in response to the motion for a preliminary injunction. The Court need not consider these projects to find that the Complaint should be dismissed for all the reasons stated in this memorandum.

based restoration treatment is only available to an unfit defendant upon the consent of the District Attorney and order of New York Supreme Court. *Id.* OMH only becomes involved once it receives the order from New York Supreme Court instructing it to provide inpatient or community-based restoration treatment. *Compl.* ¶ 27.

The Complaint alleges that outpatient competency restoration is "severely underutilized." *Id.* ¶ 32. The Complaint further alleges that OMH has failed to "issue[] standards or develop[] forms, manuals, or policies mandating that CHS doctors who conduct competency exams determine a person's individual service needs, including whether hospitalization is necessary for restoration." *Id.* ¶ 33. The Complaint, however, also goes on to acknowledge that OMH has in fact issued "Guidance for Implementation of Outpatient Competency Restoration (OCR)," which provides guidance about the process for determining a criminal defendant's appropriateness for outpatient restoration services. *Id.* ¶ 35. The Complaint further alleges that OMH has failed to implement a protocol whereby OMH would independently reassess a defendant for outpatient restoration in the weeks or months following the issuance of an *inpatient* commitment order, although Plaintiffs fail to explain how such a protocol would be consistent with OMH's limited authority under CPL 730. *Id.* ¶ 37.

The Complaint additionally includes a series of claims that OMH's outpatient restoration program is allegedly "dysfunctional." *Id.* ¶¶ 51–58. Plaintiffs do not allege that they have been harmed because of these purportedly dysfunctional outpatient services, as both individual Plaintiffs (and all members of the two purported classes) were ordered by a court to receive inpatient restoration services.

## VI.    CLASS ALLEGATIONS

Plaintiffs R.M. and A.B., by and through their next friends, bring this action not only on their own behalf, but also on behalf of similarly situated individuals in two putative classes. *Id.* ¶ 64. The putative Delays Class consists of all persons who have been, or will be in the future, charged with a

felony in New York City and who: (a) receive a CPL 730 court order to receive competency restoration services by OMH; and (b) remain confined in a New York City Department of Correction jail pending competency restoration services. *Id.* ¶ 65.[7] The putative Integration Class consists of all persons who have been, or will be in the future, charged with a felony in New York City and who: (a) receive a CPL 730 court order to receive competency restoration services by OMH; (b) do not receive an individualized assessment of the most integrated setting appropriate to their needs; and (c) will not receive competency restoration services in the most integrated setting appropriate to their needs pursuant to an individualized assessment. *Id.* ¶ 66.

## STANDARD OF REVIEW

"To survive a motion to dismiss [under Fed. R. Civ. P. 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint that merely alleges facts that are "consistent with" or "compatible with" liability fails to state a cognizable claim. *Twombly*, 550 U.S. at 557; *Iqbal*, 556 U.S. at 680.

In considering the legal sufficiency of a complaint, a court should accept its well-pleaded factual allegations to be true. However, a court is not required to accept as true "legal conclusions" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quotations omitted). "Determining whether a complaint

---

[7] As the OMH Defendants will further explain in their opposition to the motion for a preliminary injunction, in the time since the Complaint was filed, Plaintiffs R.M. and A.B. have reached the top of the waitlist pursuant to OMH's normal process and have each been transferred to OMH facilities to receive restoration treatment.

states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

## ARGUMENT

## I.    PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THEIR DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT

The Court should dismiss the First Cause of Action against Commissioner Sullivan for violation of Plaintiffs' due process rights under the Fourteenth Amendment to the Constitution pursuant to Fed. R. Civ. P. 12(b)(6). Although Plaintiffs portray the waitlist for CPL 730 defendants as the result of some unique policy failure by OMH, the reality is that State and federal governments throughout the country manage waitlists for criminal defendants found unfit to stand trial to be admitted for restoration treatment. As a result, there is a significant body of case law addressing this issue, which Plaintiffs have largely omitted from their voluminous filings in this case to date. District Courts in the Second Circuit have repeatedly rejected due process claims brought by pretrial detainees who faced significantly longer wait times for restoration-to-fitness services than the median 81 days alleged in this action. The same is true for courts outside the Second Circuit, with limited and distinguishable exceptions.

### A.    The Framework—*Jackson v. Indiana*

The United States Supreme Court's analysis in *Jackson v. Indiana*, 406 U.S. 715 (1972), provides the framework that courts use to evaluate due process claims brought by pretrial detainees requiring competency restoration. In *Jackson*, a criminal defendant was found incompetent to stand trial and committed to Indiana's state mental health institution "until . . . sane." *Id.* at 719. The Court held that "indefinite commitment of a criminal defendant solely on account of his incompetency to stand trial does not square with the Fourteenth Amendment's guarantee of due process." *Id.* at 731. It explained that "a person charged by a State with a criminal offense who is committed solely on account of his

incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. . . . Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal." *Id.* at 738. The Court explained: *"[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."* *Id.* (emphasis added). The Court determined that it was "not . . . appropriate for us to attempt to prescribe arbitrary time limits" applicable to due process claims "[i]n light of differing state facilities and procedures," among other factors. *Id.*

### B. Second Circuit Courts Nearly Uniformly Reject Due Process Claims By Defendants Awaiting Restoration

Applying *Jackson*, the Second Circuit and district courts in the Circuit have repeatedly rejected due process claims by pretrial detainees waiting to receive restoration-to-fitness treatment, even where wait times were significantly longer than 81 days. The first was *United States v. Magassouba*, 544 F.3d 387 (2d Cir. 2008). In that case, the criminal defendant appealed from an order denying his motion to dismiss the indictment charging him with various drug crimes and directing his hospitalization for psychiatric treatment. *Id.* at 391. He claimed that his nineteen-month detention from the time he was found incompetent until the date of the challenged order violated due process, warranting dismissal of his indictment and release from custody. *Id.* at 392. Rejecting the defendant's due process claim, the *Magassouba* court reiterated *Jackson*'s principle that "the Constitution itself draws no bright lines signaling when an incompetent defendant's continued detention to restore competency becomes unreasonable." *Id.* at 416. The court analyzed the constitutional reasonableness of the nineteen-month detention via a list of five factors:

(1) the length of time at issue;
(2) the medical assessments of the defendant's ability to attain competency;
(3) the reason for any delay in helping the defendant attain competency;

(4) the defendant's assertion of his rights, whether as to custody or treatment; and

(5) any prejudice to the defendant, whether in attaining competency or in proceeding thereafter to trial.

*Id.* at 416–17. The Second Circuit "conclude[d] that Magassouba's nineteen-month detention from the time he was found incompetent until the date of the challenged order was not constitutionally unreasonable so as to violate due process." *Id.* at 392.

Following *Magassouba*, district courts in this Circuit have repeatedly rejected due process claims by pretrial detainees waiting to receive restoration treatment in cases involving significantly longer wait times than what Plaintiffs allege here. In *United States v. Young*, No. 21-CR-6010L, 2022 WL 7087140 (W.D.N.Y. Oct. 12, 2022), the court applied the *Magassouba* factors to facts substantially similar to those alleged here. The court had found Young incompetent to stand trial and remanded him to county jail. *Id.* at *1. While in jail, Young was placed on a waitlist for transfer to the Federal Medical Center in Butner, North Carolina ("Butner"), where he would receive further evaluation and restoration to competency services. *Id.* After three months of waiting to be transferred to Butner, the defendant moved to dismiss the indictment due to a purported violation of his due process rights or, alternatively, for an order directing immediate transfer. *Id.* at *2. The Government explained that Butner was at capacity and maintains a "waitlist [that] is strictly chronological, so defendant's progress up the list is entirely dependent on bed space becoming available as the inmates ahead of him are moved into and out of Butner." *Id.* at *1. The Government estimated that, given the rate of movement on the waitlist, the defendant would have to wait a total of approximately six or seven months for transfer. *Id.* Weighing the *Magassouba* factors, the court noted that "[i]n the instant case, there is no dispute that the delay is attributable to a lack of resources, primarily bed space, to accommodate the number of prisoners awaiting evaluation, with a resulting backlog and lengthy waiting period." *Id.* at *3. The *Young* court held that the "defendant's continued detention has not exceeded what it permissible under the Due Process Clause," and that "the expected wait in this case of about six or

14

seven months is not so extraordinarily long as to give rise to a due process violation[.]" *Id.* The court

further noted its reluctance to interfere with the waitlist for defendants awaiting treatment at Butner,

cautioning that it did not "have either the authority, the ability, or a sound reason to somehow expedite

the process in this case. . . . No doubt every defendant awaiting evaluation would like to jump to the

head of the line, or otherwise be accorded special treatment, but for the Court to attempt to do so

would only interfere with the system in place and would likely cause more problems than it would

solve." *Id.* at *4.

In *United States v. Hylton*, No. 18-CR-102, 2023 WL 7280170 (S.D.N.Y. Nov. 3, 2023), the

district court addressed a similar due process claim. There, the court found that the detained defendant

was not competent and ordered his transfer to a Federal Medical Center ("FMC") for restoration

treatment. *Id.* at *5. Nearly seven months later, the defendant was still awaiting transfer. The

Government explained that the delay in transfer was "a nationwide systemic issue due to the high

volume of defendants awaiting placement at an FMC" and that "[t]ypically, the pipeline is first-come,

first-served, and individuals are placed in order based on the date of" the transfer order. *Id.* Based on

the waitlist, the Government projected that Hylton would receive a bed approximately ten months

from the date of the transfer order. *Id.* The court held that Hylton "has not shown that his delayed

transport to an FMC constitutes a violation of his right to due process[.]" *Id.* at *6. Just as in *Young*,

the court further found that it would be inappropriate for the court to interfere with the reasonable

waitlist for individuals awaiting restoration service:

> The immediate delay at issue here, which is a delay in transferring
> Hylton to an FMC for evaluation and treatment, is attributable to the
> limited bed space in the few FMC's qualified to address Hylton's needs,
> as well as the admirable [Bureau of Prisons ("BOP")] policy of
> distributing bed space on a first-come, first-served basis, unless a court
> order interferes with that system. None of these facts suggests that
> Hylton's right to due process is being infringed or that this Court
> should enter an Order placing Hylton's needs above those of all other
> similarly situated federal defendants and undermining the BOP's
> orderly administration of limited but essential services.

*Id.*

*United States v. Olaniyi,* No. 21-CR-350, 2024 WL 4500921 (E.D.N.Y. Oct. 15, 2024), is the most recent decision in this line of cases. In *Olaniyi,* a criminal defendant was found incompetent to stand trial and committed to a federal forensic psychiatric facility, where there was "a six-month waiting period for a committed defendant to start hospitalization[.]" *Id.* at *4–5. The defendant brought a due process challenge, arguing that he must be committed no later than thirty days following the issuance of the commitment order. *See id.* at *6. The court rejected the due process claim, recognizing that "[d]istrict courts have found months-long waits for hospitalization entirely consistent with due process[,]" *id.*, and finding that "[n]either a six-month period of transporting the defendant to [the psychiatric facility], nor the eight-month wait during the initial [competency] proceedings, constitutes a time period 'so egregious as to deny [the defendant] due process[.]'" *Id.* at *7 (quoting *Magassouba,* 544 F.3d at 418); *see id.* at *6 ("The defendant has not identified a legal basis for ordering hospitalization no later than 30 days following the start of commitment.").

Just one district court case in this Circuit potentially endorses a due process claim by a defendant waiting for restoration treatment, but the circumstances there were distinguishable. In *United States v. Smith,* 764 F.Supp.2d 541 (W.D.N.Y. 2011), the court adjudged the defendant mentally incompetent and remanded him to county jail until he could be placed at a federal treatment facility. *Id.* at 542. After two months of waiting for transfer and upon receipt of the news that placement would take another month, the defendant moved for release. *Id.* at 542–43. When the court instructed the Government to respond, Pretrial Services filed a short, less than one-page memorandum simply stating that the defendant was a flight risk and recommending that he remain detained. *See United States v. Smith,* 10-MJ-01119 (W.D.N.Y.) (ECF No. 16) (Feb. 1, 2011). Subsequently, at two different hearings, the court ordered the Government to explain why the defendant could not be placed sooner, but the Government failed to provide a sufficient explanation. The court ruled that it had not "heard

a satisfactory explanation from the government as to why defendant has not been hospitalized, either at Burner [*sic*] or at another appropriate facility." *Smith*, 764 F.Supp.2d at 545. The Court determined that "[u]nder these circumstances, I conclude that unless he poses a danger to the community, defendant's continued commitment violates his right to due process, and that he should be released, with or without conditions." *Id.* By contrast, in *Young*, *Hylton*, and *Olaniyi*, the Government *did* provide a satisfactory explanation—the finite bed space in federal secure psychiatric facilities and its operation of a waitlist—that defeated the due process claim.

### C. Courts Outside the Second Circuit Largely Reject Due Process Claims By Detainees Awaiting Restoration Treatment

Like the Second Circuit, other jurisdictions generally reject due process claims brought by pretrial detainees awaiting restoration treatment. The exceptions are: (i) a few cases in which the fact patterns allege exceptionally long wait times; and (ii) outlier cases from the Ninth Circuit.

#### 1.   *Cases Rejecting Due Process Claims*

Rejection of a pretrial detainee's claim alleging a due process violation often occurs while a court is evaluating the likelihood of success of such a claim on a motion seeking a preliminary injunction. This was the procedural posture for two decisions outside of the Second Circuit that comprehensively rejected due process claims brought by pretrial detainees awaiting competency restoration: *Glendening, as Next Friend of G.W. v. Howard,* 707 F.Supp.3d 1089 (D. Kan. 2023), and *Ind. Prot. & Advocacy Servs. Comm'n v. Ind. Family & Social Servs. Admin.*, 630 F.Supp.3d 1022 (S.D. Ind. 2022).

In *Glendening,* the plaintiffs were advocates for Kansas pretrial detainees who had been ordered to receive either competency evaluations or restoration treatment. 707 F.Supp.3d at 1098. The plaintiffs moved for a preliminary injunction against various state agencies based on the assertion that

that the waitlist for admission into the state's only facility for competency restoration—with average wait times of 336 days—violated their substantive due process rights. *Id.* at 1097. The plaintiffs sought an injunction prohibiting the state defendants from maintaining a waitlist with wait times exceeding thirty days. *Id.* at 1106. Citing the *Jackson v. Indiana* framework, the plaintiffs argued that the wait times bore no reasonable relation to the purpose of their commitment. *Id.*

The *Glendening* court analyzed the due process claim via factors substantially similar to those the Second Circuit set forth in *Magassouba*. In the Tenth Circuit, courts look to factors from *United States v. Derman,* 779 F. App'x 497, 506 (10th Cir. 2019), including: "(i) the length of detention; (ii) the extent of the prosecution's responsibility for the delay of trial; and (iii) the strength of the evidence upon which the detention is based." *Glendening,* 707 F.Supp.3d at 1106–07. The court found that while the 336-day average wait time was substantial, it was not evident that the state defendants could control the delay. *Id.* at 1107. Further, the number of individuals requiring competency evaluations and restorative services had increased by 10% over the prior six years. *Id.* Staffing shortages, exacerbated by the COVID-19 pandemic, further limited available beds. *Id.* The court also noted that the state defendants had taken steps to reduce the wait times. *Id.*

The court also rejected the plaintiffs' argument that the state defendants' delay in transferring detainees to competency restoration lacked "some reasonable relation to the purpose for which they are committed." *Id.* at 1109. As the court explained: "State hospitals lack infinite capacity." *Id.* Given finite capacity, the court identified multiple important State interests in establishing and maintaining a waitlist, including: (1) the State's "interest in evaluating and restoring the competency of each detainee so that he or she may be tried"; and (2) its "interest in providing adequate care at [the State's secure psychiatric facility] to accomplish that purpose, which obliges detainees to wait in line until services are available." *Id.* The waitlist, which is "long, [but] not indefinite . . . reflects [the State's] effort to manage the numerous external factors affecting admission rates at [the secure psychiatric facility]." *Id.*

The court concluded that "[t]he resulting delay and the State's purpose appear 'reasonably related,' because [the State] only delays as a way to triage care." *Id.* Given these circumstances, the court concluded that the plaintiffs had not shown that the state's use of a waitlist violated their substantive due process rights. *Id.*[8]

Like *Glendening*, the plaintiff in the *Ind. Prot.* case was an interest group representing criminal defendants found incompetent to stand trial in Indiana. 630 F.Supp.3d at 1025–26. The plaintiff brought an action against various State agencies tasked with providing competency restoration services to those defendants. *Id.* at 1026. Among other things, the plaintiff claimed that the state defendants failed to provide timely competency restoration services in violation of the Fourteenth Amendment and sought a preliminary injunction. *Id.* Just like Kansas, Indiana could not immediately provide competency restoration services to all defendants committed to its care due to a finite capacity of staffed beds. *Id.* The average wait for state hospital placements was 22-83 days, depending on the hospital. *Id.* Like *Glendening*, the court denied the plaintiff's preliminary injunction motion, concluding that the wait times did not violate due process under the *Jackson* framework. *Id.* at 1032. It held that the detentions were "reasonably related" to the State defendants' interest in providing competency restoration services. *Id.*

In *Lakey v. Taylor,* 435 S.W.3d 309, 314 (Tex. App. 2014), a Texas state court rejected constitutional claims brought by pretrial detainees regarding the use of a waitlist. While awaiting acceptance to a facility, which could not happen until a bed became available in accordance with the list, the defendants were detained in county jail—sometimes as long as seven months—and received no competency restoration treatment there. *Id.* A group of detainees, as well as an advocacy group,

---

[8] The *Glendening* court noted that if, by contrast, the State "could freely admit detainees to [its secure psychiatric facility] and chose not to do so, *Jackson* may forbid the delay alleged in this case. But the parties appear to agree that [the State] lacks that capacity and the waitlist is an attempt to manage its scarce resources," which is permissible. *Id.*

brought suit against the Commissioner of the Department of State Health Services, claiming that the system violated their rights under the due course of law provision of the Texas Constitution.[9] *Id.*

The state appellate court reversed the trial court's grant of summary judgment for plaintiffs, vacated a permanent injunction issued by the trial court, and rendered judgment in favor of the Commissioner. *Id.* It first acknowledged that "there is no dispute that the government has a compelling interest in restoring the competency of defendants so that they may fairly and quickly be brought to trial and that this interest outweighs the incompetent defendant's liberty interest in being free from confinement." *Id.* at 319. As for *continued* detention while awaiting their turn on the waitlist, the court agreed with the plaintiffs that the detention must be justified by progress toward that goal, "such that [their] due-process rights are violated if [they] fail[] to receive any competency-restoration treatment within a reasonable amount of time." *Id.* at 321. That left one issue: whether the Commissioner's maintenance of a waitlist violated due process. *Id.* After holding that the plaintiffs failed to demonstrate that the waitlist operated in an unconstitutional manner as to every detainee on the list, the court concluded that the plaintiffs also failed to demonstrate that the waitlist operated in an unconstitutional manner as to every length of detainment on the waitlist. *Id.* The court found that while all detainees on the waitlist must wait at least some period of time before receiving any competency restoration treatment, there was no evidence of a state policy requiring a specific length of wait. *Id.* at 321–22. The court further elaborated:

> [t]he undisputed evidence demonstrates that when a bed becomes available under the [wait]list, the wait-listed detainee is accepted by the Department into a state hospital. And while the evidence shows that some incompetent detainees on the [wait]list must wait for long periods of time before being accepted by the Department, there is no evidence of any policy or procedure specifically designed to create a long wait. Any unreasonable delay in transfer is a consequence of

---

[9] Texas courts construe this provision in the same manner as its federal counterpart, the Due Process Clause of the United States Constitution. *Id.* at 317.

circumstances, not of any Department policy or procedure with regard
to the maintenance of the [waitl]ist itself.

*Id.* at 322.

### 2.  *Cases Finding Due Process Violations*

A few cases outside of the Second Circuit have endorsed due process claims by pretrial detainees waiting for restoration to fitness treatment, but these cases fall into two distinguishable categories.

First, there are some out-of-Circuit cases where courts have found due process violations based on substantially longer wait times than the 81-day median wait alleged here. *See, e.g., United States v. McCarthy,* 703 F.Supp.3d 1377, 1380–81 (M.D. Fla. 2023) (dismissing indictment against a defendant deemed unfit to proceed after five months in custody awaiting restoration treatment); *United States v. Reeves*, 690 F.Supp.3d 531, 533 & 538 (W.D.N.C. 2023) (ordering that the indictment against the defendant was subject to dismissal after over nine months in custody awaiting restoration treatment); *Terry v. Hill*, 232 F.Supp.2d 934, 938 & 945 (E.D. Ark. 2002) (holding that the pretrial detainees' due process rights were violated by an excessive wait for restoration treatment—over eight months for inpatient evaluations and over six months for inmates awaiting treatment). Additionally, in *Disability Rts. N. Carolina v. N. Carolina Dep't of Health & Hum. Servs.*, No. 1:24-CV-335, 2025 WL 1665327 (M.D.N.C. June 12, 2025), the court issued a mixed ruling, denying the defendants' motion to dismiss due process claims but also denying the plaintiffs' motion for a preliminary injunction. There, the plaintiffs alleged average wait times of 197 days—over 6.5 months. *Id.* at *3.[10]

---

[10] When comparing New York against cases in other states, it is critically important to note that New York's restoration-to-fitness law differs fundamentally from nearly every other state in that New York defendants facing less serious non-felony charges are *not* required to undergo restoration treatment at all. Pursuant to CPL 730.50, all charges against those defendants are dismissed and they are referred for civil psychiatric treatment. In New York, only defendants facing more serious felony charges are detained while awaiting restoration treatment. Plaintiffs submitted an expert declaration in support of their motion for a preliminary injunction that acknowledges New York is "one of only a few states"

Second, the Ninth Circuit has developed an outlier body of law embracing due process claims by pretrial detainees awaiting competency restoration and requiring State psychiatric hospitals to admit defendants within days of receipt of an order—notwithstanding the Supreme Court's holding in *Jackson* that arbitrary time limits are not appropriate. The OMH Defendants are not aware of any other jurisdiction that mandates anything like the Ninth Circuit's accelerated timeline. The first of these cases was *Or. Advocacy Ctr. v. Mink*, which affirmed an injunction requiring an Oregon state mental hospital to admit defendants within seven days of a court order finding them unfit to proceed to trial. 322 F.3d 1101, 1105 (9th Cir. 2003). The basis for the injunction was the hospital's "significant, ongoing violations of substantive and procedural due process," which occurred when it held incapacitated criminal defendants in jail for weeks or months. *Id.* at 1122. The court further held that this conduct bore no reasonable relation to the evaluative and restorative purpose for which courts commit those individuals pursuant to *Jackson v. Indiana. Id.*

Over a decade later, in *Trueblood v. Wash. State Dep't of Social & Health Servs.,* 101 F.Supp.3d 1010 (W.D. Wash. 2015), the court also held that detaining a criminal defendant for more than seven days after the incapacity finding was a violation of the defendant's due process rights. *Id.* at 1022.

Courts elsewhere, however, have rejected and criticized the Ninth Circuit's reasoning and declined to follow *Mink* and *Trueblood.* In *United States v. Hylton*, the court noted that the Ninth Circuit's rulings requiring detainees to be placed by a date certain, instead of waiting their turn in line, "has severely impacted the BOP's ability to manage the placement process." 2023 WL 7280170, at *5 n.2. In *Lakey v. Taylor*, the Texas Court of Appeals was unpersuaded by *Mink*'s suggestion that *Jackson v. Indiana* conferred upon detainees "a stand-alone, due-process right to receive competency-restoration treatment," regardless of other factors. 435 S.W.3d at 320 n.9. It explained instead that "any right that

---

that has adopted this "nuanced policy approach." *See* Decl. of Lauren Elizabeth Kois, PhD, ¶ 20 (ECF Dkt. No. 42).

a detainee has to receive competency-restoration treatment arises from the fact that, in some cases, competency-restoration treatment is the state's sole justification for infringing on the detainee's liberty interest in being free from confinement." *Id.*

The *Glendening* court most extensively criticized the Ninth Circuit's logic. It first explored the potential rationale behind *Mink*'s seven-day rule, pointing out that the rule mirrored an Oregon statute requiring the state mental hospital to receive criminal defendants within seven days after an incompetency order. 707 F.Supp.3d at 1088 n.8. More importantly, however, in discussing (and rejecting) the plaintiffs' arguments, the *Glendening* court noted that they almost exclusively relied upon Ninth Circuit cases stemming from *Mink*. *Id.* at 1108–09. These cases, according to the *Glendening* court, rely on a flawed assumption: that *Jackson v. Indiana* forbade all pretrial detention. *Id.* at 1109. As the *Glendening* court correctly explained, that is not so because *Jackson* only forbids irrational pretrial detention. *Id.* The appropriate inquiry under *Jackson*, then, is whether the state hospital's delay is reasonably related to its asserted interest in restoring a detainee's competency. *Id. Glendening* found that it was so related. *Id.*

### D.  Application of the Due Process Cases

Here, the alleged 81-day median wait time for competency restoration treatment in New York is far shorter than the wait times that courts in the Second Circuit and elsewhere have repeatedly found to be consistent with criminal defendants' due process rights. Second Circuit cases have also overwhelmingly concluded that delayed competency restoration treatment does not violate due process where the State defendants show that the nature and length of the delays, caused by issues beyond the State's control, are related to the purpose of restoring the defendants to a capacity to participate in trial. Courts in this Circuit have reasonably given the federal government latitude to structure a reasonable waitlist for inpatient restoration admissions for federal defendants to federal facilities with finite bed space. Having done so, it would be exceedingly unjust—and a violation of

federalism—for this Court to interfere with the State of New York's *more* efficient, shorter waitlist for inpatient restoration admissions of individuals charged with felonies under New York State law. This Court should not follow the outlier example of the Ninth Circuit caselaw, which has been rejected and effectively criticized elsewhere. For all these reasons, the Court should find that Plaintiffs have failed to state a due process claim.

## II.    PLAINTIFFS FAIL TO STATE CLAIMS FOR RELIEF UNDER THE AMERICANS WITH DISABILITIES ACT OR THE REHABILITATION ACT

### A.    Applicable Legal Standards

#### 1.    *Reasonable Accommodation Claims*

Plaintiffs allege that the OMH Defendants have violated Plaintiffs' rights under Title II of the ADA and Section 504 of the Rehabilitation Act by failing to provide Plaintiffs a reasonable accommodation. *See Compl.* ¶¶ 75–84. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Because Section 504 of the Rehabilitation Act and the ADA impose identical requirements," courts in the Second Circuit "consider these claims in tandem." *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999).

To establish a *prima facie* claim under Title II of the ADA or Section 504 of the Rehabilitation Act, a plaintiff must demonstrate "(1) that she is a qualified individual with a disability; (2) that she was excluded from participation in the public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her disability." *Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016) (internal quotation marks omitted). A plaintiff asserting that an entity failed to accommodate his disability must allege "something different about the way the plaintiff is treated 'by reason of his disability.'" *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276–77 (2d Cir. 2003) (quoting 42 U.S.C. § 12132). Furthermore, "to plead a failure to make a

reasonable accommodation, a plaintiff must assert that disabled individuals lack access to a given government resource and suggest a plausible method for remedying that lack of access." *Meekins v. City of New York*, 524 F.Supp.2d 402, 407 (S.D.N.Y. 2007). A plausible accommodation is one "the costs of which, facially, do not clearly exceed its benefits[.]" *Id.* (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).

### 2. Olmstead *Integration Mandate Claims*

Plaintiffs alternatively allege that the OMH Defendants have violated Plaintiffs' rights under Title II of the ADA and Section 504 of the Rehabilitation Act by failing to administer services in a manner that enables Plaintiffs "to receive services in the most integrated setting appropriate to their needs." *Compl.* at ¶¶ 90, 96; *see id.* at ¶¶ 85–97. Under the "integration mandate" set out in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), "'the unjustified institutional isolation of persons with disabilities' is, in and of itself, a prohibited 'form of discrimination.'" *Davis*, 821 F.3d at 260 (quoting *Olmstead*, 527 U.S. at 600). The integration mandate requires a State to provide community-based treatment for disabled persons where (1) "the State's treatment professionals determine that such placement is appropriate," (2) "the affected persons do not oppose such treatment," and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with [similar] disabilities." *Olmstead*, 527 U.S. at 607.

Thus, when a State's medical professionals determine that community-based treatment is "appropriate" and "can be reasonably accommodated" for an individual, considering the state's resources and the needs of other individuals with disabilities, the integration mandate applies and requires a community-based placement. *See id.* at 602 (noting that "the State may generally rely on the reasonable assessments of its own professionals in determining whether an individual" is suitable for a community-based placement and that, "[a]bsent such qualification, it would be inappropriate to remove a patient from a more restrictive setting"). Conversely, the integration mandate does *not* apply

where medical professionals determine that an individual must receive treatment in an institutional setting—for example, where an individual has been determined to pose a danger to himself or others—or where community-based treatment cannot reasonably be accommodated. *See id.* at 602, 607. As with failure-to-accommodate claims, the integration mandate analysis is the same under both Title II of the ADA and Section 504 of the Rehabilitation Act. *See Davis*, 821 F.3d at 259–60.

### B. Plaintiffs Fail to State a Claim Under the ADA or Rehabilitation Act As To the Purported "Delays Class"

#### 1. *The Purported Delays Class Members Fail To State a Reasonable Accommodation Claim*

Plaintiffs fail to state claims for relief under a failure-to-accommodate theory as to the purported "Delays Class" for two reasons: (1) they have not plausibly alleged that they were denied care and treatment "due to [their] disability[,]" *Davis*, 821 F.3d at 259; and (2) they fail to allege an available accommodation "the costs of which, facially, do not clearly exceed its benefits[,]" *Borkowski*, 63 F.3d at 138.

First, Plaintiffs allege that, by delaying transfers to secure forensic psychiatric facilities, the OMH Defendants have "violated Delays Class members' right to a reasonable accommodation—timely competency restoration[.]" *Compl.* ¶ 11. However, Plaintiffs fail to plausibly allege that any delays in transfer and provision of competency restoration services are due to Plaintiffs' disability. On the contrary the Complaint states multiple times that the transfer delays are due to other reasons: allegedly insufficient resources, including a shortage of beds and staffing. *See id.* ¶¶ 8, 21, 28–29; *id.* ¶ 8 (alleging a "mismatch between [OMH's] system and the demand for services"). In determining whether plaintiffs have been denied a reasonable accommodation "due to their disabilities," the Second Circuit has held that "'[i]n assessing whether one cause among many constitutes [a] proximate cause,' plaintiffs must establish that their 'disabilities were a substantial cause of their inability to obtain

services,' rather than 'so remotely or insignificantly related to their disabilities as not to be by reason of them.'" *Tardif v. City of New York*, 991 F.3d 394, 405 (2d Cir. 2021) (quoting *Henrietta D.*, 331 F.3d at 278–79) (alterations in original).

Here, even accepting Plaintiffs' allegations as true, the transfer delays experienced by members of the purported Delays Class have occurred because of the finite resources available, coupled with the ongoing yearly increase in the number of commitment orders issued—factors which are outside of OMH's control and which have nothing to do with Plaintiffs' disability. *See Compl.* ¶¶ 8, 21, 28–29. Indeed, if OMH had the necessary bed space available, it would take custody of all defendants currently awaiting transfer to a secure psychiatric facility; however, it is unable to do so.

Once again, this precise issue has been litigated in multiple cases. Multiple courts have concluded, under similar circumstances, that plaintiffs failed to plausibly allege that transfer delays occurred due to their disability. In *Matthew P. v. Neifeld*, 80 Misc. 3d 950, 959 (N.Y. Sup. Ct. Putnam Cnty. 2023), *aff'd* No. 2023-09105 (N.Y. App. Div., 2d Dep't Oct. 15, 2025), the court rejected an ADA claim from a CPL 730 defendant who was waiting for transfer to the custody of the New York State Office for People with Developmental Disabilities ("OPWDD").[11] The court concluded that the plaintiff "was not denied care and treatment due to his disability," but rather that OPWDD delayed his transfer to a secure facility due to finite resources. Likewise, in *Winters v. Arkansas Department of Health & Human Services*, 491 F.3d 933, 936–37 (8th Cir. 2007), the Eighth Circuit upheld the denial of ADA and Rehabilitation Act claims brought by the estate of a pretrial detainee who died while on a waitlist for admission to a State psychiatric hospital. The court concluded that the decedent "was not denied admittance to the State Hospital on the basis of his disability, but for lack of available

---

[11] Pursuant to CPL 730, a felony defendant who is found unfit to stand trial due to a developmental disability is transferred to the custody of OPWDD, rather than OMH. The process otherwise works the same as it does for defendants with a mental illness.

space" and noted that while "a policy of same-day or immediate admission to an appropriate mental health facility may be desirable in the best of all worlds, it is not mandated by the ADA, the Rehabilitation Act, or the Constitution, and it may not always be feasible given a state's limited resources." *Id.* at 937. The Eighth Circuit also noted that "the solution to the problem of an inadequate number of available mental health treatment facilities requires decisions of how to best allocate available resources, and those decisions belong to the legislative branch." *Id.* Other courts have reached the same result. *See Disability Rts. N.C.*, 2025 WL 1665327, at *3 (concluding that plaintiff failed to allege that the defendant agency's "failures in administering its [competency restoration] services or failures to make reasonable modifications to its policies or procedures associated with wait times were in any way caused by, or motivated by, a disability"); *M.S. v. County of Ventura*, No. 16-CV-3084, 2016 WL 11506613, at *12 (C.D. Cal. Oct. 24, 2016) (noting that "[p]laintiffs do not allege that [defendants'] 'one in, one out' policy has anything to do with [p]laintiffs' disability; rather . . . it appears that this alleged policy is due to a lack of space" and "[d]efendants cannot be held liable for discrimination under the ADA or Rehabilitation Act because [the] [s]tate [h]ospital lacks space to accommodate [p]laintiffs"). Accordingly, Plaintiffs fail to plausibly allege that the denial of "timely competency restoration" is *because of* the purported Delays Class members' disabilities.

Second, Plaintiffs assert failure-to-accommodate claims but fail to allege any "plausible method for remedying a lack of access[,]" *Meekins*, 524 F. Supp. 2d at 407, "the costs of which, facially, do not clearly exceed its benefits[,]" *Borkowski*, 63 F.3d at 138. The ADA and Rehabilitation Act require that "covered entities make reasonable accommodations in order to provide qualified individuals with an equal opportunity to receive benefits from or participate in programs run by such entities[,]" *Mary Jo C. v. N.Y. State & Loc. Ret. Sys.*, 707 F.3d 144, 153 (2d Cir. 2013) (internal quotation marks omitted), but "a defendant need not make an accommodation at all if the requested accommodation 'would fundamentally alter the nature of the service, program, or activity[,]'" *Powell v.*

*Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 88 (2d Cir. 2004) (quoting 28 C.F.R. § 35.130(b)(7)). "Consequently, to plead a failure to make a reasonable accommodation, a plaintiff must assert that disabled individuals lack access to a given government resource and suggest a plausible method for remedying that lack of access." *Meekins*, 524 F.Supp.2d at 407. "A plausible accommodation is one 'the costs of which, facially, do not clearly exceed its benefits.'" *Id.* (quoting *Borkowski*, 63 F.3d at 138). If a plaintiff fails to plead the existence of a plausible accommodation, the court's analysis stops there. For example, in *Lawtone-Bowles v. City of New York*, the plaintiff's requested reasonable accommodation was simply that she wished to be provided with "accommodations without restrictions." No. 21-CV-5620, 2021 WL 2942013, at *5 (S.D.N.Y. July 12, 2021). The court in that case found that the plaintiff failed to state a claim for relief under the ADA and Rehabilitation Act, concluding that "[p]laintiff's request that [d]efendants provide 'accommodations without restrictions' is insufficient to show that a reasonable accommodation is available." *Id.*

Here, Plaintiffs have failed to plausibly allege the existence of *any* specific accommodation, much less one the costs of which facially do not clearly exceed its benefits. The Complaint vaguely states that Plaintiffs seek a reasonable accommodation in the form of "timely competency restoration." *Compl.* ¶ 11. However, Plaintiffs wholly fail to allege what specific accommodations or practical changes to OMH policy or practice would allow OMH to immediately admit and treat every CPL 730 defendant currently on the waitlist, as well as every new CPL 730 defendant sent by New York Supreme Court with an inpatient treatment order, with no wait time. They simply would like this Court to order that result into being, regardless of any logistical or practical impediment.[12] Just as in

---

[12] Even in the context of Plaintiffs' motion for class certification and motion for a preliminary injunction—for which Plaintiffs are required to provide *evidence* in support of their claims—they fail to provide any specificity about what actions they believe are available to OMH that, if taken, would immediately eliminate the waitlist for CPL 730 defendants. This deficiency is abundantly clear in Plaintiffs' proposed preliminary injunction order, which, in contravention of Rule 65, vaguely and

*Lawtone-Bowles*, Plaintiffs in this case engage in circular reasoning, arguing that the way to remedy transfer delays is for OMH to not delay transfers, without offering any suggestions as to how this practically would be accomplished in light of the significant systemic challenges involved. This is despite Plaintiffs' acknowledgement at various points in the Complaint that OMH faces significant logistical challenges due to an increase in commitment orders and a shortage of available beds and staffing. *See id.* ¶¶ 8, 21, 28–29.

Moreover, although OMH has in fact taken multiple, practical steps to reduce the waitlist, including a series of expansion projects that will increase OMH's capacity to treat CPL 730 patients over time, *see supra* Statement of Alleged Facts, Section IV, the Complaint strategically omits any mention of those efforts, other than to the extent that information is incorporated into the Complaint by reference to the Schatzel Affidavit. As a result, Plaintiffs have failed to articulate whether they believe those steps are insufficient, and if so, what additional specific steps they believe are required by the ADA or Rehabilitation Act.

Furthermore, even if Plaintiffs had proposed a specific accommodation that would allegedly eliminate the wait time for admission to OMH facilities, it would need to be one for which the costs do not clearly exceed its benefits. *See Borkowski*, 63 F.3d at 138. That is no small task, given the immense public costs involved in the construction projects that will expand capacity in OMH secure psychiatric facilities. As the OMH Director of the Bureau of Institutional and Transitional Services attested to in written testimony that the Complaint incorporates by reference:

> While OMH is well aware of the implications of having a waitlist for felony CPL 730 admissions, it is simply not possible for OMH to instantly create new forensic beds, or do so within any relatively short timeframe. OMH's secure facilities operate at full capacity and so creating any additional forensic beds would require additional funding, approvals from various oversight agencies, and the procurement and

---

unhelpfully states that Commissioner Sullivan should simply "provide timely and effective competency restoration services to Plaintiffs and the Delays Class members." (ECF Dkt. No. 34).

> completion of construction and buildout projects. In sum, it is a
> process that would take years, not months. . . . Further, one of the
> biggest challenges OMH continues to face preventing the construction
> of new secure facilities or the expansion of existing ones is a severe
> staffing shortage. . . . Even if a secure facility could be built overnight,
> OMH would be hard pressed to adequately staff it under current
> conditions.

*Schatzel Aff.* ¶¶ 11–12. Thus, even if Plaintiffs had alleged an available accommodation that would immediately eliminate the waitlist for CPL 730 defendants, they would need to explain how the costs of that proposed accommodation do not clearly exceed its benefits, despite the immense logistical and resources challenges involved. *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016) (noting that not all public services can be made accessible "without a prohibitive cost or unreasonable effort on the part of the public entity" and any proposed modification is only reasonable "if it is 'reasonable on its face' or used 'ordinarily or in the run of cases' and will not cause 'undue hardship'" (quoting *Halpern v. Wake Forest Univ. Health Servs.*, 669 F.3d 454, 464 (4th Cir. 2012))). Plaintiffs have made no attempt to clear this pleading requirement.

For the foregoing reasons, Plaintiffs fail to plausibly allege (1) that the denial of care and treatment for the Delays Class members was due to their disability, and (2) that there is an available accommodation, the costs of which do not clearly exceed the benefits. Accordingly, as to the purported Delays Class members, Plaintiffs fail to state a claim for relief under a failure-to-accommodate theory.

### 2. *The Purported Delays Class Members Fail To State a Claim Under* Olmstead

Plaintiffs fail to state claims for relief under an integration mandate theory as to the purported "Delays Class" for two reasons. First, any delay in transfer to a secure psychiatric facility does not implicate the integration mandate because Plaintiffs would be institutionalized and unable to engage in community-based interactions regardless of whether they are in jail or an OMH facility. *See Davis*, 821 F.3d at 260 (noting that the integration mandate prohibits the "unjustified institutional isolation

of persons with disabilities"). And second, Plaintiffs fail to allege that any state professional has determined that a less restrictive community setting is appropriate for the purported Delays Class members. *See Olmstead*, 527 U.S. at 607 (noting that "the State's treatment professionals [must] determine that such [community-based] placement is appropriate").

First, Plaintiffs allege that the OMH Defendants have violated their rights under the integration mandate set out in *Olmstead*, which prohibits "the unjustified institutional isolation of persons with disabilities" and requires that people with disabilities be served in the most integrated setting appropriate to their needs. *Id.* at 600. However, the purported Delays Class members share a key characteristic which places them wholly outside of the purview of *Olmstead*'s mandate—namely, they are all individuals who are justifiably institutionalized and who will remain institutionalized regardless of transfer, whether in jail or an OMH facility. A New York state court considered this distinction in *Matthew P. v. Neifeld*, 80 Misc. 3d 950 (N.Y. Sup. Ct. Putnam Cnty. 2023). There, a CPL 730 defendant challenged the delay in his transfer to an OPWDD facility. In that case, the Court rejected the plaintiff's *Olmstead* claim and concluded that the plaintiff's transfer delay "simply d[id] not implicate the 'integration mandate' because, upon transfer, he would justifiably be isolated in an institutionalized care facility and deprived of interaction with nondisabled persons[.]" *Id.* at 971.

Second, *Olmstead* dealt with a situation in which people with disabilities were being isolated in institutional settings, despite the state's own treatment professionals having determined that a community-based setting was appropriate. *See Olmstead*, 527 U.S. at 602. The integration mandate does not apply to individuals who *require* an institutional setting for competency restoration services and who are awaiting transfer from one institutional setting to another. *See Winters*, 491 F.3d at 936–37 (concluding that *Olmstead* did not apply to a defendant who was awaiting transfer to a state hospital, given that no treatment professionals had determined that he required a less restrictive community-based placement). In *Disability Rights North Carolina*, the court found that *Olmstead* did not apply to a

pre-trial detainee experiencing delays in treatment. 2025 WL 1665327, at *16. The court noted that "there [were] no allegations that treatment professionals have recommended that the [incapable to proceed to trial] detainees be placed in community-based settings. Rather the allegations [ ] [were] that the [ ] detainees [were] languishing in jails for prolonged periods of time[] awaiting capacity assessments and restoration services." *Id.* For this reason, the court found that the plaintiffs' claims did not implicate the integration mandate. *See id.*

Similarly here, Plaintiffs allege that the Delays Class members remain unjustifiably confined in jail while awaiting transfer to an OMH facility, but nowhere in their Complaint do they allege that the State's treatment professionals have recommended community-based placements for these individuals. *See generally Compl.* In fact, they allege the opposite—that after an evaluation by CHS and CPL 730 proceedings, a New York Supreme Court judge has ordered them to undergo *inpatient* competency restoration services in an OMH facility. *See id.* ¶¶ 22–25 (describing the CPL 730 evaluation and determination process); *id.* ¶ 26 (noting that once a court issues a commitment order for "hospital-based competency restoration," the defendant "must wait in jail, typically at Rikers Island, for transfer to an OMH hospital"); *id.* ¶ 65 (stating that the Delays Class members are individuals who have received a CPL 730 order for competency restoration services and "who remained confined in a New York City Department of Correction jail pending competency restoration services"). Thus, the integration mandate is wholly inapplicable to the circumstances of the purported Delays Class members.

For the foregoing reasons, Plaintiffs fail to plausibly allege facts which would implicate the integration mandate set out in *Olmstead.* Accordingly, as to the purported Delays Class members, Plaintiffs fail to state a claim for relief under an integration mandate theory.

**C. Plaintiffs Fail To State a Claim Under the ADA or Rehabilitation Act As To the Purported "Integration Class"**

**1. *The Purported Integration Class Members Fail To State a Claim of Discrimination "Due to Their Disability"***

Plaintiffs fail to state a claim of discrimination as to the purported "Integration Class." Similar to the purported Delays Class, the Integration Class has not plausibly alleged that they were denied care and treatment "due to [their] disability." *Davis*, 821 F.3d at 259.

As an initial matter, there is an important internal inconsistency in the Complaint concerning how, precisely, the purported Integration Class alleges that their rights have been violated. In some parts of the Complaint, Plaintiffs allege that the Integration Class are individuals "who do not receive an individualized assessment of the most integrated setting appropriate to their needs[.]" *Compl.* ¶ 66. In other places, Plaintiffs allege that the Integration Class members are individuals who are denied community-based treatment "even though they are eligible for and would benefit from outpatient competency restoration services[.]" *Id.* ¶ 37. These are contradictory positions. Plaintiffs fail to explain how it can be true that the Integration Class members have uniformly not been assessed for eligibility for community treatment, but also true that they have as a class been assessed and found to be eligible for community treatment. In any event, the Complaint is devoid of any factual support for the conclusory assertion that Integration Class members are "eligible" for community-based treatment.

Inconsistencies aside, the Integration Class has not alleged that its members were denied care and treatment due to their disability. "'In assessing whether one cause among many constitutes [a] proximate cause,' plaintiffs must establish that their 'disabilities were a substantial cause of their inability to obtain services,' rather than 'so remotely or insignificantly related to their disabilities as not to be by reason of them.'" *Tardif*, 991 F.3d at 405 (quoting *Henrietta D.*, 331 F.3d at 278–79) (alterations in original). Moreover, a plaintiff fails to state a claim where he fails to allege that a defendant agency's "failures in administering its [competency restoration] services or failures to make reasonable

modifications to its policies or procedures associated with wait times were in any way caused by, or motivated by, a disability[.]" *Disability Rts. N.C.*, 2025 WL 1665327, at *3.

Far from establishing that their disabilities were a "substantial cause" of the alleged lack of individualized assessment and community-based placement, Plaintiffs' Complaint is completely devoid of allegations that the Integration Class members were denied an individualized assessment or any care and treatment "by reason of [their] disability[.]" 42 U.S.C. § 12132; *see generally Compl.* Rather, Plaintiffs allege that none of the Integration Class members were "identified or assessed for outpatient competency restoration services *due to OMH's, DOHMH's, and HHC's deficient assessment and evaluation policies and practices.*" *Compl.* ¶ 40 (emphasis added). Furthermore, Plaintiffs do not state that OMH's alleged "failures in administering its [competency restoration] services or failures to make reasonable modifications to its policies or procedures associated with wait times were in any way caused by, or motivated by, a disability[.]" *Disability Rts. N.C.*, 2025 WL 1665327, at *3; *see generally Compl.* Accordingly, Plaintiffs fail to state a claim of discrimination under the ADA or Rehabilitation Act.[13]

### 2. *The Purported Integration Class Members Fail To State an* Olmstead *Claim*

Plaintiffs also fail to state a claim for relief under an integration mandate theory as to the purported "Integration Class." Plaintiffs do not allege that any State professional has determined that a less restrictive community setting is appropriate for the purported Integration Class members. *See Olmstead*, 527 U.S. at 607 (noting that "the State's treatment professionals [must] determine that such [community-based] placement is appropriate"). On the contrary, Plaintiffs *concede* that after an

---

[13] Plaintiffs do not appear to allege violations of the ADA and Rehabilitation Act under a failure-to-accommodate theory as to the Integration Class. *See generally Compl.* ¶¶ 85–97. However, even if Plaintiffs had alleged a failure to accommodate, they would have failed to state a claim under this theory of liability as well, given that they do not allege any "plausible method for remedying a lack of access[,]" *Meekins*, 524 F.Supp.2d at 407, "the costs of which, facially, do not clearly exceed its benefits[,]" *Borkowski*, 63 F.3d at 138. *See generally Compl.*

evaluation by CHS and CPL 730 proceedings, a New York Supreme Court judge has ordered them to undergo *inpatient* competency restoration services in an OMH facility. *See Compl.* ¶¶ 22–25 (describing the CPL 730 evaluation and determination process); *id.* ¶ 26 (noting that once a court issues a commitment order for "hospital-based competency restoration," the defendant "must wait in jail, typically at Rikers Island, for transfer to an OMH hospital"); *id.* ¶ 12 (noting that Integration Class members have been "commit[ted] . . . to a hospital for competency restoration services"). Pursuant to the New York State Criminal Procedure Law, outpatient treatment is only permissible with the consent of the District Attorney and upon the order of New York Supreme Court. *See* CPL § 730.40(1) (stating that a temporary order of observation must be issued for a CPL 730 defendant charged with a felony and that "*upon the consent of the district attorney*," the court may "commit[] him or her to the custody of the commissioner for care and treatment on an out-patient basis" (emphasis added)); *Compl.* ¶ 52 ("The district attorney must consent to it before any patient can receive an outpatient competency restoration order."). The Integration Class members have not qualified for outpatient treatment through this process, and so the integration mandate does not apply. In essence, Plaintiffs seem to be pursuing a novel theory that the ADA and Rehabilitation Act contain a hidden mandate that States *must* release a psychiatrically unfit criminal defendant for outpatient treatment, even when the District Attorney and criminal court have found that the defendant requires *inpatient* restoration treatment, based on the defendant's own assertion that he is "eligible" for community treatment. This theory finds no support in *Olmstead* and its progeny.

Plaintiffs' Integration Class claims against the OMH Defendants are deficient for the further reason that OMH is not a party to CPL 730 proceedings, cannot intervene in such a proceeding, and therefore has no authority to second-guess a commitment order or place defendants in a community-based treatment setting. *See People v. B.D.*, 79 Misc. 3d 920, 921–22 (Sup. Ct. N.Y. Cnty. 2023) (concluding that OMH could not intervene in a CPL 730 proceeding). Once OMH is in receipt of a

New York Supreme Court order mandating that OMH take custody of a criminal defendant to provide inpatient treatment, OMH "lack[s] discretion to place [Plaintiffs] in a community residence[.]" *Matter of Matthew P.*, 80 Misc. 3d at 971.

The case of *Summers v. Louisiana*, No. 20-CV-21, 2022 WL 4490161 (M.D. La. Sept. 27, 2022), is particularly instructive on this point. The court in that case concluded that plaintiffs—a portion of whom were criminal defendants deemed incompetent to stand trial—failed to state a claim under *Olmstead* against the Louisiana Department of Health & Hospitals ("LDOH") because LDOH "played no role in their commitment to [an inpatient facility] and ha[d] no ability to release them." *Id.* at *22. Rather, the plaintiffs' "commitment was based on a state court finding and order[.]" *Id.* Additionally, the court noted that "[u]nless and until [p]laintiffs can allege facts showing that one or more of them has met the requirements of state law for release into the community (or that the meeting of such requirements is imminent and not merely speculative)," plaintiffs' allegations were insufficient as a matter of law to demonstrate standing. *Id.* at *23. The plaintiffs had alleged that although they did not have a current recommendation for community-based treatment, "[their] individual needs [were] not static and [they] w[ould] likely obtain a recommendation for community-based treatment in the future." *Id.* at *2. The court deemed this a "bare-bones, factually unsupported allegation [which was] inadequate to meet [p]laintiffs' burden to sufficiently allege that the relief sought w[ould] redress [p]laintiffs' alleged injury." *Id.* at *24.  The court also noted that "more importantly, what [p]laintiffs have failed to plead is not merely that some treatment professional has recommended them for community placement, but that the state court which ordered [p]laintiffs committed [for inpatient treatment] has found that they are eligible under state law to be released to the community." *Id.* at *23.

Similarly here, Plaintiffs allege in conclusory fashion that the Integration Class members are "eligible for and would benefit from outpatient competency restoration services[,]" *Compl.* ¶ 37, without any factual support and despite the fact that a court has already determined that they require

*inpatient* competency restoration services.[14] The Complaint is conspicuously silent as to why Plaintiffs believe the Integration Class members are "eligible." *See generally id.* This "bare-bones" and "speculative" assertion is insufficient as a matter of law to demonstrate standing.[15] *Summers*, 2022 WL 4490161, at *24.

### 3. None of Plaintiffs' Other Allegations About the Outpatient Restoration Program States a Claim Under the ADA and Rehabilitation Act

Finally, the Complaint contains various other allegations about the outpatient restoration to fitness program in New York State, including that OMH has allegedly failed to issue guidance concerning individualized assessments for outpatient restoration services, *see Compl.* ¶¶ 32–37, and that the outpatient restoration program is underdeveloped, *see id.* ¶¶ 51–58. None of these complaints state a claim for relief under the ADA and Rehabilitation Act.

First, Plaintiffs allege that OMH "has not issued standards or developed forms, manuals, or policies mandating that the CHS doctors who conduct competency exams determine a person's individual service needs, including whether hospitalization is necessary for restoration." *Id.* ¶ 33. However, they concede that the *New York City Department of Health and Mental Hygiene ("DOHMH")*, not OMH, "serves as the director of community mental health services for New York City and in that capacity *develops, implements, and oversees New York City's competency examinations conducted pursuant to [CPL § 730.30]*." *Id.* ¶ 18 (emphasis added). And moreover, the Complaint contains internal inconsistencies

---

[14] Plaintiffs also claim that the individual named Plaintiffs are eligible for community-based treatment. *See Compl.* ¶¶ 14–15. However, again, these allegations are conclusory and devoid of factual support given that determinations have already been made that these individual Plaintiffs require inpatient treatment. *See id.*

[15] It is worth noting that even in *Summers*, where the court found that plaintiffs' bare-bones assertions regarding eligibility for outpatient services were insufficient, the plaintiffs had at least alleged that treatment professionals had recommended outpatient placements for certain plaintiffs in the past. *See Summers*, 2022 WL 4490161, at *2. There is no such allegation from Plaintiffs here, making Plaintiffs' allegations even sparser than those of the plaintiffs in *Summers*. *See generally Compl.*

on this point, stating both that OMH has not issued appropriate guidance while also conceding that OMH *has* issued guidance regarding outpatient restoration. *See id.* ¶ 35. To the extent Plaintiffs have critiques about the substance of these OMH guidance materials, this is not a proper subject for an integration mandate claim.[16] Plaintiffs also complain that OMH has allegedly failed to implement a protocol whereby OMH would independently reassess a defendant for outpatient restoration in the weeks or months following the issuance of an *inpatient* commitment order, although Plaintiffs fail to explain how such a protocol would be consistent with CPL 730. *Id.* ¶ 37.

Second, Plaintiffs also allege that OMH's outpatient restoration program is slow and underdeveloped. *See id.* ¶¶ 51–58. However, these allegations are entirely irrelevant to any of Plaintiffs' asserted causes of action. The purported Integration Class consists of individuals who allege they have been denied an assessment for outpatient restoration services, *not* individuals who have received outpatient treatment but found it inadequate. *See id.* ¶ 66. Thus, the Integration Class members also lack standing to assert such claims.[17]

Accordingly, Plaintiffs fail to state a claim under an *Olmstead* integration mandate theory as to the purported Integration Class.

---

[16] Plaintiffs' critiques of the OMH guidance document are extraordinarily pedantic. They complain, for example, that while the document "provides five clinical and environmental factors relevant to outpatient restoration" and contains a "*Suggested* Process for Determining Appropriateness for Outpatient Restoration," it is somehow deficient because it "does not instruct doctors to *affirmatively* and *actively* explore whether hospitalization is necessary[.]" *Compl.* ¶ 35 (first emphasis in original, second emphasis added).

[17] And, in any case, even if Plaintiffs were individuals who had received outpatient restoration services, "a request for an increase in the *quality* of [community-based] services . . . is not cognizable under the ADA or [Rehabilitation Act]." *Lindsay v. Navarretta*, No. 22-CV-1518, 2024 WL 5125954, at *11 (D. Conn. Dec. 16, 2024). To the extent that Plaintiffs allege the outpatient restoration program is "underdeveloped" and thus take issue with the quality of the program, these claims are not cognizable under the ADA or Rehabilitation Act.

## **CONCLUSION**

For the foregoing reasons, the OMH Defendants respectfully request that the Court dismiss

Plaintiffs' Complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6).

Dated:  New York, New York
　　　　October 20, 2025

　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　LETITIA JAMES
　　　　　　　　　　　　　　　　Attorney General
　　　　　　　　　　　　　　　　State of New York
　　　　　　　　　　　　　　　　*Attorney for the OMH Defendants*

　　　　　　　　　　　　　　　By: *Caroline P. Wallitt*
　　　　　　　　　　　　　　　　　——————————————————

　　　　　　　　　　　　　　　　Caroline P. Wallitt
　　　　　　　　　　　　　　　　Haley L. Hawkins
　　　　　　　　　　　　　　　　Assistant Attorneys General
　　　　　　　　　　　　　　　　28 Liberty Street
　　　　　　　　　　　　　　　　New York, New York 10005
　　　　　　　　　　　　　　　　Tel.: (212) 416-6228
　　　　　　　　　　　　　　　　Email: Caroline.Wallitt@ag.ny.gov

## **WORD COUNT CERTIFICATE**
## **PURSUANT TO LOCAL CIVIL RULE 7.1(c)**

The undersigned hereby certifies that this Memorandum of Law contains 13,962 words. This brief

complies with the Court's Individual Rule 2.C, which does not impose a page limit for briefs.

Dated:  New York, New York
　　　　October 20, 2025

　　　　　　　　　　　　　　　*Caroline P. Wallitt*
　　　　　　　　　　　　　　——————————————————
　　　　　　　　　　　　　　　　Caroline P. Wallitt