UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

R.M., by and through next friend Elfego Maldonado
Estrada, and A.B., by and through next friend Kadijah
Hutchinson-McLean, on behalf of themselves and all
others similarly situated,

25-cv-06667 (AKH)

**ORAL ARGUMENT
REQUESTED**

                                    Plaintiffs,

                    -against-

NEW YORK STATE OFFICE OF MENTAL HEALTH;
ANN MARIE T. SULLIVAN, in her official capacity as
Commissioner of the New York State Office of Mental
Health; THE NEW YORK CITY DEPARTMENT OF
HEALTH AND MENTAL HYGIENE, MICHELLE
MORSE, in her official capacity as the Commissioner of the
New York City Department of Health and Mental Hygiene;
and NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION,

                                    Defendants.

-----------------------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General
State of New York
*Counsel for OMH Defendants*
28 Liberty Street
New York, New York 10005

CAROLINE WALLITT
HALEY HAWKINS
Assistant Attorneys General
    *of Counsel*

## TABLE OF CONTENTS

TABLE OF DECLARATIONS AND EXHIBITS ................................................................iiii

TABLE OF AUTHORITIES……………………………………………………………….....iv

PRELIMINARY STATEMENT ...............................................................................................1

STATEMENT OF FACTS ........................................................................................................5

    I.    THE CPL 730 STATUTORY SCHEME .................................................................5

    II.    TRANSFER PROCESS FOR OMH INPATIENT TREATMENT OF CPL 730 FELONY DEFENDANTS ..............................................................................................6

    III.    ACCESS TO PSYCHIATRIC TREATMENT FOR CPL 730 DEFENDANTS ...................8

    IV.    RESTORATION-TO-FITNESS TREATMENT .........................................................8

    V.    OBSTACLES TO PROMPT DISCHARGE OF CPL 730 DEFENDANTS ........................8

    VI.    POST-COVID INCREASE IN 730 ORDERS ........................................................10

    VII.    MAJOR OMH PROJECTS TO INCREASE CAPACITY TO TREAT CPL 730 DEFENDANTS ..............................................................................................11

    VIII. PROHIBITION ON OVERCROWDING OMH HOSPITALS ....................................12

    IX.    ALLOCATING FINITE OMH RESOURCES AMONG POPULATIONS IN NEED OF SERVICES ..................................................................................................13

    X.    THE INDIVIDUAL PLAINTIFFS ......................................................................14

STANDARD OF REVIEW .....................................................................................................14

ARGUMENT............................................................................................................................15

    I.    PLAINTIFFS' PROPOSED INJUNCTION VIOLATES THE SPECIFICITY REQUIREMENTS OF FED. R. CIV. P. 65 ........................................................15

    II.    PLAINTIFFS HAVE NOT ESTABLISHED A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS..............................................................................................17

        A.    Plaintiffs' Claims Fail on the Facts .......................................................17

        B.    Plaintiffs' Claims Fail on the Law ........................................................20

            1.    Plaintiffs Have Not Established a Clear Likelihood of Success as to the Due Process Claims..............................................................................................21

            2.    Plaintiffs Have Not Established a Clear Likelihood of Success as to the ADA and Rehabilitation Act Claims....................................................................................26

                a.    *Reasonable Accommodation Theory* ...............................................27

                b.    Olmstead *Integration Mandate Theory* .........................................31

III.   PLAINTIFFS FAIL TO ESTABLISH IRREPARABLE HARM..............................................32

    A.   Plaintiffs' Alleged Constitutional Violations...........................................................32

    B.   Plaintiffs' Alleged "Risk of Serious Injury"...........................................................33

IV.   THE PROPOSED INJUNCTION IS NOT IN THE PUBLIC INTEREST ......................37

CONCLUSION.........................................................................................................................42

## <u>TABLE OF DECLARATIONS AND EXHIBITS</u>

Declaration of Matthew S. Schatzel, dated October 31, 2025, which includes the following exhibits:

A.   New York State Dormitory Auth., RFPs Bids OMH Mid-Hudson Forensic Psychiatric Center New Forensic Replacement Hospital BP2 Base Building;

B.   New York State Division of Budget, Press Release, *Governor Hochul Signs Legislation to Improve Mental Health Care and Strengthen Treatment for Serious Mental Illness as Part of FY 2026 Budget*, dated May 9, 2025;

C.   N.Y. Assembly Bill A2322-B, 248th Sess. (2025-2026);

D.   New York State Unified Court Sys., *First Report of the New York State Judicial Task Force on Mental Illness* (Feb. 1, 2025);

E.   NRI, *FY 2019 State Mental Health Agency Revenues and Expenditures,* January 2022;

F.   Mental Health America, *The State of Mental Health in America – 2025;*

Declaration of Caroline P. Wallitt, dated November 3, 2025, which includes the following exhibits:

G.   Decision and Order On Motion for Contempt in *People v. D.W.,* Ind. No. 70034-24, dated August 29, 2025; and

H.   Decision and Order in *People v. R.S.,* Ind. Nos. 70212-25 & 70209-25, dated October 28, 2025.

## TABLE OF AUTHORITIES

**Cases**

*Advocacy Center for Elderly and Disabled v. Louisiana Department of Health & Hospitals,*
   731 F.Supp.2d 603, 625 (E.D. La. 2010)............................................................................37

*Agostini v. Backus,*
   No. 14-CV-6188, 2015 WL 1579324 (W.D.N.Y. Apr. 9, 2015)........................................34

*Ahlschlager v. Imhof,*
   No. 24-CV-8267, 2024 WL 5168732 (E.D.N.Y. Dec. 19, 2024) .................................35–36

*Auracle Homes, LLC v. Lamont,*
   478 F.Supp.3d 199 (D. Conn. 2020)..................................................................................32

*Averhart v. Annucci,*
   No. 21-cv-383, 2021 WL 2383556 (S.D.N.Y. June 10, 2021)...........................................41

*Borkowski v. Valley Central School District,*
   63 F.3d 131 (2d Cir. 1995) .................................................................................27, 29, 30

*City of New York v. Mickalis Pawn Shop, LLC,*
   645 F.3d 114 (2d Cir. 2011) ..............................................................................................15

*Cosgrove v. Board of Education of Niskayuna Central School District,*
   175 F.Supp.2d 375 (N.D.N.Y. 2001)..................................................................................36

*Davis v. Shah,*
   821 F.3d 231 (2d Cir. 2016) ........................................................................................27, 31

*Dean v. DeBejian,*
   No. 22-CV-746, 2022 WL 17842983 (N.D.N.Y. Dec. 22, 2022)......................................34

*Deshawn v. Safir,*
   156 F.3d 340 (2d Cir. 1998) ..............................................................................................33

*Disability Rights North Carolina v. North Carolina Department of Health & Human Services,*
   No. 24-CV-335, 2025 WL 1665327 (M.D.N.C. June 12, 2025) ............................29, 38, 41

*Donohue v. Paterson,*
   715 F.Supp.2d 306 (N.D.N.Y. 2010)..................................................................................32

*Farmer v. Brennan,*
    511 U.S. 825 (1994) .................................................................................34

*Fisher v. Goord,*
    981 F.Supp. 140 (W.D.N.Y. 1997) ................................................33–34

*Frey v. Bruen,*
    No. 21-CV-5334, 2022 WL 522478 (S.D.N.Y. Feb. 22, 2022) ............32

*Friends of the East Hampton Airport, Inc. v. Town of East Hampton,*
    841 F.3d 133 (2d Cir. 2016) ....................................................................15

*Glendening, as Next Friend of G.W. v. Howard,*
    707 F.Supp.3d 1089 (D. Kan. 2023) ..............................................24–26

*Goldberg v. Kelly,*
    397 U.S. 254 (1970) .................................................................................36

*Grand River Enterprise Six Nations, Ltd. v. Pryor,*
    481 F.3d 60 (2d Cir. 2007) ..............................................................33, 37

*Henrietta D. v. Bloomberg,*
    331 F.3d 261 (2d Cir. 2003) ............................................................27–28

*Indiana Protection & Advocacy Services Commission v. Indiana Family & Social Services Administration,*
    630 F.Supp.3d 1022 (S.D. Ind. 2022) ...................................................25

*Jackson v. Indiana,*
    406 U.S. 715 (1972) ..............................................................................9, 21

*Joglo Realties, Inc. v. Seggos,*
    No. 16-CV-1666, 2016 WL 4491409 (E.D.N.Y. Aug. 24, 2016) .........32

*JSG Trading Corporation v. Tray-Wrap, Inc.,*
    917 F.2d 75 (2d Cir. 1990) ......................................................................35

*Lakey v. Taylor,*
    435 S.W.3d 309 (Tex. App. 2014) .........................................................25

*M.S. v. County of Ventura,*
    No. 16-CV-3084, 2016 WL 11506613 (C.D. Cal. Oct. 24, 2016).........29

*Mary Jo C. v. New York State & Local Retirement System,*
   707 F.3d 144 (2d Cir. 2013) ................................................................................29

*Matthew P. v. Neifeld,*
   80 Misc. 3d 950 (N.Y. Sup. Ct. Putnam Cnty. 2023) ...........................................28

*Meekins v. City of New York,*
   524 F.Supp.2d 402 (S.D.N.Y. 2007) ...........................................................27, 29, 30

*Monserrate v. New York State Senate,*
   599 F.3d 148 (2d Cir. 2010) ................................................................................14

*Murray v. Cuomo,*
   No. 20-CV-03571, 2020 WL 2521449 (S.D.N.Y. May 18, 2020) .........................15

*New York v. Shinnecock Indian Nation,*
   560 F.Supp.2d 186 (E.D.N.Y. 2008) ....................................................................15

*Nken v. Holder,*
   556 U.S. 418 (2009) ..............................................................................................38

*Lawtone-Bowles v. City of New York,*
   No. 21-CV-5620, 2021 WL 2942013 (S.D.N.Y. July 12, 2021) ............................30

*Nunez v. New York City Department of Correction,*
   11-CV-5845 (S.D.N.Y.) .........................................................................................34

*Nunez v. New York City Department of Correction,*
   782 F.Supp.3d 146 (S.D.N.Y. 2025) .....................................................................34

*Olmstead v. L.C. ex rel. Zimring,*
   527 U.S. 581 (1999) ..............................................................................................31

*Oregon Advocacy Center v. Mink,*
   322 F.3d 1101 (9th Cir. 2003) ..............................................................................25

*Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services,*
   769 F.3d 105 (2d Cir. 2014) ................................................................................37

*Paykina v. Lewin,*
   387 F.Supp.3d 225 (N.D.N.Y. 2019) ...............................................................35–36

*People v. B.D.*,
    79 Misc. 3d 920 (Sup. Ct. N.Y. Cnty. 2023) ............................................................10

*People v. D.W.*,
    Ind. No. 70034/24 (Sup. Ct. Bronx Cnty. Aug. 29, 2025) ......................................19

*People v. L.G.*,
    208 N.Y.S.3d 469 (Sup. Ct. N.Y. Cnty. 2024) ........................................................19

*People v. R.R.*,
    Ind. No. 71441-23/001 (Co. Ct. Erie Cnty. Apr. 24, 2025) .....................................10

*People v. R.S.*,
    Ind. Nos. 70212-25 & 70219-25 (Sup. Ct. Kings Cnty. Oct. 28, 2025) ..................19

*Peregrine Myanmar Limited v. Segal*,
    89 F.3d 41 (2d Cir. 1996) ..........................................................................................4

*Powell v. National Board of Medical Examiners*,
    364 F.3d 79 (2d Cir. 2004) ......................................................................................29

*Rell v. Rumsfeld*,
    389 F.Supp.2d 395 (D. Conn. 2005) ........................................................................33

*Reynolds v. Giuliani*,
    35 F.Supp.2d 331 (S.D.N.Y. 1999) ....................................................................36–37

*Rodriguez v. City of New York*,
    197 F.3d 611 (2d Cir. 1999) ....................................................................................27

*S.C. Johnson & Son, Inc. v. Clorox Company*,
    241 F.3d 232 (2d Cir. 2001) ....................................................................................15

*Smith v. Fredrico*,
    No. 12-CV-4408, 2013 WL 122954 (E.D.N.Y. Jan. 8, 2013) .................................32

*Smith v. Halstead*,
    No. 24-CV-6855, 2024 WL 4389284 (S.D.N.Y. Oct. 3, 2024) ...............................16

*T.C. v. New York State Department of Health*,
    No. 22-CV-5045, 2022 WL 17689841 (S.D.N.Y. Dec. 15, 2022) ..............16, 32, 40

*Tardif v. City of New York,*
 991 F.3d 394 (2d Cir. 2021) ................................................................................28

*Thomas v. New York City Board Of Elections,*
 898 F.Supp.2d 594 (S.D.N.Y. 2012) ...................................................................15

*Time Warner Cable of New York City v. Bloomberg L.P.,*
 118 F.3d 917 (2d Cir. 1997) ..........................................................................32–33

*T-Mobile Northeast LLC v. Water Authority of Western Nassau County,*
 249 F.Supp.3d 680 (E.D.N.Y. 2017) ..............................................................35, 37

*Trueblood v. Washington State Department of Social & Health Services,*
 101 F.Supp.3d 1010 (W.D. Wash. 2015) .............................................................25

*Turley v. Giuliani,*
 86 F.Supp.2d 291 (S.D.N.Y. 2000) ................................................................32–33

*United States v. Hylton,*
 No. 18-CR-102, 2023 WL 7280170 (S.D.N.Y. Nov. 3, 2023) .............................23

*United States v. Magassouba,*
 544 F.3d 387 (2d Cir. 2008) ........................................................................21–22, 24

*United States v. Olaniyi,*
 No. 21-CR-350, 2024 WL 4500921 (E.D.N.Y. Oct. 15, 2024) ......................23–24

*United States v. Smith,*
 764 F.Supp.2d 541 (W.D.N.Y. 2011) ..................................................................24

*United States v. Young,*
 No. 21-CR-6010L, 2022 WL 7087140 (W.D.N.Y. Oct. 12, 2022)................. 22–23, 40–41

*V.W. v. Conway,*
 236 F.Supp.3d 554 (N.D.N.Y. 2017) ...................................................................36

*Ward v. LeClaire,*
 No. 07-CV-26, 2007 WL 1532067 (N.D.N.Y. May 24, 2007) ............................34

*Winter v. Natural Resource Defense Council, Inc.,*
 555 U.S. 7 (2008) ..................................................................................................37

*Winters v. Arkansas Department of Health & Human Services,*
  491 F.3d 933 (8th Cir. 2007) .................................................................................................29

**Statutes**

Article 330 of the New York Criminal Procedure Law (CPL § 330) ...........................7, 13, 40

Article 730 of the New York Criminal Procedure Law (CPL § 730) ..................................... 5, 6

New York Correction Law § 402 ........................................................................................ 13, 40

New York Correction Law § 508 ........................................................................................8, 13, 40

New York Mental Hygiene Law § 29 ........................................................................................13

New York Mental Hygiene Law § 31 ........................................................................................12

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 79 ..............................................27

Title II of the Americans with Disabilities Act (ADA), 29 U.S.C. § 12132 ..........................27

**Rules**

Federal Rule Civil Procedure 65 ........................................................................................ 1, 15

**Regulations**

14 N.Y.C.R.R. § 57 .......................................................................................................................7

14 N.Y.C.R.R. § 540 .....................................................................................................................7

28 C.F.R. § 35.130 ......................................................................................................................29

Defendants New York State Office of Mental Health ("OMH") and Ann Marie T. Sullivan, M.D., in her official capacity as the Commissioner of OMH ("Commissioner Sullivan") (collectively, the "OMH Defendants"), by their attorney, Letitia James, Attorney General of the State of New York, submit this memorandum of law in opposition to Plaintiffs' motion for a preliminary injunction, filed August 28, 2025, (ECF Dkt. No. 32), pursuant to Fed. R. Civ. P. 65.

## PRELIMINARY STATEMENT

Plaintiffs R.M. and A.B. are individuals who have been charged with felony crimes; have been found, after an independent psychiatric examination, unfit to stand trial due to mental illness; have been ordered by New York State Supreme Court to receive inpatient restoration treatment at an OMH facility; and were housed at New York City's Rikers Island Correctional Facility ("Rikers") while awaiting transfer to an OMH secure forensic psychiatric facility pursuant to Article 730 of the New York Criminal Procedure Law ("CPL 730"). OMH had no involvement in their care, custody, evaluation, or court proceedings prior to the issuance by Supreme Court of their restoration treatment order. OMH promptly designated them for an appropriate facility, but OMH could not immediately take custody of Plaintiffs due to finite capacity at OMH facilities, which obligates OMH to maintain a chronological waitlist for admission of new CPL 730 felony defendants who require inpatient treatment. In the time since the Class Action Complaint was filed on August 12, 2025, (the "Complaint" or "Compl."), (ECF Dkt. No. 1), R.M. and A.B. each reached the top of the waitlist pursuant to OMH's normal process and were transferred to OMH facilities to receive restoration treatment.

Plaintiffs and a purported "Delays Class"[1] of CPL 730 felony defendants in New York City waiting for transfer to OMH custody have asked the Court to issue a vague preliminary injunction

---

[1] Although the Complaint asserts claims on behalf of two purported classes of Plaintiffs, the motion for a preliminary injunction addresses only the purported "Delays Class."

ordering OMH "to provide timely and effective competency restoration services to Plaintiffs and the Delays Class members." This proposed order violates Rule 65(d) because it does not describe in reasonable detail the specific acts that would be required for OMH to immediately admit all CPL 730 felony defendants for hospital treatment, without any wait time, and regardless of any practical or fiscal impediment. Additionally, Plaintiffs have failed to inform the Court of critically material facts and law which, together, show comprehensively that the motion must be denied.

_As to the facts_: Plaintiffs' motion omits the critically relevant fact that the current wait time for inpatient restoration services has been caused by a recent, historic increase in the number of CPL 730 felony orders for inpatient treatment at an OMH facility issued by New York state courts in criminal proceedings ("730 Orders"). Prior to the Covid-19 pandemic, OMH received approximately 700 such defendants per year, on average. Post-Covid, the pace of new 730 Orders has increased by more than fifty percent. In 2025, OMH has received, on average, more than 20 new 730 Orders per week, on pace for an annual total this year of more than 1,000 730 Orders. This sustained wave of new 730 Orders has exceeded the finite capacity of OMH's inpatient facilities. The number of new CPL 730 orders issued, and whether those orders direct OMH to provide inpatient or community treatment, is wholly outside the control of OMH. OMH has no role in psychiatric evaluations or criminal proceedings leading up to entry of a 730 Order.

Once it became apparent that the recent increase in the number of 730 Orders was more than a temporary post-Covid aberration, **OMH and New York State initiated multiple major projects to permanently increase OMH's capacity to house and treat CPL 730 defendants**. OMH has: (1) opened a new unit at Manhattan Psychiatric Center ("MPC") to treat CPL 730 patients; (2) allocated staffing and infrastructure at Kirby Forensic Psychiatric Center ("Kirby") to open a new unit that has increased that facility's capacity to treat CPL 730 patients; and (3) allocated staffing and infrastructure at the Rochester Regional Forensic Unit at Rochester Psychiatric Center ("RRFU") to

2

open a new unit that has increased that facility's capacity to treat CPL 730 patients. OMH and New York State have also initiated two major construction projects that will have an even greater impact on OMH's treatment capacity. In 2024, OMH authorized construction of a brand new $300 million, 340,000 square foot secure inpatient forensic psychiatric hospital on the campus of Mid-Hudson Forensic Psychiatric Center ("Mid-Hudson") to replace the current hospital. Once opened, this new facility will increase OMH's capacity to treat CPL 730 patients. In addition, in the FY 2026 budget, the New York State legislature and Governor appropriated $160 million for OMH to build and staff a new 100-bed forensic inpatient psychiatric unit on Wards Island in New York City.

Remarkably, <u>Plaintiffs' motion omits any mention of these developments</u>. As a result, Plaintiffs have wholly failed to explain if they believe the actions OMH has already taken in response to the post-Covid increase in CPL 730 orders have been inadequate; and if so, why. Plaintiffs have failed to propose *any* specific actions they believe OMH should take, consistent with its role and obligations under CPL 730. Instead, Plaintiffs' only suggestion is that this Court issue an incredibly vague order that OMH should simply "provide timely and effective" restoration services. But there is no magic wand that will immediately provide secure inpatient beds for each CPL 730 defendant on the waitlist, and there is no substitute for the hard work of securing appropriations and expanding treatment capacity consistent with patient safety, hospital regulations, and State law—all of which OMH is already doing.

<u>*As to the law*</u>: Plaintiffs' motion omits critically relevant precedent showing that their claims will not prevail on the merits. Plaintiffs fail to state a claim for violation of their due process rights under the Fourteenth Amendment because, in the Second Circuit and beyond, courts have repeatedly held that wait times for inpatient restoration services significantly longer than those alleged here do not violate pretrial detainees' due process rights. Plaintiffs' motion largely omits the directly relevant precedent and instead cherry-picks cases from the Ninth Circuit, which is an outlier on this issue.

In the Complaint, the putative Delay Class Plaintiffs also alleged an alternative theory of liability under the Americans with Disabilities Act ("ADA") and Rehabilitation Act. The Delays Class claimed that the OMH Defendants failed to accommodate their disability by not immediately transferring them to State hospitals for restoration treatment. Plaintiffs' preliminary injunction motion appears to abandon that alternative theory. Had it addressed the theory, Plaintiffs would have had to acknowledge that this precise question, too, has been thoroughly litigated and rejected by courts. The Delays Class Plaintiffs' ADA and Rehabilitation Act claims fail because they do not allege that the delays in transfer from Rikers to an OMH facility are due to Plaintiffs' disability—rather, they concede in the Complaint that the transfer delays are due to the challenge of managing finite bed space in State secure hospitals. Moreover, the claim further fails because Plaintiffs have made no attempt to plausibly allege the existence of an available accommodation, the costs of which do not clearly exceed its benefits.

The Delays Class is also not likely to succeed under an alternative *Olmstead* integration mandate theory. Any delay in transfer does not implicate the integration mandate, as Plaintiffs are subject to inpatient restoration orders and therefore would be institutionalized and unable to engage in community-based interactions regardless of whether they are in Rikers or an OMH facility. Further, State treatment professionals have not recommended that these plaintiffs receive treatment in a less restrictive community setting.

The Court should deny Plaintiffs' preliminary injunction motion for four independent reasons. *First*, Plaintiffs' vague, unhelpful proposed injunction violates Rule 65(d)'s requirement that "an injunction must be more specific than a simple command that the defendant obey the law" as construed by Plaintiffs. *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996). *Second*, the Delays Class Plaintiffs have not established a clear likelihood that they will prevail on the merits. *Third*, because their constitutional claims are not likely to succeed on the merits, Plaintiffs have also failed to establish

irreparable harm. *Fourth*, neither the balance of equities nor the public interest would be served by granting the requested injunction, which would jeopardize OMH's ability to safely manage its hospitals and allocate finite resources among all groups of New Yorkers with mental illness who require OMH care and treatment.

## STATEMENT OF FACTS

### I.     THE CPL 730 STATUTORY SCHEME

A defendant who is not mentally competent to stand trial cannot be prosecuted for a criminal offense. Before a criminal case can proceed, the court must ensure that a person accused of a crime is able to understand the criminal proceedings against them, as well as to assist and consult with their attorney to prepare a defense. CPL 730 furnishes the procedure in New York State for determining a criminal defendant's fitness to stand trial and for managing the care of a defendant adjudged to be an incapacitated person.

If the criminal court believes that an individual may lack capacity to stand trial, it must order that person to undergo a competency examination. *See generally* CPL § 730.20. In cases arising in New York City, the court issues the order of examination to the director of community mental health services in New York City's Department of Health and Mental Hygiene, a local governmental agency independent of OMH, which then delegates the task of conducting the competency exam to New York City Correctional Health Services ("CHS"). After conducting the competency exam, CHS doctors prepare a report of findings, which is submitted to the court and shared with the defense and the District Attorney's office responsible for prosecuting the offense. *See* CPL § 730.20(5). Depending on the results of the CHS report, the court may order a hearing on the issue of competency. *See generally* CPL § 730.30.

If the court finds that the individual is psychiatrically unfit to proceed, what happens next depends upon the severity of the charges. If the defendant is facing only misdemeanor or other non-

felony charges, the court dismisses the indictment, issues a final order of observation, and orders OMH to provide the defendant with *civil* psychiatric treatment for a period not to exceed ninety days. CPL § 730.50(1). If the defendant is facing felony charges, the court issues an order committing the person to OMH's custody for care, treatment, and restoration to fitness to stand trial. CPL § 730.50(1). Competency restoration services involve psychiatric treatment to stabilize the person, as well as education about how the legal system works so that the person understands, among other things, the charges against them and the roles of the judge, prosecutor, and defense attorney. Upon issuance of a 730 Order, the defendant's criminal case is suspended until they are restored to fitness. *See* CPL § 730.60(2).

When a court commits a defendant facing felony charges to OMH custody for restoration treatment, CPL 730 provides two options. The court may order OMH to provide inpatient treatment in an OMH hospital. CPL § 730.50(1). Alternatively, and only upon the consent of the District Attorney, the court may order OMH to provide outpatient restoration treatment while the defendant remains free in the community. *Id.*

## II.    TRANSFER PROCESS FOR OMH INPATIENT TREATMENT OF CPL 730 FELONY DEFENDANTS

Pursuant to CPL 730, OMH has no authority to intervene in the underlying proceedings to determine whether a criminal defendant is fit to stand trial or whether a felony defendant found unfit will receive inpatient or community treatment. OMH remains uninvolved with such decisions, except in rare instances when it might be contacted for clinical input by the court or a party to the criminal proceeding. *See* Declaration of Matthew S. Schatzel, dated Oct. 31, 2025 ("*Schatzel Decl.*"), ¶ 4. Typically, OMH first becomes involved when it is served with an order from an issuing New York State court finding that a defendant charged with felony crimes is unfit to proceed and directing the defendant to be transferred to OMH custody for restoration treatment. *Id.* ¶ 5. If the 730 Order instructs OMH to provide inpatient treatment, OMH will, within a few days of receipt, designate an

appropriate institution at which to place the defendant. *Id.* ¶ 6. The defendant remains in New York City custody, including receiving psychiatric treatment from the City, until they are transferred to the designated OMH facility. *Id.* ¶ 10.

OMH provides psychiatric treatment to many different populations of New Yorkers with mental illness, and it accordingly operates over two dozen psychiatric hospitals and other facilities throughout New York State that provide various types of treatment and levels of care in different settings. OMH operates three secure psychiatric facilities that are equipped to safely provide restoration to fitness treatment for defendants subject to 730 Orders: Central New York Psychiatric Center, Kirby, and Mid-Hudson. *Id.* ¶ 7. OMH also operates secure forensic units in two civil psychiatric hospitals—MPC and RRFU. *Id.*

Because of the unique public safety risks posed by patients being treated at secure psychiatric hospitals, state law requires these facilities to have physical security measures in place to protect patients and staff and to minimize the risk of escape. *Id.* ¶ 8; *see also* CPL § 330.20(b); 14 N.Y.C.R.R. § 540.6(a)(1). These measures include structural modifications, such as locked, gender-segregated wards and a secure perimeter, as well as more granular modifications to the physical environment, such as specific fixtures that cannot be used as weapons or to assist in an escape. *Schatzel Decl.* ¶ 8; *see also* 14 N.Y.C.R.R. § 57.1(d). State law also requires secure facilities to train staff on how to prevent escape and manage the specific security risks posed by these patients, whom courts have determined should otherwise be housed in secure jail or prison facilities. *Schatzel Decl.* ¶ 8; *see also* CPL § 330.20(1)(b).

Given the current volume of 730 Orders issued by New York criminal courts, along with the number of other patients requiring treatment in OMH's secure facilities, the facilities currently operate at full capacity, and there is usually no room to immediately admit newly designated felony CPL 730 patients. *Schatzel Decl.* ¶ 9. As a result, when OMH receives a new 730 Order for inpatient treatment,

it places the defendant on a waitlist for admission at the designated facility. *Id.* OMH admits defendants in chronological order as beds become available. *Id.*

### III.    ACCESS TO PSYCHIATRIC TREATMENT FOR CPL 730 DEFENDANTS

Criminal defendants who are in the custody of New York City while awaiting transfer to an OMH facility continue to have access to psychiatric treatment, including psychiatrists, medication, and therapy. *Id.* ¶ 10. If psychiatric staff at Rikers determine that an incarcerated individual requires inpatient treatment, New York Corrections Law § 508 provides the option to admit the individual to Bellevue Hospital for further care and treatment while awaiting transfer to OMH. *Id.* OMH has no input or control over whether Rikers staff seek inpatient admission for individuals detained at Rikers. *Id.* ¶ 11.

### IV.    RESTORATION-TO-FITNESS TREATMENT

Once a CPL 730 defendant is transferred to OMH custody, OMH staff provide restoration treatment to restore the individual to fitness to stand trial. *Id.* ¶ 12. This process involves providing further psychiatric treatment to stabilize the patient, if necessary, and then providing legal education to ensure the individual has an appropriate understanding of the legal process and the charges against them. *Id.* ¶¶ 13-14. CPL 730 defendants who are actively psychotic may have little to no insight into their mental illness and may thus refuse to cooperate with psychiatric treatment or take medication. *Id.* ¶ 13. For these individuals, OMH may seek judicial intervention pursuant to New York Mental Hygiene Law and OMH's regulations to treat the individual over their objection. *Id.*

### V.    OBSTACLES TO PROMPT DISCHARGE OF CPL 730 DEFENDANTS

Once OMH succeeds in restoring a CPL 730 defendant to fitness to stand trial, the CPL does not permit OMH to immediately discharge the individual back to New York City's custody on its own accord. *Id.* ¶ 15. Rather, OMH must notify the court that issued the 730 Order and request an order

to produce the defendant. *Id.* This process takes time, and OMH frequently waits as long as 1-2 weeks to receive an order to produce from New York criminal courts. *Id.* OMH staff check the pending discharge list at least twice weekly and send e-mails to the courts at least once a week to remind judicial staff of outstanding orders to produce. *Id.* ¶ 16. These court delays inhibit OMH's ability to quickly discharge restored defendants and admit the next person on the waitlist for admission. *Id.* OMH has been working collaboratively with the New York State Office of Court Administration to shorten the turnaround time for orders to produce restored CPL 730 defendants, which has resulted in a recent decrease in outstanding orders to produce. *Id.*

When OMH succeeds in restoring an individual to fitness the individual is returned to the custody of, as relevant here, the City's Rikers facilities, some individuals will unfortunately stop taking their mediations soon after discharge from OMH custody as their treatment over objection orders do not authorize the continued administration of medication over objection in a jail setting, decompensate psychiatrically, and must be returned to OMH custody for further restoration treatment. *Id.* ¶ 17. Plaintiffs agree that this is a frequent dynamic. *See* Declaration of Justina Rzewinski (ECF Dkt. No. 41), ¶ 56; Declaration of Lauren Elizabeth Kois, Ph.D., (ECF Dkt. No. 42), ("*Kois Decl.*"), ¶ 92 (estimating that this occurs in 21% of cases).

Another challenge arises in cases where the CPL 730 defendant does not respond to treatment while in OMH custody. *Schatzel Decl.* ¶ 18. Pursuant to *Jackson v. Indiana*, 406 U.S. 715 (1972), if the State determines that there is no substantial likelihood that a defendant will attain capacity to stand trial, it "must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant." 406 U.S. at 738. Thus, if a criminal defendant demonstrates minimal chances of ever achieving competency, OMH must apply to the criminal court to convert the defendant from CPL 730 status to civil status, after which OMH may transfer the individual from the secure facility to a civil facility. *Schatzel Decl.* ¶ 18. Recently, however,

some New York criminal court judges have held that a defendant may choose to block OMH's application for *Jackson* relief. *Id.* ¶ 19; *see, e.g.*, *People v. R.R.*, Indictment No. 71441-23/001 (Co. Ct. Erie Cnty. Apr. 24, 2025) (holding that OMH lacks standing to pursue *Jackson* relief over the defendant's objection); *People v. B.D.*, 79 Misc. 3d 920 (Sup. Ct. N.Y. Cnty. 2023) (same). As a result, some CPL 730 defendants who have blocked a *Jackson* conversion continue to occupy space at OMH secure psychiatric facilities that could be used to treat other unfit defendants, even though OMH staff have determined that the individual will never be restored to fitness. *Schatzel Decl.* ¶ 19.

## VI.  POST-COVID INCREASE IN 730 ORDERS

Between 2016 and 2019, the number of new 730 Orders hovered around 700 per year. *Id.* ¶ 20. In 2020, the year of the Covid-19 pandemic and resulting social distancing mandates and lockdowns, that number dipped to 493. *Id.* Post-Covid, the number of new 730 Orders issued by New York state courts subsequently began to increase dramatically, as illustrated by the below table. *Id.*

| Year | CPL 730 Felony Orders | Avg. Rate of New Orders Per Week |
|------|-----------------------|----------------------------------|
| 2016 | 740 | 14.2 |
| 2017 | 715 | 13.7 |
| 2018 | 745 | 14.3 |
| 2019 | 753 | 14.4 |
| 2020 | 493 | 9.4 |
| 2021 | 726 | 13.9 |
| 2022 | 869 | 16.7 |
| 2023 | 981 | 18.8 |
| 2024 | 973 | 18.6 |
| 2025 | 893 orders received through October 27, 2025 | 20.8 |

As indicated in the table, post-Covid, the pace of new 730 Orders has increased by more than fifty percent. *Id.* ¶ 21. In 2025, OMH has received, on average, more than 20 new 730 Orders per week, on pace for an annual total this year of more than 1,000 730 Orders. *Id.* This sustained wave of new 730 Orders has exceeded the finite capacity of OMH's inpatient facilities and has resulted in longer-than-normal wait times for admission into OMH's secure facilities. *Id.*

## VII.    MAJOR OMH PROJECTS TO INCREASE CAPACITY TO TREAT CPL 730 DEFENDANTS

Once it became apparent that the recent increase in the number of 730 Orders was something more than a temporary post-Covid aberration, OMH initiated multiple major projects to permanently increase its capacity to house and treat CPL 730 defendants and therefore minimize the admission wait times for this population. *Id.* ¶ 22.

OMH recently completed three such projects. First, on February 7, 2024, OMH opened a new unit at MPC with capacity for 25 beds to treat CPL 730 defendants. *Id.* ¶ 23. Because MPC is a civil hospital that does not have the same security measures in place as OMH's secure forensic psychiatric facilities, this unit is intended to treat a subset of CPL 730 defendants who are charged with less serious offenses and pose lower management and safety concerns. *Id.*

Second, on February 27, 2025, OMH allocated staffing and infrastructure at RRFU to open a new unit that has increased that facility's capacity to treat CPL 730 defendants by 25 beds. *Id.* ¶ 24.

Third, on March 4, 2025, OMH allocated staffing and infrastructure at Kirby to open a new unit that has increased that facility's capacity to treat CPL 730 defendants by 25 beds. *Id.* ¶ 25.

Next, OMH and New York State have initiated two major construction projects. *Id.* ¶ 26. In 2024, New York State authorized construction of a brand new $300 million secure inpatient forensic psychiatric hospital on the Mid-Hudson campus, which will replace the current hospital. *Id.* This new hospital will have 340,000 square feet of space and will increase OMH's capacity to treat CPL 730 patients. *Id.* This construction project will necessarily take time, not least due to the rigorous regulatory

and infrastructure requirements for secure forensic psychiatric facilities. *Id.* The new Mid-Hudson secure hospital is expected to open in or around June 2028. *Id.*

While OMH does not control the State budget, OMH routinely notifies the Governor and legislature of its priorities and anticipated future needs. *Id.* ¶ 27. As a result of these efforts, as part of the FY 2026 New York State Budget legislation, the New York State legislature and Governor appropriated $160 million for the purpose of building infrastructure and providing staffing for 100 new forensic inpatient psychiatric beds on Wards Island in New York City, primarily for CPL 730 defendants. *Id.*

Other New York State initiatives, not controlled by OMH, are also under discussion. *Id.* ¶ 28. The New York State Legislature has explored amendments that may reduce the waitlist for CPL 730 defendants. *Id.* A bill has been introduced in the State Assembly that would amend CPL 730 to allow defendants to receive competency restoration services in county jails, where appropriate. *Id.* The New York State Unified Court System has also created a Judicial Task Force on Mental Illness to help the courts respond to the needs of individuals with mental illness, including those who are the subject of competency proceedings under CPL 730. *Id.* ¶ 29.

## VIII.    PROHIBITION ON OVERCROWDING OMH HOSPITALS

When faced with a surge of requests for admission to its inpatient facilities, OMH may not simply admit all applicants if doing so would overcrowd its hospitals beyond their safe capacity. *Id.* ¶ 30. OMH hospitals, including its secure facilities, must be accredited by an approved national or regional accrediting organization such as the Joint Commission, a national accreditation body that ensures hospitals meet patient safety standards. *Id.* ¶ 31; *see also* MHL § 31.08. Psychiatric hospitals must meet rigorous safety standards including, for example, by always maintaining a defined ratio of trained staff to patients on site. *Schatzel Decl.* ¶ 31. If OMH were to overcrowd its hospitals beyond their safe capacity, doing so would jeopardize accreditation of the hospitals. *Id.* Loss of accreditation

would lead to loss of Medicaid and Medicare reimbursements, among other serious operational consequences. *Id.* State law expressly authorizes OMH to "defer admission to any facility in the department when the total number of patients therein exceeds its capacity to an extent which will not permit adequate care and treatment to be provided patients." N.Y. Mental Hygiene Law § 29.07(a). By this statutory provision, the New York State Legislature endowed OMH with the discretion to delay admission of patients to its facilities to maintain the necessary standard of care and safety.

## IX.  ALLOCATING FINITE OMH RESOURCES <u>AMONG POPULATIONS IN NEED OF SERVICES</u>

New York State is a national leader in mental health treatment and consistently ranks among the top States in per capita investments of taxpayer dollars in mental health services. *Schatzel Decl.* ¶ 33. New York State is also known for obtaining positive results to its mental health initiatives, ranking first in the nation across seventeen measures in at least one survey. *Id.* But, like any government agency, OMH only has access to finite resources, which are provided through the legislative appropriations process. *Id.* ¶ 32.

As such, requests for additional resources dedicated for CPL 730 patients must be balanced against the many other populations of New Yorkers with mental illness served by OMH who critically require resources, staff, and attention. *Id.* ¶ 34. At secure forensic psychiatric facilities, OMH serves multiple populations in addition to CPL 730 defendants. *Id.* OMH must devote secure hospital staff, resources, and bed space to persons who suffer from a dangerous mental disorder and have been acquitted of a crime by reason of that illness, *see* CPL § 330.20; and persons who need treatment while incarcerated pursuant to a sentence following conviction or who are in pre-sentence detention. *Schatzel Decl.* ¶ 34; *see* Correction Law §§ 402 & 508. Outside of secure forensic psychiatric facilities, OMH must devote resources to patients who require inpatient treatment in civil psychiatric facilities, as well as patients who require community-based mental health services and housing to remain in the

community. *Schatzel Decl.* ¶ 34. OMH may not simply reallocate all of its finite resources to any one of the critical populations its serves at the expense of the others. *Id.*

Additionally, OMH does not have access to unlimited staff. *Id.* ¶ 35. Mental health systems around the nation are facing a severe shortage of qualified mental health staff. *Id.* OMH currently struggles to maintain required and adequate staffing levels at its already operating secure facilities, which often can only be accomplished with mandated overtime. *Id.* When OMH seeks to expand services or create new facilities, it must carefully plan for how to adequately staff the new service or facility, given the persistent reality of staffing shortages in the mental health field. *Id.*

## X.    THE INDIVIDUAL PLAINTIFFS

Since the Complaint was filed on August 12, 2025, the individual Plaintiffs R.M. and A.B. reached the top of the waitlist pursuant to OMH's normal process and were transferred to OMH facilities and currently are receiving restoration treatment. *Id.* ¶ 36.

On August 5, 2025, prior to the filing of the Complaint in this litigation, OMH identified R.M. as being appropriate for designation to the new unit at MPC dedicated to treat CPL 730 defendants who are charged with less serious offenses and pose lower management and safety concerns. *Id.* ¶ 37. On August 25, 2025, R.M. was admitted to MPC. *Id.*

Plaintiff A.B. was hospitalized at Bellevue Hospital, which is not part of OMH, for inpatient psychiatric treatment during his time in New York City custody. *Id.* ¶ 38. OMH reviewed whether A.B. was appropriate for designation to MPC, but he was determined not to be an appropriate candidate due to the serious nature of his charges. *Id.* On September 8, 2025, A.B. was admitted to Mid-Hudson. *Id.*

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Monserrate v. New York State Senate*, 599 F.3d 148, 154 (2d Cir. 2010) (internal citation omitted). When the

preliminary injunction would affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate: "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016) (internal citation omitted). Where a plaintiff "seeks a mandatory injunction against the government that would change the status quo existing when the case was filed," a heightened standard applies in which the plaintiff "must show "a 'clear' or 'substantial' likelihood of success on the merits." *Murray v. Cuomo*, No. 20-cv-03571, 2020 WL 2521449, at *8 (S.D.N.Y. May 18, 2020) (quoting *Thomas v. New York City Bd. Of Elections*, 898 F.Supp.2d 594, 597 (S.D.N.Y. 2012)).

## ARGUMENT

## I.   PLAINTIFFS' PROPOSED INJUNCTION VIOLATES THE SPECIFICITY REQUIREMENTS OF FED. R. CIV. P. 65

As a threshold matter, Federal Rule of Civil Procedure 65(d)(1) requires that every order granting an injunction must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." For this reason, an injunction must be "more specific than a simple command that the defendant obey the law." *New York v. Shinnecock Indian Nation,* 560 F.Supp.2d 186, 189 (E.D.N.Y. 2008) (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 240 (2d Cir. 2001)).

The rule against vague injunctions is designed, in part, "to prevent uncertainty and confusion on the part of those to whom the injunction is directed, and to be sure that the appellate court knows precisely what it is reviewing." *Shinnecock Indian Nation,* 560 F.Supp.2d at 189 (internal citation omitted); *see also City of New York v. Mickalis Pawn Shop, LLC,* 645 F.3d 114, 146 (2d Cir. 2011) (vacating injunction imposing on the defendants an obligation to act "in full conformity with applicable laws pertaining to firearms" and to "adopt [ ] appropriate prophylactic measures to prevent violation" of

those laws); *Smith v. Halstead*, No. 24-CV-6855, 2024 WL 4389284, at *3 (S.D.N.Y. Oct. 3, 2024) (denying motion for a temporary restraining order and a preliminary injunction, in part, because the interim relief requested—that the plaintiff not be housed in unconstitutionally harsh conditions and that he be provided with adequate medical care—amounted to a vague "follow the law" injunction); *T.C. v. New York State Dep't of Health*, 22-CV-5045, 2022 WL 17689841, at *11 (S.D.N.Y. Dec. 15, 2022) (denying motion for a preliminary injunction requiring a State agency to "promptly" place individuals with developmental disabilities in community residences, which was "arguably [] tantamount to a simple command that the defendant obey the law") (internal quotations omitted).

Here, Plaintiffs seek a preliminary injunction ordering Commissioner Sullivan to "provide timely and effective competency restoration services" to Plaintiffs and the putative Delays Class members. *See* [Proposed] Order Granting Plaintiffs' Motion For Preliminary Injunction, (ECF Dkt. No. 34), at 2. This proposed injunction violates Rule 65(d)(1) because it amounts to an overly broad and unduly vague command that OMH obey CPL 730, as Plaintiffs construe the law. Pursuant to CPL 730, OMH must admit and provide restoration treatment to felony defendants upon receipt of a 730 Order issued by a New York state court. As described in the attached Declaration of BITS Director Matthew Schatzel, OMH staff spend a significant amount of time and resources doing exactly that. *Schatzel Decl.* ¶¶ 4-17. Plaintiffs complain about OMH's practice of maintaining a waitlist for new CPL 730 felony inpatient admissions, but nowhere in their proposed injunction or motion do Plaintiffs state any specific actions they believe OMH must take to eliminate the waitlist, consistent with its role and obligations under CPL 730, its general obligations under New York's Mental Hygiene Law, and its duties to all other New Yorkers with mental illness who require care and treatment. Plaintiffs simply ask this Court to order OMH to eliminate the waitlist by judicial fiat without regard for any fiscal or practical obstacle to that achieving result. Tellingly, Plaintiffs do not address the multiple significant steps OMH has already taken to reduce the waitlist nor do they explain why they believe these ongoing

16

efforts are so insufficient as justify the extraordinary relief they seek. Rule 65(d)(1) does not permit the Court to issue the vague, unhelpful injunction Plaintiffs have requested.

## II.    PLAINTIFFS HAVE NOT ESTABLISHED A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS

Because they seek a mandatory injunction against the government, Plaintiffs bear the heightened burden of showing a clear or substantial likelihood of success on the merits. They cannot do so because their claims fail on both the facts and the law.

### A.    Plaintiffs' Claims Fail on the Facts

Plaintiffs' lawsuit and motion for a preliminary injunction are premised entirely on the unsupported and false factual premise that OMH fails to promptly admit CPL 730 defendants to OMH hospitals due to some failure of will or administration. Plaintiffs claim that "[t]he Legal Aid Society [has] advocated to OMH for systemic changes to address this long-standing problem," purportedly "to no avail." *See* Memorandum of Law In Support of Plaintiffs' Motion For Preliminary Injunction, (ECF Dkt. No. 33), ("*Plaintiffs' MOL*"), at 7. Plaintiffs have not established a clear likelihood of success on the merits because the evidence already in the record shows that this claim is untrue.

First, the evidence shows that the size of the current waitlist is not due to any action or inaction by OMH. Rather, the increase in the waitlist was caused by the recent and dramatic post-Covid increase in the number of 730 Orders issued by New York state courts. Between 2016 and 2019, the number of 730 Orders hovered around 700 per year. *Schatzel Decl.* ¶ 20. In 2020, the year of the Covid-19 pandemic and resulting social distancing mandates and lockdowns, that number dipped to 493. *Id.* Post-Covid, the pace of new 730 Orders has increased by more than fifty percent. *Id.* ¶ 21. In 2025, OMH has received, on average, more than 20 new 730 Orders per week, on pace for an annual total this year of more than 1,000 730 Orders. *Id.* This sustained wave of new 730 Orders has exceeded the

finite capacity of OMH's inpatient facilities and has resulted in longer than normal wait times for admission into OMH's secure facilities. *Id.*

Although Plaintiffs' motion suggests that the recent increase in CPL 730 admission wait times is due to some policy failure by OMH, buried in their voluminous filing is a concession that this is not true. Plaintiffs filed a declaration by Lauren Elizabeth Kois, Ph.D., who concedes that there has been a recent significant *national* increase in the number of criminal defendants found unfit to stand trial. *See Kois Decl.* ¶¶ 13-17. Dr. Kois reports that nationwide, "courts are ordering far more defendants to undergo capacity evaluations than ever before, and evaluators are opining a far greater portion of those defendants unfit. This has led to far more court orders for restoration services, which places tremendous strain on the systems responsible for delivering restoration services." *Id.* ¶ 15. As a result, Dr. Kois writes, "[r]estoration waitlists continue to grow throughout the country," with criminal defendants in some jurisdictions waiting "months—[or] even years—to begin restoration treatment." *Id.*[2]

Second, Plaintiffs argue that this Court should intervene because OMH has purportedly *refused* to address the increased wait times for CPL 730 patients. That claim is false. OMH has in fact undertaken multiple major projects to increase its capacity to admit and treat CPL 730 defendants. This includes: (1) opening a new unit at MPC, a non-secure hospital, dedicated to treating CPL 730 defendants who pose lesser safety concerns; (2) expanding capacity for CPL 730 defendants at Kirby;

---

[2] Contradicting Dr. Kois's Declaration, Plaintiffs have also submitted a declaration from the Legal Aid Society Director of Data and Research who writes, incorrectly, that the data purportedly do "not support the hypothesis that the increase in wait times is due to an increase in 730 orders." *See* Declaration of Dr. Leighann Starkey In Support of Motion to Certify Class, (ECF Dkt. No. 14), ¶¶ 17-20. Dr. Starkey reaches this conclusion based on the plainly incorrect statement that "the current rate of temporary and commitment orders are comparable to pre-pandemic rates." *Id.* ¶ 20. In fact, Dr. Starkey's data appears to cut off at 2022, making her conclusions about the "current" rate of 730 Orders entirely unsupported.

(3) expanding capacity for CPL 730 defendants at RRFU; (4) authorizing construction of a brand new $300 million secure inpatient forensic psychiatric hospital on the Mid-Hudson campus to replace the current hospital that will increase OMH's capacity to treat CPL 730 defendants; and (5) following a $160 million appropriation in the FY 2026 State budget, authorizing a hospital expansion that will add capacity for 100 new forensic inpatient psychiatric beds on Wards Island in New York City for CPL 730 defendants. *Schatzel Decl.* ¶¶ 23-27. Plaintiffs omit any mention of these actions, let alone explain if they believe the actions OMH has already taken in response to the post-Covid increase in CPL 730 orders have been inadequate; and if so, why. Plaintiffs have failed to propose *any* specific actions they believe OMH should take, consistent with its role and obligations under CPL 730 and the N.Y. Mental Hygiene Law generally.[3]

Moreover, Plaintiffs' claim that New York's restoration to fitness process violates defendants' rights is misguided for the additional reason that New York has been a national leader in policy innovations that *reduce* the number of psychologically unfit defendants in detention. First, New York's restoration-to-fitness law differs fundamentally from nearly every other state in that New York

---

[3] Plaintiffs cite two examples of "state court judges [who] have voiced concern" about wait times for CPL 730 admissions. *See Plaintiffs' MOL* at 25-26. It is true that some New York state court judges have expressed concerns about whether OMH has complied quickly enough with their 730 Orders, and some judges have even held OMH in contempt. By contrast, other judges have denied motions by criminal defendants seeking to hold OMH in contempt, noting OMH's efforts to fairly admit all CPL 730 defendants in chronological order. *See, e.g., People v. R.S.*, Ind. Nos. 70212-25 & 70219-25 (Sup. Ct. Kings Cnty. Oct. 28, 2025) (denying motion for contempt and finding that "[t]his is a complex and multifaceted problem; its potential solutions require stakeholders from all branches of government to recognize the problem, prioritize addressing it, and collaborate to ameliorate it"); *People v. D.W.*, Ind. No. 70034/24 (Sup. Ct. Bronx Cnty. Aug. 29, 2025). A true and accurate copy of *People v. D.W. and People v. R.S.* is annexed to the Declaration of Caroline P. Wallitt, dated Nov. 3, 2025, as **Exhibit G** and **Exhibit H**, respectively. With respect to *People v. L.G.*, 208 N.Y.S.3d 469 (Sup. Ct. N.Y. Cnty. 2024), *aff'd as modified*, 238 A.D.3d 568 (1st Dep't 2025), OMH has moved in the Court of Appeals for leave to appeal and has asked the Court of Appeals to provide clarity to the divergent opinions of state court judges on this issue. In any event, the legal issue in these State court criminal cases is whether OMH complied quickly enough with the terms of a particular State court's 730 Order, which is distinct from the questions of federal constitutional and statutory law at issue in this case.

defendants facing less serious non-felony charges are *not* required to undergo restoration treatment at all. Pursuant to CPL 730.50, all charges against those defendants are dismissed and they are referred for civil psychiatric treatment. In New York, only defendants facing more serious felony charges are detained while awaiting restoration treatment. The Kois Declaration acknowledges that New York is "one of only a few states" that has adopted this "nuanced policy approach." *Kois Decl.* ¶ 20. Second, in 2012, New York amended CPL 730 to provide the option of outpatient restoration treatment upon the consent of the District Attorney and order of the criminal court.[4] While Plaintiffs complain that too few defendants are designated for outpatient treatment, CPL 730 gives OMH no authority to intervene in that determination.[5] OMH can only provide outpatient services to a defendant upon a specific criminal court order to that effect, an order it has no role in seeking or obtaining.

    **B.**    <u>**Plaintiffs' Claims Fail on the Law**</u>

As to the law, Plaintiffs' motion ignores the overwhelming weight of cases showing that none of their claims will prevail on the merits. The OMH Defendants have filed a motion to dismiss, (ECF Dkt. Nos. 62-63), setting forth in detail why each of Plaintiffs' claims fails to state a claim as to which

---

[4] New York is one of 32 States that has instituted an outpatient restoration option. *See* National Conference of State Legislatures, <u>Legislative Primer Series on Front-End Justice: Competency to Stand Trial</u>, *available at* <u>https://www.ncsl.org/civil-and-criminal-justice/legislative-primer-series-on-front-end-justice-competency-to-stand-trial?utm_source=chatgpt.com</u>.

[5] Plaintiffs' papers repeatedly, misleadingly cite an email from OMH's Deputy Counsel for Litigation Jesse Snyder in support of the assertion that OMH can serve no more than 15 defendants in its outpatient restoration program. *See Compl.* ¶ 51; *Kois Decl.* ¶ 17. That claim is false. The full email, available at ECF No. 13-4, shows that Mr. Snyder informed Legal Aid Society ("LAS") attorneys that OMH's outpatient restoration program has flexibility to increase in proportion to the number of outpatient orders it receives. Mr. Snyder informed LAS that "an incremental increase would allow us time to build up programming to support a larger number of outpatient orders, and **we would be supportive of more outpatient orders**." (emphasis added). Mr. Snyder also proposed a meeting with OMH, LAS, and District Attorneys to "discuss [OMH's] 730 outpatient programming and capacity issues further with you if that would be helpful." Rather than accept OMH's offer to work collaboratively, LAS chose to file this lawsuit.

relief may be granted. The OMH Defendants incorporate by reference the arguments in that motion, which are summarized here for completeness.

        1.        Plaintiffs Have Not Established a Clear Likelihood
                        of Success as to the Due Process Claims

Plaintiffs allege that Commissioner Sullivan has violated their due process rights under the Fourteenth Amendment to the Constitution. But District Courts in the Second Circuit have repeatedly rejected due process claims brought by pretrial detainees who faced significantly longer wait times for restoration-to-fitness services than the median 81 days alleged in this action. The same is true for courts outside the Second Circuit, with limited and distinguishable exceptions.

In *Jackson v. Indiana*, 406 U.S. 715 (1972), the Supreme Court held that it was "not . . . appropriate for us to attempt to prescribe arbitrary time limits" applicable to due process claims by pretrial detainees requiring competency restoration "[i]n light of differing state facilities and procedures," among other factors. *Id.*

Applying *Jackson*, the Second Circuit and district courts in the Circuit have repeatedly rejected due process claims by pretrial detainees waiting to receive restoration-to-fitness treatment, even where wait times were significantly longer than 81 days. In *United States v. Magassouba*, 544 F.3d 387 (2d Cir. 2008), the criminal defendant appealed from an order denying his motion to dismiss the indictment charging him with various drug crimes and directing his hospitalization for psychiatric treatment. *Id.* at 391. He claimed that his nineteen-month detention from the time he was found incompetent until the date of the challenged order violated due process, warranting dismissal of his indictment and release from custody. *Id.* at 392. Rejecting the defendant's due process claim, the *Magassouba* court reiterated *Jackson*'s principle that "the Constitution itself draws no bright lines signaling when an incompetent defendant's continued detention to restore competency becomes unreasonable." *Id.* at 416. The court analyzed the constitutional reasonableness of the nineteen-month detention via a list of five factors and "conclude[d] that Magassouba's nineteen-month detention from the time he was

found incompetent until the date of the challenged order was not constitutionally unreasonable so as to violate due process." *Id.* at 392.

Following *Magassouba*, district courts in this Circuit have repeatedly rejected due process claims by pretrial detainees waiting to receive restoration treatment in cases involving significantly longer wait times than what Plaintiffs allege here. **Plaintiffs' motion omits any mention of these directly applicable cases.** In *United States v. Young*, No. 21-CR-6010L, 2022 WL 7087140 (W.D.N.Y. Oct. 12, 2022), the court found the defendant incompetent to stand trial and remanded him to county jail. *Id.* at *1. While in jail, Young was placed on a waitlist for transfer to the Federal Medical Center in Butner, North Carolina ("Butner"), where he would receive further evaluation and restoration to competency services. *Id.* After three months of waiting to be transferred to Butner, the defendant moved to dismiss the indictment due to a purported violation of his due process rights or, alternatively, for an order directing immediate transfer. *Id.* at *2. The Government explained that Butner was at capacity and maintains a "waitlist [that] is strictly chronological, so defendant's progress up the list is entirely dependent on bed space becoming available as the inmates ahead of him are moved into and out of Butner." *Id.* at *1. The Government estimated that, given the rate of movement on the waitlist, the defendant would have to wait a total of approximately six or seven months for transfer. *Id.* Weighing the *Magassouba* factors, the court noted that "[i]n the instant case, there is no dispute that the delay is attributable to a lack of resources, primarily bed space, to accommodate the number of prisoners awaiting evaluation, with a resulting backlog and lengthy waiting period." *Id.* at *3. The *Young* court held that the "defendant's continued detention has not exceeded what it permissible under the Due Process Clause," and that "the expected wait in this case of about six or seven months is not so extraordinarily long as to give rise to a due process violation[.]" *Id.* The court further noted its reluctance to interfere with the waitlist for defendants awaiting treatment at Butner, cautioning that it did not "have either the authority, the ability, or a sound reason to somehow expedite the process in

this case. . . . No doubt every defendant awaiting evaluation would like to jump to the head of the line, or otherwise be accorded special treatment, but for the Court to attempt to do so would only interfere with the system in place and would likely cause more problems than it would solve." *Id.* at *4.

In *United States v. Hylton*, No. 18-CR-102, 2023 WL 7280170 (S.D.N.Y. Nov. 3, 2023), the district court addressed a similar due process claim. There, the court found that the detained defendant was not competent and ordered his transfer to a Federal Medical Center ("FMC") for restoration treatment. *Id.* at *5. Nearly seven months later, the defendant was still awaiting transfer. The Government explained that the delay in transfer was "a nationwide systemic issue due to the high volume of defendants awaiting placement at an FMC" and that "[t]ypically, the pipeline is first-come, first-served, and individuals are placed in order based on the date of" the transfer order. *Id.* Based on the waitlist, the Government projected that Hylton would receive a bed approximately ten months from the date of the transfer order. *Id.* The court held that Hylton "has not shown that his delayed transport to an FMC constitutes a violation of his right to due process[.]" *Id.* at *6. Just as in *Young*, the court further found that it would be inappropriate for the court to interfere with "the admirable [Bureau of Prisons ("BOP")] policy of distributing bed space on a first-come, first-served basis" or otherwise "undermining the BOP's orderly administration of limited but essential services." *Id.*

*United States v. Olaniyi,* No. 21-CR-350, 2024 WL 4500921 (E.D.N.Y. Oct. 15, 2024), is the most recent decision in this line of cases. In *Olaniyi*, a criminal defendant was found incompetent to stand trial and committed to a federal forensic psychiatric facility, where there was "a six-month waiting period for a committed defendant to start hospitalization[.]" *Id.* at *4–5. The defendant brought a due process challenge, arguing that he must be committed no later than thirty days following the issuance of the commitment order. *See id.* at *6. The court rejected the due process claim, recognizing that "[d]istrict courts have found months-long waits for hospitalization entirely consistent with due process[,]" *id.*, and finding that "[n]either a six-month period of transporting the defendant

to [the psychiatric facility], nor the eight-month wait during the initial [competency] proceedings, constitutes a time period 'so egregious as to deny [the defendant] due process[.]'" *Id.* at *7 (quoting *Magassouba,* 544 F.3d at 418); *see id.* at *6 ("The defendant has not identified a legal basis for ordering hospitalization no later than 30 days following the start of commitment.").[6]

Outside of the Second Circuit, many courts have also rejected due process claims brought by pretrial detainees in similar circumstances. In *Glendening, as Next Friend of G.W. v. Howard,* 707 F.Supp.3d 1089 (D. Kan. 2023), the plaintiffs were advocates for Kansas pretrial detainees who had been ordered to receive either competency evaluations or restoration treatment. 707 F.Supp.3d at 1098. The plaintiffs moved for a preliminary injunction against various state agencies based on the assertion that that the waitlist for admission into the state's only facility for competency restoration— with average wait times of 336 days—violated their substantive due process rights. *Id.* at 1097. The plaintiffs sought an injunction prohibiting the state defendants from maintaining a waitlist with wait times exceeding thirty days. *Id.* at 1106. The court rejected the plaintiffs' argument that the state defendants' delay in transferring detainees to competency restoration lacked "some reasonable relation to the purpose for which they are committed." *Id.* at 1109. As the court explained: "State hospitals lack infinite capacity." *Id.* Given finite capacity, the court identified multiple important State interests in establishing and maintaining a waitlist, including: (1) the State's "interest in evaluating and restoring the competency of each detainee so that he or she may be tried"; and (2) its "interest in providing adequate care at [the State's secure psychiatric facility] to accomplish that purpose, which obliges detainees to wait in line until services are available." *Id.* The waitlist, which is "long, [but] not

---

[6] Just one district court case in this Circuit, *United States v. Smith,* 764 F.Supp.2d 541 (W.D.N.Y. 2011), potentially endorses a due process claim by a defendant waiting for restoration treatment, but the circumstances there were distinguishable for the reasons explained in the OMH Defendants' motion to dismiss. *See* Memorandum of Law In Support of OMH Defendants' Motion to Dismiss, (ECF Dkt. No. 63) ("*MTD MOL*"), at 16-17.

indefinite . . . reflects [the State's] effort to manage the numerous external factors affecting admission rates at [the secure psychiatric facility]." *Id.* The court concluded that "[t]he resulting delay and the State's purpose appear 'reasonably related,' because [the State] only delays as a way to triage care." *Id.* Given these circumstances, the court concluded that the plaintiffs had not shown that the state's use of a waitlist violated their substantive due process rights. *Id.; see also Ind. Prot. & Advocacy Servs. Comm'n v. Ind. Family & Social Servs. Admin.*, 630 F.Supp.3d 1022 (S.D. Ind. 2022) (pretrial detention of individuals waiting for inpatient restoration treatment was "reasonably related" to the State defendants' interest in providing competency restoration services); *Lakey v. Taylor,* 435 S.W.3d 309, 314 (Tex. App. 2014) (rejecting state constitutional claims brought by pretrial detainees regarding the use of a waitlist).

A few cases outside of the Second Circuit have endorsed due process claims by pretrial detainees waiting for restoration to fitness treatment, but these cases fall into two distinguishable categories. First, there are some out-of-Circuit cases where courts have found due process violations based on substantially longer wait times than the 81-day median wait alleged here. *See MTD MOL* at 21.[7] Second, the Ninth Circuit has developed an outlier body of law embracing due process claims by pretrial detainees awaiting competency restoration and requiring State psychiatric hospitals to admit defendants within days of receipt of an order—notwithstanding the Supreme Court's holding in *Jackson* that arbitrary time limits are not appropriate. *See Or. Advocacy Ctr. v. Mink,* 322 F.3d 1101, 1105 (9th Cir. 2003); *Trueblood v. Wash. State Dep't of Social & Health Servs.,* 101 F.Supp.3d 1010 (W.D. Wash. 2015). While Plaintiffs' motion omits reference to the directly applicable Second Circuit case law, it

---

[7] When comparing New York against cases in other states, it is critically important to note that New York's restoration-to-fitness law differs fundamentally from nearly every other state in that New York defendants facing less serious non-felony charges are *not* required to undergo restoration treatment at all. Pursuant to CPL 730.50, all charges against those defendants are dismissed and they are referred for civil psychiatric treatment.

extensively cites these Ninth Circuit cases. Courts elsewhere, however, have rejected and criticized the Ninth Circuit's reasoning and declined to follow *Mink* and *Trueblood. See, e.g.*, *Glendening*, 707 F.Supp.3d at 1108-09.

Here, the alleged median wait time for competency restoration treatment in New York is far shorter than the wait times that courts in the Second Circuit and elsewhere have repeatedly found to be consistent with criminal defendants' due process rights. Second Circuit cases have also overwhelmingly concluded that delayed competency restoration treatment does not violate due process where the State defendants show that the nature and length of the delays, caused by issues beyond the State's control, are related to the purpose of restoring the defendants to a capacity to participate in trial. Courts in this Circuit have reasonably given the federal government latitude to structure a reasonable waitlist for inpatient restoration admissions for federal defendants to federal facilities with finite bed space. Having done so, it would be exceedingly unjust—and a violation of federalism—for this Court to interfere with the State of New York's *more* efficient, shorter waitlist for inpatient restoration admissions of individuals charged with felonies under New York State law. This Court should not follow the outlier example of the Ninth Circuit caselaw, which has been rejected and effectively criticized elsewhere. For all these reasons, the Court should find that Plaintiffs have failed to state a due process claim.

> ### 2.    Plaintiffs Have Not Established a Clear Likelihood of Success as to the ADA and Rehabilitation Act Claims

In the Complaint, the Delays Class Plaintiffs also alleged an alternative theory of liability under the ADA and Rehabilitation Act. Plaintiffs' preliminary injunction motion appears to abandon that alternative theory by failing altogether to address it. Had it addressed the theory, Plaintiffs would have had to acknowledge that this precise question, too, has been thoroughly litigated and rejected by courts.

### a.    *Reasonable Accommodation Theory*

The Complaint alleged that the OMH Defendants have violated Plaintiffs' rights under Title II of the ADA and Section 504 of the Rehabilitation Act by failing to provide Plaintiffs a reasonable accommodation. *See Compl.* ¶¶ 75–84. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Because Section 504 of the Rehabilitation Act and the ADA impose identical requirements," courts in the Second Circuit "consider these claims in tandem." *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999).

To establish a *prima facie* claim under Title II of the ADA or Section 504 of the Rehabilitation Act, a plaintiff must demonstrate "(1) that she is a qualified individual with a disability; (2) that she was excluded from participation in the public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her disability." *Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016) (internal quotation marks omitted). A plaintiff asserting that an entity failed to accommodate his disability must allege "something different about the way the plaintiff is treated 'by reason of his disability.'" *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276–77 (2d Cir. 2003) (quoting 42 U.S.C. § 12132). Furthermore, "to plead a failure to make a reasonable accommodation, a plaintiff must assert that disabled individuals lack access to a given government resource and suggest a plausible method for remedying that lack of access." *Meekins v. City of New York*, 524 F.Supp.2d 402, 407 (S.D.N.Y. 2007). A plausible accommodation is one "the costs of which, facially, do not clearly exceed its benefits[.]" *Id.* (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).

Plaintiffs failed to state claims for relief under a failure-to-accommodate theory as to the purported "Delays Class" for two reasons. *First*, Plaintiffs allege that, by delaying transfers to secure

forensic psychiatric facilities, the OMH Defendants have "violated Delays Class members' right to a reasonable accommodation—timely competency restoration[.]" *Compl.* ¶ 11. However, Plaintiffs failed to plausibly allege that any delays in transfer and provision of competency restoration services are due to Plaintiffs' disability. On the contrary, the Complaint states multiple times that the transfer delays are due to other reasons: allegedly insufficient resources, including a shortage of beds and staffing. *See id.* ¶¶ 8, 21, 28–29; *id.* ¶ 8 (alleging a "mismatch between [OMH's] system and the demand for services"). In determining whether plaintiffs have been denied a reasonable accommodation "due to their disabilities," the Second Circuit has held that "'[i]n assessing whether one cause among many constitutes [a] proximate cause,' plaintiffs must establish that their 'disabilities were a substantial cause of their inability to obtain services,' rather than 'so remotely or insignificantly related to their disabilities as not to be by reason of them.'" *Tardif v. City of New York*, 991 F.3d 394, 405 (2d Cir. 2021) (quoting *Henrietta D.*, 331 F.3d at 278–79) (alterations in original).

Here, even accepting Plaintiffs' allegations as true, the transfer delays experienced by members of the purported Delays Class have occurred because of the finite resources available, coupled with the ongoing yearly increase in the number of 730 Orders issued—factors which are outside of OMH's control and which have nothing to do with Plaintiffs' disability. *See Compl.* ¶¶ 8, 21, 28–29. Indeed, if OMH had the necessary bed space available, it would take custody of all defendants currently awaiting transfer to a secure psychiatric facility; however, it is unable to do so.

Once again, this precise issue has been litigated in multiple cases, which Plaintiffs' motion fails to address. Multiple courts have concluded, under similar circumstances, that plaintiffs failed to plausibly allege that transfer delays occurred due to their disability. *See Matthew P. v. Neifeld*, 80 Misc. 3d 950, 959 (Sup. Ct. Putnam Cnty. 2023), *aff'd* No. 2023-09105 (2d Dep't Oct. 15, 2025) (rejecting ADA claim brought by CPL 730 defendant waiting for transfer to the custody of the New York State Office for People with Developmental Disabilities); *Winters v. Arkansas Department of Health & Human*

*Services*, 491 F.3d 933, 936–37 (8th Cir. 2007) (holding that detainee "was not denied admittance to the State Hospital on the basis of his disability, but for lack of available space" and noting that while "a policy of same-day or immediate admission to an appropriate mental health facility may be desirable in the best of all worlds, it is not mandated by the ADA, the Rehabilitation Act, or the Constitution, and it may not always be feasible given a state's limited resources); *Disability Rts. N. Carolina v. N. Carolina Dep't of Health & Hum. Servs.*, No. 1:24-CV-335, 2025 WL 1665327, at *3 (M.D.N.C. June 12, 2025) (concluding that plaintiff failed to allege that the defendant agency's "failures in administering its [competency restoration] services or failures to make reasonable modifications to its policies or procedures associated with wait times were in any way caused by, or motivated by, a disability"); *M.S. v. County of Ventura*, No. 16-CV-3084, 2016 WL 11506613, at *12 (C.D. Cal. Oct. 24, 2016) (noting that "[p]laintiffs do not allege that [defendants'] 'one in, one out' policy has anything to do with [p]laintiffs' disability; rather . . . it appears that this alleged policy is due to a lack of space" and "[d]efendants cannot be held liable for discrimination under the ADA or Rehabilitation Act because [the] [s]tate [h]ospital lacks space to accommodate [p]laintiffs").

*Second*, the Complaint asserted failure-to-accommodate claims but failed to allege any "plausible method for remedying a lack of access[,]" *Meekins*, 524 F. Supp. 2d at 407, "the costs of which, facially, do not clearly exceed its benefits[,]" *Borkowski*, 63 F.3d at 138. The ADA and Rehabilitation Act require that "covered entities make reasonable accommodations in order to provide qualified individuals with an equal opportunity to receive benefits from or participate in programs run by such entities[,]" *Mary Jo C. v. N.Y. State & Loc. Ret. Sys.*, 707 F.3d 144, 153 (2d Cir. 2013) (internal quotation marks omitted), but "a defendant need not make an accommodation at all if the requested accommodation 'would fundamentally alter the nature of the service, program, or activity[,]'" *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 88 (2d Cir. 2004) (quoting 28 C.F.R. § 35.130(b)(7)). "Consequently, to plead a failure to make a reasonable accommodation, a plaintiff must assert that

disabled individuals lack access to a given government resource and suggest a plausible method for remedying that lack of access." *Meekins*, 524 F.Supp.2d at 407. "A plausible accommodation is one 'the costs of which, facially, do not clearly exceed its benefits.'" *Id.* (quoting *Borkowski*, 63 F.3d at 138). If a plaintiff fails to plead the existence of a plausible accommodation, the court's analysis stops there. For example, in *Lawtone-Bowles v. City of New York*, the plaintiff's requested reasonable accommodation was simply that she wished to be provided with "accommodations without restrictions." No. 21-CV-5620, 2021 WL 2942013, at *5 (S.D.N.Y. July 12, 2021). The court in that case found that the plaintiff failed to state a claim for relief under the ADA and Rehabilitation Act, concluding that "[p]laintiff's request that [d]efendants provide 'accommodations without restrictions' is insufficient to show that a reasonable accommodation is available." *Id.*

Here, the Complaint failed to plausibly allege the existence of *any* specific accommodation, much less one the costs of which facially do not clearly exceed its benefits. The Complaint vaguely states that Plaintiffs seek a reasonable accommodation in the form of "timely competency restoration." *Compl.* ¶ 11. However, Plaintiffs wholly fail to allege what specific accommodations or practical changes to OMH policy or practice would allow OMH to immediately admit and treat every CPL 730 defendant currently on the waitlist, as well as every new CPL 730 defendant sent by a New York state court with a 730 Order, with no wait time. They simply would like this Court to order that result into being, regardless of any logistical or practical impediment. The deficiency in Plaintiffs' reasonable accommodation claim is even more glaring in the present context of the motion for a preliminary injunction, where Plaintiffs had the burden of providing *evidence* showing a clear likelihood of success on the merits. <u>Instead of providing such evidence, Plaintiffs have apparently abandoned this theory altogether.</u> And rather than articulating what specific accommodation they have in mind, Plaintiffs proposed a preliminary injunction order, which, in contravention of Rule 65, vaguely and unhelpfully states that Commissioner Sullivan should simply "provide timely and effective

competency restoration services" to Plaintiffs and the Delays Class members." *See* Argument, Section I, *supra*.

### b.    **Olmstead *Integration Mandate Theory***

The Complaint alternatively alleged that the OMH Defendants have violated Plaintiffs' rights under Title II of the ADA and Section 504 of the Rehabilitation Act by failing to administer services in a manner that enables Plaintiffs "to receive services in the most integrated setting appropriate to their needs." *Compl.* ¶¶ 90, 96; *see id.* ¶¶ 85–97. This theory too, has been abandoned in the motion for a preliminary injunction. Under the "integration mandate" set out in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), "'the unjustified institutional isolation of persons with disabilities' is, in and of itself, a prohibited 'form of discrimination.'" *Davis*, 821 F.3d at 260 (quoting *Olmstead*, 527 U.S. at 600). The integration mandate requires a State to provide community-based treatment for disabled persons where (1) "the State's treatment professionals determine that such placement is appropriate," (2) "the affected persons do not oppose such treatment," and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with [similar] disabilities." *Olmstead*, 527 U.S. at 607.

Plaintiffs have failed to establish a clear likelihood success for the putative Delays Class on an Olmstead integration mandate theory for two reasons. First, any delay in transfer to a secure psychiatric facility does not implicate the integration mandate because Plaintiffs would be institutionalized and unable to engage in community-based interactions regardless of whether they are in jail or an OMH facility. *See Davis*, 821 F.3d at 260 (noting that the integration mandate prohibits the "unjustified institutional isolation of persons with disabilities"). And second, Plaintiffs fail to allege that any state professional has determined that a less restrictive community setting is appropriate for the purported Delays Class members. *See Olmstead*, 527 U.S. at 607 (noting that "the State's treatment professionals [must] determine that such [community-based] placement is appropriate").

31

III.    **PLAINTIFFS FAIL TO
        <u>ESTABLISH IRREPARABLE HARM</u>**

    A.    <u>Plaintiffs' Alleged Constitutional Violations</u>

Plaintiffs argue that "[w]here a plaintiff asserts a constitutional violation, there is a presumption of irreparable harm" and that because Plaintiffs have alleged due process violations, they have therefore established irreparable harm. *Plaintiffs' MOL* at 23–24.

However, "[i]n the Second Circuit . . . [the] presumption of irreparable harm arising from a constitutional deprivation is not automatic." *Frey v. Bruen*, No. 21-CV-5334, 2022 WL 522478, at *9 (S.D.N.Y. Feb. 22, 2022) (quoting *Joglo Realties, Inc. v. Seggos*, No. 16-CV-1666, 2016 WL 4491409, at *16 (E.D.N.Y. Aug. 24, 2016)). Rather, the Second Circuit has opined: "we think it often will be more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights." *Time Warner Cable of N.Y.C. v. Bloomberg L.P.*, 118 F.3d 917, 924 (2d Cir. 1997). In other words, when "the violation of a constitutional right is the irreparable harm asserted [ ], the [first] two prongs of the preliminary injunction threshold merge into one: in order to show irreparable injury, plaintiff must show a likelihood of success on the merits." *Turley v. Giuliani*, 86 F.Supp.2d 291, 295 (S.D.N.Y. 2000); *see also Auracle Homes, LLC v. Lamont*, 478 F.Supp.3d 199, 227 (D. Conn. 2020) (analyzing irreparable harm in the context of a constitutional claim under the approach articulated in *Time Warner*); *Smith v. Fredrico*, No. 12-CV-4408, 2013 WL 122954, at *6 (E.D.N.Y. Jan. 8, 2013) (same); *Donohue v. Paterson*, 715 F.Supp.2d 306, 315 (N.D.N.Y. 2010) (same); *but see T.C.*, 2022 WL 17689841, at *7 (finding irreparable harm in a case where defendants did not dispute the issue of irreparable harm, but stating that "[i]t makes little sense that a party can, in effect, manufacture a finding of irreparable harm by asserting a meritless constitutional claim," noting that this approach is "out of step with [five] other circuits," and citing cases within the Second Circuit in which the court "understandably[] reason[ed] that the mere assertion of a

constitutional injury is insufficient to automatically trigger a finding of irreparable harm" (internal quotation marks omitted)).

Here, while Plaintiffs allege that they face the risk of injury during their pretrial detention, they have failed to establish a substantial likelihood of success on the merits as to their constitutional due process claims. *See* Argument, Section II.B.1, *supra*. Accordingly, Plaintiffs also fail to establish irreparable harm as to these claims. *See Time Warner Cable of N.Y.C.*, 118 F.3d at 924; *Turley*, 86 F.Supp.2d at 295.

### B.    Plaintiffs' Alleged "Risk of Serious Injury"

Plaintiffs additionally argue that they have established irreparable harm by alleging "worsened mental health conditions and physical injuries, and the continued risk thereof from dangerous conditions and inadequate mental health care on Rikers Island." *Plaintiffs' MOL* at 23. They also allege that "the longer that Plaintiffs and class members languish in jail without necessary competency restoration services, the poorer their response to treatment when it is finally provided." *Id.* at 24.

"To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). Furthermore, "[a] preliminary injunction cannot be issued based on past harm" because "[t]he purpose of a preliminary injunction is to prevent future harm." *Fisher v. Goord*, 981 F.Supp. 140, 168 (W.D.N.Y. 1997); *see also Rell v. Rumsfeld*, 389 F.Supp.2d 395, 401 (D. Conn. 2005) ("A past injury is insufficient to establish irreparable harm." (citing *Deshawn v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998))).

Here, although Plaintiffs have alleged past harms—*i.e.*, physical injury and denial of medical appointments experienced by the two named Plaintiffs—these allegations are insufficient to establish irreparable harm. *See Fisher*, 981 F.Supp. at 168. Plaintiffs' allegations of *future* harm, which are the

relevant consideration for purposes of a preliminary injunction, are based on generalizations concerning predicted "systemic lack of access to medical services[,]" "rampant violence[,]" and "excessive force[]" while in New York City custody. *Plaintiffs' MOL* at 24. However, with respect to an irreparable harm argument that relies on allegations concerning prison conditions, courts in the Second Circuit "view[] [these allegations] with great caution[.]" *Fisher*, 981 F.Supp. at 167 (citing *Farmer v. Brennan*, 511 U.S. 825, 846–47 (1994)). Indeed, courts have concluded that allegations such as future threats, harassment, retaliation, or denial of access to legal mail services by prison officials, are too speculative to give rise to a finding of irreparable harm. *See, e.g., Dean v. DeBejian*, No. 22-CV-746, 2022 WL 17842983, at *3 (N.D.N.Y. Dec. 22, 2022) (legal mail services); *Agostini v. Backus*, No. 14-CV-6188, 2015 WL 1579324, at *3 (W.D.N.Y. Apr. 9, 2015) (retaliation); *Ward v. LeClaire*, 07-CV-26, 2007 WL 1532067, at *2 (N.D.N.Y. May 24, 2007) (threats and harassment). Thus, Plaintiffs' concerns regarding potential obstacles to the provision of services, violence, and excessive force in the prison context are too speculative to meet the irreparable harm requirement. *See Ward*, 2007 WL 1532067, at *2.[8]

Furthermore, to the extent that Plaintiffs allege that their continued confinement at Rikers will result in delays in competency restoration and poorer response to treatment, this allegation is purely speculative given the highly individual—and thus, highly variable—nature of treatment response. In support of this allegation, Plaintiffs reference a supporting declaration submitted by Dr. Lauren

---

[8] Policies and procedures in New York City jails are subject to separate litigation in this District to which OMH is not a party. *See Nunez v. New York City Dep't of Correction*, 11-cv-5845 (S.D.N.Y.). On May 13, 2025, Judge Swain ordered the appointment of an independent Remediation Manager authorized to "provide leadership and executive management with the goal of developing and implementing a sustainable system that protects the constitutional rights of incarcerated people" in New York City jails. *See Nunez v. New York City Dep't of Correction*, 782 F.Supp.3d 146, 175 (S.D.N.Y. 2025), *reconsideration denied*, No. 11-CV-5845-LTS-RWL, 2025 WL 2939046 (S.D.N.Y. Oct. 16, 2025).

Elizabeth Kois, which makes uncertain and generalized statements concerning the potential effect on

Plaintiffs' competency restoration. *See Kois Decl.* ¶¶ 60–69. For example, Dr. Kois notes that,

> "[a]s unfit defendants wait in jail . . . their untreated symptoms *may* intensify and
> become more entrenched[,] . . . [t]he jail environment itself . . . *can* exacerbate existing
> psychiatric symptoms and *potentially* worsen the very conditions that render defendants
> unfit[,] . . . [and] their cognitive functioning and insight *may* decline, making eventual
> restoration increasingly difficult to achieve[.]"

*Id.* ¶ 63 (emphasis added). And while Dr. Kois states that "severe psychopathology and cognitive

impairments significantly predict poorer restoration prospects[,]" she also admits that "[c]urrent

literature lacks direct examination" of how the *duration* of a person's untreated psychosis "impact[s] [

] restoration outcomes." *Id.* ¶ 62. It is crucial that Plaintiffs' evidentiary support hedges when it comes

to their allegations concerning future poor response to treatment and competency restoration services.

An allegation that an injury "may" or "could" occur is too speculative to establish irreparable harm.

*See T-Mobile Ne. LLC v. Water Auth. of W. Nassau Cnty.*, 249 F.Supp.3d 680, 683 (E.D.N.Y. 2017)

(noting that plaintiff's "assertions that lack of access to Antenna Facilities '*could* result in dropped calls'

and that there '*may* be impaired wireless service' . . . are too speculative to constitute irreparable harm"

(emphasis in original)); *see also JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990)

(finding a plaintiff had not established irreparable harm where its allegations were based on "a remote

and speculative possibility of future harm rather than the imminent likelihood of injury").

Moreover, the cases Plaintiffs cite in support of their arguments concerning irreparable harm

are distinguishable. In both *Ahlschlager v. Imhof* and *Paykina v. Lewin*, the plaintiffs made individualized

and concrete allegations regarding ongoing and imminent injuries they would experience if a

preliminary injunction were not granted. *See Ahlschlager v. Imhof*, No. 24-CV-8267, 2024 WL 5168732,

at *2–3 (E.D.N.Y. Dec. 19, 2024); *Paykina v. Lewin*, 387 F.Supp.3d 225, 240–41 (N.D.N.Y. 2019).

Specifically, in *Ahlschlager*, plaintiff alleged that her service dog "help[ed] her walk more easily,

prevent[ed] her from falling, and combat[ted] symptoms of various mental health conditions" and

defendant "*d[id] not dispute* [her] claims that separation from her service dog ha[d] *caused* her mental health symptoms, including her depression, agoraphobia, and panic disorder, to increase in severity and frequency." 2024 WL 5168732, at *3. In *Paykina*, plaintiff had shown that his prolonged solitary confinement "[was] subjecting him to present and future psychological damage" based on substantial evidence presented concerning "the *imminent* psychological damage and the general *worsening* of symptoms [plaintiff] face[d] by additional confinement[.]" 387 F.Supp.3d at 241. No such concrete and specific allegations of imminent irreparable injury have been put forth in this case; rather, Plaintiffs resort to generalized assertions concerning what "may" happen with respect to Plaintiffs' treatment response if competency restoration services are delayed.

Furthermore, *V.W. v. Conway* and *Reynolds v. Giuliani* involve specific factual circumstances which are not applicable to this case. *See V.W. v. Conway*, 236 F.Supp.3d 554, 588–89 (N.D.N.Y. 2017); *Reynolds v. Giuliani*, 35 F.Supp.2d 331, 339–40 (S.D.N.Y. 1999). In *V.W.*, the plaintiffs' allegations hinged on the specific circumstances surrounding the denial of education and special education services for juveniles placed in solitary confinement. 236 F.Supp.3d at 565. The court regarded this as clear irreparable harm given the "hind[rance] [to] important aspects of [ ] adolescent development[,]" *id.* at 589, and the court's conclusion in a prior case that "[i]t is almost beyond dispute that wrongful discontinuation of a special education program . . . subjects that student to actual irreparable harm[,]" *id.* (quoting *Cosgrove v. Bd. of Educ. of Niskayuna Cent. Sch. Dist.*, 175 F.Supp.2d 375, 392 (N.D.N.Y. 2001)). And *Reynolds* concerned changes to a public welfare program which plaintiffs claimed wrongfully deprived them of public benefits. 35 F.Supp.2d at 333. In addition to the "declarations and testimony describing in stark detail the hardships endured by plaintiffs[,]" *id.* at 339–40, the court noted that "[t]he Supreme Court has observed that denying welfare benefits . . . may deprive [a] person 'of the very means by which to live[,]'" *id.* at 339 (quoting *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970)), and found as a result that "there simply is no question that plaintiffs have established the risk of

immediate and irreparable harm[,]" *id.* at 340. These are specific circumstances for which irreparable

harm was established by prior case law, and which are not present in this case.

Finally, Plaintiffs cite to *Advocacy Center for Elderly and Disabled v. Louisiana Department of Health*

*& Hospitals*, a decision issued in the Eastern District of Louisiana. 731 F.Supp.2d 603, 625 (E.D. La.

2010). To the extent the Court considers this case issued by a court outside of the Second Circuit, (1)

that court's finding primarily focused on plaintiffs' constitutional claims and the associated

presumption of irreparable harm, (2) the court appears to have applied a less stringent standard than

is required in the Second Circuit, noting that plaintiffs had "presented evidence that continued

incarceration *could* exacerbate the [plaintiffs'] mental conditions[,]" and (3) defendants in that case did

not contest plaintiffs' allegations that continued confinement would necessarily exacerbate their

mental conditions. *Id.* (emphasis added); *see Grand River Enter. Six Nations, Ltd.*, 481 F.3d at 66

(requiring that plaintiffs allege an injury which is "neither remote nor speculative"); *T-Mobile Ne. LLC*,

249 F.Supp.3d at 683 (regarding allegations that an injury "could" or "may" occur as insufficient to

establish irreparable harm). *Advocacy Center* is therefore unpersuasive with respect to the circumstances

of this case and the Second Circuit's standard for irreparable harm.

Accordingly, Plaintiffs fail to establish irreparable harm which is "neither remote nor

speculative." *Grand River Enter. Six Nations, Ltd.*, 481 F.3d at 66.

## IV.    THE PROPOSED INJUNCTION IS NOT IN THE PUBLIC INTEREST

"[A] plaintiff seeking a preliminary injunction must demonstrate not just that they have some

likelihood of success on the merits and will suffer irreparable harm absent an injunction, but also that

the 'balance of equities tips in his favor[ ] and . . . an injunction is in the public interest.'" *Otoe-*

*Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 112 n.4 (2d Cir. 2014)

(quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When the Government is the

opposing party, as it is here, the "balancing of equities" and "public interest" factors merge into one. *Nken v. Holder,* 556 U.S. 418, 435 (2009).

In *Disability Rts. N. Carolina,* the court reviewed a proposed injunction very similar to the one Plaintiffs propose here and concluded that it would not be in the public interest. In that case, the plaintiff moved for a preliminary injunction requiring the defendant agency to provide capacity assessments for pretrial detainees within fourteen days of an order directing the evaluation and restoration treatment within fourteen days of a judicial incapacity determination. 2025 WL 1665327, at *4. The court cited testimony from the State agency warning of the likely "catastrophic effects the requested relief would have on both [] detainees and staff, which raises serious logistical and safety concerns for not only those groups, but others who [the State mental health agency] serves in the state psychiatric hospitals." *Id.* at *22. The State also pointed to past "overcrowding at the [state psychiatric hospitals that] ha[ve] led to serious patient and staff injury, resulting in Immediate Jeopardy status from the Joint Commission." *Id.* Moreover, the court noted that because the State already had "efforts in progress to reduce wait times," the plaintiff had "essentially request[ed] federal court intervention where none may be necessary." *Id.* (internal citation omitted).

Here, Plaintiffs have not demonstrated that their proposed preliminary injunction would serve the public interest. The proposed order would decidedly not be in the public interest, for five reasons.

*First*, given the vague, unhelpful language of the proposed injunction and Plaintiffs' total failure to address OMH's ongoing efforts, the immediate effect of the requested order would simply be confusion and uncertainty. *Schatzel Decl.* ¶ 40. The proposed order does not identify any specific actions Plaintiffs believe OMH should take to eliminate the waitlist for CPL 730 defendants that OMH has not already taken. *Id.* It is not clear what OMH would be required to do "to provide timely and effective competency restoration services to Plaintiffs and the Delays Class members" that OMH is

not already doing. *Id.* There is no silver bullet available to OMH that would eliminate the waitlist. The public interest would not be served by the vague requested order.

*Second*, if one reads the proposed injunction as requiring OMH to immediately admit all CPL 730 defendants on the waitlist to OMH hospitals, regardless of hospital capacity or staffing, such an order would truly have catastrophic effects for OMH and all its patients and staff, just as in *Disability Rts. N. Carolina. Id.* ¶ 41. As explained in Mr. Schatzel's Declaration, OMH hospitals are currently operating at their safe capacity limit. *Id.* If OMH were ordered to immediately admit all CPL 730 defendants on the waitlist, OMH would not be able to safely operate its hospitals. *Id.* Such an order would raise serious logistical and safety concerns for hospital patients, staff, and visitors and would be very likely to result in serious injuries and potentially even death. *Id.* Even putting safety concerns aside, it would not be possible for staff to maintain the current standard of patient care in an overcrowded hospital, which would inhibit the efficacy of restoration treatment—the entire purpose of the admission for CPL 730 defendants—and further prolonging hospital stays. *Id.* Moreover, if OMH were forced to operate its hospitals above their safe capacity, in violation of applicable regulations and standards, this would jeopardize the Joint Commission accreditation of all OMH hospitals. *Id.* ¶ 42. Loss of Joint Commission accreditation for even one OMH hospital would lead to the loss of Medicaid and Medicare reimbursement, among other serious operational consequences across OMH's network of care. *Id.*[9]

_____

[9] In the Kois Declaration, Plaintiffs seem to concede that OMH may in fact *not* take actions that would jeopardize the safety and efficacy of its inpatient restoration treatment program. Dr. Kois writes: "Inpatient restoration requires dedicated treatment units with around-the-clock licensed mental health professionals, multidisciplinary staffing across psychiatry, psychology, and specialized disciplines, and formalized competence restoration modalities including individual sessions, group therapy, mock courtroom exercises, and individualized treatment plans. Essential components include rigorous admission screening, intensive day treatment structures, crisis intervention protocols, quality assurance mechanisms for monitoring clinical progress, and staff trained specifically in forensic matters and competence restoration techniques. Facilities must maintain hospital accreditation standards and therapeutic milieus designed to reinforce courtroom participation skills." *Kois Decl.* ¶ 18. It would not

*Third*, alternatively, if one reads the proposed injunction as requiring OMH to reallocate its finite resources *away* from the other populations it serves and toward CPL 730 defendants, that too would have catastrophic effects. *Schatzel Decl.* ¶ 43. OMH has a finite budget appropriated from taxpayer dollars by the State legislature and Governor and serves numerous critical populations of New Yorkers with mental illness. *Id.* At secure forensic psychiatric facilities, OMH serves multiple populations in addition to CPL 730 defendants. *Id.* OMH must devote secure hospital staff, resources, and bed space to persons who suffer from a dangerous mental disorder and have been acquitted of a crime by reason of that illness, *see* CPL § 330.20; and persons who need treatment while incarcerated pursuant to a sentence following conviction or who are in pre-sentence detention. *Id.*; *see* Correct. Law §§ 402 & 508. Outside of secure forensic psychiatric facilities, OMH must devote resources to patients who require inpatient treatment in civil psychiatric facilities, as well as patients who require community-based mental health services and housing to remain in the community. *Schatzel Decl.* ¶ 43. It would be highly inequitable for the Court to order OMH to take finite resources away from these other critical populations in an attempt to eliminate the wait time for CPL 730 defendants. *See, e.g.*, *T.C.*, 2022 WL 17689841, at *8 ("This Court does not find that the public interest is served by placing the needs of Plaintiffs over the needs of other residents with whom they would be housed.").[10] For similar practical reasons, in *Young*, 2022 WL 7087140, the district court that rejected the defendant's due process claim noted that it did not "have either the authority, the ability, or a sound reason to somehow expedite the [federal BOP's waitlist] process" for psychiatrically unfit defendants. Id. at * 4.

---

be possible for OMH to maintain these elements if forced to immediately admit all CPL 730 defendants on the waitlist.

[10] Alternatively, the proposed order could be read as requiring OMH to prioritize admission of the putative Delays Class, consisting of CPL 730 defendants arrested in New York City, while de-prioritizing the needs of CPL 730 defendants arrested elsewhere in the State. This result would be highly inequitable as well.

The court further cautioned that "for the Court to attempt to do so would only interfere with the system in place and would likely cause more problems than it would solve." *Id.*

*Fourth*, just as in *Disability Rts. N. Carolina*, the proposed injunction would not be in the public interest because OMH already has "efforts in progress to reduce wait times," meaning Plaintiffs "essentially request[] federal court intervention where none may be necessary." 2025 WL 1665327, at *22.

*Fifth*, Plaintiffs cite to *Averhart v. Annucci*, No. 21-cv-383, 2021 WL 2383556, at *16 (S.D.N.Y. June 10, 2021), for the general proposition that "upholding constitutional rights surely serves the public interest." *Plaintiffs' MOL* at 26. That principle is inapplicable here because there are no constitutional rights at stake. Plaintiffs have *not* stated a claim for a violation of their due process rights under the Fourteenth Amendment. *See* Argument, Section II.B.1, *supra*.

## <u>CONCLUSION</u>

For the foregoing reasons, the OMH Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction in its entirety, together with such other relief as the Court may award.

Dated:  New York, New York
       November 3, 2025

Respectfully submitted,

LETITIA JAMES
Attorney General
State of New York
*Attorney for the OMH Defendants*

By: *Caroline P. Wallitt*

Caroline P. Wallitt
Haley Hawkins
Assistant Attorneys General
28 Liberty Street
New York, New York 10005
Tel.: (212) 416-6228
Email: Caroline.Wallitt@ag.ny.gov

**WORD COUNT CERTIFICATE**
**PURSUANT TO LOCAL CIVIL RULE 7.1(c)**

The undersigned hereby certifies that this Memorandum of Law contains 14,375 words. This brief

complies with the Court's Individual Rule 2.C, which does not impose a page limit for briefs.

Dated:  New York, New York
        November 3, 2025

_Caroline P. Wallitt_
_____
Caroline P. Wallitt