# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

R.M., by and through next friend Elfego
Maldonado Estrada, and A.B., by and through
next friend Kadijah Hutchinson-McLean, on
behalf of themselves and all others similarly
situated,

               Plaintiffs,

               - vs -

NEW YORK STATE OFFICE OF MENTAL
HEALTH; ANN MARIE T. SULLIVAN, in
her official capacity as the Commissioner of the
New York State Office of Mental Health; the
NEW YORK CITY DEPARTMENT OF
HEALTH AND MENTAL HYGIENE;
MICHELLE MORSE, in her official capacity
as the Commissioner of the New York City
Department of Health and Mental Hygiene; and
NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION;

               Defendants.

C.A. No. 1:25-cv-06667-AKH

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO OMH DEFENDANTS' <u>MOTION TO DISMISS THE COMPLAINT</u>

Davis Polk & Wardwell LLP
450 Lexington Ave
New York, New York 10018
(212) 450-4000

The Legal Aid Society
49 Thomas Street, 10th Floor
New York, New York 10013
(212) 577-3398

Washington Square Legal Services
Civil Rights in the Criminal Legal System Clinic
245 Sullivan Street, 5th Floor
New York, NY 10012
(212) 998-6430

*Attorneys for Plaintiffs and the Putative Class*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

    A.  OMH's Policies and Practices Delay Competency Restoration Services ........................ 2

    B.  OMH's Policies and Practices Expose Plaintiffs and Class Members to Dangerous Jail
        Conditions That Undermine Competency Restoration ..................................................... 4

    C.  Named Plaintiffs Have Been Harmed by Delays for Competency Restoration Services
        and OMH Defendants' Failure to Evaluate Them for Outpatient Restoration ................ 5

LEGAL STANDARD ............................................................................................................ 7

ARGUMENT .......................................................................................................................... 8

I.      PLAINTIFFS AND DELAYS CLASS MEMBERS HAVE STATED A DUE PROCESS
        CLAIM AGAINST OMH COMMISSIONER SULLIVAN ............................................ 8

    A.  The Complaint Alleges a Violation of Plaintiffs' Due Process Rights Under *Jackson v.
        Indiana* ............................................................................................................................ 9

        1.  OMH Defendants' Claims of Resource Constraints Are Not Properly Before the
            Court and Do Not Render Plaintiffs' Confinement "Related to the Purpose of
            Competency Restoration" .......................................................................................... 10

        2.  Plaintiffs' Wait Times Bear No Reasonable Relation to Competency
            Restoration ................................................................................................................. 15

    B.  OMH Defendants Overstate the Relevance of *Magassouba* and Its Limited
        Progeny ............................................................................................................................ 18

II.    PLAINTIFFS STATE A CLAIM THAT OMH DEFENDANTS DENY PLAINTIFFS
       AND DELAYS CLASS MEMBERS A REASONABLE ACCOMMODATION .......... 23

    A.  Plaintiffs Allege They Are Excluded from Participating in Their Criminal Proceedings
        Because of Their Disability ............................................................................................. 25

    B.  Plaintiffs Identify a Timely and Effective Competency Restoration System as a
        Reasonable Accommodation for Participating in their Criminal Proceedings ............. 27

III.   PLAINTIFFS STATE AN *OLMSTEAD* CLAIM AS TO PLAINTIFFS AND THE
       INTEGRATION CLASS ................................................................................................ 30

A.  For Purposes of an *Olmstead* Claim, Unnecessary Segregation is Discrimination Due to Disabilities .................................................................................................. 32

B.  Plaintiffs Allege that OMH Defendants' Lack of Assessment Standards and Procedures and Failure to Provide an Adequate Outpatient Program Subjects Plaintiffs and Integration Class Members to Unnecessary Segregation................................................ 33

C.  Plaintiffs Allege that They Are Appropriate for a More Integrated Setting .................. 40

CONCLUSION ................................................................................................................ 43

## TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Advoc. Ctr. For Elderly & Disabled v. La. Dep't of Health and Hosps.*,
   731 F. Supp. 2d 603 (E.D. La. 2010) ........................................................ 12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................. 14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .......................................................................... 7, 18

*Conn. Off. of Prot. & Advoc. for Pers. with Disabilities v. Connecticut*,
   706 F. Supp. 2d 266 (D. Conn. 2010) ............................................... 35, 36

*Davis v. Shah*,
   821 F.3d 231 (2d Cir. 2016) ....................................................... 24, 31, 33

*Day v. Dist. of Columbia*,
   894 F. Supp. 2d 1 (D.D.C. 2012) .................................................... 36, 40

*In re De Carvalho*,
   2019 WL 6130534 (S.D. Fla. Nov. 19, 2019) ........................................ 23

*Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*,
   804 F.3d 178 (2d Cir. 2015) .................................................................. 24

*DeLuca v. AccessIT Grp., Inc.*,
   695 F. Supp. 2d 54 (S.D.N.Y. 2010) ......................................... 8, 11, 29

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) .................................................................. 38

*Disability Advocs., Inc. v. Paterson*,
   598 F. Supp. 2d 289 (E.D.N.Y. 2009) .................................................. 30

*Disability Advocs., Inc. v. Paterson*,
   653 F. Supp. 2d 184 (E.D.N.Y. 2009) .................................................. 40

*Disabled in Action v. Bd. of Elections in City of N.Y.*,
   752 F.3d 189 (2d Cir. 2014) ............................................................ 25, 28

*Disability Rights N.C. v. N.C. Dep't of Health & Hum. Servs.*,
   2025 WL 1665327 (M.D.N.C. June 12, 2025) ...................................... 32

*Dunakin v. Quigley*,
   99 F. Supp. 3d 1297 (W.D. Wash. 2015) ............................................. 35

*Edrei v. Maguire*,
  892 F.3d 525 (2d Cir. 2018) ............................................................ 7

*Floyd v. City of N.Y.*,
  283 F.R.D. 153 (S.D.N.Y. 2012) .................................................... 38

*Frederick L. v. Dep't of Pub. Welfare*,
  157 F. Supp. 2d 509 (E.D. Pa. 2001) ............................................. 40

*Glendening ex rel. G.W. v. Howard*,
  707 F. Supp. 3d 1089 (D. Kan. 2023) ...................................... 12, 15, 17

*Glob. Network Commc'ns, Inc. v. City of N.Y.*,
  458 F.3d 150 (2d Cir. 2006) ......................................................... 7, 8

*Henrietta D. v. Bloomberg*,
  331 F.3d 261 (2d Cir. 2003) ................................................... *passim*

*Ind. Prot. & Advoc. Servs. Comm'n v. Ind. Fam. & Soc. Servs. Admin.*,
  630 F. Supp. 3d 1022 (S.D. Ind. 2022) .............................. 12, 15, 16, 17

*Irvine v. Johnson*,
  2025 WL 1093541 (D.S.D. Apr. 11, 2025) ................................... 13, 22

*Isaac A. v. Carlson*,
  775 F. Supp. 3d 1296 (N.D. Ga. 2025) ......................................... 41

*Jackson v. Indiana*,
  406 U.S. 715 (1972) ............................................................ 8, 9, 14, 16

*Jeremiah M. v. Crum*,
  695 F. Supp. 3d 1060 (D. Alaska 2023) ......................................... 40

*Joseph S. v. Hogan*,
  561 F. Supp. 2d 280 (E.D.N.Y. 2008) ........................................... 40

*Kritner v. Alabama Dep't of Human Res.*,
  2025 WL 451836 (M.D. Ala. Feb. 10, 2025) .................................. 41

*Lakey v. Taylor*,
  435 S.W.3d 309 (Tex. App. 2014) ................................................ 16

*Lamda Sols. Corp. v. HSBC Bank USA, N.A.*,
  574 F. Supp. 3d 205 (S.D.N.Y. 2021) ........................................... 11

*Lindsay v. Navarretta*,
  2024 WL 5125954 (D. Conn. Dec. 16, 2024) ............................. 36, 39

*Lynch v. City of N.Y.*,
  952 F.3d 67, 75 (2d Cir. 2020) .............................................. 8, 14, 16

*Mahn v. Allegis Grp., Inc.*,
    2025 WL 1504812 (S.D.N.Y. May 24, 2025) ........................................... 8, 11, 29

*Martinez v. Cuomo*,
    459 F. Supp. 3d 517 (S.D.N.Y. 2020) .................................................... 28

*Mary Jo C. v. N.Y. & Loc. Ret. Sys.*,
    707 F.3d 144 (2d Cir. 2013) .................................................................29

*Meekins v. City of N.Y.*,
    524 F. Supp. 2d 402 (S.D.N.Y. 2007) ...................................... 24, 25, 29

*Messier v. Southbury Training School*,
    562 F. Supp. 2d 294 (D. Conn. 2008) ............................................ *passim*

*M.J. v. Dist. of Columbia*,
    401 F. Supp. 3d 1 (D.D.C. 2019) .......................................................... 41

*Murphy ex rel. Murphy v. Minn. Dep't of Human Servs.*,
    260 F. Supp. 3d 1084 (D. Minn. 2017) ................................................. 41

*Noel v. N.Y. City Taxi & Limousine Comm'n*,
    687 F.3d 63 (2d Cir. 2012) ................................................................... 26

*Noll v. Int'l Bus. Mach. Corp.*,
    787 F.3d 89 (2d Cir. 2015) ...................................................................25

*Olmstead v. L.C.*,
    527 U.S. 581 (1999) ....................................................................... *passim*

*Oregon Advoc. Ctr. v. Mink*,
    322 F.3d 1101 (9th Cir. 2003) ................................................... 10, 12, 18

*Pate v. Robinson*,
    383 U.S. 375 (1966) ............................................................................ 26

*Pa. Dep't of Corrs. v. Yeskey*,
    524 U.S. 206 (1998) ............................................................................ 25

*People v. B.D.*,
    79 Misc. 3d 920 (N.Y. Sup. Ct. 2023) ............................................ 20, 37

*People v. L.G.*,
    208 N.Y.S. 3d 469 (Sup. Ct. 2024)......................................................11

*Rumsfeld v. F. for Acad. and Inst. Rts., Inc.*,
    547 U.S. 47 (2006) ..............................................................................38

*Schwartz v. Dolan*,
    86 F.3d 315 (2d Cir. 1996) .................................................................. 15

*Siino v. City of N.Y.*,
  2020 WL 3807451 (E.D.N.Y. Feb. 27, 2020) ........................................................ 36

*SM Kids, LLC v. Google LLC*,
  963 F.3d 206 (2d Cir. 2020) ........................................................................... 34

*Steward ex rel. Green v. Young*,
  787 F. Supp. 3d 476 (W.D. Tex. 2025) ................................................... 34, 35, 41

*Summers v. Louisiana*,
  2022 WL 4490161 (M.D. La. Sept. 27, 2022) ................................................... 37, 38

*Tardif v. City of N.Y.*,
  991 F.3d 394 (2d Cir. 2021) ........................................................................ 32, 33

*Tennessee v. Lane*,
  541 U.S. 509 (2004) ................................................................................... 26, 29

*Thomas v. Westchester Cnty. Health Care Corp.*,
  232 F. Supp. 2d 273 (S.D.N.Y. 2022) ..................................................................20

*Timothy B. v. Kinsley*,
  2024 WL 1350071 (M.D.N.C. Mar. 29, 2024) ...................................................... 40

*Trueblood v. Wash. State Dep't of Soc. & Health Servs.*,
  2016 WL 4418180 (W.D. Wash. Aug. 19, 2016) .................................................. 18

*United States v. Al Kassar*,
  660 F.3d 108 (2d Cir. 2011) ........................................................................... 17

*United States v. Brown*,
  602 F.2d 1073 (2d Cir. 1979) ......................................................................... 17

*United States v. Calderon-Chavez*,
  688 F. Supp. 3d 472 (W.D. Tex. 2023) ........................................................ 13, 17

*United States v. Carter*,
  2020 WL 1620530 (E.D. Wis. Apr. 1, 2020) ...................................................... 22

*United States v. Colucci*,
  743 F. Supp. 3d 452 (E.D.N.Y. 2024) .............................................................. 21

*United States v. Diaz*,
  2025 WL 1678428 (D. Conn. June 13, 2025) .................................................... 23

*United States v. Donnelly*,
  41 F.4th 1102 (9th Cir. 2022) ........................................................................ 22

*United States v. Florida*,
  682 F. Supp. 3d 1172 (S.D. Fla. 2023) ............................................................. 41

*United States v. Hylton*,
    2023 WL 7280170 (S.D.N.Y. Nov. 3, 2023) ........................................... 13, 16, 17, 19

*United States v. Lara*,
    671 F. Supp. 3d 1257 (D.N.M. 2023) ................................................................. 13

*United States v. Magassouba*,
    544 F.3d 387 (2d Cir. 2008) ...................................................................... *passim*

*United States v. McCarthy*,
    703 F. Supp. 3d 1377 (M.D. Fla. 2023) ...................................................... 13, 22

*United States v. Mouton*,
    2023 WL 3872206 (S.D. Tex. June 7, 2023) ............................................... 12, 14

*United States v. Olaniyi*,
    2024 WL 4500921 (E.D.N.Y. Oct. 15, 2024).......................................... 13, 15, 19

*United States v. Ortega*,
    No. 22-cr-91 (S.D.N.Y. Mar. 3, 2025) .............................................................. 21

*United States v. Parish*,
    2024 WL 3904626 (S.D.N.Y. Aug. 22, 2024) .............................................. 16, 21

*United States v. Schmidt*,
    105 F.3d 82 (2d Cir. 1997) ............................................................................. 18

*United States v. Smith*,
    764 F. Supp. 2d 541 (W.D.N.Y. 2011) .................................................... 18, 19, 21

*United States v. Walters*,
    910 F.3d 11 (2d Cir. 2018) ....................................................................... 17, 18

*United States v. Wazny*,
    2022 WL 17363048 (M.D. Penn. Dec. 1, 2022) ........................................ 13, 22

*United States v. Young*,
    2022 WL 7087140 (W.D.N.Y. Oct. 12, 2022) ......................................... 13, 17, 19

*United States v. Zapata-Herrera*,
    2015 WL 4878319 (S.D. Cal. Aug. 14, 2015) .................................................... 18

*Washington v. Hand*,
    429 P.3d 502 (Wash. 2018) ............................................................................. 10

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020) ............................................................. 8, 11

*Wright v. New York State Dep't of Corr.*,
    831 F.3d 64 (2d Cir. 2016). ............................................................... 24, 25, 27, 28

STATUTES & RULES

18 U.S.C. § 4241 ................................................................................................ 19

28 C.F.R. pt. 35, App. A (1998) ........................................................................ 38

28 C.F.R. pt. 35, App. B (2011) ........................................................................ 25

28 C.F.R. § 35.102(a) ........................................................................................ 25

28 U.S.C. § 636(b)(1) ........................................................................................ 33

Fed. R. Civ. P. 12(b)(1) ..................................................................................... 34

Fed. R. Civ. P. 12(b)(6) ..................................................................... 7, 8, 12, 14

N.Y. Crim. Proc. L. § 330.20(b) ......................................................................... 4

N.Y. Crim. Proc. L. § 730 ......................................................................... *passim*

N.Y. Crim. Proc. L. § 730.60(2) ....................................................................... 27

14 N.Y.C.R.R. § 540.6(a)(1) ................................................................................ 4

## PRELIMINARY STATEMENT

This case centers on people who are unfit for trial and their rights to receive timely competency restoration services and to be provided the opportunity, when appropriate, to receive those services in the community or in a setting other than a secure hospital. New York State's administration of the competency restoration system has made these rights illusory, bringing about a state of affairs shockingly incompatible with the U.S. Constitution and federal disability rights statutes.

Named Plaintiffs R.M. and A.B. ("Named Plaintiffs"), individually and on behalf of two putative classes (collectively, "Plaintiffs"), allege that Defendants cause them to languish on Rikers Island ("Rikers") for months at a time—in conditions of neglect and brutality—as they wait for necessary competency restoration services. This outcome is the product of numerous practices—insufficient capacity in hospitals, the absence of a system for identifying and assessing people for more integrated settings, and an inadequate outpatient program—which expose people to harm, not least of which are delays in their criminal proceedings, the risk of psychiatric deterioration that reduces the prospects that they will eventually be restored to competency, and unnecessary segregation. Defendants New York State Office of Mental Health ("OMH") and Ann Sullivan, Commissioner of the New York State Office of Mental Health (together, "OMH Defendants"), seeking to avoid scrutiny of their practices, move to dismiss Plaintiffs' Complaint for failure to state a claim, but each of their arguments is devoid of merit. Accordingly, the Court should deny OMH Defendants' motion to dismiss in its entirety.

## STATEMENT OF FACTS[1]

### A.  OMH's Policies and Practices Delay Competency Restoration Services

Plaintiffs in this action are individuals who have been found unfit to stand trial and who have received a competency restoration order pursuant to New York Criminal Procedure Law § 730 ("CPL 730"). Compl. ¶¶ 14, 15. Through these orders, Plaintiffs are entrusted to the care of OMH Defendants. As a result of its failed policies and practices, for years, OMH has delayed providing these competency restoration services to Plaintiffs, leaving them to languish on Rikers for months while awaiting transfer to an OMH hospital. *Id.* ¶ 1.

Individuals subject to CPL 730 orders *cannot* proceed in their criminal cases until they have received competency restoration services and are deemed fit. *Id.* ¶¶ 3, 26. Despite these stakes, OMH routinely refuses to accept custody of individuals subject to CPL 730 orders in a timely manner; instead, OMH ignores their treatment needs for months on end. *Id.* ¶ 2. For example, in 2024, the median wait time in jail prior to transfer to OMH custody was eighty-one days, with 130 individuals waiting longer than 100 days and some waiting up to six months or more. *Id*. ¶¶ 2, 30-31. During this waiting period, individuals are separated from their families, kept from the treatment they need to progress in their criminal proceedings, and exposed to brutal jail conditions. *Id.* ¶¶ 3, 6.

OMH Defendants' own policies and conduct have produced these delays. While OMH has acknowledged that outpatient competency restoration services may be appropriate for people who are deemed incompetent to stand trial, *id.* ¶ 35, OMH lacks standards, policies, or procedures to

---

[1] Unless otherwise noted, all defined terms have the same meaning as in the Class Action Complaint (ECF 1) ("Complaint"), all citations and quotations are omitted, and all emphases added.

identify such individuals, *id*. ¶¶ 32-34.[2] Indeed, the OMH-approved forms that doctors use to evaluate defendants in competency exams do not direct doctors to assess suitability for outpatient services. *Id*. ¶ 33. Unsurprisingly, few such individuals are identified, and even if they were, OMH does not operate a system that can serve them; in fact, OMH's underdeveloped and under-resourced outpatient competency restoration programs cannot serve more than fifteen individuals at a time, *id*. ¶¶ 32, 51. As a result, almost all individuals deemed incompetent to stand trial are designated to receive competency restoration services at hospitals where limited beds are available, causing them to wait for months on Rikers. *Id*. ¶¶ 10, 27-28.

These delays are exacerbated by OMH's policy of serving the vast majority of individuals deemed incompetent in "secure," as opposed to civil, hospitals. *Id*. ¶ 38. OMH implements this policy without any process for determining whether "secure" hospitalization is necessary for any particular individual. *Id*. OMH has designated only four "secure" hospitals in all of New York State and a single "non-secure" unit at a civil hospital to provide competency restoration services, and OMH typically operates these hospitals at full capacity. *Id*. ¶ 28. This further extends long waitlists, and individuals on the waitlist remain at Rikers—without competency restoration services—until OMH moves them to a hospital bed. *Id*. ¶¶ 26-29.[3]

---

[2] Contrary to OMH Defendants' claims, OMH Defs.' Mem. in Support of Mot. Dismiss ("OMH MTD") at 10, ECF 63, OMH's "Guidance for Implementation of Outpatient Competency Restoration (OCR)," which is described at Paragraph 35 of the Complaint, does not set out such standards, policies, or procedures. That document merely states that outpatient restoration can be appropriate and lists some potentially relevant considerations. It does not prompt or require any doctor or other actor to take any steps to ensure that individuals suited to outpatient restoration are placed there. Compl. ¶¶ 33, 35-38.

[3] OMH Defendants state they have been dealing with "an unexpectedly steep increase in the number of inpatient felony CPL 730 orders issued by courts throughout New York State" since "in or around 2022." OMH MTD at 8. This assertion relies on the Affidavit of Matthew S. Schatzel ("Schatzel Affidavit"), which is not properly before the court on this Motion, *see infra* n.9, and further is irrelevant to the legal sufficiency of Plaintiffs' claims. But even if the data were relevant and its accuracy were assumed, Plaintiffs allege that median delays of a month or more were routine even prior to 2022, Compl. ¶¶ 30-31, and while OMH Defendants claim that the volume of new 730 orders has increased by approximately 12% from 2022 to 2024, *see* Decl. of Matthew S. Schatzel in Support of OMH Defs.' Mot. to Dismiss ¶ 20, ECF 69; OMH MTD at 8, Plaintiffs allege that median delays have increased by *more than 65%* during the same interval, Compl. ¶¶ 30-31.

OMH Defendants claim they are required by law to provide restoration services in secure facilities. OMH MTD at 7. While OMH Defendants cite to Plaintiffs' Complaint for this statement, the Complaint alleges that OMH Defendants' practice of designating 730 defendants to secure facilities is done as "a matter of policy," not required by law. Compl. ¶ 28. Neither CPL § 330.20(b) (defining a secure facility) nor 14 N.Y.C.R.R. § 540.6(a)(1) (stating the commissioner "may" designate a secure facility to receive a person who has been remanded to the commissioner pursuant to a final order of observation), require a person with a CPL 730 order to be placed at a secure facility.

### B. OMH's Policies and Practices Expose Plaintiffs and Class Members to Dangerous Jail Conditions That Undermine Competency Restoration

Because of OMH's practice of delaying competency restoration services, Plaintiffs spend extended time in jail on Rikers, in an environment where violence is widespread, and healthcare is often absent. *Id.* ¶¶ 44-47. In 2024, only 49.4% of incarcerated individuals' requests for health services resulted in DOC staff producing the incarcerated individual to a Correctional Health Services ("CHS") clinic, and only 39.5% of those productions were timely. *Id*. ¶ 44. Each Named Plaintiff has experienced disruptions in accessing medical and mental health services. Between March and July 2025, corrections staff did not produce Plaintiff R.M. for several medical appointments, including chronic care, wound care, and social work appointments. *Id.* ¶ 45. Similarly, corrections staff did not produce Plaintiff A.B. for a medical appointment and other mental health appointments. *Id.*

Individuals incarcerated on Rikers are exposed to a severe risk of physical harm and excessive force. *Id.* ¶ 47. Moreover, corrections officers respond to manifestations of psychiatric disabilities with harsh discipline and administrative restrictions. *Id.* Specifically, in the mental health units, Rikers correctional officers arbitrarily engage in an unofficial practice called

"deadlocking," which involves locking individuals in their cells for days or even weeks. *Id.* This practice effectively enforces solitary-like conditions with no accountability. *Id.* In addition, people with psychiatric disabilities are more likely to experience physical and sexual assault. *Id.* Both R.M. and A.B. have experienced physical violence at the hands of other incarcerated people while waiting on Rikers for competency restoration services. *Id.* ¶ 49.

The more time spent in the unsafe, unpredictable, and unsupportive environment of Rikers, the greater the likelihood that individuals subject to CPL 730 orders will decompensate. *Id.* ¶ 46. Commonly, people who experience extended periods of inadequate mental health treatment have an increased risk of suicide and poorer treatment outcomes. *Id.* Thus, Plaintiffs psychiatrically deteriorate during their time on Rikers. *Id.* And since June 2021, approximately half of the fifty-nine people who have died in the jail system were individuals with psychiatric needs, including at least five people who were subject to CPL 730 procedures. *Id.*

## C. Named Plaintiffs Have Been Harmed by Delays for Competency Restoration Services and OMH Defendants' Failure to Evaluate Them for Outpatient Restoration

Like all putative class members, Named Plaintiffs R.M. and A.B. have been harmed by delays in receiving competency restoration services.

R.M. is a thirty-one-year-old Latino man who resided in private housing in Brooklyn, New York prior to his arrest. *Id.* ¶ 14. He received a diagnosis of "other specified schizophrenia spectrum" and "other psychotic disorder," a mental impairment that substantially limits one or more major life activities, including thinking. *Id.* Following his arrest, R.M. remained in the community and continued to report to his court dates. *Id.* On March 12, 2025, R.M. was found unfit to stand trial and ordered committed to an OMH hospital for competency restoration. *Id.* R.M. was remanded to jail following his commitment, even though he was qualified to receive competency restoration services in the community with appropriate services and supports, and he

desired such services. *Id.* OMH reasonably could have accommodated R.M. in an outpatient program, but OMH Defendants failed to assess him and failed to require any CHS doctor to assess him to determine the competency restoration setting most appropriate for his needs. *Id.* ¶¶ 14, 33, 36, 40. Instead, OMH placed R.M. on a waitlist for a bed at a secure hospital and, as of the time of the filing of the Complaint, he was jailed on Rikers for 153 days and counting awaiting transfer to the hospital. *Id.* ¶ 14.[4] He did not receive any competency restoration services while detained. *Id.*

A.B. is a twenty-nine-year-old Black man who resided in supportive housing in the Bronx, New York prior to his arrest. *Id.* ¶ 15. He has a diagnosis of "other specified schizophrenia spectrum" and "other psychotic disorder," a mental impairment that substantially limits one or more major life activities, including thinking, working, and self-care. *Id*. A.B. was incarcerated at Rikers following his arrest because he was unable to post bail. *Id.* On March 26, 2025, the court found that he was unfit to stand trial and ordered him committed to an OMH hospital for competency restoration services. *Id.* After OMH placed A.B. on a waitlist for a bed at a secure hospital, he waited in a Rikers jail for 139 days and counting as of the time of the filing of the Complaint, awaiting transfer to the hospital.[5] *Id.* He did not receive any competency restoration services while detained. *Id.* A.B. was qualified to receive competency restoration services in the community with appropriate services and supports, and he desired such services. *Id.* OMH reasonably could have accommodated A.B. in an outpatient program, but OMH Defendants failed

---

[4] R.M. ultimately spent a total of 166 days awaiting competency restoration before he was transferred to the hospital. Reply Decl. of Shona Hemmady in Further Supp. of PI Mot. ("Hemmady PI Reply Decl.") ¶ 3, ECF 89.

[5] Like R.M., A.B. also ultimately spent a total of 166 days awaiting competency restoration before being transferred to the hospital. Hemmady PI Reply Decl. ¶ 4.

to assess or reassess him, and also failed to require any CHS doctor to assess him to determine which competency restoration setting was most appropriate for his needs. *Id.* ¶¶ 15, 33, 36, 40.

On August 12, 2025, Named Plaintiffs filed the Complaint in this action. They seek to vindicate the rights of all persons who have been, or will be in the future, charged with a felony in New York City and: (a) who receive a CPL 730 court order to receive competency restoration services by OMH, and (b) who remain confined in a New York City Department of Correction jail pending competency restoration services (the "Delays Class"), *id*. ¶ 65; as well as all persons who have been, or will be in the future, charged with a felony in New York City and: (a) who receive a CPL 730 court order to receive competency restoration services by OMH; (b) who do not receive an individualized assessment of the most integrated setting appropriate to their needs; and (c) who will not receive competency restoration services in the most integrated setting appropriate to their needs pursuant to an individualized assessment (the "Integration Class"), *id*. ¶ 66.[6]

## LEGAL STANDARD

A complaint need contain "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiffs' favor." *Edrei v. Maguire*, 892 F.3d 525, 532 (2d Cir. 2018). A court generally may not consider facts or documents beyond the pleading itself. *Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 155-56 (2d Cir. 2006). The law makes a limited exception for documents incorporated by reference in or integral to a complaint—i.e., documents that are the subject of "a clear, definite and substantial reference" in the complaint, not

---

[6] Named Plaintiffs sue OMH Defendants on behalf of themselves, the Delays Class, and the Integration Class. They sue Municipal Defendants on behalf of themselves and the Integration Class only.

mere "[l]imited quotation," *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010), or on which the complaint "relies *heavily* [for] [their] terms and effects," *Glob. Network Commc'ns, Inc.*, 458 F.3d at 156. But such documents may be considered only for the fact of their contents, not their truth. *See Mahn v. Allegis Grp., Inc.*, 2025 WL 1504812, at *2 n.3 (S.D.N.Y. May 24, 2025); *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 245-46 (S.D.N.Y. 2020). This is because a court's task in evaluating a Rule 12(b)(6) motion is "to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of N.Y.*, 952 F.3d 67, 75 (2d Cir. 2020)).

## ARGUMENT

OMH Defendants' arguments that Plaintiffs' allegations do not state due process, reasonable accommodation, and integration mandate claims are rooted in numerous procedural improprieties (including citations to facts outside the pleadings and jurisdictional arguments that are improper on a Rule 12(b)(6) motion) and mischaracterizations of Plaintiffs' Complaint and the applicable law. None of their arguments provide any grounds for dismissal of Plaintiffs' claims.

## I.     PLAINTIFFS AND DELAYS CLASS MEMBERS HAVE STATED A DUE PROCESS CLAIM AGAINST OMH COMMISSIONER SULLIVAN

Plaintiffs' Complaint alleges that the nature and duration of their extended confinement on Rikers bear no connection to the purpose of their commitment: competency restoration. They therefore state a due process claim under the test the Supreme Court articulated in *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). The Second Circuit's elaboration on the *Jackson* test in *United States v. Magassouba*, 544 F.3d 387 (2d Cir. 2008), is ill-suited to assess the legal sufficiency of a civil claim challenging pre-treatment confinement, but Plaintiffs state a claim even under the *Magassouba* test.

### A. The Complaint Alleges a Violation of Plaintiffs' Due Process Rights Under *Jackson v. Indiana*

OMH Defendants' prolonged confinement of Plaintiffs on Rikers while they await competency restoration services violates due process. As the Supreme Court explained in *Jackson*, "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." 406 U.S. at 738. Indeed, "a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial"—like Plaintiffs here—"cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." *Id.*

OMH Defendants concede that the standard articulated in *Jackson* "provides the framework" for "due process claims brought by pretrial detainees requiring competency restoration," including the claims asserted by Plaintiffs here. OMH MTD at 12. And OMH Defendants do not contest that the lawful purpose of Plaintiffs' commitment is "restoring the[m] . . . to a capacity to participate in trial." *See id.* at 23. But Plaintiffs' incarceration for months-long periods in brutal conditions on Rikers bears no relationship to that purpose. *See* Compl. ¶¶ 43-50. As the Court stated at a recent status conference, Plaintiffs allege that Rikers is a "place of undesirability, to put it very mildly." Nov. 13, 2025 Status Conf. Tr. 5:4-11, ECF 89-1; *see also* Compl. ¶¶ 44-49. This is particularly true for individuals with mental illness, whose medical needs are frequently neglected (as were Named Plaintiffs') and who are vulnerable to harsh punishments and assaults (as Named Plaintiffs experienced). Compl. ¶¶ 43-49. As a result, by the time they are transferred from Rikers to OMH facilities, individuals subject to 730 orders have often decompensated markedly. *Id.* ¶¶ 46, 48.

Because Plaintiffs have alleged that they are confined for months under conditions that actively undermine competency restoration—the undisputed purpose of their confinement—they have sufficiently stated a due process claim under *Jackson*. Other courts have reached similar holdings. *See, e.g.*, *Washington v. Hand*, 429 P.3d 502, 507-08 (Wash. 2018) (en banc) (holding that "detaining an incompetent defendant for 76 days" pre-treatment violated due process because it "likely harms a defendant's mental health and runs counter to the very purpose for which he was committed—which is to restore the defendant's competency"); *cf. Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003) (failing to "discern[] a legitimate state interest in keeping mentally incapacitated criminal defendants locked up in county jails for weeks or months"). OMH Defendants attempt to evade this result in two ways. First, they claim that because limited state resources purportedly necessitate *some* delay prior to provision of competency restoration services, the months-long delays Plaintiffs experience therefore "relate[] to the purpose of restoring [them] to a capacity to participate in trial." OMH MTD at 23. Second, OMH Defendants focus on the *duration* of the alleged delays in isolation from the nature of those delays, and claim that, because courts have accepted similar delays in unanalogous factual and procedural circumstances, the Court should reject Plaintiffs' claims on the pleadings. *Id*. at 13-21, 23. Both these attempts fail.

### 1. OMH Defendants' Claims of Resource Constraints Are Not Properly Before the Court and Do Not Render Plaintiffs' Confinement "Related to the Purpose of Competency Restoration"

While OMH Defendants do not claim that Plaintiffs' incarceration on Rikers facilitates or contributes to their restoration to competency in any way, OMH Defendants suggest that where they can "show" that delays are "caused by issues beyond the State's control," *Jackson*'s "reasonable relation" requirement is somehow satisfied or excused. OMH MTD at 23.

As a threshold matter, OMH Defendants have not *shown* anything and could not permissibly do so at this stage. Their claims regarding purported "issues outside [their] control"

rely on factual matter *outside* the Complaint—principally an affidavit submitted by an OMH

official in a different case.[7] *See, e.g.*, *id.* at 6-9 (citing Schatzel Affidavit). This is entirely improper.

On a motion to dismiss, "a court must generally limit itself to the facts stated in the complaint"

and should not "consider[] affidavits and exhibits submitted by defendants." *Lamda Sols. Corp. v.*

*HSBC Bank USA, N.A.*, 574 F. Supp. 3d 205, 211, 213 (S.D.N.Y. 2021). Plaintiffs' "limited

quotation" from the referenced affidavit, *see* Compl. ¶ 29, is not sufficient to incorporate it in the

Complaint. *DeLuca*, 695 F. Supp. at 60 (cleaned up). And even if it were, the Court could then

consider the Schatzel Affidavit only for the fact of its contents, not *for its truth*, as OMH

Defendants urge. *See Mahn*, 2025 WL 1504812, at *2 n.3; *Weight Watchers*, 504 F. Supp. 3d

at 245-46. Thus, at most, the Schatzel Affidavit could support the proposition that OMH

Defendants have previously cited purportedly insurmountable resource constraints to excuse

delays—not as evidence that specific constraints *in fact* exist and *in fact* preclude them from

remedying the delays.[8]

Even if OMH Defendants' factual claims about resource constraints were properly before

the Court on this Motion, which they are not, the existence of such constraints would not defeat

Plaintiffs' due process claim. While OMH Defendants insist that Plaintiffs' due process claim must

be dismissed on the pleadings because—by invoking "finite bed space" and "the operation of a

---

[7] OMH Defendants improperly rely on the Schatzel Affidavit to make a host of contestable factual pronouncements, including that "it is simply not possible for OMH to instantly create new forensic beds" and that OMH has already taken certain vaguely described remedial efforts to alleviate delays, as well as to provide detailed statistics regarding bed capacity and CPL 730 orders more generally. *See* OMH MTD at 8-9, 30. OMH Defendants also claim that the State of New York's inpatient restoration admissions process is "more efficient" and "shorter" than the process for federal facilities, such that it would be "exceedingly unjust—and a violation of federalism—for this Court to interfere with" New York State's system. *Id.* at 23-24. OMH Defendants make no attempt to explain how the Court's actions here would somehow "violat[e] . . . federalism," nor do they (or could they) contest this Court's authority to remedy due process violations. *Id.*

[8] Notably, OMH Defendants recycle assertions of insurmountable constraints that a state court rejected in the matter where the Schatzel Affidavit was originally offered and held OMH in civil contempt. *See People v. L.G.*, 208 N.Y.S.3d 469, 477-78 (Sup. Ct. 2024), *aff'g as modified*, 235 N.Y.S.3d 279 (App. Div. 2025).

waitlist"—they have provided a purportedly "satisfactory explanation" for the delays, OMH MTD at 3, 17, OMH Defendants cite no case applying their invented "satisfactory explanation" test in evaluating a Rule 12(b)(6) motion. And their simplistic argument proves too much. Under their reasoning, any delays—no matter the length—would be constitutionally permissible *as a matter of law* if attributable to resource constraints. This cannot be true. As a district court in Texas reasoned when confronted with a similar argument, "[t]o find that logistical hurdles excuse a due process violation would render the Due Process Clause meaningless." *United States v. Mouton*, 2023 WL 3872206, at *2 (S.D. Tex. June 7, 2023). "The same rationale would permit governments to underfund prisons, criminal defense, or courts, and then have a ready excuse for the series of due process violation after due process violation that would inevitably ensue." *Id.* OMH Defendants' out-of-circuit cases suggesting that any delay attributable to resource constraints is acceptable so long as it is "not indefinite" are unpersuasive for similar reasons. *See Glendening ex rel. G.W. v. Howard*, 707 F. Supp. 3d 1089, 1109 (D. Kan. 2023); *Ind. Prot. & Advoc. Servs. Comm'n v. Ind. Fam. & Soc. Servs. Admin.*, 630 F. Supp. 3d 1022, 1032 (S.D. Ind. 2022). In suggesting that a state violates due process only if plaintiffs show that it "could freely admit detainees to [treatment] and chose not to do so," 707 F. Supp. 3d at 1109, the *Glendening* court essentially absolved the state of any affirmative obligation to comply with detainees' due process rights. This is incompatible with *Jackson*.

Many courts have rejected the notion that extended confinement in jail without competency restoration somehow becomes "related to the purpose of competency restoration" if the state attributes the delays to resource constraints. *See, e.g., Mink*, 322 F.3d at 1121 ("Lack of funds, staff or facilities cannot justify the State's failure to provide [such persons] with [the] treatment necessary for rehabilitation."); *Advoc. Ctr. For Elderly & Disabled v. La. Dep't of Health &*

12

*Hosps.*, 731 F. Supp. 2d 603, 621 (E.D. La. 2010) (finding that where "[i]ncompetent Detainees remain[ed] in jail because [the hospital was] full, not because there [was] any suggestion that remaining in jail might restore their competency," the nature of plaintiffs' commitment was not reasonably related to its purpose).[9] OMH Defendants' systemic deficiencies cannot transform an unconstitutional deprivation of liberty into a permissible one, and "[d]etainees who require competency restoration . . . should not be penalized for the State's resource allocation decisions," *Irvine v. Johnson*, 2025 WL 1093541, at *5-6 (D.S.D. Apr. 11, 2025). This is particularly true where, as here, Plaintiffs bring claims on behalf of a putative class, seeking injunctive relief to remedy unconstitutional delays for *all* individuals similarly situated—unlike in several of OMH Defendants' cited cases, in which individual defendants sought court orders moving themselves to the top of an existing waitlist. *See, e.g.*, *United States v. Hylton*, 2023 WL 7280170, at *6 (S.D.N.Y. Nov. 3, 2023) (refusing to "enter an Order placing [the defendant's] needs above those of all other similarly situated federal defendants"); *United States v. Young*, 2022 WL 7087140, at *4 (W.D.N.Y. Oct. 12, 2022) ("No doubt every defendant awaiting evaluation would like to jump to the head of the line, or otherwise be accorded special treatment"); *cf. United States v. Olaniyi*, 2024 WL 4500921, at *6 (E.D.N.Y. Oct. 15, 2024) (citing *Hylton* and *Young*). The fairness

---

[9] *See also, e.g.*, *United States v. McCarthy*, 703 F. Supp. 3d 1377, 1381 (M.D. Fla. 2023) ("The lack of resources, whether in the form of facilities, personnel, or funding, is an issue for the legislative or executive branches to address. But the solution cannot be commitment of an incompetent defendant to the debilitating purgatory of indefinite confinement."); *United States v. Calderon-Chavez*, 688 F. Supp. 3d 472, 482 (W.D. Tex. 2023) (finding a due process violation despite the pre-hospitalization delay resulting from "the executive and legislative branches' failure to allocate sufficient resources to promptly admit incompetent criminal defendants to psychiatric facilities"); *Irvine*, 2025 WL 1093541, at *9-10 (finding a due process violation despite the prolonged detention resulting from limited staffing, resources, and bed availability); *United States v. Wazny*, 2022 WL 17363048, at *6 (M.D. Pa. Dec. 1, 2022) (finding a due process violation based on projected pre-hospitalization delay and explaining that the lack of resources is of "limited significance when balanced against the due process and statutory rights of a criminal defendant"); *see also United States v. Lara*, 671 F. Supp. 3d 1257, 1265 (D.N.M. 2023) ("[I]f the Government wants to continue to file charges against severely mentally ill individuals for alleged conduct that may be related to symptoms of their mental health, then the Government needs to figure out how to allocate those resources to competency restoration facilities." (cleaned up)).

concerns about disrupting an existing waitlist that animated the courts' decisions in those cases are not present here.

While OMH Defendants also claim that the delays Plaintiffs experience are "beyond the State's control," OMH MTD at 23, *Jackson* requires OMH Defendants to ensure that Plaintiffs' confinement bears a reasonable relation to the purpose of their commitment, even if circumstances over which they purportedly lack control make this difficult. 406 U.S. at 738. In any event, OMH Defendants' asserted lack of control directly contravenes the allegations in the Complaint that OMH's dysfunction in administering the competency restoration system consigns Plaintiffs to indefinite legal limbo and that Commissioner Sullivan has chosen not to reallocate resources within OMH's hospital system to address competency restoration delays. Compl. ¶¶ 3, 8, 28-29, 59-61; *see supra* Statement of Facts § A.[10] These allegations—not OMH Defendants' vague assertions of helplessness—must be credited at the motion-to-dismiss stage. *See Lynch*, 952 F.3d at 74-75 ("The court, in deciding a Rule 12(b)(6) motion to dismiss a complaint, is required to accept all 'well-pleaded factual allegations' in the complaint as true." (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009))).[11]

---

[10] While OMH Defendants claim that additional facilities are being built, these purported facts are not properly before the Court because they come from the Schatzel Affidavit, which is not incorporated by reference as Defendants suggest and could not be assumed true even if it were, as explained above. *See supra* Argument § I.A.1. If the Court chooses to consider these external factual assertions, the existence of these projects merely underscores the severity of the current violations. Further, OMH Defendants offer no detail as to how these developments will resolve the delays alleged in the Complaint and cite no authority for the proposition that generalized reference to remedial efforts supposedly underway can defeat a due process claim. *Cf. Mouton*, 2023 WL 3872206, at *2 ("[T]he [Bureau of Prison's] efforts to improve its competency services [do not] generally excuse the continued detention of [the defendant].").

[11] OMH Defendants also attempt to attack Plaintiffs' motions for class certification and a preliminary injunction, suggesting that these motions "fail to provide any specificity about what actions [Plaintiffs] believe are available to OMH that, if taken, would immediately eliminate the waitlist." OMH MTD at 29 n.12. Plaintiffs disagree with these assertions, but more importantly, Plaintiffs' pending motions are irrelevant to the Court's consideration of the Defendant's pending motion to dismiss the Complaint. The question before the Court now is whether Plaintiffs' Complaint states a claim—which it does. To state a claim under *Jackson*, Plaintiffs are not required to allege the specific corrective actions OMH Defendants might take to remedy their due process violations; Plaintiffs are not required to plead with specificity at all. *See supra* Legal Standard. Even in the context (....continued)

In short, OMH Defendants' systemic failures in administering the competency restoration system neither give them license to violate Plaintiffs' due process rights nor provide a basis to dismiss Plaintiffs' claim on the pleadings.

### 2. Plaintiffs' Wait Times Bear No Reasonable Relation to Competency Restoration

Unable to contest that the *nature* of Plaintiffs' confinement under brutal conditions on Rikers does not serve the purpose of competency restoration, OMH Defendants overwhelmingly focus on *Jackson*'s duration prong. Though Plaintiffs allege that they experience an eighty-one-day *median*, *pre-hospitalization* wait time to receive restoration services in New York City, Compl. ¶ 30—and often face much longer delays, *id.* ¶¶ 2, 31—OMH Defendants contend that an eighty-one-day wait time is consistent with due process because it is shorter than delays permitted in other cases in the Second Circuit or elsewhere. *See* OMH MTD at 23.

As a threshold matter, none of the cases on which OMH Defendants rely were dismissals on the pleadings, and none concluded that the delay times at issue were permissible *per se*. Rather, the courts in OMH Defendants' cited cases found that due process had not been violated in specific circumstances—which differed substantially from Plaintiffs' circumstances—after evaluating a factual record. For example, in *Olaniyi*, the court rendered its decision only after conducting an evidentiary hearing and after "review[] [of] the entire record in th[e] case." *See* 2024 WL 4500921, at \*1; *see also Glendening*, 707 F. Supp. 3d at 1109, 1116 (denying preliminary injunction); *Ind.*

---

of relief, courts caution against overly prescriptive remedial orders. *See, e.g.*, *Schwartz v. Dolan*, 86 F.3d 315, 319 (2d Cir. 1996) ("In view of the need for federal courts to exercise a proper respect for the integrity and function of local government institutions and to avoid intruding unnecessarily on a state's governance of its own affairs . . . the [New York State Department of Social Services] should have been allowed the opportunity to present its own proposal for the modification of the notices after the existing scheme was declared unconstitutional.") (cleaned up).

*Prot.*, 630 F. Supp. 3d at 1032-33 (same).[12] No such factual record exists here, where the parties have not progressed beyond the pleadings. The cases OMH Defendants cite therefore do not hold that an eighty-one-day median wait time is constitutionally permissible *as a matter of law*, regardless of circumstance.

Any such holding would be inconsistent with *Jackson*, which held that "nature and duration" must be considered *together* and in light of the "purpose for which the individual is committed." 406 U.S. at 738. Tellingly, in all instances, the cases OMH Defendants cite involved confinements meaningfully different in *nature* and *purpose* than the confinements alleged here. For one thing, *none* of the cases OMH Defendants cite involved individuals confined on Rikers. As Plaintiffs allege and as one court in this district recently observed, the nature of confinement on Rikers makes time served there "materially different than time served at a jail or prison elsewhere in the United States." *United States v. Parish*, 2024 WL 3904626, at *6 (S.D.N.Y. Aug. 22, 2024) (cleaned up). Further, in several of OMH Defendants' cited cases, history or medical testimony indicated that the confined individual was capable of restoration through a specific treatment; Plaintiffs, by contrast, have not yet received any medical evaluation as to their ability to attain competency, Compl. ¶¶ 14, 15; *see, e.g.*, *Hylton*, 2023 WL 7280170, at *1, 4 (noting defendant "had responded well to medication in the past"); *Magassouba*, 544 F.3d at 396 (noting BOP evaluators' judgment that defendant was restorable through a "course of psychotropic medication"). Some of OMH Defendants' cited cases did not actually involve pre-treatment delay

---

[12] OMH Defendants also rely on *Lakey v. Taylor*, in which a Texas state appellate court vacated a permanent injunction that was issued upon a grant of summary judgment. 435 S.W.3d 309, 312 (Tex. App. 2014). The procedural posture was materially different from the case at bar, where at the pleadings stage the Court must accept the facts alleged in the Complaint as true and draw all reasonable inferences in Plaintiffs' favor. *See Lynch*, 952 F.3d at 74-75. Moreover, in *Lakey*, the court explicitly stated that it was not tasked with deciding whether any individual plaintiff's constitutional rights were violated because of a delay, but rather was tasked with addressing a facial challenge under the Texas Constitution to the policy of wait-listing individuals found unfit to stand trial before admitting them to state hospitals for treatment. *See* 435 S.W.3d at 321-23.

times comparable to those Plaintiffs face. *See, e.g.*, *Ind. Prot.*, 630 F. Supp. 3d at 1026 (involving pre-treatment delay times of 22-83 days on average); *Magassouba*, 544 F.3d at 417, 418 n.26 (involving pre-treatment delay of approximately two months, to which defendant did not object, and noting that, in general, government should use *10 days* as a "benchmark" for when transfer reasonably should occur). Finally, the out-of-circuit cases OMH Defendants cite that suggest any delay attributable to resource constraints is acceptable so long as it is "not indefinite" are simply wrong on the law. *See Glendening*, 707 F. Supp. 3d at 1109; *see also supra* Argument § I.A.1 (addressing OMH Defendants' procedurally improper arguments regarding resource constraints).[13]

Further, several of the decisions OMH Defendants cite involved individuals who sought dismissal of their indictment or charges as a remedy for the delay—an outcome that Plaintiffs here do not seek. *See* OMH MTD at 13-15; *Magassouba*, 544 F.3d at 391-92; *Hylton*, 2023 WL 7280170, at *6; *Young*, 2022 WL 7087140, at *1, *3. Such a remedy is "drastic" and appropriate "only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018) (first quoting *United States v. Brown*, 602 F.2d 1073, 1076 (2d Cir. 1979)). Obtaining this remedy requires a movant to "show that the Government's conduct was 'so outrageous that common notions of fairness and decency would be offended were judicial process invoked to obtain a conviction.'" *Id.* at 27 (quoting *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011)). "Successful

---

[13] Moreover, the *Glendening* court's decision was based in part upon the plaintiffs' failure to dispute that the state had taken steps to reduce wait times for receiving competency restoration services. 707 F. Supp. 3d at 1107. Here, Plaintiffs allege that delays "have steadily increased for over a decade," and that "[r]ather than systematically address the problem of untimely competency restoration services, OMH has adopted a complacent approach," in which it "periodically" deploys "band-aid" efforts that have been ineffectual in improving wait times. Compl. ¶ 59. As for *Indiana Protection & Advocacy Services Commission*, the court in that case reasoned that *Jackson v. Indiana* does not even apply to pre-hospitalization delays. 630 F. Supp. 3d at 1031 ("The Court is not persuaded that *Jackson* controls this case."). Courts have recognized *Indiana Protection* as an outlier for this reason. *See, e.g.*, *Calderon-Chavez*, 688 F. Supp. 3d at 487 n.90, 488 (determining that the "conclusion that *Jackson*'s reasonableness requirement doesn't apply to pre-hospitalization delays is against the weight of authority"). Indeed, OMH Defendants do not even attempt to dispute that *Jackson* controls. OMH MTD at 12.

motions to dismiss on this ground have '[o]rdinarily' involved 'coercion' or a 'violation of the defendant's person.'" *Id.* (alteration in original) (quoting *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997)). Plaintiffs do not seek dismissal of any indictment; they have filed a civil suit, and thus need only allege "enough facts to state a [due process] claim . . . that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiffs' confinement on Rikers for months at a time, without any competency restoration services, plausibly violates their due process rights.

In sum, OMH Defendants cite no case suggesting, much less holding, that an eighty-one-day median wait time for competency restoration services is acceptable *per se*. In fact, courts have found that *shorter* wait times violate due process. *See, e.g.*, *Mink*, 322 F.3d at 1106, 1121-1123 (finding that average wait time of one month violated due process and affirming an injunction mandating a seven-day limit); *Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 2016 WL 4418180, at *3, *5 (W.D. Wash. Aug. 19, 2016) (mandating a seven-day limit for admission for an in-hospital evaluation because "wait times in excess of seven days . . . do not bear a reasonable relation to the purpose of confinement"); *United States v. Smith*, 764 F. Supp. 2d 541, 545 (W.D.N.Y. 2011) (finding a delay of longer than ten weeks violated due process); *see also United States v. Zapata-Herrera*, 2015 WL 4878319, at *3 (S.D. Cal. Aug. 14, 2015) (noting that cases concerning delays longer than seven days supported finding the defendant's delay of seventy-two days was "most likely unconstitutional"). Therefore, OMH Defendants cite no authority that supports a dismissal on the pleadings under the circumstances here.

### B. OMH Defendants Overstate the Relevance of *Magassouba* and Its Limited Progeny

OMH Defendants assert that the Second Circuit and the courts within it have "[n]early [u]niformly reject[ed] [d]ue [p]rocess [c]laims" brought by "pretrial detainees waiting to receive

restoration-to-fitness treatment," citing *United States v. Magassouba*, 544 F.3d 387 (2d Cir. 2008),

as the first in a line of such cases. OMH MTD at 13.[14]

　　As an initial matter, OMH Defendants do not actually argue that the five-factor test

articulated in *Magassouba* applies here, nor could they.[15]

　　*First*, contrary to OMH Defendants' (incorrect) assertion—and unlike here—*Magassouba*

did not concern "pretrial detainees waiting to receive restoration-to-fitness treatment." OMH MTD

at 13. Rather, in *Magassouba*, doctors had already found the criminal defendant, Magassouba,

substantially likely to regain competency through treatment *and* he had already been offered such

treatment, but Magassouba had refused it. 544 F.3d at 396. After the court issued an order finding

that Magassouba was likely to remain incompetent to stand trial absent medication (and ultimately

later mandating that Magassouba receive involuntary treatment), Magassouba moved to dismiss

his indictment on the theory that a 19-month confinement—a period encompassing time before,

during, and after treatment—violated his right to due process. *See id.* at 392, 398-99. Here, by

contrast, the Complaint alleges a due process violation based solely on Plaintiffs' *pre-treatment*

confinement, and Plaintiffs do *not* seek the dismissal of their indictments to remedy that violation.

Moreover, the *Magassouba* court did not rule on the permissible length of pre-treatment

---

[14] The other in-circuit cases that OMH Defendants cite are by no means "uniform[]." OMH MTD at 13. As OMH Defendants acknowledge, one case supports Plaintiffs' position, not theirs. *See* OMH MTD at 16; *Smith*, 764 F. Supp. at 545 (finding over ten weeks of detention without treatment violated an incompetent defendant's right to due process and ignoring *Magassouba*'s multi-factor test). The other three are inapposite. *See* OMH MTD 14-16; *Young*, 2022 WL 7087140, at *1-2 (defendant sought extraordinary measure of dismissal of the indictment as a remedy for the alleged due process violation); *Hylton*, 2023 WL 7280170, at *6 (defendant sought to dismiss pending probation violations); *Olaniyi*, 2024 WL 4500921, at *1, *6 (rejecting defendant's request for an order that he be hospitalized for treatment no later than 30 days following his commitment to BOP custody under 18 U.S.C. § 4241, and adopting the government's proposed conclusions of law without reasoning).

[15] Those five factors are: "(1) the length of time at issue; (2) the medical assessments of the defendant's ability to attain competency; (3) the reason for any delay in helping the defendant attain competency; (4) the defendant's assertion of his rights, whether as to custody or treatment; and (5) any prejudice to the defendant, whether in attaining competency or in proceeding thereafter to trial." *Magassouba*, 544 F.3d at 416-17.

confinement, much less hold, as OMH Defendants seem to suggest, OMH MTD at 13-14, that 19 months of pre-treatment confinement could be permissible. *See id.* at 418 n.26 (advising instead that the government would be "well advised" to use a benchmark of ten days for when an individual subject to a preliminary finding of incompetence must be transported to a hospital for evaluation and treatment).

*Second*, many of the *Magassouba* factors have little or no application to the circumstances here. For example, due to OMH Defendants' inaction, Plaintiffs and class members here have not yet received a medical assessment of their ability to attain competency, and will not receive such an assessment until they are in treatment.[16] *Cf.* N.Y. Senate Bill 2025-S1004A (pending state legislation seeking to amend CPL 730 to require this assessment be conducted during the initial 730 examination).[17] *Magassouba*'s second factor ("the medical assessments of the defendant's ability to attain competency") thus does not, and cannot, apply here. Similarly, as to the penultimate factor ("the defendant's assertion of his rights, whether as to custody or treatment"), Plaintiffs undisputedly have had no reasonable earlier opportunity to challenge their confinement, unlike Magassouba, who had gone through multiple hearings without doing so. *See* 544 F.3d at 394-99, 418. These mismatches demonstrate that the *Magassouba* test is not well-suited to assessing the legal sufficiency of Plaintiffs' claims.

In short, *Magassouba* is inapposite, and no court has concluded that *Magassouba*'s multi-factor test should be applied to assess the legal sufficiency of a civil claim challenging pre-

---

[16] This assessment is conducted by OMH treatment professionals; the timing of this assessment varies, and may only occur after years of treatment. *See People v. B.D.*, 79 Misc. 3d 920, 922 n.1 (N.Y. Sup. Ct. 2023) (noting that OMH's provision of mental health treatment of the defendant over the course of five or more years had not rendered him fit to proceed in the criminal case, leading the State to seek civil commitment).

[17] At the motion to dismiss stage, the Court may take judicial notice of the Senate Bill, as it is a public record. *See Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2022).

treatment confinement of individuals deemed incompetent. But even if the Court were to apply the

*Magassouba* factors at this stage (to the extent doing so is even possible on the facts alleged in the

Complaint), Plaintiffs still state a due process claim:

*Length of Time at Issue (Factor 1)*. Plaintiffs allege lengthy delays in awaiting

competency restoration services. These months-long wait times weigh in Plaintiffs' favor on the

first *Magassouba* prong, particularly when factoring in the harsh jail conditions at Rikers as courts

routinely do in considering periods of confinement. *See, e.g.*, Sentencing Tr. at 21:5-21:22, *United*

*States v. Ortega*, No. 22-cr-91 (S.D.N.Y. Mar. 3, 2025) (considering the harshness of conditions,

including inadequate medical care, in sentencing a defendant).

Unlike in *Magassouba*, which addressed whether the criminal defendant's due process

rights were violated by a *total* nineteen-month period of confinement—encompassing before,

during, and after treatment, *see* 544 F.3d at 415-16—Plaintiffs A.B. and R.M. solely challenge the

length of their *pre-treatment* confinement of at least 153 and 139 days, respectively, at Rikers

before receiving treatment, Compl. ¶¶ 14-15. This period of pre-treatment confinement is

significant to *Jackson*'s nature and purpose analysis because people with CPL 730 orders are not

progressing toward competency at all during these periods of time. To the contrary, their mental

health is likely deteriorating at Rikers, where the "harsh and unconstitutional conditions . . . are

well-documented" and time is "materially different than [time] served at a jail or prison elsewhere

in the United States," *United States v. Parish*, 2024 WL 3904626, at *6 (S.D.N.Y. Aug. 22, 2024)

(alteration in original) (quoting *United States v. Colucci*, 743 F. Supp. 3d 452, 462 (E.D.N.Y.

2024)); *see also* Compl. ¶¶ 3-4, 47. For these reasons, among others, numerous courts have held

that multiple months of pre-treatment detention offend due process. *See, e.g.*, *Smith*, 764 F. Supp.

2d at 545 (holding that a reasonable time for pre-hospitalization commitment "should be

*significantly shorter* than four months").[18] The first *Magassouba* factor thus weighs in favor of Plaintiffs.

     ***Medical Assessments of Defendant's Ability to Attain Competency (Factor 2) and Assertion of Rights (Factor 4).*** As discussed *supra* at 20, the second and fourth *Magassouba* factors are inapplicable here. To the extent they apply at all, they weigh in favor of Plaintiffs, who—as a result of OMH Defendants' delays—have not yet been assessed for their ability to attain competency and who have had no reasonable earlier opportunity to challenge the delays in their transfers.

     ***Reason for Delay (Factor 3).*** The alleged reasons for Plaintiffs' delayed treatment likewise weigh in favor of finding a due process violation. "The delay in Magassouba's attainment of competency [was] largely attributable to his own action, specifically, his invocation . . . of his right to refuse treatment." *Magassouba*, 544 F.3d at 418. Here, the opposite is true—Plaintiffs allege that the delays are wholly attributable to OMH Defendants. *See supra* at 2-3. Indeed, OMH has admitted that it delays competency restoration for people who are designated for a hospital bed. *See* Compl. ¶ 29; *see also supra* at 3-4.

     ***Prejudice to the Detained Individual (Factor 5).***[19] The final *Magassouba* factor weighs heavily in favor of Plaintiffs. While the criminal defendant in *Magassouba* had not shown that the

---

[18] *See also United States v. Donnelly*, 41 F.4th 1102, 1107 (9th Cir. 2022) (finding more than four months of pre-treatment detention unconstitutional based on the maximum statutory period Congress authorized for hospitalization); *United States v. Carter*, 2020 WL 1620530, at *3 (E.D. Wis. Apr. 1, 2020) (finding "the four months that the defendant spent in custody prior to the hospitalization was a presumptive violation of his due process rights"); *Irvine v. Johnson*, 2025 WL 1093541, at *1, *11 (D.S.D. Apr. 11, 2025) (finding five-and-a-half months unconstitutional); *United States v. McCarthy*, 703 F. Supp. 3d 1377, 1380-81 (M.D. Fla. 2023) (finding five months unconstitutional); *Wazny*, 2022 WL 17363048, at *5 (finding six months unconstitutional); *see also supra* Argument § I.A.2.

[19] The *Magassouba* opinion refers to "prejudice to the *defendant*," 544 F.3d at 417, further illustrating that the multi-factor test is designed to assess when a due process violation warrants the dismissal of a criminal indictment, not to test the sufficiency of a civil claim.

delays caused any undue prejudice to "his ability to attain competency or to his ability to defend against the charges at trial," 544 F.3d at 419, Plaintiffs here allege the opposite. They allege that they are at "great risk of neglect and abuse that thwarts, rather than aids, their restoration to fitness," and the longer they spend on Rikers, "the greater the chance that they will not receive the care they need and [that they will] deteriorate psychiatrically." Compl. ¶¶ 43, 46. Courts have found similar allegations that detention worsened a criminal defendant's health conditions sufficient to show prejudice. *See United States v. Diaz*, 2025 WL 1678428, at *6 (D. Conn. June 13, 2025); *In re De Carvalho*, 2019 WL 6130534, at *2 (S.D. Fla. Nov. 19, 2019).

In sum, while the *Magassouba* test has not been—and, Plaintiffs submit, should not be—applied to assess the legal sufficiency of a civil claim, Plaintiffs' allegations show that each *Magassouba* factor weighs in their favor.

## II.    PLAINTIFFS STATE A CLAIM THAT OMH DEFENDANTS DENY PLAINTIFFS AND DELAYS CLASS MEMBERS A REASONABLE ACCOMMODATION

OMH Defendants argue that Plaintiffs fail to state a claim for relief under an Americans with Disabilities Act ("Title II") or Section 504 of the Rehabilitation Act ("Section 504") failure-to-accommodate theory. OMH MTD at 26-31. However, OMH Defendants misconstrue both Plaintiffs' claims and the applicable law. First, OMH Defendants argue that Plaintiffs do not allege they faced discrimination *due to* their disabilities, OMH MTD at 26-27, but this argument is premised on misrepresenting the government program at issue in Plaintiffs' claim. Second, OMH Defendants claim that Plaintiffs do not identify "*any* specific accommodation," even though they concede that Plaintiffs *do* propose "timely competency restoration" as a reasonable accommodation. OMH MTD at 29 (emphasis in original). Finally, OMH Defendants assert that "immediately admit[ting]" every person on the waitlist and each newly committed individual "with no wait time"—an accommodation that Plaintiffs *do not* propose—would constitute undue

hardship, citing facts about resource constraints that are not properly before the Court for reasons discussed *supra* Argument § I.A.1. OMH MTD at 29-30. Each of OMH Defendants' arguments is unavailing. Plaintiffs allege that they are excluded from their *criminal proceedings* because of their disability, and they identify a timely competency restoration program as a reasonable accommodation. Though OMH Defendants attempt to dispute the reasonableness of Plaintiffs' proposed accommodation, that fact-intensive dispute cannot be resolved on a motion to dismiss.

To state a claim under Title II or Section 504,[20] a plaintiff must allege "(1) that she is a qualified individual with a disability; (2) that she was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her disability." *Davis v. Shah*, 821 F.3d 231, 259-60 (2d Cir. 2016). A plaintiff may base her claim on the theory that a defendant failed to provide a reasonable accommodation that is necessary for equal access to a government program. *See id.* at 259-60. To state this claim, plaintiffs "must assert that disabled individuals lack access to a given government resource" because of their disabilities "and suggest a plausible method for remedying that lack of access." *Meekins v. City of N.Y.*, 524 F. Supp. 2d 402, 407 (S.D.N.Y. 2007). A plaintiff "faces only a light burden of production as to the facial reasonableness of his proposed accommodation." *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 76 (2d Cir. 2016) (cleaned up) (quoting *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 190 (2d Cir. 2015)). The burden then shifts to defendants to establish that the accommodation is unreasonable such that it constitutes an undue hardship. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 280-81

---

[20] "Because the standards imposed by Title II on public entities are generally equivalent to those of § 504," courts "'treat claims under the two statutes identically' in most cases." *Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)). In the instant case, OMH Defendants concede that the standards are the same under both statutes. *See* OMH MTD at 24. As such, for simplicity for purposes of this Opposition, Plaintiffs will refer only to Title II going forward.

(2d Cir. 2003). Determining whether a proposed accommodation is reasonable is a "fact-specific" inquiry, *Wright*, 831 F.3d at 72 (quoting *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015)), which "cannot be determined on a motion to dismiss," *Meekins*, 524 F. Supp 2d. at 409.

### A. Plaintiffs Allege They Are Excluded from Participating in Their Criminal Proceedings Because of Their Disability

OMH Defendants mischaracterize the Title II service, program, or activity at issue in Plaintiffs' claim as the "transfer and provision of competency restoration services." OMH MTD at 26. After erecting this straw man, OMH Defendants then argue that Plaintiffs fail to allege that their disabilities *caused* the delayed provision of services. *Id.* at 26. These arguments distort Plaintiffs' allegations. The Title II service, program, or activity at issue in Plaintiffs' claim is their *criminal proceeding*, Compl. ¶ 77, not the provision of competency restoration services. Plaintiffs seek an equal opportunity to participate in their criminal proceedings; Plaintiffs are unable to participate in those proceedings *because of their disabilities*, and therefore require a reasonable accommodation. Compl. ¶ 77.

As a threshold matter, Plaintiffs properly identify their criminal proceedings as a service, program, or activity covered by Title II. Compl. ¶ 77. Title II applies broadly to "all services, programs, and activities provided or made available by public entities," 28 C.F.R. § 35.102(a), and encompasses "anything a public entity does." 28 C.F.R. pt. 35, App. B (2011); *see also Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 209 (1998) (recognizing the breadth of Title II and holding that "the ADA plainly covers state institutions *without* any exception" (emphasis in original)); *Disabled in Action v. Bd. of Elections in City of N.Y.*, 752 F.3d 189, 199 (2d Cir. 2014) (rejecting a narrow interpretation of the benefit at issue that "would render meaningless" Title II's prohibition on discrimination by public entities).

Consistent with its remedial purpose, Title II "must be broadly construed to effectuate its purpose" of eliminating disability-based discrimination, *Noel v. N.Y. City Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012), including discrimination in the context of Plaintiffs' criminal proceedings. Indeed, the ADA's history and Supreme Court jurisprudence make clear that a criminal proceeding is a service, program, or activity under Title II. The ADA was enacted against a backdrop of "pervasive unequal treatment in the administration of state services and programs, including systemic deprivations of fundamental rights." *Tennessee v. Lane*, 541 U.S. 509, 524 (2004). In deliberations leading to the ADA's passage, Congress observed that "many individuals . . . were being excluded from courthouses and court proceedings by reason of their disability." *Id.* at 527. In *Tennessee v. Lane*, the Supreme Court held that Title II imposes a "duty to accommodate . . . consistent with the well-established due process principle that, 'within the limits of practicability, a State must afford to all individuals a meaningful opportunity to be heard' in its courts." *Id.* at 532. Although *Lane* addressed the physical accessibility of courtrooms, *id.* at 531-32, the Court's logic applies with equal force to criminal proceedings. As *Lane* observed, Title II enforces "basic constitutional guarantees," including due process. *Id.* at 523. And as the Supreme Court has held, a state's procedures must be adequate to protect a criminal defendant's due process right to not be convicted when incompetent to proceed to trial. *Pate v. Robinson*, 383 U.S. 375, 378 (1966). Construing Title II to apply in the context of criminal proceedings reinforces the constitutional guarantee of a fair trial.[21]

The service, program, or activity at issue here is Plaintiffs' criminal proceedings; with this proper reading of Plaintiffs' claim, OMH Defendants' argument that Plaintiffs' unequal access is

---

[21] Without mutual enforcement of Title II and due process rights, people who are potentially unfit to proceed would be faced with two untenable choices: face their criminal case despite being unfit, or seek competency restoration services and suffer extreme delays in their criminal cases and prolonged confinement in a dangerous jail.

not "due to Plaintiffs' disability" falls apart. OMH MTD at 26. To establish causation at the pleading stage, a plaintiff must allege "that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities." *Henrietta D.*, 331 F.3d at 277. Here, Plaintiffs do just that: They allege that they received diagnoses of psychiatric disabilities and have been found unfit to stand trial. Compl. ¶¶ 14-15. As a result of their disabilities, a state court has committed Plaintiffs to OMH's custody for care and treatment, and by law, Plaintiffs' criminal proceedings are suspended. CPL 730.60(2); Compl. ¶¶ 24, 26. Plaintiffs are therefore prevented from participating in their criminal proceedings *because of their disabilities*, and they will remain barred from participation until they regain competency. Compl. ¶ 26. Accordingly, Plaintiffs allege that their exclusion from their criminal proceedings is *because of* their disability and, thus, satisfies their pleading obligation.

### B. Plaintiffs Identify a Timely and Effective Competency Restoration System as a Reasonable Accommodation for Participating in their Criminal Proceedings

OMH Defendants' assertion that Plaintiffs fail to identify a facially reasonable accommodation, *see* OMH MTD at 3, 26, 29, is belied by OMH Defendants' concession that Plaintiffs *do* propose timely competency restoration as a reasonable accommodation, OMH MTD at 29. OMH Defendants attempt to dispute the reasonableness of Plaintiffs' proposed accommodation by arguing that it would cause undue hardship or fundamentally alter OMH Defendants' program. This argument fails, however, because (1) it hinges on facts not properly before the Court, for the same reasons discussed *supra* Argument § I.A.1, and (2) OMH Defendants raise a fact-intensive dispute not appropriate for resolution at the pleading stage.

Plaintiffs meet their "light burden" to identify a facially plausible reasonable accommodation, *Wright*, 831 F.3d at 76—a timely competency restoration program, Compl. ¶¶ 77, 83. Specifically, they allege that New York has developed a competency restoration program as

an accommodative regime that enables criminal defendants with mental health disabilities to meaningfully participate in their criminal proceedings. *Id.* Plaintiffs allege, however, that OMH Defendants administer this competency restoration program with dysfunction, denying Plaintiffs meaningful access to their criminal proceedings, and instead forcing Plaintiffs to wait months for services that will restore them to competency, while their criminal cases are suspended. Compl. ¶¶ 1, 8, 21, 26-29.[22]

The touchstone of a reasonable accommodation is that it provides "*meaningful* access" to a program or service, *Henrietta D.*, 331 F.3d at 282, and that the accommodation is effective, *Wright*, 831 F.3d at 73; *see also Martinez v. Cuomo*, 459 F. Supp. 3d 517, 524 (S.D.N.Y. 2020) (noting "accommodations need not be 'perfect'" but "still must ensure . . . 'read[y] access[]' . . . in this case"); *Disabled in Action*, 752 F.3d at 200 (recognizing that what is reasonable "under some circumstances" may not "provide[] meaningful access" in others). When an accommodative scheme is so ineffectual that people with disabilities still lack meaningful access to a program, the mere existence of an accommodative scheme is insufficient to achieve compliance with Title II obligations. So held the Second Circuit in *Henrietta D. v. Bloomberg*, a case brought by people with HIV-related diseases who alleged that their illnesses made it difficult to navigate New York City's complicated public benefits system and that the City's "offered accommodation"—namely, a scheme with procedural rules to facilitate access to benefits—was so "broken" and "highly ineffectual" that plaintiffs lacked meaningful access to the benefits to which they were entitled. 331 F.3d at 264, 266, 271, 279-80 (affirming the district court's injunction requiring City to provide reasonable accommodation). Like the plaintiffs in *Henrietta D.*, Plaintiffs here allege that

---

[22] Defendants' failure to provide this reasonable accommodation also exposes Plaintiffs to the distinct harms of inadequate treatment and dangerous conditions on Rikers, which increase the likelihood that they will deteriorate psychiatrically, placing them further away from the goal of attaining competency. Compl. ¶ 46.

the competency restoration program as operated and administered by OMH Defendants fails to provide an effective accommodation, as required under Title II.

OMH Defendants repeatedly rewrite Plaintiffs' proposed accommodation as a demand for immediate admission of "every CPL 730 defendant currently on the waitlist, as well as every new CPL 730 defendant . . . with no wait time." OMH MTD at 29 & n.12 ("immediately eliminate the waitlist"); *id.* at 31 (same). Plaintiffs, however, make no such demand. *See* Compl. ¶¶ 77, 83, Prayer for Relief ¶ f.[23] Rather than challenge Plaintiffs' proposed accommodation of *timely competency restoration*, OMH Defendants focus only on unraveling the "immediate admission" accommodation they fabricate, citing facts not properly before the Court to assert that their imagined accommodation would constitute a fundamental alteration. OMH MTD at 29-31.

In any event, OMH Defendants' fundamental alteration argument is unavailing as a basis for dismissal of Plaintiffs' Complaint. First, the determination of whether an accommodation fundamentally alters a program is a "fact-specific, case-by-case inquiry," *Mary Jo C. v. N.Y. & Loc. Ret. Sys.*, 707 F.3d 144, 153 (2d Cir. 2013), which is not appropriate for resolution on a motion to dismiss, *see Meekins*, 524 F. Supp 2d. at 409. Second, OMH Defendants' citation to the Schatzel affidavit for facts about the State's limited resources is improper since Plaintiffs make only limited quotation of this document, *DeLuca*, 695 F. Supp. 2d at 60; and to the extent the Court considers the affidavit, it should be for the fact of its contents, not its truth, *Mahn*, 2025 WL 1504812, at *2 n.3. Third, "ordinary considerations of cost and convenience alone cannot justify a State's failure to provide individuals with a meaningful right of access to the courts." *Lane*, 541 U.S. at 533. And finally, making effective a competency restoration program that state law requires OMH

---

[23] Plaintiffs only seek a timely competency restoration program as an accommodation and, as relief in this matter, an "injunction preventing . . . unreasonable delay in jail prior to receipt of competency restoration services." Compl., Prayer for Relief ¶ f.

Defendants to provide does not constitute a fundamental alteration. *See Henrietta D.,* 331 F.3d at 281 ("The reasonableness of the modifications . . . is evidenced by the fact that virtually all are modifications that defendants have long purported—but failed—to provide, and that they are now required by local law to provide."); *Disability Advocs., Inc. v. Paterson,* 598 F. Supp. 2d 289, 335 (E.D.N.Y. 2009) ("Where individuals with disabilities seek to receive services . . . and the state *already provides* services . . . assessing and moving the particular plaintiffs to that setting, in and of itself, is not a 'fundamental alteration.'" (emphasis in original)).

Plaintiffs make a *prima facie* showing that they are excluded from their criminal proceedings due to their disabilities and that a timely competency restoration program is a reasonable accommodation to enable them access to those proceedings. Plaintiffs thus state a reasonable accommodation claim on behalf of themselves and the putative Delays Class.

## III. PLAINTIFFS STATE AN *OLMSTEAD* CLAIM AS TO PLAINTIFFS AND THE INTEGRATION CLASS

OMH Defendants also misconstrue Plaintiffs' *Olmstead* claims and misrepresent the applicable law. First, OMH Defendants ignore *Olmstead*'s central holding establishing that unnecessary segregation *is* discrimination due to disabilities. Second, OMH Defendants misidentify as "other allegations" Plaintiffs' core *Olmstead* allegations that OMH has neither a system for assessing Plaintiffs to determine the most integrated setting appropriate to their needs, nor an adequate outpatient competency restoration program for those persons who are appropriate for placement there. OMH MTD at 38-39. Finally, OMH Defendants disregard the weight of federal authority rejecting their argument that an *Olmstead* claim hinges on a *state* treatment

professional's determination, OMH MTD at 35. None of OMH Defendants' arguments provide grounds for dismissal of Plaintiffs' well-pled *Olmstead* claims.[24]

To state an *Olmstead* claim, as with all Title II claims, a plaintiff must first allege that (1) they are a qualified individual with a disability, (2) they are excluded from participation in a public entity's services, programs, or activities or were otherwise discriminated against by a public entity, and (3) such exclusion or discrimination was due to disability. *Davis*, 821 F.3d at 259. In *Olmstead*, the Supreme Court recognized that "unjustified institutional isolation" of people with disabilities is a "form of discrimination." 527 U.S. 581, 600 (1999). Thus, a plaintiff challenging unnecessary segregation satisfies the *prima facie* element of "discrimination on the basis of disability" under Title II by alleging that (1) community-based services are appropriate, (2) the plaintiffs do not oppose such services, and (3) the services can be reasonably accommodated. *Davis*, 821 F.3d at 262. Plaintiffs here allege that OMH Defendants' administration of New York's competency restoration program subjects Named Plaintiffs and putative Integration Class members to unnecessary segregation in violation of Title II's integration mandate, which is cognizable under *Olmstead*. Specifically, Plaintiffs allege that OMH Defendants use unlawful methods of administration—including the absence of any routine assessments and underdevelopment of an outpatient competency restoration program—that lead to Plaintiffs' unnecessary segregation. Compl. ¶¶ 21, 32-38, 51.

---

[24] OMH Defendants also dedicate more than two pages and a stray footnote arguing that the Court should dismiss a claim that Plaintiffs do not pursue—namely, they challenge Plaintiffs' supposed Integration Mandate claim on behalf of the putative Delays Class, OMH MTD at 31-33, 35 n.13. Plaintiffs do not respond to these arguments because Plaintiffs did not include such a claim in their Complaint.

### A. For Purposes of an *Olmstead* Claim, Unnecessary Segregation is Discrimination Due to Disabilities

Contorting Plaintiffs' *Olmstead* allegations, OMH Defendants argue that Plaintiffs fail to allege that they were "denied an individualized assessment or any care and treatment '*by reason of [their] disability*.'" OMH MTD at 34-35 (emphasis added). This reframing of Plaintiffs' Complaint ignores the detailed factual allegations that OMH Defendants use unlawful methods of administering their competency restoration system—including systemically failing to provide standards and procedures to identify and assess people to determine the most integrated setting appropriate to their needs—that lead to Plaintiffs' unnecessary segregation in hospitals.[25] Plaintiffs are not required to allege that OMH Defendants' systemic failure is *due to* Plaintiffs' disabilities, and OMH Defendants cite no binding authority—unsurprisingly, since none exists—holding that those allegations are necessary to state an *Olmstead* claim. The one in-circuit case they cite, *Tardif v. City of N.Y.*, 991 F.3d 394, 404 (2d Cir. 2021), does not support OMH Defendants. *Tardif* involved a reasonable accommodation claim, not an *Olmstead* claim, and the portion of *Tardif* that Defendants perplexingly quote pertains to the standards for a reasonable accommodation claim.[26] Similarly unavailing is OMH Defendants' citation to an out-of-circuit and as of yet unadopted report and recommendation, quoting a magistrate judge's analysis of the plaintiffs' failure-to-accommodate claim. OMH MTD at 34-35; *Disability Rights N.C. v. N.C. Dep't of Health & Hum.*

---

[25] *See* Compl. ¶ 21 ("[P]eople who are appropriate for an outpatient program are not identified . . . ."); *id.* ¶ 33 ("OMH has not issued standards or developed forms, manuals, or policies mandating that the CHS doctors who conduct competency exams determine a person's individual service needs, including whether hospitalization is necessary for restoration."); *id.* ¶ 42 ("OMH's . . . lack of any standards or regular process for identifying and assessing people's treatment needs creates a void in New York's competency restoration system that causes people to be unnecessarily segregated or placed at risk of segregation.").

[26] OMH Defendants' error is particularly obvious since the *Tardif* court rehashed the Second Circuit's discussion in *Henrietta D.*, which is itself a reasonable accommodation case, as discussed *supra*. *See Tardif*, 991 F.3d at 404 ("In *Henrietta D. v. Bloomberg*, we addressed the proper standard of causation for a reasonable accommodation claim.").

*Servs.*, 2025 WL 1665327, at *15 (M.D.N.C. June 12, 2025).[27] That analysis has no relevance to Plaintiffs' *Olmstead* causes of action.

Under *Olmstead* and its progeny, allegations that an individual is qualified for, would benefit from, and desires services in a more integrated setting and can be accommodated in such setting make out Title II claim. "*Olmstead* unquestionably holds that the 'unjustified institutional isolation of persons with disabilities' is, in and of itself, a prohibited 'form of discrimination.'" *Davis*, 821 F.3d at 260 (quoting *Olmstead*, 527 U.S. at 600). In *Olmstead*, the Supreme Court observed that people with disabilities receive "dissimilar treatment" when they are forced to "relinquish participation in community life they could enjoy" and remain in institutions simply to receive appropriate services available in the community. 527 U.S. at 601. Thus, while other theories of Title II liability, such as a failure to accommodate, may require allegations that a plaintiff is denied access to a program due to their disability, *see, e.g.*, *Tardif*, 991 F.3d at 405, those standards are not applicable when unnecessary segregation is the challenged disability-based discrimination.

### B. Plaintiffs Allege that OMH Defendants' Lack of Assessment Standards and Procedures and Failure to Provide an Adequate Outpatient Program Subjects Plaintiffs and Integration Class Members to Unnecessary Segregation

OMH Defendants argue that Plaintiffs do not state an *Olmstead* claim because "OMH is not a party to CPL 730 proceedings, cannot intervene in such a proceeding, and therefore has no authority to second-guess a commitment order or place defendants in a community-based setting." OMH MTD at 36. Again, this argument wholly misconstrues Plaintiffs' allegations. Plaintiffs do

---

[27] Pursuant to 28 U.S.C. § 636(b)(1), when parties file objections to a report and recommendation by a magistrate judge, the district court judge "*shall* make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made" (emphasis added). Both parties in *Disability Rights North Carolina* filed such objections, and disposition of those objections remains pending.

not ask OMH to intervene in a CPL 730 proceeding, and Plaintiffs neither allege that OMH is a party to one, nor that OMH, on its own, may place Plaintiffs and Integration Class members into a community-based setting. Rather, Plaintiffs' *Olmstead* claims challenge what OMH systemically does not do *prior to* the CPL 730 proceedings—namely, administer a system with standards and procedures for identifying and assessing people to determine the most integrated setting appropriate to their needs. Compl. ¶¶ 33-38.[28] Absent those standards and procedures, hospitalization occurs by default.

OMH Defendants also argue that any allegations about the inadequacy of their outpatient competency restoration program are "irrelevant," or alternatively are "quality of service" claims, and Plaintiffs lack standing to bring these claims. OMH MTD at 39 & n.17. As a threshold matter, OMH Defendants improperly raise this conclusory standing argument since they did not move to dismiss under Federal Rule of Civil Procedure 12(b)(1), *see SM Kids, LLC v. Google LLC*, 963 F.3d 206, 210 (2d Cir. 2020) (noting that standing challenges are "properly brought under Fed. R. Civ. P. 12(b)(1)"), and therefore their argument should be disregarded. OMH Defendants' other arguments fail, since Plaintiffs do not challenge the quality of OMH Defendants' outpatient competency restoration program.[29] Plaintiffs instead allege that OMH's systemic failure to maintain adequate capacity for those who are appropriate for such placement and administrative dysfunction within the program harms Plaintiffs and Integration Class members. Compl. ¶¶ 51-58.

---

[28] OMH Defendants do not dispute that they lack such a system; they argue, without citation to *any* authority, that Plaintiffs may not raise the absence of OMH Defendants' standards and procedures for assessment and identification as part of their *Olmstead* claim. OMH MTD at 39. That argument simply cannot be credited. Implementation of measures to assess people's suitability for a more integrated setting is part and parcel of an effective *Olmstead* plan. *Steward ex rel. Green v. Young*, 787 F. Supp. 3d 476, 698-99 (W.D. Tex. 2025). Plaintiffs' related allegations therefore state an *Olmstead* claim.

[29] OMH Defendants imply but do not explain their argument that Plaintiffs' claims are about quality of services. OMH MTD at 39 n.17. Contrary to this assertion, Plaintiffs do not challenge *quality* of services, but rather the limited capacity in the outpatient competency restoration program and administrative dysfunction. *See, e.g.*, Compl. ¶¶ 51, 53, 57.

Both of OMH Defendants' systemic failures—the failure to develop and maintain an assessment system, and the failure to provide a sufficient outpatient program—are methods of administration that subject Plaintiffs and Integration Class members to unnecessary segregation.

An unlawful "method of administration" is one that leads to discrimination, including unnecessary segregation of people with disabilities in violation of the integration mandate. *See Conn. Office of Prot. & Advoc. for Pers. with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 275-76 (D. Conn. 2010); *see also Olmstead*, 527 U.S. at 600 (holding that "unjustified institutional isolation of persons with disabilities is a form of discrimination").[30] In *Olmstead*, the Supreme Court held that states have an affirmative "obligation to avoid unjustified isolation of individuals with disabilities." *Id.* at 597. *Olmstead* was groundbreaking precisely because it means that a state may no longer sit on its proverbial hands, indifferent to a person's right to participate in community life; it *must* act to avoid unnecessary institutionalization. *See, e.g.*, *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1319-20 (W.D. Wash. 2015) (denying motion to dismiss where plaintiff alleged that failure to conduct an evaluation caused him to be "denied non-institutional care or services that could lead to discharge"). In so acting, the government must identify and assess individuals to determine the most integrated setting appropriate to their needs; and, as appropriate, the government must make recommendations consistent with those assessments, and thereafter make those settings reasonably available. *See, e.g.*, *Steward ex rel. Green v. Young*, 787 F. Supp. 3d 476, 698-99 (W.D. Tex. 2025) (noting that *Olmstead*'s "key principles" include having "[a] 'reliable sense of how many individuals are currently institutionalized and are eligible for services in

---

[30] Though OMH Defendants do not dispute that they are a public entity bound by Title II, they argue that "Integration Class members have not qualified for outpatient treatment through [the CPL 730] process, and so the integration mandate does not apply." OMH MTD at 36. The integration mandate, however, applies to all public entities, including in situations where the public entity lacks procedures necessary to determine whether an individual is appropriate for a more integrated setting. *See supra* Argument § II.A.

community-based settings,' . . . and the establishment of 'procedures to avoid unjustifiable institutionalization in the first place'"); *Lindsay v. Navarretta*, 2024 WL 5125954, at *13 (D. Conn. Dec. 16, 2024) (holding that allegation that defendant had an insufficient "supply of providers to meet the demand for community services" stated a plausible methods of administration claim).

Numerous courts recognize that a plaintiff may state a "methods of administration" claim by alleging defendants' failure to assess whether an individual is appropriate for community-based services, or another less segregated alternative. *See, e.g.*, *Siino v. City of N.Y.*, 2020 WL 3807451, at *45 (E.D.N.Y. Feb. 27, 2020) ("A person with disabilities may establish an integration mandate violation where the public entity fails to assess what services are appropriate and whether the person is in the most integrated setting appropriate to their needs[—]a practice that leads to unjustified segregation."); *Conn. Office of Prot. & Advoc. for Pers. with Disabilities*, 706 F. Supp. 2d at 278 (holding that plaintiffs sufficiently alleged a "methods of administration claim" by pleading defendants' failure to "assess and identify the long-term care needs . . . and to determine whether those needs could be appropriately met in integrated, community-based settings."). Unless the government knows how many people under its care are appropriate for more integrated settings—information knowable only through routine assessment—it cannot fulfill the integration mandate. *Cf. Day v. District of Columbia*, 894 F. Supp. 2d 1, 28-29 (D.D.C. 2012) (holding that the absence of tracking of nursing home discharges against baseline data meant that the District of Columbia had not demonstrated commitment to deinstitutionalization).

Additionally, courts recognize that the absence of a system of assessment is bound up with the state's failure to develop a program with enough capacity to serve the numbers of people who are appropriate for a more integrated setting. In *Messier v. Southbury Training School*, for example, the district court considered an integration mandate challenge brought by residents with

mental disabilities to the Southbury Training School, on the basis that the school administered its programs with no "formal mechanism for considering community placement for class members." 562 F. Supp. 2d 294, 328 (D. Conn. 2008). The court held that Title II did not tolerate procedures where remaining institutionalized is "the default option for residents." *Id.* at 337. To the contrary, a public entity has a "statutory duty to consider the appropriateness of community placement." *Id.* at 326. And this duty was violated by a policy of passive, occasional review of a resident's suitability for community placement. *Id.* at 326. The court recognized that the failure to assess people for community integration directly impacted the development of an adequate community program: "Having failed to learn how many class members could or should be placed in the community, the defendants failed to develop resources for placing class members" and even "told the legislature that there was no demand for community placement." *Id.* at 338-339. "The Supreme Court's reasoning in *Olmstead* makes it clear that a state must do more than wait until the residents of its facilities have affirmatively asked to be placed in the state's integrated residential settings . . . ." *Id.* at 337.

Here, OMH Defendants do not dispute that they lack standards and procedures related to requiring doctors who perform CPL 730 exams to assess the appropriate treatment setting for Plaintiffs prior to commitment for purposes of competency restoration. It is of no moment that in *People v. B.D.*, the state court held that OMH lacked the authority to convert a criminal defendant to civil status due to having "no procedural vehicle" for intervention in a criminal proceeding, 79 Misc. 3d at 921-22, or that the court in *Summers v. Louisiana*, 2022 WL 4490161, at *22 (M.D. La. Sept. 27, 2022), found that plaintiffs had not established standing because the defendant department of health did not play a role in the plaintiffs' commitment procedures, and did not have

the power to release the plaintiffs into the community.[31] Unlike *B.D.* and *Summers*, Plaintiffs' claims center on OMH Defendants' *pre*-commitment conduct. Compl. ¶¶ 33-36.[32] Plaintiffs allege that, as the state mental health authority, OMH is responsible for administering the competency restoration system, Compl. ¶¶ 16-17, 86, 90, 93, 96-97, and that OMH Defendants' "lack of any standards or regular process for identifying and assessing people's treatment needs" *before* commitment causes the unnecessary segregation of Plaintiffs and Integration Class members. Compl. ¶ 42.[33] These allegations make out a methods of administration claim because administering a system where hospitalization occurs by "default" is an abdication of OMH Defendants' responsibility under the integration mandate. *Messier*, 562 F. Supp. 2d at 329; *see also Olmstead,* 527 U.S. at 603 (noting that "persons with disabilities must be provided the option of declining to accept a particular accommodation") (quoting 28 C.F.R. pt. 35, App. a, p. 350 (1998)).[34]

---

[31] OMH Defendants misrepresent the *Summers* court's holding. Contrary to OMH Defendants' statement that the *Summers* court "concluded that plaintiffs . . . failed to state a claim under Olmstead," OMH MTD at 37, the court expressly did not rule on the defendants' motion to dismiss for failure to state a claim, since it determined that it lacked jurisdiction, *Summers*, 2022 WL 4490161, at *26.

[32] Plaintiffs do not and need not allege that OMH is involved in the CPL 730 proceeding to make out their *Olmstead* claim. And although Plaintiffs allege that OMH lacks any standards related to *reassessment* of people who remain confined for months pending hospital-commitment, Compl. 37, Plaintiffs do not allege that OMH can independently amend a commitment order.

[33] Specifically, Plaintiffs allege that OMH Defendants unlawfully administer the competency restoration system by issuing a set of forms, manuals, and guidance devoid of any requirements that forensic examiners, or any other entity for that matter, evaluate individuals to determine the most integrated setting appropriate to individuals' needs. Compl. ¶¶ 33-35.

[34] Invoking *Summers*, OMH Defendants attempt to argue that Plaintiffs lack standing because they have failed to provide more detail regarding *Integration Class members*' appropriateness for an outpatient restoration program. OMH MTD at 37-38. As noted above, arguments challenging the Court's subject matter jurisdiction are improperly raised in this motion and, on that basis alone, should be disregarded. But OMH Defendants' standing argument is also baseless because a court's standing inquiry is addressed to named plaintiffs, not class members. *See, e.g., Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) ("We do not require that each member of a class submit evidence of personal standing."). *Summers* is no different, as the court simply examined the *named plaintiffs'* factual allegations in a non-class action case. 2022 WL 4490161 at *22-24. In any case, Plaintiffs have alleged sufficient facts, as detailed herein, to establish the standing as to the Named Plaintiffs for Article III purposes. *See Floyd v. City of N.Y.*, 283 F.R.D. 153, 169 & n.97 (S.D.N.Y. 2012) (citing *Rumsfeld v. F. for Acad. and Inst. Rts., Inc.*, (….continued)

Finally, OMH Defendants do not dispute that their outpatient competency restoration program is inadequate. Instead, they argue that the alleged inadequacies are "entirely irrelevant" because the Integration Class "consists of individuals who allege they have been denied an assessment for outpatient restoration services, *not* individuals who have received outpatient treatment but found it inadequate." OMH MTD at 39. To be clear, Plaintiffs do not allege that outpatient "*treatment*"—i.e., the psychiatric treatment and legal education services provided in OMH Defendants' competency restoration program—is inadequate and thus do not challenge its quality.[35] Rather, they allege that the program lacks adequate capacity and is operated in a dysfunctional manner. Compl. ¶¶ 51, 53, 57. And the one case OMH Defendants cite actually supports Plaintiffs, as it holds that a challenge to capacity of an existing program "is actionable under the ADA and Section 504." *Lindsay*, 2024 WL 5125954, at *11.

Because OMH Defendants have a policy of assessing *no one*, the Integration Class consists of both people who are denied assessments *and* people who are harmed by the inadequacy and dysfunction of OMH's outpatient competency restoration program. For example, Plaintiffs offer J.C.'s and T.P.'s stories as examples of people harmed by administrative dysfunction in OMH's outpatient competency restoration. Both spent weeks waiting simply to be scheduled for competency restoration services, only to ultimately lose their opportunity to remain in the community when those services were never provided. Compl. ¶¶ 54-56. J.C. and T.P., like the Named Plaintiffs and Integration Class members, also separately suffered the harm of not having their needs assessed. Compl. ¶¶ 32, 36, 38, 54-56.

---

547 U.S. 47, 53 n.2 (2006)) (noting that in actions seeking injunctive relief through a class, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement").

[35] OMH Defendants imply but do not explain their argument that Plaintiffs' claims are about quality of services. OMH MTD at 39 n.17.

In any event, Plaintiffs and Integration Class members are harmed by the program's limited capacity because even if OMH Defendants established a system for assessing people for potential placement in their outpatient program, OMH Defendants are unable to meet the needs of more than 15 people at any given time. Compl. ¶ 51. OMH Defendants' practices of not administering an assessment system and maintaining limited program capacity together perpetuate a vicious cycle that limits the opportunities for integration. Not troubling themselves to assess how many people are suitable for their outpatient restoration program, OMH Defendants also do not trouble themselves to secure the resources to build out that program. Compl. ¶ 63. *Olmstead* does not tolerate this state of affairs. *Messier*, 562 F. Supp. 2d at 338-339.

### C. Plaintiffs Allege that They Are Appropriate for a More Integrated Setting

OMH Defendants argue that Plaintiffs' *Olmstead* claims should be dismissed because they do not allege that a *state* treatment professional determined that Plaintiffs and members of the putative Integration Class are appropriate for a more integrated setting than a secure hospital. OMH MTD at 35. Courts have firmly rejected the argument that a *state* treatment professional determination is required for an *Olmstead* claim. *See, e.g.*, *Timothy B. v. Kinsley*, 2024 WL 1350071, at *15 (M.D.N.C. Mar. 29, 2024); *Jeremiah M. v. Crum*, 695 F. Supp. 3d 1060, 1108 (D. Ala. 2023); *Day*, 894 F. Supp. 2d at 23; *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 291 (E.D.N.Y. 2008); *Frederick L. v. Dep't of Pub. Welfare*, 157 F. Supp. 2d 509, 540 (E.D. Pa. 2001).

These courts recognize the perversity of making a plaintiff's claim "depend on securing an evaluation from the same entity accused of subjecting them to unjustified isolation." *Jeremiah M.*, 695 F. Supp. 3d at 1108. As noted in *Disability Advocates, Inc. v. Paterson*, requiring a plaintiff to plead a treatment professional determination by the very agency with a practice of eschewing treatment determinations would "eviscerate the integration mandate" and "condemn the placements of [people with disabilities] to the virtually unreviewable discretion" of defendants.

653 F. Supp. 2d at 259. Where plaintiffs allege that a defendant does not routinely evaluate individuals' appropriateness for a more integrated setting, "it would be unreasonable to dismiss [an integration claim] for failure to allege facts relating to the (nonexistent) determinations of the state's treatment professionals." *Murphy ex rel. Murphy v. Minn. Dep't of Human Servs*., 260 F. Supp. 3d 1084, 1116 n.7 (D. Minn. 2017).

It is thus sufficient for Plaintiffs to allege that they are qualified to receive services in a more integrated setting. *See Kritner v. Alabama Department of Human Resources*, 2025 WL 451836, *9 (M.D. Ala. Feb. 10, 2025) ("A formal . . . determination as a prerequisite to suit is not required."); *M.J. v. District of Columbia*, 401 F. Supp. 3d 1, 12-13 (D.D.C. 2019) (denying motion to dismiss, holding plaintiffs need not allege a treatment professional determination to sufficiently allege that they could reside in the community with treatment). In fact, in two recent decisions that found state governments liable for *Olmstead* violations, courts held that plaintiffs proved appropriateness for a more integrated setting with evidence of past community treatment, not a state treatment professional determination. *See Steward ex rel. Green*, 787 F. Supp. 3d at 751; *United States v. Florida*, 682 F. Supp. 3d 1172, 1227 (S.D. Fla. 2023). At the pleading stage, factual allegations that a plaintiff previously received community-based services are sufficient because those services were provided pursuant to recommendations by a treatment professional. *Cf. Isaac A. v. Carlson*, 775 F. Supp. 3d 1296, 1344 (N.D. Ga. Mar. 25, 2025) (denying motion to dismiss, reasoning plaintiff Zack adequately alleged that he was previously referred to and received community-based services).

Here, Plaintiffs allege that Named Plaintiffs and putative Integration Class members are qualified to receive competency restoration services in the community, or other non-secure alternatives, with appropriate services and supports. Compl. ¶¶ 14-15, 21, 37. Plaintiffs allege that

Plaintiff R.M. sought medical treatment in the community, lived in stable housing, and attended his CPL 730 exam in the community. *Id.* ¶ 40. And Plaintiff A.B. received community-based mental health services, including supportive housing and outpatient mental health treatment through an Assertive Community Treatment team. *Id.* ¶ 41. Both Named Plaintiffs took prescribed mental health medications while detained. *Id.* ¶¶ 40-41. Further, Plaintiffs allege that other similarly situated individuals are qualified for services in a more integrated setting, such as outpatient competency restoration. *Id.* ¶¶ 21, 37. Plaintiffs, accordingly, have met their pleading obligations.

This Court should not credit OMH Defendants' attempt to raise a fact dispute by arguing that "a court has already determined that [the plaintiffs] require *inpatient . . .* services." OMH MTD at 37-38.[36] Plaintiffs allege that instead of being asked to consider outpatient treatment, state courts are routinely presented with one option—inpatient care—as though that is the only option. In these circumstances, a state court's commitment order does not constitute a determination as to the appropriateness of inpatient versus outpatient treatment, let alone a determination based on the "reasonable medical judgment[] of [a] public health official." *Messier*, 562 F. Supp. 2d at 322. Plaintiffs allege that because of OMH Defendants' unlawful methods of administration, "courts lack information relevant to any determination of whether hospitalization or outpatient placement is appropriate in any given case before issuing a commitment order." Compl. ¶¶ 9-10, 36.[37] The

---

[36] OMH Defendants argue that Plaintiffs must demonstrate that a *state* treatment professional has made a determination, OMH MTD at 35, while also arguing that "the District Attorney and criminal court"—neither a state *treatment* professional—have determined that inpatient placement is necessary and such (nonexistent) determination is entitled to deference, *id.* at 36. In addition to misrepresenting the state court's commitment process, OMH Defendants' arguments are internally inconsistent.

[37] Notwithstanding OMH Defendants' arguments, OMH MTD at 34, there is no contradiction between Plaintiffs' allegation that OMH Defendants fail to assess putative class members' treatment needs, and their allegation that putative class members are appropriate for a more integrated setting. Compl. ¶ 42. Just because OMH Defendants have not bothered to know who among the approximately 100 people awaiting competency restoration services on Rikers are appropriate for a more integrated setting does not mean nobody is. Regardless, because (….continued)

Court cannot resolve a dispute as to such determinations on a motion to dismiss. And as Plaintiffs have alleged detailed facts to make out their *Olmstead* claim, the Court should deny OMH Defendants' motion on this basis.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to dismiss.

---

Plaintiffs allege that the Named Plaintiffs and putative Integration Class members are qualified for a more integrated setting, they make out the *prima facie* elements of an *Olmstead* claim.

Dated: December 4, 2025
      New York, New York

Respectfully submitted,

By:   /s/ *Elena Landriscina*
    Elena Landriscina
    Shona Hemmady
    Philip Desgranges
    Ranit Patel
    THE LEGAL AID SOCIETY
    49 Thomas Street, 10th Floor
    New York, New York 10013
    (212) 577-3398
    elandriscina@legal-aid.org
    shemmady@legal-aid.org
    pdesgranges@legal-aid.org
    rpatel@legal-aid.org

By:   /s/ *Alexis Karteron*
    Alexis Karteron
    WASHINGTON SQUARE LEGAL
    SERVICES
    CIVIL RIGHTS IN THE CRIMINAL
    LEGAL SYSTEM CLINIC
    245 Sullivan Street, 5th Floor
    New York, NY 10012
    (212) 998-6430
    alexis.karteron@nyu.edu

By:   /s/ *James I. McClammy*
    James P. Rouhandeh
    James I. McClammy
    Diane O. Lucas
    Chui-Lai Cheung
    Marie Killmond
    DAVIS POLK & WARDWELL LLP
    450 Lexington Avenue
    New York, NY 10017
    (212) 450-4000
    rouhandeh@davispolk.com
    james.mcclammy@davispolk.com
    diane.lucas@davispolk.com
    chui-lai.cheung@davispolk.com
    marie.killmond@davispolk.com

    *Counsel for Plaintiffs R.M. and A.B.*