## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

R.M., by and through next friend Elfego Maldonado
Estrada, and A.B., by and through next friend Kadijah
Hutchinson-McLean, on behalf of themselves and all
others similarly situated,

*Plaintiffs*,

- against -

NEW YORK STATE OFFICE OF MENTAL
HEALTH; ANN MARIE T. SULLIVAN, in her official
capacity as Commissioner of the New York State Office
of Mental Health; the NEW YORK CITY
DEPARTMENT OF HEALTH AND MENTAL
HYGIENE; MICHELLE MORSE, in her official
capacity as the Commissioner of the New York City
Department of Health and Mental Hygiene; and NEW
YORK CITY HEALTH AND HOSPITALS
CORPORATION,

*Defendants.*

Civ. Action No. 25-cv-6667 (AKH)

## REPLY MEMORANDUM OF LAW IN FURTHER
## SUPPORT OF OMH DEFENDANTS' MOTION TO DISMISS

LETITIA JAMES
Attorney General
State of New York
*Attorney for OMH Defendants*
28 Liberty Street
New York, New York 10005
Tel: (212) 416-6228

CAROLINE P. WALLITT
HALEY L. HAWKINS
Assistant Attorneys General
   *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................................1

ARGUMENT........................................................................................................................4

I.  THE ALLEGED TRANSFER WAIT TIMES DO NOT VIOLATE DUE PROCESS.......4

    A.  *Young*, *Hilton*, and *Olaniyi* Are Squarely On Point....................................................4

    B.  Plaintiffs' Distinctions Between *Young*, *Hylton*, and *Olaniyi* and This Case
        are Peripheral and Immaterial ........................................................................6

    C.  Plaintiffs Have Not Plausibly Alleged That Their Incarceration Bears No
        Reasonable Relationship To the Purpose of Confinement....................................9

    D.  OMH Defendants Do Not Ask the Court To Make Factual Findings....................11

    E.  Plaintiffs Improperly Downplay *Magassouba* and Its Factors.........................12

    F.  Plaintiffs Continue to Rely On Outlier Cases, Principally from the Ninth Circuit.................14

II.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ADA OR
THE REHABILITATION ACT AS TO THE PURPORTED "DELAYS CLASS"
MEMBERS.......................................................................................................................16

    A.  Plaintiffs Fail to Allege Discrimination "Due to Their Disabilities".........................16

    B.  Plaintiffs Fail to Allege an Available Accommodation, the Costs of Which
        Do Not Clearly Exceed Its Benefits.................................................................19

III.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ADA OR
THE REHABILITATION ACT AS TO THE PURPORTED "INTEGRATION
CLASS" MEMBERS.........................................................................................................23

    A.  Plaintiffs Fail to Plausibly Allege That They Are Eligible for Outpatient
        Restoration Services.......................................................................................23

    B.  Plaintiffs' Unprecedented ADA Theory Is Unsupported By Law.........................27

IV.  POTENTIAL FOR POST-LITIGATION COLLABORATION ON
PRACTICAL SOLUTIONS..............................................................................................31

CONCLUSION.................................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advoc. Ctr. for the Elderly & Disabled v. La. Dep't of Health & Hosps.,*
  731 F.Supp.2d 603 (E.D. La. 2010) ................................................................................................ 14

*Borkowski v. Valley Cent. Sch. Dist.,*
  63 F.3d 131 (2d Cir. 1995) ............................................................................ 16, 19, 21-22

*Casey v. Odwalla, Inc.,*
  338 F.Supp.3d 284 (S.D.N.Y. 2018) ........................................................................................ 15

*Davis v. Shah,*
  821 F.3d 231 (2d Cir. 2016) ................................................................................................ 16-17

*Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.,*
  804 F.3d 178 (2d Cir. 2015) ........................................................................................................ 21

*DiFolco v. MSNBC Cable LLC,*
  622 F.3d 104 (2d Cir. 2010) ....................................................................................................... 7

*Disability Rts. N.C. v. N.C. Dep't of Health & Hum. Servs.,*
  No. 24-CV-335, 2025 WL 1665327 (M.D.N.C. June 12, 2025) ......................................... 19

*Dunakin v. Quigley,*
  99 F.Supp.3d 1297 (W.D. Wa. 2015) ...................................................................................... 30

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,*
  544 U.S. 280 (2005) ...................................................................................................................... 26

*Frederick v. Dep't of Pub. Welfare,*
  157 F.Supp.2d 509 (E.D. Pa. 2001) ........................................................................................ 27

*Irvine v. Johnson,*
  No. 21-cv-4224, 2025 WL 1093541 (D.S.D. Apr. 11, 2025) ............................................. 14

*Jackson v. Indiana,*
  406 U.S. 715 (1972) ................................................................................................................. 5, 10

*Lawtone-Bowles v. City of New York,*
  No. 21-CV-5620, 2021 WL 2942013 (S.D.N.Y. July 12, 2021) .................................... 20-21

*M.S. v. County of Ventura,*
  No. 16-CV-3084, 2016 WL 11506613 (C.D. Cal. Oct. 24, 2016) ..................................... 18

*Matthew P. v. Neifeld,*
    80 Misc. 3d 950 (N.Y. Sup. Ct. Putnam Cnty. 2023), *aff'd* No. 2023-09105 (N.Y. App.
    Div., 2d Dep't Oct. 15, 2025) ................................................................................................ 18, 29

*Meekins v. City of New York,*
    524 F.Supp.2d 402 (S.D.N.Y. 2007) ............................................................. 19-20, 22-23

*Messier v. Southbury Training Sch.,*
    562 F.Supp.2d 294 (D. Conn. 2008) ...................................................................... 30

*Nunez v. City of New York,*
    11-cv-5845 (S.D.N.Y.) ......................................................................................... 9

*Olmstead v. L.C. ex rel. Zimring,*
    527 U.S. 581 (1999) ................................................................................ 2, 24, 26

*Or. Advoc. Ctr. v. Mink,*
    322 F.3d 1011 (9th Cir. 2022) ............................................................................ 14

*Panayoty v. Annucci,*
    898 F.Supp.2d 469 (N.D.N.Y. 2012) ................................................................... 15

*People v. B.D.,*
    79 Misc. 3d 920 (Sup. Ct. N.Y. Cnty. 2023) ...................................................... 29

*S Moore U.S.A., Inc. v. Standard Reg. Co.,*
    139 F.Supp.2d 348 (W.D.N.Y. 2001) ................................................................. 31

*Siino v. City of New York,*
    No. 14-CV-7217, 2020 WL 3807451 (E.D.N.Y. Feb. 27, 2020) ........................ 30

*State of Conn. Off. of Prot. & Advoc. For Pers. With Disabilities v. Connecticut,*
    706 F.Supp.2d 266 (D. Conn. 2010) ................................................................... 30

*Summers v. Louisiana,*
    20-cv-289, 2022 WL 4490161 (M.D. La. Sept. 27, 2022) .................................. 25

*Tennessee v. Lane,*
    541 U.S. 509 (2004) ............................................................................................ 17

*Trueblood v. Wash. State Dep't of Soc. & Health Servs.,*
    101 F.Supp.3d 1010 (W.D. Wash. 2015) ..................................................... 14-15

*Trueblood v. Wash. State Dep't of Soc. & Health Servs.,*
    681 F.Supp.3d 1149 (W.D. Wash. 2023) ..................................................... 15-16

*United States v. Calderon-Chavez,*
    688 F.Supp.3d 472 (W.D. Tex. 2023) ................................................................. 14

*United States v. Donnelly*,
  41 F.4th 1102 (9th Cir. 2022) ..................................................................................14

*United States v. Hylton*,
  No. 18-cr-102, 2023 WL 7280170 (S.D.N.Y. Nov. 3, 2023) ...............................4-6, 8, 10-11, 13-15

*United States v. Jackson*,
  No. 19-cr-356, 2021 WL 753307 (E.D.N.Y. Feb. 26, 2021)..................................................6

*United States v. Magassouba*,
  544 F.3d 387 (2d Cir. 2008) ...................................................................................12-13, 15

*United States v. McCarthy*,
  703 F.Supp.3d 1377 (M.D. Fla. 2023) ........................................................................14

*United States v. Olaniyi*,
  No. 21-cr-350, 2024 WL 4500921 (E.D.N.Y. Oct. 15, 2024) ............................................4-5, 13, 15

*United States v. Parish*,
  No. 13-cv-829, 2024 WL 3904626 (S.D.N.Y. Aug. 22, 2024) ..........................................9

*United States v. Smith*,
  764 F.Supp.2d 541 (W.D.N.Y. 2011)........................................................................16

*United States v. Walters*,
  910 F.3d 11 (2d Cir. 2018) ...................................................................................8

*United States v. Wazny*,
  No. 21-cr-247, 2022 WL 17363048 (M.D. Pa. Dec. 1, 2022) ..........................................14

*United States v. Young*,
  No. 21-cr-6010L, 2022 WL 7087140 (W.D.N.Y. Oct. 12, 2022)............................4-6, 8, 10, 12-15

*Washington v. Hand*,
  192 Wash.2d 289 (Wash. 2018)................................................................................14

*Winters v. Ark. Dep't of Health & Hum. Servs.*,
  491 F.3d 933 (8th Cir. 2007)..................................................................................18

*Wright v. N.Y. State Dep't of Corrs.*,
  831 F.3d 64 (2d Cir. 2016) .................................................................................21-22

**Federal Statutes**

18 U.S.C.
  § 4241......................................................................................................................31

Americans With Disabilities Act...................................................................................*passim*

Rehabilitation Act ................................................................................................................*passim*

**State Statutes**

New York Criminal Procedure Law
    § 730 ................................................................................................................*passim*

New York Corrections Law ........................................................................................................14

**Miscellaneous Authorities**

Nicole R. Johnson & Philip J. Candilis, *Outpatient competence restoration: A model and outcomes*, 5
    WORLD J. PSYCHIATRY 228 (2015). .........................................................................................31

Defendants New York State Office of Mental Health ("OMH") and Ann Marie T. Sullivan, M.D., in her official capacity as the Commissioner of OMH ("Commissioner Sullivan") (collectively, "OMH Defendants"), by their attorney, Letitia James, Attorney General of the State of New York, submit this reply memorandum of law in further support of their motion to dismiss the  Class Action Complaint, filed August 12, 2025 (ECF No. 1) ("*Compl.*").

## PRELIMINARY STATEMENT

The contents of Plaintiff's opposition to the motion to dismiss (ECF No. 94) ("*Pls.' Opp. MOL*") confirm that this Court should grant OMH Defendants' motion to dismiss.

*First*, Plaintiffs fail to state a claim for a violation of their due process rights. Until this very motion, Plaintiffs have failed to acknowledge, much less address, the body of on-point Second Circuit case law squarely rejecting due process claims by criminal defendants deemed unfit to stand trial and who, by virtue of the finite available spots at government psychiatric facilities, are placed on a waitlist and detained in jail until they can be admitted. Now that Plaintiffs have been presented with these cases, they assert irrelevant and peripheral distinctions in an attempt to avoid their unambiguous holdings regarding due process. Plaintiffs continue to rely instead almost exclusively on outlier cases from courts outside of the Second Circuit, which do not overcome the directly applicable case law from this Circuit.

*Second*, Plaintiffs fail to state a claim under the Americans with Disabilities Act ("ADA") or the Rehabilitation Act as to the purported Delays Class under a failure-to-accommodate theory. Plaintiffs' opposition brief confirms this result in two ways: (1) it shows that Plaintiffs have not alleged discrimination "due to their disabilities," and (2) it underscores that Plaintiffs have not pled the existence of an available accommodation, the costs of which, facially, do not clearly exceed its benefits. As to the first point, Plaintiffs argue that they seek to participate in their criminal proceedings, and

that any delay in access to competency restoration services amounts to discrimination due to their disabilities. This argument is unavailing. Plaintiffs do not take issue with the State's provision of competency restoration services—itself a reasonable accommodation for individuals deemed incompetent to participate in their criminal proceedings. Rather, Plaintiffs complain about the alleged delay in the provision of these services. Although Plaintiffs' inability to participate in their criminal proceedings without restoration treatment may be a consequence of their disabilities, the delay in the provision of these services is not. Rather, as Plaintiffs acknowledge in their Complaint, any delay is due to finite treatment capacity. Courts have repeatedly held that such delays for unfit defendants to receive restoration treatment do not amount to discrimination "due to" a Plaintiff's disability. Plaintiffs ignore these cases.

As to the second point, the Complaint also failed to plead the existence of an available accommodation, the costs of which, facially, do not clearly exceed its benefits. The Complaint proposed an accommodation of "timely competency restoration," which is far too vague to support a reasonable accommodation claim. Plaintiffs mischaracterize this argument as a "fundamental alteration" defense that must be deferred to later proceedings. Not so: this is a _pleading requirement_, which the Complaint makes no attempt to satisfy.

_Third_, Plaintiffs fail to state a claim under the ADA or the Rehabilitation Act as to the purported Integration Class under an _Olmstead_ integration mandate theory. Plaintiffs' attempt to apply an _Olmstead_ analysis to this case is fundamentally a categorical error. _Olmstead_ provides that the ADA requires States to provide community-based treatment under certain circumstances to individuals who are "**qualified**" for community treatment. _Olmstead v. L.C. ex rel. Zimring_, 527 U.S. 581, 603 (1999) (emphasis added). The Named Plaintiffs and the purported Integration Class are categorically not qualified for community treatment because they are subject to a valid court order mandating that they

must receive *inpatient* psychiatric treatment. Because eligibility for community-based treatment is a pleading requirement to establish an *Olmstead* integration mandate claim, Plaintiffs' failure to plausibly allege eligibility for these services compels dismissal of Plaintiffs' ADA and Rehabilitation Act claims as to the Integration Class.

Plaintiffs' opposition brief, moreover, clarifies just how legally unsupported their theory in this case is. Plaintiffs argue that regardless of whether New York's criminal procedure law provides OMH with any authority to intervene in criminal proceedings and recommend unfit defendants for outpatient competency restoration services, the ADA *mandates* that OMH alone *must* take on this role. The clear implication of Plaintiffs' theory is that the Court should extend the ADA to require every State to offer community-based restoration treatment for psychiatrically unfit defendants who have been charged with felony crimes. The vast majority of States, and the federal government, do not offer *any* community-based treatment option for such individuals—New York is one of the very few jurisdictions to do so. Plaintiffs have obviously cited no legal support for this novel interpretation of the ADA, which would have the effect of casting doubt on the validity of the criminal procedure laws of most States and the federal government.

Although this case must be dismissed as a matter of law, OMH Defendants continue to be willing to work collaboratively and in good faith with Plaintiffs and other entities involved in the process set forth by Article 730 of the New York Criminal Procedure Law ("CPL 730") to increase capacity and reduce wait times for CPL 730 defendants. To that end, OMH Defendants encourage Plaintiffs to share any specific, practical proposals that Plaintiffs believe would reduce wait times.

## ARGUMENT

## I.    THE ALLEGED TRANSFER WAIT TIMES DO NOT VIOLATE DUE PROCESS

In their Opposition brief, Plaintiffs devote approximately fifteen pages trying to avoid the on-point case law from within the Second Circuit squarely rejecting due process claims brought by pre-trial detainees found psychiatrically unfit to stand trial who waited for months in jail for admission to a hospital to receive restoration treatment. *See Pls' Opp. MOL* at 8-23. For the reasons set forth below, their arguments fail.

### A.    *Young*, *Hilton*, **and** *Olaniyi* **Are Squarely On Point**

In well-reasoned decisions on similar facts, three district courts in this Circuit have rejected due process claims based on Plaintiffs' legal theory: *United States v. Olaniyi*, No. 21-cr-350, 2024 WL 4500921 (E.D.N.Y. Oct. 15, 2024); *United States v. Hylton*, No. 18-cr-102, 2023 WL 7280170 (S.D.N.Y. Nov. 3, 2023); and *United States v. Young*, No. 21-cr-6010L, 2022 WL 7087140 (W.D.N.Y. Oct. 12, 2022). In each of these cases, the court considered and squarely rejected an allegation of a due process violation asserted by a criminal defendant deemed unfit to stand trial who, due to finite capacity, had to wait months in jail for transfer to a government hospital for competency restoration. *See Olaniyi*, 2024 WL 4500921, at *7; *Hylton*, 2023 WL 7280170, at *6; *Young*, 2022 WL 7087140, at ** 3-4.

Plaintiffs failed to address *Young*, *Hylton*, or *Olaniyi* in any of their earlier filings. Now that OMH Defendants have brought *Young*, *Hylton*, and *Olaniyi* to the Court's attention as legal precedent supporting the dismissal of Plaintiffs' due process claim, Plaintiffs try to downplay their significance and argue—incorrectly—that they have no bearing on the due process claim in this case.

These cases are squarely on point. In each case, a pre-trial defendant claimed a due process violation as a result of a months-long wait for admission to a government psychiatric hospital to receive restoration treatment. *See Olaniyi*, 2024 WL 4500921, at **5-7 (defendant expected to wait six

months to start hospitalization alleged due process violation); *Hylton*, 2023 WL 7280170, at *6 (defendant expected to wait ten months to start hospitalization alleged due process violation); *Young*, 2022 WL 7087140, at **3-4 (defendant expected to wait six to seven months to start hospitalization alleged due process violation).

In each of these cases, the court relied upon the legal standard of "reasonableness," which is set forth in *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). *See Hylton*, 2023 WL 7280170, at *6 (citing to the *Jackson* legal standard verbatim); *Young*, 2022 WL 7087140, at *3 (same); *Olaniyi*, 2024 WL 4500921, at *6 (confinement permitted as long as it is not "constitutionally unreasonable") (quoting *United States v. Magassouba*, 544 F.3d 387, 417 (2d Cir. 2008)). Most importantly, in each of these cases, the court applied the relevant due process legal standard to explicitly find that a **months-long period of pre-hospitalization detention does not violate due process**. Rather than grapple with the clear application of the due process analysis by these courts to the claims in this case, Plaintiffs' opposition brief simply ignores the critical statements of law in each case. **The following statements are nowhere to be found in Plaintiffs' brief**:

- *Olaniyi*: "The defendant has not identified a legal basis for ordering hospitalization no later than 30 days following the start of commitment. . . . **District courts have found months-long waits for hospitalization entirely consistent with due process**. . . . Neither a six-month period of transporting the defendant to [the hospital], nor the eight-month wait during the initial proceedings, constitutes a time period 'so egregious as to deny [the defendant] due process.'" 2024 WL 4500921, at *6-7 (internal citation omitted) (emphasis added).

- *Hylton*: the defendant "**has not shown that his delayed transport to [the hospital] constitutes a violation of his right to due process.**" 2023 WL 7280170, at *6 (emphasis added).

- *Young*: "**the expected wait in this case of six or seven months is not so extraordinarily long as to give rise to a due process violation.**" 2022 WL 7087140, at *3 (emphasis added).

These holdings are in line with many others in which courts have repeatedly held that a period of pre-trial detention that may well include months of delays does not violate due process. *See, e.g.*, *United States v. Jackson*, No. 19-cr-356, 2021 WL 753307, at *3 (E.D.N.Y. Feb. 26, 2021) (nine-month pre-trial detention due to delays during COVID-19 pandemic "not great enough to constitute a violation of due process"); *see id.* (collecting cases with 19-month and 26-month pre-trial detention delays in which the Second Circuit found no due process violation).

### B.    Plaintiffs' Distinctions Between *Young*, *Hylton*, and *Olaniyi* and This Case Are Peripheral and Immaterial

Rather than engage with the due process analysis in *Young*, *Hylton*, and *Olaniyi* head on, Plaintiffs raise peripheral and immaterial distinctions with those cases.

#### 1.    *Procedural Posture*

Plaintiffs first argue that this Court should disregard *Young, Hylton,* and *Olaniyi* because the due process analysis in those cases arose in the context of a motion in an ongoing criminal matter, rather than on a Rule 12 motion to dismiss in a civil lawsuit. *See generally Pls.' Opp. MOL* at 15-18. Plaintiffs do not provide any support for their contention that that the due process analysis, which is a question of law, applies any differently in this civil lawsuit. *Of course,* the vast majority of due process case law regarding pre-trial defendants found unfit to stand trial will arise in the context of criminal

prosecutions. That does not mean that a criminal defendant who chooses to bring a civil lawsuit may disregard the directly extensive body of due process law developed in criminal cases.

Moreover, there is no dispute of material fact here that requires any evidentiary analysis or development of a record.[1] Plaintiffs allege that they are criminal defendants who have been found incompetent to stand trial. *Compl.* ¶¶ 14 & 15. Plaintiffs further allege that, at the time of the Complaint, they were waiting in jail at New York City's Rikers Island ("Rikers") for placement at an OMH hospital to undergo competency restoration. *Id.* Plaintiffs allege that they are forced to wait for placement at OMH hospitals due to finite space. *Id.* ¶ 28. Finally, Plaintiffs allege that, at the time of the Complaint, the median wait time for admission was 81 days. *Id.* ¶ 30. The only dispute on this motion is whether those allegations state a due process claim as a matter of law. The courts in *Young, Hylton,* and *Olaniyi*, upon consideration of a materially similar set of circumstances, found that the defendants' due process rights had not been violated.

Plaintiffs also argue that, in *Hylton* and *Young,* the defendants sought dismissal of their indictment as a remedy for the alleged violation of their due process rights. *See Pls.' Opp. MOL* at 17. They argue that this Court should ignore the due process holding in those cases because a defendant must meet a heavy burden to succeed in dismissing an indictment.[2] *Id.* at 17-18. This distinction is

---

[1] Plaintiffs dedicate a significant portion of their opposition brief objecting to OMH Defendants' citation to an affidavit that Plaintiffs quoted and relied upon in their Complaint. *See* Affidavit of Matthew S. Schatzel, sworn to on the 15th day of February, 2024 (ECF No. 11-6). *See generally Pls.' Opp. MOL* at 10-13. Even though OMH Defendants are permitted to provide the full context of an affidavit that Plaintiffs incorporated by reference in their Complaint (*DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)), the Court need not rely on any portion of the Schatzel Affidavit in order to find that Plaintiffs have failed to state a claim as a matter of law.

[2] To justify dismissal of an indictment for outrageous governmental misconduct, a defendant must show that that the misconduct was "so outrageous that common notions of fairness and decency would be offended were judicial process invoked to obtain a conviction." *United States v. Walters,* 910 F.3d 11, 27 (2d Cir. 2018).

also not persuasive. The due process analysis does not change based on the requested remedy. The *Hylton* and *Young* courts could have readily found that the defendant had established a due process violation but that dismissal of the complaint was not the appropriate relief. The *Hylton* and *Young* courts did not do that. Instead, they squarely held that the months-long transfer delays at issue did not violate due process. *Hylton,* 2023 WL 7280170, at *6; *Young,* 2022 WL 7087140, at *3.

Plaintiffs' treatment of *Jackson v. Indiana* conclusively shows that there is no merit to their argument that the due process analysis in *Young, Hylton,* and *Olaniyi* may be disregarded, simply because it arose in a different procedural posture in a criminal case. Plaintiffs' entire due process claim is premised on the Supreme Court's analysis in *Jackson. See Pls.' Opp. MOL* at 9 (parties agree that Jackson "provides the framework" for due process claims brought by pre-trial detainees requiring competency restoration). But *Jackson* was not a civil lawsuit. The Supreme Court's due process analysis in that case came in the context of a criminal defendant's motion for a new trial. If Plaintiffs are willing to embrace the due process analysis in that criminal case as foundational to their lawsuit, they cannot in the same breath disregard subsequent decisions applying the *Jackson* due process standard.[3]

2.    *Nature and Purpose of Confinement*

Plaintiffs next contend that this Court should disregard *Young, Hylton,* and *Olaniyi* because those cases purportedly "involved confinements meaningfully different in *nature* and *purpose* than the confinements alleged here." *Pls.' Opp. MOL* at 16 (emphasis in original). Neither point holds up.

---

[3] The connection between this civil lawsuit and criminal cases involving unfit defendants is a two-way street. If this Court were to find that Plaintiffs have stated a due process claim based on the allegations in this case, that holding would certainly open the floodgates for pre-trial federal criminal defendants currently on the federal wait list for admission for restoration treatment to bring new due process motions in their criminal cases.

As to the purpose of the confinement, the circumstances are materially identical. This case, as in each of *Young*, *Hylton*, and *Olaniyi*, involves pre-trial defendants who have been detained in jail while awaiting admission to a government hospital for psychiatric restoration to fitness treatment. Plaintiffs vaguely suggest that the "purpose" of the confinement was somehow different in *Hylton* because the defendant "had responded well to medication in the past." *Pls.' Opp. MOL* at 16. That purported distinction is immaterial to the due process analysis.

As to the nature of the confinement, Plaintiffs argue that because they are confined at Rikers, the normal due process analysis applicable to pre-trial detainees awaiting admission for inpatient restoration treatment does not apply. Plaintiffs cite no support for this position.[4] To the extent that Plaintiffs raise concerns about conditions at Rikers, those issues are properly the subject of ongoing class action litigation against the New York City Department of Correction in front of Judge Swain. *See Nunez v. City of New York*, 11-cv-5845 (S.D.N.Y.).  In *Nunez*, a certified class is challenging the conditions of pre-trial detainees at Rikers, including an alleged inadequacy in mental health services. Indeed, the plaintiffs in this case are class members in *Nunez*, based on their status as incarcerated individuals confined in jails operated by the New York City Department of Correction.

C.    **Plaintiffs Have Not Plausibly Alleged That Their Incarceration Bears No Reasonable Relationship To the Purpose of Confinement**

In *Jackson v. Indiana*, the Supreme Court held that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." 406 U.S. at 738. Plaintiffs argue that they have alleged that their incarceration while

---

[4] Plaintiffs cite *United States v. Parish*, No. 13-cv-829, 2024 WL 3904626, at *6 (S.D.N.Y. Aug. 22, 2024), in which the court granted a federal incarcerated individual's motion for compassionate release based on several factors specific to the individual's history. The court did not hold that normal due process principles do not apply for individuals who have been detained at Rikers.

waiting for admission for restoration treatment "bears no relationship" to the purpose of confinement because they are *waiting* for treatment, not *receiving* it (yet). *Pls.' Opp. MOL* at 9.

Once again, Plaintiffs hope the Court will ignore the most directly applicable case law, which defeats their legal theory. Cases within this Circuit do *not* hold that a pre-trial detention "bears no relationship" to the purpose of confinement if the detainee is waiting for treatment, rather than receiving it. Just the opposite. The district court's analysis in *Young* is particularly instructive. There, the district court cited *Jackson* and expressly noted the "reasonable relation" standard. 2022 WL 7087140, at *3. The court also acknowledged that an order committing the defendant for restoration treatment had been issued, after which "[m]ore than four months have elapsed . . . and defendant has not yet undergone a medical evaluation, or been transferred to a facility where such an evaluation could be performed. It appears that it may be more months before that occurs." *Id.* at *2. But the court did not hold that this period of waiting bore no relation to the purpose of confinement. Rather, applying *Jackson*, it held that "*[a]t some point*, a defendant's continued confinement, with no trial, evaluation or treatment in sight, *can* violate the defendant's due process rights." *Id.* at *3 (emphasis added). Despite the months-long wait, the court held that "[i]n my judgment, that point has not been reached here." *Id.* Likewise, in *Hylton*, the court cited the *Jackson* "reasonable relationship" standard before holding that the defendant's months-long wait for admission to the hospital did *not* violate that standard. 2023 WL 7280170, at *6.

In *Glendening v. Howard*, the District of Kansas further articulated why a pre-trial detainee's confinement may be reasonably related to State interests, even during the period of time when the detainee is waiting for admission to a State hospital that currently lacks capacity for new patients:

> State hospitals lack infinite capacity. Sometime, a detainee must wait. The State has a continued interest in evaluating and restoring the competency of each detainee so that he or she may be tried. The State

> has a further interest in providing adequate care at [the secure forensic
> psychiatric facility] to accomplish that purpose which obliges detainees
> to wait in line until services are available.

707 F.Supp.3d 1089, 1109 (D. Kan. 2023). In sum, the State "only delays as a way to triage care,"

which reasonably relates to State interests in the continued provision of such care in a safe, secure,

and equitable manner given the available resources. *Id.*

### D. OMH Defendants Do Not Ask the Court To Make Factual Findings

Plaintiffs argue that OMH Defendants have improperly asked the Court to make a factual

finding that any admission delays are caused by systemic issues beyond the State's control. Plaintiffs

further maintain that this question is not appropriately before the Court on a motion to dismiss. *Pls.'*

*Opp. MOL* at 10. This argument misunderstands the motion to dismiss. It is certainly true that

admission wait times are a function of the fact that there is finite capacity in State hospitals. The

Complaint expressly pleads this fact: "OMH delays competency restoration for people who are

designated for a hospital bed because there is no bed or staff capacity at hospitals that OMH has

designated for competency restoration services." *Compl.* ¶ 28. For purposes of this motion, the critical

point is that Plaintiffs do not allege that OMH has the available capacity or ability to immediately

admit Plaintiffs but is simply failing to do so for other, unrelated reasons. *Id.* ¶ 63. The Court need

not resolve any disputes about the root *causes* of current hospital capacity because, under materially

similar circumstances, courts in this Circuit have repeatedly held that months-long waits for admission

of pre-trial detainees to government hospitals do not violate due process. *See Hylton*, 2023 WL

7280170, at *6 ("The immediate delay at issue here . . . is attributable to the limited bed space in the

few [hospitals] qualified to address Hylton's needs . . . . None of these facts suggests that Hylton's

right to due process is being infringed[.]"); *Young*, 2022 WL 7087140, at *3 ("[T]here is no dispute that

the delay is attributable to a lack of resources, primarily bed space, to accommodate the number of

prisoners awaiting evaluation, with a resulting backlog and lengthy waiting period. There is no suggestion or evidence that defendant's wait time is in any way due to malfeasance or bad faith on the part of the Government.").[5]

E.    **Plaintiffs Improperly Downplay *Magassouba* and Its Factors**

Just as with the relevant district court cases, Plaintiffs attempt, for an entire section of their opposition brief, to undercut the applicability of the Second Circuit decision in *Magassouba. See Pls.' Opp. MOL* at 18-23. But whatever factual distinctions exist do not detract from *Magassouba*'s status as the principal Second Circuit case assessing when the pre-trial detention of an incompetent defendant might violate due process. As such, its holdings are of great significance and—unlike the Ninth Circuit cases Plaintiffs primarily rely on instead—are binding on this Court. *Magassouba* contains three critical points that are directly relevant here.

*First*, *Magassouba* reiterated the Supreme Court's guidance that "the Constitution itself draws no bright lines signaling when an incompetent defendant's continued detention to restore competency becomes unreasonable." 544 F.3d at 416 (citing *Jackson*, 406 U.S. at 738).

*Second*, the Second Circuit found that even a nineteen-month period of pre-trial detention after being found incompetent—which, in that case, included time the defendant spent refusing medication—"was not constitutionally unreasonable so as to violate due process." *Id.* at 392.

---

[5] While OMH Defendants do not ask the Court to make factual findings, it is clearly the case that Plaintiffs selectively omitted material facts about the causes of current CPL 730 wait times from their Complaint, implying that this circumstance is the result of some unique failure of policy or will by OMH employees. In subsequent filings, Plaintiffs have dropped this narrative and conceded that, in fact, there has been a massive recent *nationwide* trend of courts finding more defendants unfit to stand trial, resulting in substantial wait times throughout the country. *See* Declaration of Lauren Elizabeth Kois, PhD, filed Aug. 28, 2025 (ECF No. 42), at ¶ 15.

*Third*, *Magassouba* developed a list of five factors for courts to consider "[i]n determining what constitutes a constitutionally unreasonable period of detention for an incompetent defendant[.]" *Id.* at 416. Contrary to Plaintiffs' argument, application of the five *Magassouba* factors yields the conclusion that Plaintiffs have not, as a matter of law, stated a claim for a due process violation:

1.     **The length of time at issue**: This factor clearly favors OMH Defendants. The alleged median wait time of 81 days here for admission to a hospital for restoration treatment is significantly shorter than the wait times of other cases within the Second Circuit in which the court concluded there was no due process violation. *See Olaniyi*, 2024 WL 4500921, at \*7; *Hylton*, 2023 WL 7280170, at \*6; *Young*, 2022 WL 7087140, at \*\*3-4.

2.     **The medical assessments of the defendant's ability to attain competency**: This factor is inapplicable here, so it cannot be said to favor either Plaintiffs or OMH Defendants. To the extent it applies, it favors OMH Defendants. In contrast to *Jackson*, Plaintiffs do not allege that they have been "confined for a lengthy time despite the fact that medical experts [have] concluded that no effort could render [them] competent to stand trial in light of [their] severe mental and physical impairments." 544 F.3d at 417.

3.     **The reason for any delay in helping the defendant attain competency**: This factor favors OMH Defendants because the Complaint concedes that the delay is based on finite capacity. *See Compl.* ¶ 28. Plaintiffs do not allege that OMH has capacity to immediately admit Plaintiffs but, rather, is simply failing to do so. *See id.* ¶ 63. Applying *Magassouba*, courts in this Circuit have repeatedly found that this circumstance is a valid reason for delayed admission. *Hylton*, 2023 WL 7280170, at \*6; *Young*, 2022 WL 7087140, at \*3.

4.     **The defendant's assertion of his rights**: This factor in inapplicable here, so it cannot be said to favor either Plaintiffs or OMH Defendants.

5.    **Any prejudice to the defendant**: This is the only factor that arguably favors Plaintiffs, in part, as the Complaint alleges that a prolonged period of detention increases the challenge of restoring an individual to competency. However, for the vast majority of defendants, there will be no prejudice because the criminal proceedings are stayed and will resume once the defendant is restored to fitness. Moreover, the risk of decompensation is tempered by Section 508 of the N.Y. Corrections Law, which authorizes the removal from Rikers of any incarcerated individual who requires inpatient mental health treatment at an appropriate psychiatric hospital.

Thus, based only on the facts pled by Plaintiffs, the totality of the circumstances demonstrates that Plaintiffs have not stated a claim for a due process violation.

## F.    **Plaintiffs Continue to Rely On Outlier Cases, Principally from the Ninth Circuit**

Having attempted to evade the directly applicable due process cases from courts within this Circuit, Plaintiffs continue to rely instead primarily on outlier cases from the Ninth Circuit.[6] Plaintiffs also rely upon a smattering of additional cases that lie outside the Second Circuit.[7]

Under the doctrine of vertical *stare decisis*, this Court is bound only by the decisions of the United States Supreme Court and the United States Court of Appeals for the Second Circuit. *Panayoty v. Annucci*, 898 F.Supp.2d 469, 479-80 (N.D.N.Y. 2012). Of all the cases presented by the parties on the issue of due process, this Court is bound only by the holding of *Magassouba*. The District Court

---

[6] Specifically, *United States v. Donnelly*, 41 F.4th 1102 (9th Cir. 2022); *Or. Advoc. Ctr. v. Mink,* 322 F.3d 1011 (9th Cir. 2022); *Zapata-Herrera*, 2015 WL 4878319; *Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 101 F.Supp.3d 1010 (W.D. Wash. 2015); *Washington v. Hand*, 192 Wash.2d 289 (Wash. 2018).

[7] Specifically, *Irvine v. Johnson*, No. 21-cv-4224, 2025 WL 1093541 (D.S.D. Apr. 11, 2025); *United States v. McCarthy,* 703 F.Supp.3d 1377 (M.D. Fla. 2023); *United States v. Calderon-Chavez,* 688 F.Supp.3d 472 (W.D. Tex. 2023); *Lara,* 671 F.Supp.3d 1257; *United States v. Wazny,* No. 21-cr-247, 2022 WL 17363048 (M.D. Pa. Dec. 1, 2022); *Carter,* 2019 WL 9410160; *Advoc. Ctr. for the Elderly & Disabled v. La. Dep't of Health & Hosps.,* 731 F.Supp.2d 603 (E.D. La. 2010).

decisions within the Second Circuit—*Young, Hylton,* and *Olaniyi*—are persuasive authority and this Court may afford them great weight. *Id.* at 480. Courts typically look to legal precedent in other districts only in limited circumstances, such as when the courts of the relevant circuit have not addressed the issue. *See, e.g., Casey v. Odwalla, Inc.,* 338 F.Supp.3d 284, 298 n.7 (S.D.N.Y. 2018) (looking to district courts outside Second Circuit because no Second Circuit courts addressed a particular issue). Here, three different district court judges within the Second Circuit have held that months-long pre-hospitalization detention periods for defendants unfit to stand trial do <u>not</u> violate due process. *See Olaniyi*, 2024 WL 4500921, at *7; *Hylton*, 2023 WL 7280170, at *6; *Young,* 2022 WL 7087140, at ** 3-4. Plaintiffs have offered no valid reason for this Court to put those cases aside and rely on out-of-circuit cases instead.[8]

As Plaintiffs acknowledge, OMH Defendants identified and cited one district court case within this Circuit in which the court potentially endorsed a due process argument by a defendant waiting for restoration treatment. *United States v. Smith,* 764 F.Supp.2d 541 (W.D.N.Y. 2011). But as the OMH

---

[8] As OMH Defendants argued in their motion to dismiss, multiple courts have criticized the Ninth's Circuit's reasoning in this area as unpersuasive. *See* Memorandum of Law In Support of OMH Defendants' Motion to Dismiss, filed Oct. 20, 2025 (ECF No. 63) ("*OMH MTD MOL"*), at 22-23. In *Hylton*, Judge Cote noted that the Ninth Circuit's rulings have "severely impacted the [federal Bureau of Prison's] ability to manage the placement process." 2023 WL 7280170, at *5 n.2. Moreover, it is far from clear that the Ninth Circuit precedent has led to tangible benefits for incarcerated individuals. Plaintiffs rely heavily on *Trueblood*, where the court held that a wait time of more than seven days violates due process. 101 F.Supp.3d at 1022. The court issued a permanent injunction to that effect. *Id.* at 1024. The Washington State Department of Social and Health Services ("DSHS") thereafter negotiated a settlement agreement with the plaintiffs to bring itself into substantial compliance with the permanent injunction, incorporating the seven-day wait limit and adding other goals for programming and organization. *Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 681 F.Supp.3d 1149, 1154 (W.D. Wash. 2023). Eight years later, DSHS was still unable to consistently comply with the seven-day rule and became subject to over $300 million in fines for untimely inpatient competency evaluation and restoration services, one-third of which became due immediately. *Id.* at 1155. While the *Trueblood* plaintiffs were able to impose a seven-day deadline on paper, that has still proven to be an unachievable outcome in practice, even eight years later.

Defendants explained in their motion, the circumstances in that case were distinguishable—*see OMH MTD MOL* at 16-17—Plaintiffs' opposition brief fails to acknowledge or rebut the material distinguishing features identified by OMH Defendants.

## II. PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ADA OR THE REHABILITATION ACT AS TO THE PURPORTED "DELAYS CLASS" MEMBERS

In their motion to dismiss, OMH Defendants argue that Plaintiffs fail to state a claim for relief under the ADA or Rehabilitation Act failure-to-accommodate theory for two reasons. First, Plaintiffs have not plausibly alleged discrimination "due to [their] disabilit[ies.]" *Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016). Second, the Complaint fails to identify the existence of an available accommodation, "the costs of which, facially, do not clearly exceed its benefits." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995). *See OMH MTD MOL* at 26. In response, Plaintiffs argue that OMH Defendants' "argument is premised on misrepresenting the government program at issue in Plaintiffs' claim;" and they frame their failure-to-accommodate claims as "alleg[ing] that they are excluded from their *criminal proceedings* because of their disability." *Pls.' Opp. MOL* at 23–24 (emphasis in original). Plaintiffs further argue that "Plaintiffs *do* propose 'timely competency restoration' as a reasonable accommodation" and that, to the extent that OMH Defendants dispute the reasonableness of this proposal, this is a "fact-intensive dispute [that] cannot be resolved on a motion to dismiss." *Id.* (emphasis in original). Not only are Plaintiffs' arguments unavailing, they also by turns misapprehend OMH Defendants' arguments and ignore applicable legal standards.

### A. Plaintiffs Fail to Allege Discrimination "Due to Their Disabilities"

To establish a *prima facie* failure-to-accommodate claim under Title II of the ADA or Section 504 of the Rehabilitation Act, a plaintiff must demonstrate "(1) that she is a qualified individual with a disability; (2) that she was excluded from participation in the public entity's services, programs or

activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her disability." *Davis*, 821 F.3d at 259. Plaintiffs argue that "[t]he Title II service, program, or activity at issue in Plaintiffs' claim is their *criminal proceeding*, not the provision of competency restoration services." *Pls.' Opp. MOL* at 25 (citation omitted) (emphasis in original). Thus, they reason, "[a]s a result of their disabilities, a state court has committed Plaintiffs to OMH's custody for care and treatment, and by law, Plaintiffs' criminal proceedings are suspended," *id.* at 27, meaning that "Plaintiffs are unable to participate in those proceedings *because of their disabilities*, and therefore require a reasonable accommodation[,]" *id.* at 25 (emphasis in original). In support of this contention, Plaintiffs cite to *Tennessee v. Lane*, 541 U.S. 509 (2004), a case involving litigants requiring a wheelchair to physically access a courtroom, who were denied a reasonable accommodation. *Id.* at 513–14, 532–33.

However, even accepting Plaintiffs' framing of the government services from which they allege they have been excluded, their logic still suffers from one fatal flaw—the State's provision of competency restoration services through the CPL 730 process *is itself* the reasonable accommodation which allows individuals deemed incompetent to eventually participate in their criminal proceedings. Plaintiffs do not appear to take issue with the provision of competency restoration services or deny that they will receive these services once they are admitted to an OMH facility; rather, they wish for these services to be provided *more quickly* despite systemic capacity constraints. And the delay in transfers to OMH facilities is not *due to Plaintiffs' disabilities*. Rather, as Plaintiffs have acknowledged in their Complaint, the delays have occurred because of the finite capacity available. *See Compl.* ¶ 28 ("OMH delays competency restoration for people who are designated for a hospital bed because there is no bed or staff capacity at hospitals that OMH has designated for competency restoration services."). Because the Complaint concedes that the delay in admission is not *due to* Plaintiffs'

disability, Plaintiffs' reasonable accommodation claim fails.

Moreover, in their opposition, Plaintiffs simply fail to address the multiple cases cited by OMH Defendants in their motion to dismiss, in which courts have rejected reasonable accommodation claims brought by pretrial defendants found unfit to stand trial who had to wait for admission to government hospitals due to finite capacity. In each of these cases, the court concluded that the transfer delays were not "due to" the plaintiffs' disabilities. *See Matthew P. v. Neifeld*, 80 Misc. 3d 950, 959 (N.Y. Sup. Ct. Putnam Cnty. 2023), *aff'd* No. 2023-09105 (N.Y. App. Div., 2d Dep't Oct. 15, 2025) (rejecting ADA claim from CPL 730 defendant waiting for transfer and concluding that plaintiff "was not denied care and treatment due to his disability," but rather that the transfer delay occurred due to finite resources); *Winters v. Ark. Dep't of Health & Hum. Servs.*, 491 F.3d 933, 936–37 (8th Cir. 2007) (affirming dismissal of ADA failure-to-accommodate claim and concluding that plaintiff "was not denied admittance to the State Hospital on the basis of his disability, but for lack of available space"); *M.S. v. County of Ventura*, No. 16-CV-3084, 2016 WL 11506613, at *12 (C.D. Cal. Oct. 24, 2016) (noting that "[p]laintiffs do not allege that [defendants'] 'one in, one out' policy has anything to do with [p]laintiffs' disability; rather . . . it appears that this alleged policy is due to a lack of space" and "[d]efendants cannot be held liable for discrimination under the ADA or Rehabilitation Act because [the] [s]tate [h]ospital lacks space to accommodate [p]laintiffs"); *see also Disability Rts. N.C. v. N.C. Dep't of Health & Hum. Servs.*, No. 24-CV-335, 2025 WL 1665327, at *3 (M.D.N.C. June 12, 2025) (report and recommendation recommending dismissal of reasonable accommodation claim because plaintiff failed to allege that defendant agency's "failures in administering its [competency restoration] services or failures to make reasonable modifications to its policies or procedures associated with wait times were in any way caused by, or motivated by, a disability"). The reasonable accommodation section of Plaintiffs' opposition brief wholly fails to acknowledge or rebut these directly applicable cases or offer

18

any cases which contradict them. Plaintiffs' attempt to frame the issue by arguing that they seek access to their criminal proceeding, not restoration services, fails based on a review of these cases. Each of these cases involved an unfit defendant who also sought access to a criminal proceeding. But each court denied the reasonable accommodation claim because the individual had not plausibly alleged a denial of services "due to" their disability. Accordingly, Plaintiffs fail to plausibly allege that any alleged discrimination was "due to Plaintiffs' disabilities."

**B.    Plaintiffs Fail to Allege an Available Accommodation,
the Costs of Which Do Not Clearly Exceed Its Benefits**

To establish a *prima facie* failure-to-accommodate claim under Title II of the ADA or Section 504 of the Rehabilitation Act, Plaintiffs must also allege a "plausible method for remedying a lack of access[,]" *Meekins v. City of New York*, 524 F.Supp.2d 402, 407 (S.D.N.Y. 2007), "the costs of which, facially, do not clearly exceed its benefits[,]" *Borkowski*, 63 F.3d at 138. In their opposition, Plaintiffs argue that they have alleged the existence of an available accommodation—"timely competency restoration"—and that OMH Defendants' dispute regarding the reasonableness of this proposed accommodation "hinges on facts not properly before the Court" and "raise[s] a fact-intensive dispute not appropriate for resolution at the pleading stage." *Pls.' Opp. MOL* at 27. Plaintiffs' arguments fail for two reasons: (1) Plaintiffs' proposed accommodation is based on circular reasoning, and not sufficiently specific under applicable case law, and (2) Plaintiffs misapprehend OMH Defendants' motion as making a fundamental alteration defense. That is not the case. *Borkowski* provides a pleading standard, which Plaintiffs fail to address.

First, Plaintiffs argue that they "meet their 'light burden' to identify a facially plausible reasonable accommodation—a timely competency restoration program[.]" *Id.* (quoting *Wright v. N.Y. State Dep't of Corrs.*, 831 F.3d 64, 76 (2d Cir. 2016)). This proposed accommodation is vague and

employs circular reasoning: Plaintiffs suggest that the way to remedy transfer delays is for OMH to not delay transfers, without pleading any specific facts about how this practically would be accomplished. Courts have dismissed similar vague and circular reasonable accommodation pleadings. *See Lawtone-Bowles v. City of New York*, No. 21-CV-5620, 2021 WL 2942013, at *5 (S.D.N.Y. July 12, 2021) (concluding that plaintiff's request for "'accommodations without restrictions' [was] insufficient to show that a reasonable accommodation is available"). By contrast, *Meekins v. City of New York* is illustrative of a pleading that specifically identified a plausible accommodation. The plaintiff in that case "claim[ed] limited access to parking in New York City and, in turn, limited access to some of New York City's institutions[.]" 524 F.Supp.2d at 409. He pled the existence of a specific plausible accommodation: "that the City could accommodate [him] by allowing him and other members of the class to park for a limited amount of time in the spaces made available to Special Vehicle Permit holders." *Id.* The court found this proposed accommodation facially reasonable. *See id.* The proposed accommodation in *Meekins* is specific and articulable, unlike Plaintiffs' circular and highly ambiguous proposed accommodation of "timely competency restoration" in this case.

Plaintiffs double-down on the ambiguity of their proposed accommodation, denying that they are requesting "immediate" admission of all defendants waiting for transfer, but failing to explain what "timely" means or what specific action they *do* request. *See generally Pls.' Opp. MOL* at 27–30. As explained in *Lawtone-Bowles* and demonstrated in *Meekins*, this type of vague proposal is insufficient to establish the existence of "an available accommodation" under the relevant pleading standard. 2021 WL 2942013, at *5. Furthermore, even the cases Plaintiffs cite for the proposition that "a plaintiff 'faces only a light burden of production as to the facial reasonableness of his proposed accommodation'" involved plaintiffs who identified much more specific and tangible accommodations than Plaintiffs have done here. *Pls.' Opp. MOL* at 24; *see Wright*, 831 F.3d at 76

(concluding that incarcerated individual's request for motorized wheelchair was facially reasonable accommodation, especially where majority of state prison systems already allowed for use of motorized wheelchairs on case-by-case basis); *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 190–91 (2d Cir. 2015) (finding three months of medical leave for student to be facially reasonable accommodation).

Second, Plaintiffs fail to establish the second pleading requirement regarding their proposed accommodation—that is, that the accommodation is one, "the costs of which, facially, do not clearly exceed its benefits." *Borkowski*, 63 F.3d at 138. Neither *Borkowski* nor its cost-versus-benefits pleading standard appear anywhere in Plaintiffs' opposition brief.

Rather than address their failure to meet the *Borkowski* pleading standard, Plaintiffs attempt to confuse the issue by suggesting that OMH Defendants have made a premature fundamental alteration defense. Plaintiffs claim that "Defendants attempt to dispute the reasonableness of Plaintiffs' proposed accommodation by arguing that it would cause undue hardship or fundamentally alter OMH Defendants' program[,] . . . [which] raise[s] a fact-intensive dispute not appropriate for resolution at the pleading stage." *Pls.' Opp. MOL* at 27. This is not the case. OMH Defendants do not raise a "fundamental alteration" defense at this stage of the case; rather, OMH Defendants argue that Plaintiffs have failed to plausibly allege the existence of a proposed accommodation, the costs of which does not clearly exceed its benefits, which is a requirement born by plaintiffs *at the pleading stage. See OMH MTD MOL* at 29–31; *Borkowski*, 63 F.3d at 138 ("[P]laintiff [must] suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits. Once the plaintiff has done this, she has made out a *prima facie* showing that a reasonable accommodation is available[.]"). Thus, any of Plaintiffs' points concerning the "fundamental alteration" defense are inapplicable here.

Plaintiffs rely heavily on their contention that "[d]etermining whether a proposed accommodation is reasonable is a fact-specific inquiry, which cannot be determined on a motion to dismiss," citing *Wright*, 831 F.3d at 72, and *Meekins*, 524 F.Supp.2d at 409. *Pls.' Opp. MOL* at 25 (internal quotation marks and citations omitted). However, they confuse (1) the pleading standards imposed on plaintiffs to make a *prima facie* showing of the availability of a reasonable accommodation with (2) the standards used to evaluate the reasonableness of the accommodation defendants have provided, at the summary judgment stage. In *Wright*, the Second Circuit reversed the district court's award of summary judgment to defendants, because the accommodation that *defendants had provided* was unreasonable. *See* 831 F.3d at 72–76. *Plaintiffs*, on the other hand, had already met their initial burden to show a "facially reasonable" proposed accommodation. *Id.* at 76. Moreover, the "fact-specific inquiry" language which Plaintiffs emphasize is drawn from *Noll v. International Business Machines Corporation*, which noted that "the reasonableness of an employer's accommodation[,]" not the reasonableness of plaintiff's proposed accommodation at the pleading stage, "is a 'fact-specific' question that often must be resolved by a factfinder." 787 F.3d 89, 94 (2d Cir. 2015).

Similarly in *Meekins*, the "fact-specific" inquiry Plaintiffs allude to was applied to evaluate "the [defendant's] ability to implement th[e] [proposed accommodation] without incurring undue costs." 524 F.Supp.2d at 409. But that analysis only occurred because the plaintiff in *Meekins* had already met the pleading requirement to show a plausible accommodation, the costs of which do not clearly exceed its benefits. *Id.* Plaintiffs here fail at that initial hurdle. And, although Plaintiffs repeatedly make reference to the inapplicable "fact-specific" inquiry, they make no reference at all to the *required* "cost/benefit" analysis articulated in *Meekins*, nor do they make any attempt to satisfy this pleading requirement. *See generally Pls.' Opp. MOL* at 23–30; *see Meekins*, 524 F.Supp.2d at 407 & n.65.

Accordingly, Plaintiffs fail to allege an available accommodation, the costs of which, facially,

do not clearly exceed its benefits.

### III. PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ADA OR THE REHABILITATION ACT AS TO THE PURPORTED "INTEGRATION CLASS" MEMBERS

Plaintiffs' opposition brief confirms that they have failed to state a claim under the ADA or the Rehabilitation Act as to the purported Integration Class under an *Olmstead* integration mandate theory. First, the Named Plaintiffs and the purported Integration Class are not qualified for community treatment, and thus cannot assert an *Olmstead* claim, because the Complaint concedes that they are subject to valid court orders mandating that they must receive *inpatient* psychiatric treatment. Plaintiffs offer no meaningful response to this critical point. Second, Plaintiffs' opposition brief clarifies just how unsupported their ADA theory is. Plaintiffs explain that their theory depends on the contention that the ADA implicitly requires that OMH must unilaterally intervene in criminal proceedings and screen unfit defendants for referral to community treatment, even if the New York Criminal Procedure Law gives OMH no authority to do so. Plaintiffs cite no authority for this novel interpretation that would radically extend a federal anti-discrimination statute to put a state's executive agency at odds with its judiciary and criminal procedure law.

#### A. Plaintiffs Fail to Plausibly Allege That They Are Eligible for Outpatient Restoration Services

*Olmstead* provides that the ADA requires States to provide community-based treatment under certain circumstances to individuals who are "<u>qualified</u>" for community treatment. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 (1999) (emphasis added). The Named Plaintiffs and the purported Integration Class cannot as a matter of law assert an *Olmstead* integration mandate claim because **they are not qualified for community treatment**. On the contrary, they pled that **they are subject to a valid court order mandating that they must receive *inpatient* psychiatric treatment** at an

appropriate facility. *See Compl.* ¶ 12 (noting that purported Integration Class members have been "commit[ted] . . . to a hospital for competency restoration services"); *id.* ¶ 14 ("R.M. was found unfit to stand trial and ordered committed to an OMH hospital for competency restoration."); *id.* ¶ 15 ("[T]he court found that [A.B.] was unfit to stand trial and ordered him committed to an OMH hospital for competency restoration services.").

Thus, unlike every one of the cases that Plaintiffs rely upon, a court has made an affirmative determination that each Plaintiff here is *not* eligible for community-based treatment and that they require inpatient competency restoration services. A plaintiff categorically cannot allege an *Olmstead* integration mandate claim under these circumstances. *See, e.g.*, *Matthew P.*, 80 Misc. 3d at 971 (finding no basis for *Olmstead* integration mandate claim where "[t]he State's treatment professionals had *not* determined that community placement was appropriate for [plaintiff]" and the "[Office for People with Developmental Disabilities ']OPWDD['] lacked discretion to place [plaintiff] in a community residence . . . [because] it was required under the Criminal Procedure Law *and the terms of the temporary order of observation* to place him in the institutionalized care setting" (second emphasis added)); *Summers v. Louisiana*, 20-cv-289, 2022 WL 4490161, at *22 (M.D. La. Sept. 27, 2022) (concluding that Louisiana Department of Health had no authority to release plaintiffs from an institutionalized setting because their institutionalization was by virtue of court order). **Plaintiffs have not identified a single case in which a plaintiff was "qualified" for community treatment under *Olmstead* despite being under a valid court order to receive inpatient hospital treatment.** Because eligibility for community-based treatment is a pleading requirement to establish an *Olmstead* integration mandate claim, Plaintiffs' failure to plausibly allege eligibility for these services requires dismissal of Plaintiffs' Integration Class ADA and Rehabilitation Act claims.

Plaintiffs' opposition brief fails to offer any meaningful response to this simple point. Plaintiffs

make three arguments, none of which withstand scrutiny.

*First*, Plaintiffs confusingly claim that whether courts have ordered them to receive inpatient treatment is a "fact dispute[.]" *Pls.' Opp. MOL* at 42. There is no fact dispute: Plaintiffs' own Complaint concedes that Plaintiffs are subject to inpatient commitment orders. *See Compl.* ¶¶ 12, 14–15.

*Second*, Plaintiffs argue that even though they are subject to valid inpatient commitment orders, perhaps the State criminal court judges simply signed off on those orders without any thought or independent judgment because "state courts are [allegedly] routinely presented with one option— inpatient care—as though that is the only option." *Pls.' Opp. MOL* at 42. There is no basis for the suggestion that criminal court judges lack the knowledge, agency, and independent thought required to issue a CPL 730 commitment order for outpatient treatment in an appropriate case. By statute, in any given case, a defendant could propose a community treatment option; if the District Attorney consents, the court may order outpatient restoration services. In each of the Plaintiffs' cases, that result did not occur because the District Attorney or criminal court (or both) determined that inpatient treatment was the more appropriate option.

Moreover, as the Municipal Defendants noted in their motion to dismiss, Plaintiffs' argument that this Court should alter or cast doubt on valid state court orders runs afoul of the *Rooker-Feldman* doctrine. *See* ECF No. 68 at 11–13. That doctrine directs federal courts to abstain from considering claims "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283 (2005). The doctrine forbids this court from issuing an order that would overturn the orders directing Plaintiffs to receive inpatient competency restoration treatment.

*Third*, Plaintiffs focus on the irrelevant question of whether they must plead an opinion from

a State treatment professional. *See Olmstead*, 527 U.S. at 607 (courts must ask whether "the State's treatment professionals [have] determine[d] that [community-based] treatment is appropriate"). Plaintiffs insist that they need not plead a State treatment professional opinion and may simply assert the bare conclusory "alleg[ation] that they are qualified to receive services in a more integrated setting." *Pls.' Opp. MOL* at 41. Plaintiffs also argue that, alternatively, they may rely on allegations that Plaintiffs have received community-based treatment in the past. *Id.* at 41–42. This argument misses the forest for the trees: regardless of whether Plaintiffs have received community-based treatment in the past, or even if they were to locate some treatment professional who could opine in favor of release, Plaintiffs are **categorically not qualified for community-based treatment** because a criminal court has ordered Plaintiffs to receive *inpatient* competency restoration services.

Plaintiffs have not cited to any case in which an individual plausibly alleged eligibility for community-based treatment, *despite being the subject of a court order mandating inpatient treatment*. This includes the cases they cite in support of their argument that past community-based services are sufficient to allege current eligibility; none of the plaintiffs in those cases were subject to a court order mandating inpatient services. *See id.* at 41 (collecting cases); *see also Frederick v. Dep't of Pub. Welfare*, 157 F.Supp.2d 509, 540 (E.D. Pa. 2001) (interpreting *Olmstead* to not necessarily require state professional recommendation for community-based treatment, but only because the "state professional" language in *Olmstead* was included so as to "not allow States to *avoid* the integration mandate by *failing to require professionals to make recommendations* regarding the service needs of institutionalized individuals" (emphasis added)).

Accordingly, Plaintiffs fail to state a claim under an *Olmstead* integration mandate theory.

### B.    Plaintiffs' Unprecedented ADA Theory Is Unsupported By Law

The Integration Class Plaintiffs' *Olmstead* theory is premised on the assertion that the OMH Defendants fail to evaluate unfit criminal defendants to determine whether outpatient restoration treatment might be appropriate. In their motion to dismiss, the OMH Defendants explained that this theory misunderstands OMH's role in CPL 730 proceedings: OMH is not a party to criminal matters or CPL 730 proceedings, cannot intervene in such proceedings, and has no authority to second-guess an inpatient commitment order or place defendants in a community-based treatment setting. New York's Criminal Procedure Law grants authority to the District Attorney and criminal courts to assess and determine whether an unfit defendant should be committed to inpatient or outpatient treatment. Typically, OMH's first notice of a CPL 730 matter comes when it is served with a court order requiring that OMH take custody of a defendant to provide restoration treatment and mandates the setting (inpatient or outpatient) in which it must do so.[9]  *See OMH MTD MOL* at 36–37.

In response, Plaintiffs' opposition brief clarifies that Plaintiffs are asking the Court to adopt

---

[9] Although this point is tangential to the legal arguments underlying the motion to dismiss, OMH Defendants must respond to Plaintiffs' continued false assertion that "OMH Defendants are unable to meet the needs of more than 15 people at any given time" in its outpatient program and "do not trouble themselves to secure resources to build out that program." *Pls.' Opp. MOL* at 40 (citing *Compl.* ¶ 51). This assertion, which Plaintiffs have repeated in multiple filings, is a blatant mischaracterization of the source they cite. Plaintiffs assert that this claim is derived from an email sent to Legal Aid Society attorneys by OMH Deputy Counsel for Litigation Jesse Snyder, in which Mr. Snyder wrote the following regarding OMH's outpatient restoration services:

> [W]e currently have a framework that utilizes services we already have access to, but there are capacity limitations. So going from numbers like 2 or 3 as currently exists to 15 or 20 or 25 overnight would not be feasible for us, but an incremental increase would allow us time to build up programming to support a larger number of outpatient orders, and we would be supportive of more outpatient orders.

*See* E-mail between representatives of the Legal Aid Society ("LAS") and representatives of OMH, dated Apr. 28, 2023, annexed to the Declaration of Shona Hemmady In Support of Pls.' Mot. for (continued . . .)

an unprecedented interpretation of the ADA that would sweep aside New York's statutory scheme, overturn existing state judicial orders, and cast into doubt the criminal procedure laws of most other States and the federal government. Regardless of the CPL, Plaintiffs insist that OMH has an affirmative duty under *Olmstead* to intervene "*prior to* the CPL 730 proceedings" and "administer a system with standards and procedures for identifying and assessing people to determine the most integrated setting appropriate to their needs." *Id.* at 34 (emphasis in original). They argue that "[i]t is of no moment" that OMH is neither a party or potential intervenor in CPL 730 proceedings, nor involved in the pre-commitment evaluation process under CPL 730. *See id.* at 37–38. Rather, Plaintiffs state that the ADA created an affirmative mandate for OMH to ignore binding state law, intervene pre-commitment, independently evaluate a defendant for potential eligibility for community treatment, and recommend community treatment to the criminal court. Plaintiffs insist that if OMH fails to cast aside state law and unilaterally take these actions, that would constitute "an abdication of OMH Defendants' responsibility under the integration mandate." *Id.* at 38. This proposition is (1) patently contrary to state law, (2) unsupported by any case law interpreting the *Olmstead* integration mandate, and (3) extreme in its potential application to state and federal competency restoration regimes across the country.

First, as explained in OMH Defendants' motion to dismiss, OMH is not a party to CPL 730 proceedings, cannot intervene in such proceedings, and therefore has no authority to second-guess a commitment order or place defendants in a community-based treatment setting where it has been ordered by the criminal court to do otherwise. *See OMH MTD MOL* at 36–37; *People v. B.D.*, 79 Misc.

---

Class Certification, filed Aug. 26, 2025, as Ex. D (ECF No. 31-D) at 1. Mr. Snyder also proposed a meeting with OMH, LAS, and District Attorneys to "discuss [OMH's] 730 outpatient programming and capacity issues further with you if that would be helpful." *Id.*

3d 920, 921–22 (Sup. Ct. N.Y. Cnty. 2023); *Matthew P. v. Neifeld*, 80 Misc. 3d 950, 971 (N.Y. Sup. Ct. Putnam Cnty. 2023), *aff'd* No. 2023-09105 (2d Dep't Oct. 15, 2025). Additionally, CPL 730 provides that if a court believes that an individual may lack capacity to stand trial, it is the court that initiates the competency examination process, *see* CPL § 730.20; *Compl.* ¶ 22, after which, if the defendant is deemed incompetent to stand trial and a commitment order is issued, the court may order inpatient treatment or, upon the consent of the District Attorney, order OMH to provide outpatient restoration treatment, CPL § 730.50(1). Thus, under the state criminal procedure law, it is wholly outside of OMH's purview to proactively conduct pre-commitment evaluations for eligibility for outpatient competency restoration services and intervene in CPL 730 proceedings in order to bring its determinations to the court. Plaintiffs' solution to this legal incompatibility appears to be for OMH to ignore state law.

Second, Plaintiffs cite no cases that support their radical conclusion. To state it clearly, Plaintiffs insist that the ADA, as interpreted by *Olmstead*, contains a secret mandate that each State's mental health agency must affirmatively intervene in criminal proceedings with potentially unfit defendants in order to proactively assess those defendants for potential community placement— regardless of State criminal procedure law or whether the criminal court has requested such intervention. Plaintiffs have obviously not identified any case or other legal authority that endorses this revolutionary theory, or anything like it. The cases Plaintiffs *do* cite are all readily distinguishable because they concern the standard *Olmstead* question of whether individuals in certain civil institutional settings may be eligible for more integrated treatment.[10] No case law supporting Plaintiffs' theory

---

[10] *See, e.g., Dunakin v. Quigley*, 99 F.Supp.3d 1297, 1305, 1319 (W.D. Wa. 2015) (state failed to comply with federal process under Nursing Home Reform Act ("NHRA"), specific to determining whether individuals with intellectual disabilities residing in Medicaid-certified nursing facilities could be served (continued . . .)

exists because the ADA does not contain such a sweeping affirmative obligation. Plaintiffs have offered no reason why this Court should be the first to endorse this highly unusual theory.

Finally, if one were to accept Plaintiffs' theory, the result would be that most States', and the federal government's, criminal competency restoration regimes would necessarily and categorically violate the ADA. New York is one of a minority of jurisdictions that offers *any* outpatient restoration treatment option for criminal defendants found unfit to stand trial. In most States, such defendants are without exception committed for inpatient treatment.[11] The same is true for defendants facing federal charges.[12] Thus, under Plaintiffs' theory, whereby every State's mental health authority is obligated to preemptively evaluate and release unfit criminal defendants into the community for treatment, regardless of criminal procedure law or a criminal court judge's order for inpatient treatment, most States' and the federal government's criminal restoration programs would be unlawful. This is an unreasonable interpretation of the ADA, which is entirely unsupported by law.

---

in community-based settings); *State of Conn. Off. of Prot. & Advoc. For Pers. With Disabilities v. Connecticut*, 706 F.Supp.2d 266, 277 (D. Conn. 2010) (state was required to comply with the *Olmstead* integration mandate as it pertained to placement of individuals with disabilities in privately-run nursing homes); *Messier v. Southbury Training Sch.*, 562 F.Supp.2d 294, 320 (D. Conn. 2008) (state civil facility for people with developmental disabilities did not have a system to consider less restrictive, community placement for its residents); *Siino v. City of New York*, No. 14-CV-7217, 2020 WL 3807451, at *14–15 (E.D.N.Y. Feb. 27, 2020) (plaintiff claimed that adult protective services organization "steer[ed] her toward guardianship and institutionalization rather than helping her to pursue . . . community placement").

[11] Thirty-five states have statutes which authorize outpatient restoration for some unfit criminal defendants and only sixteen states, including New York, actually offer outpatient restoration programs. *See* Nicole R. Johnson & Philip J. Candilis, *Outpatient competence restoration: A model and outcomes*, 5 WORLD J. PSYCHIATRY 228 (2015). At the pleadings stage, the Court may consider matters of public record, including State criminal statutes. *See, e.g.*, *S Moore U.S.A., Inc. v. Standard Reg. Co.*, 139 F.Supp.2d 348, 363 (W.D.N.Y. 2001) (collecting cases).

[12] *See* 18 U.S.C. § 4241 (providing that if a defendant facing federal charges is found unfit, "the court shall commit the defendant to the custody of the Attorney General" who "shall hospitalize the defendant for treatment in a suitable facility").

## IV.    POTENTIAL FOR POST-LITIGATION <u>COLLABORATION ON PRACTICAL SOLUTIONS</u>

While this final point is not part of the Rule 12 analysis, OMH Defendants would be remiss not to address the Court's admonition at the November 13, 2025, conference. At that conference, the Court stated its belief that the parties should work collaboratively on solutions to the issue of wait times for admission of CPL 730 defendants who have been ordered to receive inpatient restoration treatment at an OMH facility. OMH Defendants share the concerns expressed by the Court and Plaintiffs about individuals who are waiting to be admitted. OMH's mandate is to provide care and treatment for New Yorkers with mental illness, and OMH employees have dedicated their careers to the service of that mission. OMH does not wish for any CPL 730 defendant—or any other individual seeking treatment at an OMH facility—to wait any longer than is necessary for admission.

As OMH Defendants have stated in multiple filings in this matter, in response to the increase in CPL 730 inpatient orders, OMH has secured hundreds of millions of dollars in State appropriations and has taken multiple specific steps to permanently increase its capacity to treat CPL 730 defendants and thereby reduce wait times. *See, e.g.,* Memorandum of Law In Opposition to Plaintiffs' Motion for a Preliminary Injunction, filed Nov. 3, 2025 (ECF No. 71), at 11-12.

Plaintiffs' lawsuit seems to have been based on the premise that there are additional steps Plaintiffs believe OMH should be taking that would *<u>more quickly</u>* eliminate the wait list for defendants subject to CPL 730 inpatient treatment orders. But Plaintiffs have repeatedly failed to articulate specific, practical proposals about what those steps might be. Even Plaintiffs' Reply Memorandum of Law In Further Support of their Motion for a Preliminary Injunction, filed Nov. 17, 2025 (ECF No. 88) ("*Pls.' Reply MOL for PI Motion*"), which Plaintiffs filed after being put on notice by the Court at the November 13, 2025 conference that their proposed injunction was too vague, fails to provide

31

workable suggestions. Plaintiffs' reply vaguely suggests that OMH should admit "groups of individuals" in "phased timeframes," with the end result that every individual will be admitted "within seven days of that individual's commitment order." *Id.* at 17-18. Plaintiffs have offered no realistic proposals for how their "phased timeframes" process could admit individuals more quickly than the current waitlist, or how OMH would admit all new CPL 730 defendants within seven days, given finite hospital capacity and the volume of new CPL 730 orders each week.

This lawsuit should be dismissed on the pleadings for the numerous reasons explained in OMH Defendants' motion to dismiss and this reply. But although Plaintiffs have failed to state a valid claim for relief in this Court, that does not mean there are not important public policy issues at stake. Post-litigation, OMH will continue to actively seek opportunities to reduce wait times and will remain willing to meet with Plaintiffs and consider in good faith any specific, practical proposals that Plaintiffs believe would aid this effort. Post-litigation collaboration would be more likely to be productive for the additional reason that any long-term, practical solutions to this issue will require the input of multiple independent actors who are not parties to this lawsuit, including the New York criminal courts, county District Attorneys, other criminal defense organizations, and the State legislature responsible for revisions to CPL 730 and appropriations of taxpayer dollars.

**<u>CONCLUSION</u>**

For the foregoing reasons and those stated in OMH Defendants' memorandum of law in support of their motion to dismiss, OMH Defendants respectfully request that the Court grant their

motion to dismiss in its entirety.

Dated:      New York, New York
              December 18, 2025

Respectfully submitted,

LETITIA JAMES
Attorney General
State of New York
*Attorney for OMH Defendants*

By: *Caroline P. Wallitt*

Caroline P. Wallitt
Haley L. Hawkins
Assistant Attorneys General

28 Liberty Street
New York, New York 10005
Tel.: (212) 416-6228
Email: Caroline.Wallitt@ag.ny.gov

**WORD COUNT CERTIFICATE**
**PURSUANT TO LOCAL CIVIL RULE 7.1(c)**

The undersigned hereby certifies that this Memorandum of Law contains 10,779 words. This brief

complies with the Court's Individual Rule 2.C, which does not impose a page limit for briefs.

Dated:  New York, New York
        December 18, 2025

_Caroline P. Wallitt_
_____
            Caroline P. Wallitt

34